Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 1 of 315
Vera F. Dolan, MSPH FALU   August 26, 2022
Barwick, James v. United States of America

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

ALBANY DIVISION

_____

JAMES BARWICK,

      Plaintiff,             Civil Action

  v.                   File No:

UNITED STATES OF AMERICA,      1:21-cv-144-

      Defendant.           LAG

_____

VIDEOCONFERENCE DEPOSITION OF

VERA F. DOLAN, MSPH FALU

DATE:        Friday, August 26, 2022

TIME:        8:18 a.m. PDT/11:18 a.m. EDT

LOCATION:    Remote Proceeding

             United States Attorney's Office

             333 Las Vegas Boulevard South,

             Suite 5000

             Las Vegas, NV 89101

REPORTED BY:  Latice Flanders, Notary Public

JOB NO.:     5379088

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 2 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF JAMES BARWICK:

LEE GUTSCHENRITTER, ESQUIRE (by videoconference)

STEVEN WISEBRAM, ESQUIRE (by videoconference)

Finch McCranie LLP

229 Peachtree Street Northeast, Suite 2500

Atlanta, GA 30303-1701

lee@finchmccranie.com

swisebram@finchmccranie.com

(404) 658-9070


ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:

BOWEN REICHERT SHOEMAKER, ESQUIRE

(by videoconference)

KEVIN D. ABERNETHY, ESQUIRE (by videoconference)

United States Attorney's Office

Georgia Middle District

300 Mulberry Street, Suite 400

Macon, GA 31202

bowen.shoemaker@usdoj.gov

kevin.abernethy@usdoj.gov

(478) 621-2630

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 3 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 3

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Veronica Jones, Paralegal,

United States Attorney's Office

(by videoconference)

Devon Holloway, Law Clerk (by videoconference)

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 4 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 4

                        I N D E X

EXAMINATION:                                              PAGE

        By Mr. Gutschenritter                             8


                     E X H I B I T S

  NO.                DESCRIPTION                          PAGE

  Exhibit 1        Expert Report of

                   Vera F. Dolan, MSPH FALU,

                   07/08/2022, 46 pages                   12

  Exhibit 2        Ultrasound Report,

                   James T. Barwick,

                   10/14/2019, 2 pages                    69

  Exhibit 3        Cat Scan Report,

                   James T. Barwick,

                   10/15/2019, 6 pages                    85

  Exhibit 4        Diagnostic Imaging,

                   James T. Barwick,

                   10/28/2019, 3 pages                    85

  Exhibit 5        Second Affidavit - Vera Dolan,

                   10/10/2014, 5 pages                    126

  Exhibit 6        Multiple Documents -

                   Taitz v. Johnson, et al.

                   Filed: 07/14/2014, 52 pages           134

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 5 of 315
Vera F. Dolan, MSPH FALU                                    August 26, 2022
Barwick, James v. United States of America

Page 5

E X H I B I T S (Cont'd)

NO.                DESCRIPTION                          PAGE

Exhibit 7    Publication - Vera F. Dolan,

             Advantage of a Life Expectancy,

             Updated 06/15/2020, 18 pages        134

                 (Exhibits attached.)


D O C U M E N T S   R E Q U E S T E D

NO.                DESCRIPTION                          PAGE

1            Copy of First Affidavit,

             Vera F. Dolan, 09/2014              132

Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 6

P R O C E E D I N G S

THE REPORTER:  Good morning.  My name is Latice Flanders; I am the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 11:18 a.m.

This is the deposition of Vera F. Dolan taken in the matter of James Barwick v. The United States of America, on Friday, August 26, 2022, at the U.S. Attorney's Office in Las Vegas, Nevada.

I am a notary authorized to take acknowledgments and administer oaths in the State of Georgia.  Parties agree that I will swear in the witness remotely, outside of her presence.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording virtually of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

Page 7

At this time will everyone in attendance please identify yourselves for the record.

MR. GUTSCHENRITTER:  Lee Gutschenritter, and Steve Wisebram, on behalf of the plaintiffs.

MS. SHOEMAKER:  Bowen Reichert Shoemaker, Kevin Abernethy, Veronica Jones, and Devon Holloway for the United States of America.

MS. DOLAN:  Vera Dolan.  I'm the expert.

THE REPORTER:  Thank you.  And hearing no objection, I will now swear in the witness.

Will you please raise your right hand, and state your name again for the record?

MS. DOLAN:  Vera Dolan.

WHEREUPON,

VERA F. DOLAN, MSPH FALU, called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

Counsel, you may proceed.

MR. GUTSCHENRITTER:  This will be the deposition of Vera F. Dolan, taken pursuant to notice and agreement of counsel for all purposes allowed

Page 8

under the Federal Rules Civil Procedure.

EXAMINATION

BY MR. GUTSCHENRITTER:

Q    Ms. Dolan, I would assume you would like to read and sign?  Is that correct?

A    Excuse me, sir?  Yes --

Q    Would you like to read and sign your deposition?

A    Yes.

Q    And I know you have given several depositions over the course of your career, so I won't go through the usual preamble.  But I'll just note that we have a court reporter who is remote, you and I are not in the same room together, and it's important that we don't talk over each other.  So there'll be times where I'm asking a question, and you'll probably know where I'm going with the question, but please wait until I finish before you give your answer.

Likewise, if at any point time I cut you off, or you want to go back and expound upon or change one of your answers, just let me know, and I'll be happy to accommodate that.  Okay?

A    Thank you.  Yes.

Q    If you answer a question that I ask, I'm going to assume that you understood the question.  Is

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 9 of 315
Vera F. Dolan, MSPH FALU                          August 26, 2022
Barwick, James v. United States of America

Page 9

that fair?

    A    Yes.

    Q    What printed documents do you have in front of you today, Ms. Dolan?

    A    I have my report, and the materials supporting the report.

    Q    And when you say "materials supporting" your "report," can you tell us, for the record, what those materials are?

    A    I have the report.  I have the worksheet that calculates the adjusted life expectancies.  Oh. I also have my CV, and my Rule 26 List of Testimony. I have the note -- adverse medical conditions notes from medical and other records for -- for James Barwick.  I also have the three literature sources for the three different mortality risk factors for Mr. Barwick, and the supporting Charlson Comorbidity calculated score for Mr. Barwick's diabetes risk factor.

    Q    And we received some number of articles last night from Ms. Jones, the paralegal for the U.S. Attorney's Office.  Do you have those articles in front of you?

    A    No.  I don't.

    Q    When did you provide those articles to Ms.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 10 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 10

Shoemaker, or Mr. Abernethy, or their office?

A    Last night.

Q    And are those articles that you consulted in the preparation of your report, or were they materials that you reviewed in preparation for your testimony today?

A    They were articles that I used in preparation for my report.

Q    Why did you wait until yesterday to produce them to the U.S. Attorney's Office?

A    I -- because I did not know that this was the kind of information that I needed to share. Usually, what people ask me to do is -- is, you know, share all the materials.  But this is what I'm directed to do from my attorney.  The -- the -- my retaining counsel.  I -- I don't have any other information for that.

MS. SHOEMAKER:  Lee, if you want me to clarify, I'm happy to.  I don't want to interrupt, though.

MR. GUTSCHENRITTER:  Please do.

MS. SHOEMAKER:  Sure.  So Ms. Dolan provided us with the articles that were cited in her report, and we didn't talk about other articles beyond that.

Page 11

And then yesterday, during depo prep, I learned that were additional articles on which she relied, that we didn't previously have or know about because they weren't cited in the report.  And so, she referenced them during her prep.

And at that time, I asked her to provide them to me so that we could get them to you.

MR. GUTSCHENRITTER:  Okay.  Thank you.

BY MR. GUTSCHENRITTER:

Q    So Ms. Dolan, when we're referencing your report -- obviously, again, we're virtual -- I was provided with a document.  The front page reads, Expert Report of Vera F. Dolan.  Then, there's some initials after your name.  And it's a 46-page PDF document that has what I believe to be the entirety of your written report as it pertains to this case.

Some other materials.  And then, the last document is a copy of your CV.  Is that the order of the materials that you have in front of you when we're referencing your expert report?

A    I -- I have one packet here that starts off with my report, and -- and then it ends with my CV, and my Rule 26.  That's in one stapled packet.

Q    Okay.  Thank you -- I think that answers my question.  So I think we have the same materials in

Page 12

front of us.

MR. GUTSCHENRITTER:  I'm going to e-mail to the court reporter, at the conclusion of our deposition, that 46-page PDF, and mark it for the record as Exhibit 1, the "Export Report of Vera F. Dolan."

(Exhibit 1 was marked for identification.)

BY MR. GUTSCHENRITTER:

Q    If you will flip to your CV, please, ma'am?

A    I'm there.

Q    And my question is, is this a true and accurate copy of your CV?

A    Yeah.  Let me check to -- I'm checking the date that this was -- and the date would be on page 18 "Last update June 24."  Yes.  This is a true and accurate copy of my CV.

Q    So in other words, there haven't been any updates, or changes, or additions to your CV since that date; correct?

A    No.

Q    And I would like to go through some of the degrees and certifications that you hold.  After your name, there's the initials "MSPH."  Tell us what that stands for, and where you obtained that certification,

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 13 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 13

or degree?

A    That's a master's of science in public health.  That was in epidemiology, and I received it at the University of North Carolina at -- at Chapel Hill in 1981.

Q    And then, what about "FALU"?

A    That is a credential from the life insurance industry.  It's the highest credential in life underwriting.  It's A Fellow of the Academy of Life Underwriting, and I received that in 1998.

Q    And for the FALU certification, is that something that you're required to do Continuing Education, or any sort of ongoing activities to maintain that credential?

A    There's -- there's no requirement like that.  No.

Q    And what about your master's in public health in epidemiology?  Is there any sort of Continuing Education requirement for that?

A    No.

Q    And then looking down on the first page of your CV, you're a "Principal" at VDF "Consulting, Inc."?  Is that right?

A    Well, VFD Consulting.  Yes.

Q    VFD.  I'm sorry.  And what is the nature of

Page 14

the business of VFD Consulting?

A    Well, I'm an independent consultant.  And my field of expertise is providing life and health insurance and related industries mortality and underwriting research, market research, product development, business development and technology, underwriting education and training, and litigation support to multinational clients.

Q    And so, you just listed a lot of different professional activities.  But are all those professional activities under the umbrella of VFD Consulting?

A    Yes.

Q    Are there any other employees of VDF Consulting?

A    VFD.  No.  I -- I do not have any employees.

Q    And do you derive any other income, or have any other employment positions, outside of your role as principal of VFD?

A    Not at this time.  I -- what I've been doing since 2017, has been pursuing a patent, and which I have now, and -- and that's mentioned in my "Education and Professional Certifications."  And I've been spending significant time acquiring those patents and trying to license those patents at this time.  So

Page 15

that's an ongoing business effort that I've been actively pursuing since 2017.

Q    And could you tell us, just generally, the subject matter of those patents?

A    Yeah.  The first patent is very specifically tailored to a new way to improve laboratory reference intervals.  The lab -- and it -- it's essentially a -- a revolution in scientific medicine, and precision diagnosis.

Q    And did you develop those patents yourself, or in conjunction with anyone else?

A    I developed them in conjunction with my patent attorneys.

Q    Looking further down under "Experience," there's several companies, many of which appear to insurance companies.  But tell us the nature of your work for those companies?

A    Basically, I'm a -- a research and development person.  And they are companies that wanted research, and some that wanted product development, some that wanted surveys, some that wanted analysis of their own situation.  It -- it depended on what was being asked for.

Q    And would the subject matter of all of those various activities you just described primarily

Page 16

pertain to life expectancy?

A    No.  Not primarily.  Life expectancy has to do with the life settlement industry.  And -- and I designed the first automated life expectancy calculator for the life settlement industry.  And that was only one partner.

The other groups had to do with life, health, structured settlements.  Other things.  Not just life expectancy.

Q    Setting aside your work in litigation as an expert witness, what percentage of your professional activities pertain to life expectancy calculation, or analysis, in one capacity or another versus other subject matters that don't involve life expectancy?

A    Okay.  If you're asking about current -- my current activity, the only place where I am actively calculating life expectancies is -- is in litigation.

The other current activity right now that I'm engaged in is finding a home for my patents.  And that's essentially a marketing and you know -- a situation that can change at any minute.

Q    If you'll flip over to the second page of your CV, and under sort of the top, it says "Multiple retentions," and then that appears to be a list of law firms; correct?

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 17 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 17

A    Correct.

Q    And are those law firms that have retained you as an expert witness, multiple times?

A    Yes.

Q    And "Expert witness brokers and search firms."  Tell me the significance of listing that on your CV?  Is that where you advertise your services as an expert, or something else?

A    Yeah.  It -- they -- these are people that either, you know, match me with an attorney for a fee, or they actually service the broker, and they charge my rate, plus extra rate, for them to handle it.

Essentially, for me to be with these people, they've had to screen me, and accept me, as an expert.  So there was a -- a qualification process that had to happen before I was accepted by these people.  So these people have qualified me as an expert.

Q    And did these people, the firms, or businesses that we're looking at here, do you pay money to them for them to advertise your expert services?

A    No.  It -- I don't pay them a fee.  These people, I don't pay a fee, up front.  They either charge a -- a finder's fee, or they add money on top of my fee as their payment.  So I don't -- I'm not the

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 18 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 18

one that pays them, up front.

Q   Is there any websites to which you or your company pay money to, to have you listed as an expert witness?

MR. ABERNETHY:  I think we may have lost the connection with Bowen.  Let me --

THE REPORTER:  Okay.  We need to go off the record?

MR. ABERNETHY:  Yeah.  Let me see if I --

THE REPORTER:  So we are off the record at 11:35 a.m.

(Off the record.)

THE REPORTER:  We are back on the record at 11:35 a.m.

BY MR. GUTSCHENRITTER:

Q   And just for the record, I'll ask you that question again, ma'am.  Are there any websites that you or your company pay money to, to advertise your services as an expert witness in litigation cases?

A   Yes.  I do.

Q   What are those websites?

A   One is ALM.  One is Experts.com.  And one is JurisPro.

Q   And do those websites charge you an annual

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 19 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 19

fee, or a monthly fee?  How does that work?

A    It's an annual fee.

Q    And approximately, how much is the annual fee for each one of those websites?

A    Any -- somewhere between 400- and $500 a year.

Q    And is that the same fee that JurisPro charges?

A    Oh.  I'm talking about all of them.  Sorry. You said ALM [sic].  I thought you meant all of them. All -- all of them.  ALM, Experts.com, and JurisPro charge between 400- and $500 a year.

Q    And looking further down on page 2 of your CV, under the subheading "Single cases," that then lists a pretty significant list of law firms; correct?

A    Yes.

Q    And are those all law firms that have retained you as an expert witness?

A    Those are all law firms that have paid me, one way or another, for my expert services.  So there have been firms that paid me for time in deposition. So they -- they count as clients because I provided them expert services.

Q    Well, in other words, I will be paying you for your time in this deposition.  Does that mean

Page 20

you'll list my law firm on this list?

A    Once the check clears.  Yes.

Q    Okay --

A    Because --

Q    Let me ask it this way.  I understand that it's listed by law firm, and not by case.  But is this --

A    Correct.

Q    -- a comprehensive listing of every law firm that has retained you as an expert witness, or paid you as an expert witness, in some capacity?

A    Yes.

Q    And I ask that question because there's no date on here.  So I wanted to be sure that this wasn't a snapshot of a couple years, or something.  This is the entirety of your career as an expert witness; correct?

A    Correct.

Q    And is it fair to say that the vast majority of the litigation cases where you have served as an expert witness involves the subject matter of life expectancy?

A    I would say that the split that I have -- I've got three "expertises."  One is life expectancy, and that's 80 percent of my cases.  The other

Page 21

expertise is in the life insurance underwriting field,

and that's 20 percent of my cases.  And the third

expertise that I have is in epidemiology.  But those

cases are very few and far between.

Q    So how many times have you served as an

expert witness in your capacity as an epidemiologist?

A    I believe about four -- four or five times.

Yes.

Q    And have you ever had cases where the three

subjects you just described, overlap?  In other words,

where you had testified in your capacity as an

epidemiologist, but also in your capacity for life

expectancy?

A    No.  They've -- they've always been very

distinct from each other.

Q    And approximately how many depositions have

you given in your capacity as an expert?

A    Twenty-eight.

Q    Twenty-eight?

A    Twenty-eight.  Yes.

Q    And then, how many times have you testified

in court as an expert?

A    Fifteen.

Q    And how many times have you been retained as

an expert witness in a litigation matter?

Page 22

A    Probably, over 300.  I -- I do not have an accurate count of that.

Q    Of the roughly 300 cases where you have been retained as an expert witness, to your knowledge, have all of those cases been in active litigation?

A    I think litigation was involved, one way or the other, in -- in those cases.  Yes.

Q    And I guess is there a reason why you have only been deposed 28 times out of 300 cases?

A    My reports are really good.  And -- and a lot of times, you know, the -- the cases just settle.

Q    Well, I'll ask it this way.  In the vast majority of these approximately 300 cases, you were authoring an expert report similar to what you have done in this case?

A    Yes.  I've also been a consult -- a consultant as well.  So you know, those cases never went to any form of litigation that I was involved in.

Q    And you have served as expert witness on behalf of the United States, a number of times; correct?

A    Yes.

Q    Approximately, how many cases have you been retained as an expert by the government?

A    About 18.

Page 23

Q    Eighteen?

A    Yes.

Q    And of those 18, are you able to give us an estimate on approximately how many of those are currently active cases in litigation?

A    I would say, three.

Q    And where are those three cases pending?

A    Well, one's in Macon, Georgia.  One's in Columbus, Ohio.  And I believe the other one is in Oklahoma City.

Q    And are all of those cases in federal court?

A    I believe so.  I don't know.

Q    In the cases in Oklahoma City, and Columbus, are you retained by the United States Attorneys in those cases?

A    Yes.

Q    And tell me, briefly, the subject matter that you are testifying on in those cases in Oklahoma City, and in Columbus?

A    They're -- they're both -- they're also life expectancies.  And I didn't -- I don't have in my mind, right now, what those cases are about.  I'm prepared for this case.

Q    Have you been deposed in either one of those cases?

A     Not -- not so far.  Not at this time.

Q     Have you authored expert reports in both of those cases?

A     The Oklahoma City, I've contributed a report.  The Columbus, Ohio one, I'm still working on my notes.  So I haven't finished that part.

Q     And what are the underlying allegations in the Oklahoma City case?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A     I -- I cannot remember at this time.

Q     Have you ever given testimony in the State of Georgia, either in state court, or in federal court?

A     Yes.

Q     When was that?

A     If I -- let me refer to my Rule 26 that's at the -- the last -- last two -- last page.  That would have been -- yeah.  "Trial, August" 27th and 29th, two thousand --

MR. GUTSCHENRITTER:  Frozen again.

THE REPORTER:  I'm frozen again.

MR. GUTSCHENRITTER:  We're frozen.

THE REPORTER:  All right.  We're going to go ahead and go off the record at 11:45 a.m.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 25 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 25

(Off the record.)

THE REPORTER:  We are back on the record at 11:47 a.m.

BY MR. GUTSCHENRITTER:

Q    And Ms. Dolan, you were just telling us about the case that you testified in, in the State of Georgia.  I don't have your Rule 26 handy with me. But tell me what that case involved, and who hired you to testify?

MS. SHOEMAKER:  Lee, just I think it was produced along with that packet.  I think it should be the last page.  Check it and see.

MR. GUTSCHENRITTER:  I see.  Yep.

THE WITNESS:  Yeah.  All right.  If you go down -- all the way down to where it says -- the first "Trial" in that list?  That's the trial that was in Atlanta.  "Jackson National Life -- v. Sterling Crum."

MR. GUTSCHENRITTER:  Yes.  Okay.  I see that.

BY MR. GUTSCHENRITTER:

Q    And who retained you as an expert in that case?

A    Jackson National Life.

Q    And what was the name of the lawyer that

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 26 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 26

retained you?

A      Retained me?  Mike Miller.

THE WITNESS:  Frozen again?

MS. SHOEMAKER:  No --

THE WITNESS:  Oh.  No.  Okay.

MR. GUTSCHENRITTER:  No.  We're on.

BY MR. GUTSCHENRITTER:

Q    So I sort of breezed through this, but you were talking earlier about your patent work.  And what percentage of your time is spent working on developing and marketing your patents versus your expert work?

A    Well, it -- it fluctuates up and down.  I spent a lot more time when -- when I was putting the -- the patent together and getting it through.  So I think over -- right now -- if you're talking about now, I would say a -- a good 10- to 15 percent of my time is spent on pursuing marketing and licensing my patent.

Q    And so, you have gotten through the patent process on both of these?  Is that right?

A    Oh.  Yeah.  I've -- I've -- I got my patents.  The first patent came out on the Election Day, 2020.  And the second patent came out the following spring.

Q    And you described them earlier as

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 27 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 27

revolutionary.  Tell me what you mean by that?

A    Are you familiar with what lab test reference intervals are?

Q    Not really.

A    Okay.  When -- when you get your blood tested -- say, cholesterol.  The report comes back with three numbers.  The first number is your cholesterol result, and then there are two numbers associated with it.  A -- a low number, and a high number.

Those are the -- that is called the reference interval.  If your cholesterol result is between those two numbers, then it's considered normal.  If your cholesterol result is outside that interval, it's considered abnormal.  And that has been the situation that has been the standard practice in lab -- lab test medicine since the 1980s.

The genesis of those reference intervals is from the 1980s, when they first started the large analyzing machines.  They took college professors, and their students, drew their blood, did a statistical analysis on their blood, and set that up as the standard for lab test reference intervals.

But -- and -- and that's the way it's been since the 1980s.  So it's all one age.  All unisex.

Page 28

When data was collected back in the '80s, it was very scarce and precious. So the standard that still is there today is that you base these lab test reference intervals on 120 people, and that's how it's been since the 1980s. The lab test people just didn't like what was going on.

And my work with the -- the data from the life insurance industry allowed me to make a discovery that allows me to -- anybody to replace those reference intervals with big data analysis by age, and sex. And that's what I've patented. It's a revolution in lab test reference interval generation.

Q And so under your patents, do you essentially do away with reference ranges, or do you substitute in different ranges, or how does that work?

A In -- what I substitute in is lookup charts specific by age, and sex. And instead of doing one test at a time, it's two tests at a time. So there's no probability involved. It's all certainty. You know exactly where normal is, and exactly where abnormal is.

Q And have you been successful in selling your patents to outside companies, or customers?

A Well, before COVID, I had a deal with Lab One -- Lab -- LabCorp. I was speaking with their

Page 29

chief scientist, Alex Katayev.  And we went through a proof of concept, and they were ready to go.  We were just waiting for the first patent to come out.

But the patent came out on Election Day, 2020, and COVID was in effect.  And COVID has basically shut down, you know, medical innovation all over the world.  So I was not successful in placing my patents since -- you know, because of COVID rules.

I'm currently talking with one of the large reinsurers to see if they would include that as part of their proprietary underwriting tools.

Q    And I think you described it earlier.  But tell me what you view as the problem, or problems, with the current reference ranges used by outside labs such as LabCorp and others?

A    They're unisex.  They're "uni-age."  From my analyses, you know, what -- normal and abnormal for cholesterol is different between young people and old people, and men -- and men and women.  So the current lab test interval -- reference intervals are not precise, which means that people may be, you know, being treated inappropriately.

And so, what my discovery will do is fix that.

Q    Well, doesn't LabCorp, and Quest, already

Case 1:21-cv-00144-LAG  Document 21-4  Filed 02/13/23  Page 30 of 315
Vera F. Dolan, MSPH FALU  August 26, 2022
Barwick, James v. United States of America

Page 30

have separate reference ranges for adult men, and adult women, and children of a certain age?

A    Yes.  But the official requirements for what constitutes a reference interval has still not changed. The authority regulating that has not changed it.

Q    Who is the authority regulating that?

A    CLSI.

Q    Is that CLEO?

A    No.  It's CLSI.  That's not CLEO.  I don't have -- I don't recall the numbers.  I mean the -- what the acronym is at this point.

Q    Have you ever heard of CLEO?

A    Yes.  I have.

Q    So back to your work as an expert witness. Have you ever worked with Ms. Shoemaker, or Mr. Abernethy, before?

A    No.

Q    Do you know how they found you?

A    I think someone referred them to me.

Q    Someone in the U.S. Department of Justice?

A    I believe so.  Yes.

Q    Have you ever been retained by the Middle District of Georgia?  By the U.S. Attorney's Office in the Middle District of Georgia?  Other than --

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 31 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 31

A    I don't think so.  I don't think so.

Q    And have you turned over any of your timesheets or bills that you have submitted?

MS. SHOEMAKER:  Lee, we addressed that in our e-mail to you.

MR. GUTSCHENRITTER:  What?  I don't recall seeing that.

MS. SHOEMAKER:  Yeah.  I sent you an e-mail about all the items that requested as part of Exhibit A to the deposition notice.  And included in that was our position on Request No. 10, which was that we weren't going to produce her invoices.

But her billing information is included in our expert disclosures, and you're welcome to ask her questions about it.  But that we weren't going to provide the invoices, or bills.

Kevin, I don't know if you have the date of the e-mail?  I don't have it in front of me, but it was --

MR. ABERNETHY:  I can pull it up. Yeah.  Hold on.

MR. GUTSCHENRITTER:  Okay.  All right. And what's the basis for asserting that we're not entitled to get the invoices?  Just out of curiosity.

MS. SHOEMAKER:  Yeah.  Of course.  That

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 32 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 32

it's privileged attorney/expert communications.  So

that what's reflected on the invoices would include

her description of the work that we have asked her to

do.

So you're certainly entitled to

information about her compensation.  So you're welcome

to ask her about her billing rate, or the number of

hours that she's worked.

But our position is that the actual

invoices, themselves, fall under the privilege from

Rule 26.

BY MR. GUTSCHENRITTER:

Q    Ms. Dolan, how many hours have you spent

working on this case?

A    I think it's -- it -- I've reached about 30

hours.

Q    And I'm going to flip back to the first

couple of pages of your written report.  And feel free

to refer to that as we go forward, or any other

documents that you would like.  If you look over at

page 2 of your report, tell me the materials that you

reviewed in connection with the case?

A    They are the materials -- the complaint, the

medical records including Albany Arie -- Primary --

Arie -- Health Care, East Albany Medical Center,

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 33 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 33

Phoebe Putney Memorial hospital, Phillip Poulos, M.D., Phoebe Sleep Disorders Clinic, Nexus Pain Center of Albany, Georgia Home Medical, and Mr. Barwick's deposition.

Q    And when you say "Mr. Barwick's deposition," does that refer to my client, James Barwick?

A    Yes.

Q    And are you aware that my client's father, who's also named James Barwick, gave a deposition in the case?

A    Not -- I did not know that.  No.

Q    So you haven't reviewed any other depositions other than James T. Barwick's deposition; correct?

A    That's correct.

Q    And you reviewed the complaint.  Have you looked any other pleadings connected with the case?

A    No.  Just the complaint.

Q    And is it common practice for you, as an expert --

MR. GUTSCHENRITTER:  I'm sorry.

MS. SHOEMAKER:  I just wanted to add in.  This is not listed in her report.  But she also reviewed the most recent records from Emory.  Just in fullness of disclosure.  The records from Emory came

Page 34

out after her report.  But she's reviewed those as well.

MR. GUTSCHENRITTER:  Thank you. Thanks.  Thanks for clarifying.

BY MR. GUTSCHENRITTER:

Q    So you reviewed the complaint.  And is it common practice for you to review a complaint when you're serving as an expert witness?

A    Yes.  I need to know what is being disputed, and I need to see if there was any stipulation to pre-existing conditions.  You know, I need to see what is being admitted by the other side, going into the case.

Q    And are there ever circumstances where you review additional pleadings?  In other words, discovery responses, or other pleadings on file with the court?

A    I -- I review whatever the attorney sends me.

Q    Understood.  And I understand you to say that that would be the complaint in every case?  And then depending on the attorney's preference, you may or may not review additional pleadings?  Is that fair?

A    Well, I always look at whatever the attorney sends me.  So yeah.  It's -- I -- I look at that.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 35 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 35

Q    And so the medical records that you reviewed, which are summarized, and you just listed them for us, and of course, you also reviewed the Emory records.  That's several thousand pages of records?  Right?

A    Yes.

Q    And did you review every record, every document, within each medical record?

A    Yes.

Q    And so, how much time did you spend reviewing those thousands of pages of records?

A    Well, of the -- of the 30 hours, the vast majority was, you know, spent in review.

Q    And so, we'll get into the details of this. But essentially, what you were asked to do was come up with a life expectancy for Mr. Barwick as of October 8, 2019?  Is that correct?

A    That's correct.

Q    And in the course of reviewing all of the medical records that we just discussed, you saw where Mr. Barwick was diagnosed with having a perforated, or ruptured, appendix, and subsequently became septic, and was diagnosed with necrotizing fasciitis; correct?

A    I -- I saw that.  Yes.

Q    And did you see where he underwent over ten

different surgeries as a result of that?

A     I didn't pay attention very closely to that because my focus was on what his life expectancy was as of October 8, 2019.

Q     And so, did you consider how all of those conditions that resulted after October 8th -- which is the subject of this litigation -- did you review or consider how those impairments that he now has, would affect his life expectancy?

A     No.  I'm look -- my life expectancy is for that date, October 8, 2019.  What happens after that -- what I care about is, were any conditions, after that, consistent with his pre-existing conditions?

Q     And are you aware of the fact that Mr. Barwick has an ileostomy bag?

A     Yes.

Q     And as a life expectancy expert, as you sit here today, do you have any opinion whether a person who has an ileostomy bag would have an increased or decreased life expectancy as compared to the population?

          MS. SHOEMAKER:  I'll object to form. That's outside the scope of her opinion testimony as an expert.  She was only retained to opine about his

life expectancy on October 8th.  But she can answer if she can.

A     I have no opinion at this time.

Q     You don't have an opinion whether his life expectancy would increase or decrease as a result of having an ileostomy bag?

A     I --

MS. SHOEMAKER:  Object to form on the same basis.

A     I didn't study it.  I didn't take a look at it.  I -- I only -- no.  I studied what his pre-existing conditions were.  I did not study or analyze what his post-experience was.

Q     I understand.  But we have talked in detail about your extensive experience predicting life expectancies.  And I understand you haven't researched it as it relates to this case.  But as a person who's been in the field for a few decades, are you able to tell us, one way or the other, whether you believe his life expectancy would increase or decrease as a result having an ileostomy bag?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her opinion testimony.

THE WITNESS:  Okay.

MS. SHOEMAKER:  She's not testifying

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 38 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 38

about that.

THE WITNESS:  What you look for is the underlying causes of that.  And I did not study what the underlying causes are.  The underlying causes are the things that drive a mortality risk profile.  And I've not done that for Mr. Barwick per the ileostomy.

BY MR. GUTSCHENRITTER:

Q    And so, do you have an opinion as to whether that ileostomy is a result of sepsis, and necrotizing fasciitis?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I've -- I've not studied that.  I have no answer for you.  I have no opinion.

Q    And so, we talked about your expert credentials in the three areas that you offer testimony in your capacity as an expert witness.  And just to be clear, you are not a medical doctor; correct?

A    No.  I am not.

Q    And you're not qualified to examine patients, or prescribe medications, or make medical diagnoses; correct?

A    I make -- I do not examine patients.  I do not, you know, prescribe treatment.  But I can make

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 39 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 39

diagnoses as an underwriter.

Q    Well, do you agree that only a medical doctor is qualified to make a medical diagnosis?  Do you agree or disagree with that statement?

A    I disagree with that statement because there are other things besides treatment that a diagnosis can be made.

Q    You disagree with that statement?

A    Yes.  I do.  Because I'm doing it as an underwriter, not as a medical doctor.

Q    Well, you didn't go to medical school?  Right?

A    I did attend medical school classes at Johns Hopkins when I was getting my BA in public health.  I did --

Q    But you're not sitting here, saying that you would be qualified to physically examine a patient, and render a medical diagnoses; correct?

A    No.  That's not my training.  That's not my training.

Q    And you're not qualified to prescribe medications, or anything like that; correct?

A    No.  That's not the -- the field that I'm qualified for.

Q    And you're not able to order imaging

studies, or things like that, for medical patients; correct?

A    Not for medical patients.  But for anyone that I'm underwriting.  Yes.  I can order whatever tests or -- or things that I need in order to get the information to develop his mortality risk profile.  Underwriters order tests all the time.

Q    But a medical doctor would be the one to actually place the order for those procedures; correct?

A    I -- I'm not sure about that.  As an underwriter, we've -- I've asked for, you know, X-rays to be done, tests to be done.  I just recently asked, in a fetal alcohol case, for the person to have their records reviewed by a fetal alcohol specialist.  And that was done.

So I can order things.  I can order exams, and -- done -- things.  But it would be as an underwriter.

Q    To be clear, you can ask for things.  But you cannot order things?  You cannot order medical tests and procedures in the same manner as a doctor; correct?

A    I can require.  You know, that's what -- that's the term of art that underwriters use.  I can

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 41 of 315
Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 41

require these tests to be done --

Q    Do you understand the question that I'm asking you?

A    I understand what -- what I'm hearing.  I understand what I'm hearing.  And you're asking me as a medical doctor.  I already said, I am not a medical doctor.  I'm an underwriter.

And underwriters can diagnose.  And underwriters can order things.

Q    We're in Atlanta, Georgia.  You, yourself, cannot call Northside hospital, and order an imaging study; correct?

A    No.  As an underwriter, I ask my attorney, or I ask the -- the agent, or whoever, and say "I need this in order to proceed."  And then, that goes down the line.  That's how -- that's the capacity of my ordering.

Q    Right.  Has a court of law ever held that you were qualified to make a medical diagnosis?

MS. SHOEMAKER:  Object to form.

MR. GUTSCHENRITTER:  What's the objection?

MS. SHOEMAKER:  It's unclear what you mean.  Has any court of law ever held that she could make a medical diagnosis?  It's a vague question.  She

Page 42

can answer to the extent she understands it.

THE WITNESS:  I -- I've been in the proceeding where there was undiagnosed alcoholism. And I, you know, basically stated in court that there was undiagnosed alcoholism.  And therefore, I did.  I -- that was a diagnosis of alcohol use disorder.  And that was accepted in court as part of the testimony on the insurability of the deceased.  So that was accept -- was accepted.

BY MR. GUTSCHENRITTER:

Q    What case was that?

A    That was -- let's see.

MS. SHOEMAKER:  She's looking at her Rule 26.

THE WITNESS:  I'm -- I'm looking for -- for where that was.  Oh.  Yeah.  That was the -- okay. All the way at the bottom of page 2 of my Rule 26. "Trial, August 8, 2016 -- the Marriage of -- Burwell Pruitt" versus "Gary -- Burwell," in "Superior Court of -- State of California, County of Kern."

Yeah.  I -- I made an underwriting diagnosis, and it was accepted in court.

BY MR. GUTSCHENRITTER:

Q    Has a federal judge ever held that you were qualified to offer a medical diagnosis in a case in

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 43 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 43

which you were serving as an expert witness?

    A    I can't recall because I don't really distinguish between federal and state court. They're -- they're all court to me.

                MS. SHOEMAKER:  Lee, we have been going about an hour.  No rush.  But whenever you get to the end of your next line of questioning, if we could take a break?  That would be great.  We're going to try to get IT in here to make sure that the computer's on the network.

                MR. GUTSCHENRITTER:  Let's take about a 15-minute break, and plan to come on about 12:30?

                MS. SHOEMAKER:  Okay.  So yeah.

                THE WITNESS:  All right.

                MS. SHOEMAKER:  9:30 for us.  Got it.

                THE WITNESS:  All right.

                THE REPORTER:  Okay.  We are off the record at 12:13 p.m.

                (Off the record.)

                THE REPORTER:  We are back on the record at 12:33 p.m.

BY MR. GUTSCHENRITTER:

    Q    Ms. Dolan, we have talked about this earlier.  But I don't know if I ever asked you this specific question.  Has your testimony ever been

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 44 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 44

rejected or limited either in whole, or in part?

A    I have had cases where the judge said that I can speak to general underwriting issues, but I could not speak to anything that was regulated by state law. So my testimony was limited just at -- to not involve state law.

Q    In what case was that?

A    That was the Salopek case.  The -- a Marcie Salopek v. Zurich American.  That was a deposition of February 6, 2020.

Q    And in that case, you authored a report, and also gave testimony in that case; correct?

A    That's correct.

Q    And an issue in that case concerned alcohol use disorder as well; correct?

A    Yes.  But this was a -- a contestable claim case.  So this was not life -- this was not a life expectancy.  This was a life underwriting case in which a contestable claim was disputed.

Q    I understand that.  Do you believe that the testimony that you offered in that case, along with the written report submitted in that case, is consistent with the opinions that are expressed in your written report in this case?

A    Yes.

Page 45

Q    We talked about how much time you have spent working on this case.  How much have you billed the government for your time spent on this case?

A    I can't recall.  But of those 30 hours, I think the majority of them have been billed, or in the process of being billed.

Q    Maybe a better way to ask it.  What's your billable rate?  Your hourly rate?

A    Oh.  It's 350 an hour for all services.

Q    I think I cut you off.  Did you say "350 an hour for all services"?

A    Correct.

Q    And if you come, live, to testify in this case in the Middle District, would you bill for your travel time?

A    Since COVID, I have done a $100 surcharge during COVID travel.  If there's no restrictions related to COVID, I don't charge for travel time.

Q    Let me understand that.  You charge a surcharge if there are COVID travel -- tell me what you mean by that?

A    Requirements for masks.  Requirements for vaccination.  Requirements for testing.

Q    If there is a masks requirement, why do you charge $100 surcharge?

Page 46

A    It's -- it's COVID travel.  It's -- it's not free travel.  That -- that is my policy.

Q    I'm sorry?  What did you say?  It's COVID travel.  It's not what?

A    That's -- it's not my policy.  It's not usual, standard form of travel.

Q    Because you have to wear a mask, that's not a normal travel standard.  And so, you would charge $100 for that inconvenience, I guess?

A    Yes.

Q    And you also said if there are vaccination requirements.  Would that be an additional $100 charge?

A    No.  I -- I would not travel if there would be a vaccination requirement.

Q    And is that because you, yourself, are not vaccinated?

MS. SHOEMAKER:  Object to form.  That's irrelevant.

A    You know, I'm -- I am not vaccinated.

Q    And so if there was a vaccination requirement at the federal courthouse for this case, you would not come to testify?  Is that correct?

MS. SHOEMAKER:  I'm going to object to form again.  This is about her personal health status.

Page 47

BY MR. GUTSCHENRITTER:

Q    I'm not asking about your personal health status. I'm just asking if there was a policy in place, at the federal courthouse, saying that you to be vaccinated in order to enter, I understand your testimony to be that you would opt not to come attend the trial, in-person? Is that correct?

A    That's -- that's correct.

Q    You talked earlier about an instance where your testimony had been limited in a court proceeding. Are there any other cases, to your knowledge, where your testimony has been limited by a court?

A    Not to my knowledge.

Q    To your knowledge, have you ever been excluded entirely from testifying as an expert?

A    No. No. Never.

Q    And I just sort of want to talk about your ultimate conclusion in the case. From reviewing your report, I understand that you estimated that Mr. Barwick would have a life expectancy anywhere between 11.1 years and 16.9 years, with a middle estimate of 13.9 years. Is that correct?

A    The 13.9 years is the most likely life expectancy. And the range of likelihood is bounded by 11.1 on the bottom, and 16.9 on the top. That is the

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 48

range of likelihood.

Q    And this is set out in your report.  I'm not asking you to read, verbatim, from your report.  But just give me sort of an overall, sort of global, summary of what you did to arrive at those figures?

A    What I did was underwrite Mr. Barwick, using his medical records, and his deposition.  Looking for what his mortality risk profile would be as of the morning of October 8, 2019.

Once I got his mortality risk profile, then I went to the medical literature to find the risk factors that would represent the additional risk from those conditions that he had.  I applied those risk factors to the base table -- the U.S. Life Tables, and then come up with a statistical calculation that shows his adjusted life expectancy, depend -- reflecting his mortality risk profile as of that day.

Q    And as it pertains to your evaluation of Mr. Barwick's health status on October 8, 2019, did you consider whether or not he had a ruptured appendix as of that date?  Did that factor at all into your analysis?

A    No.  This was before -- before that.

Q    How do you know that?

A    That is what I read in the medical records.

Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 49

Q    So it's your position that Mr. Barwick didn't have any issues with his appendix as of October 8th?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her opinion.

A    No --

Q    Well, I want to understand.  Yeah.  Go ahead.  I'm sorry.

A    No.  I -- but -- but without -- you know, but for his appendix, what was his mortality risk profile as of that day?  And I did not account for any acute injury after that.  This was, you know, his pre-existing medical conditions as of that day.

Q    So you're not going to offer any testimony in terms of whether or not his appendix had perforated, or ruptured, as of October 8, 2019; correct?

A    That's correct.  I'm not speaking to his appendix at all.

Q    And in fact, you wouldn't be qualified to offer that kind of testimony?  Is that fair?

A    I don't know about that.  That was just not my assignment.  I've not taken a look at that.

Q    Well, you have explained to me what your assignment was.  I'm asking, do you acknowledge that

you would not be qualified to offer testimony in terms of whether or not Mr. Barwick had a ruptured appendix as of October 8th?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A    Of -- of course, I'm qualified.  I can speak to what's in the medical records.

Q    But, ma'am, you're not a medical doctor; correct?

A    I am an underwriter.  I can speak to what is a medical condition of anyone.  It -- it's just was not the scope of my assignment to do that.

Q    You have not received any medical training, and you would not be qualified to examine a patient, and determine whether or not that patient had appendicitis, or a ruptured appendix, on a particular date; correct?

A    I am not a medical doctor who examines patients.  I am an underwriter who evaluates medical records.

MS. SHOEMAKER:  Lee, we're not offering her to give any sort of appendix testimony.  If that helps at all.  I don't know if you're trying to make sure that we're not trying to sneak something in.  But we don't anticipate offering her for anything related

Page 51

to the appendix at all.

BY MR. GUTSCHENRITTER:

Q    If you'll turn to page 3 of your report, please?  And do you see that middle paragraph that states "From a review of his medical records and deposition, Mr. Barwick has been diagnosed and treated for many impairments, some that represented a primary excess risk of mortality, and some that were not primary excess risks of mortality."  Did I read that correctly?

A    Yes.  You did.

Q    And so, what were the primary excess risks of mortality that you identified?

A    I identified three for Mr. Barwick.  Alcohol use disorder, diabetes with comorbidities, and current smoking.

Q    And do you acknowledge that alcohol use disorder is a medical condition?

A    It's a medical and lifestyle condition. Yes.

Q    So in other words, do you acknowledge that it is a medical condition?

A    Yes.  Yes.

Q    And you recognize, or do you understand that the American Medical Association has stated that, in

fact, alcohol use disorder is a medical condition?

A    What the American Medical Association states is its business.  I'm looking at this as an underwriter.

Q    Do you understand that the American Medical Association has published information saying that a medical doctor is the only person qualified to render a diagnosis of alcohol use disorder?

MS. SHOEMAKER:  Object to form.

A    The -- the AMA can say whatever it wants. That's not what the life underwriting community believes.

Q    Do you understand that the U.S. Supreme Court has taken judicial notice of the fact that alcohol use disorder is a medical condition that can only be diagnosed by a medical doctor?  Do you understand that?

MS. SHOEMAKER:  Object to form.

A    I have no opinion about that.  You know, and it doesn't touch on my job duties as an underwriter. It doesn't touch on the job duties of life underwriting in the insurance industry.

Q    And you understand that Mr. Barwick treated with a number of different physicians prior to October of 2019; correct?

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 53 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 53

A    I believe so.  Yeah.  Yeah.  Yes.  I -- I saw different medical records from different providers.  That's correct.

Q    And you understand that none of those medical doctors ever diagnosed him with alcohol use disorder, or documented that he had sort of problem with alcohol abuse; correct?

A    Correct.  And that's typical.  That's what we life underwriters usually find in medical records.  That the doctors don't do a -- a diagnosis.

Q    Is it your testimony that because Mr. Barwick's physicians failed to make a diagnosis of alcohol use disorder, that they would be committing malpractice by failing to recognize and diagnose --

A    I have --

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I have no opinion about that.

Q    Is it your testimony that every physician that examined Mr. Barwick at any time in his life, but certainly in the years that concern the findings in your report, that they simply failed to diagnose him with alcohol use disorder?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I have no opinion about that.

Q    If there are medical doctors who testify in this case that, in fact, based on their review of the medical records and available evidence, they do not believe that Mr. Barwick has ever had alcohol use disorder, would you disagree with that testimony?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I have no opinion about that.  I stand by my underwriting opinion.

Q    Do you think that are you more qualified than a medical doctor to determine whether or not a person has alcohol use disorder?

A    I am qualified as an underwriter, and I am doing my job as an underwriter.  And what I saw in Mr. Barwick's records is a classical profile of an alcohol use disorder that's not disclosed.

Q    We're going to talk about that.  But that wasn't my question.  My question was, do you believe that you are better qualified than a medical doctor to render a diagnosis of alcohol use disorder?

A    As an underwrite -- doctor -- medical doctors are not underwriters.  I am qualified as an underwriter.  And as far as medical doctors are concerned, I have no opinion about that.

Page 55

Q    You have told us that you think that you're qualified to give a diagnosis.  My question is different.  Do you believe that you are more qualified than a medical doctor to render a diagnosis of alcohol use disorder?  "Yes," or "No"?

MS. SHOEMAKER:  Object to form.  Asked and answered, Lee.

A    I have no opinion about that.

Q    Okay.  Okay.  Looking at the subheading "Alcohol use disorder," it appears that you listed numerous subparagraphs from subparagraph "a.," all the way through "ee.," that you contend are indications that Mr. Barwick has alcohol use disorder.  Is that right?

A    That's correct.

Q    Let's start with the first one.  What does subparagraph "a." say?

A    "Ascites and hyperechoic liver on ultrasound" indicating "cirrhosis, history of distended abdomen" indicating "ascites."

Q    Well, let me start by asking you this.  I have looked through the adverse medical condition 77-page document that was produced two days ago.  And it seems to me in terms of the medical records that you claim supports your position, consists of imaging

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 56 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 56

reports, and certain lab reports.  Is that fair?

A    Yes.  Imaging reports, and lab reports, are critical, objective pieces of evaluation.

Q    So specifically, I want to take those in turn.  So let's first talk about the lab reports. Or excuse me.  I'm sorry.  I misspoke.  The imaging reports.

MS. SHOEMAKER:  Is there something specific?  Is there a specific one you're talking about?

MR. GUTSCHENRITTER:  Well, I see her sorting papers.

THE WITNESS:  I'm --

BY MR. GUTSCHENRITTER:

Q    I'll ask what you're referencing there, Ms. Dolan?

A    Well, what I'm doing is I'm going to the section on substance abuse, where the records would be listed.  That -- the records that would speak to that imaging would be listed.

Q    Well, before you do that, let me ask you. Do you have any of the paper copies of the imaging reports in front of you?

A    No.  All I have is my adverse medical condition note summering -- summarizing my notes from

those records.

Q   Well, I'll just represent to you, and then I'll ask you to look in your record as you were about to do.  But from what I can tell, the imaging report that you're relying on, and the only one you're relying on, is an ultrasound that was done on October 14, 2019.  So I would ask you to look at your record, and tell me if I'm right or wrong on that?

A   Yeah.  I -- I see -- I see two records here.  Sets of records.  One from Albany Area Primary Health Care, and another from Phoebe Putney, you know -- the medical hospital.  The -- on October 14th from Phoebe Putney, and October 15th, 2019, from Albany Area.

Yes.  They -- those are the ultrasounds that I can see immediately that I'm referring to.

Q   And just to clarify.  There was an ultrasound on October 14th, and then there was a CT on October 15th?  Right?

A   Okay.  That's a little more detailed than what I have in my notes.  But that's consistent with what you've said.

Q   And so, just to clarify.  Are those the two imaging reports that you're relying on to support your opinion as it pertains to alcohol use disorder?

A   Yes.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 58 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 58

Q    And I understand there are lab reports, and we'll touch on that later.  But I'm just focusing on the imaging.

A    Yeah.  What I'm looking for is the imaging that indicates cirrhosis, and ascites.  And those are the imaging that speak to that.

Q    I understand.  So it's the October 14-, and the October 15 imaging reports?  That's what you're relying on?  Right?

A    That's what I'm -- that's what I'm picking up right away.  Yes.  From my notes.

Q    Well, I'm going to share my screen, and ask you some questions about those imaging reports.  Are you able to see my screen, ma'am?

A    Yes.

Q    Do you recognize this as the ultrasound report that was performed on Mr. Barwick on October 14, 2019?

A    That looks familiar.

Q    And this would be the same report that you were referencing a moment ago?  Correct?

A    Yeah.  That -- that looks consistent with that.

Q    And I'm just scrolling through so you can see it.  But it's a little over one page.  The second

Vera F. Dolan, MSPH FALU                 August 26, 2022
Barwick, James v. United States of America

Page 59

page is just a physician's signature.  But the ultrasound, itself, is just a one-page document.  Do you see that?

    A    Yes.  I do.

    Q    Tell me everything on this report that supports your opinion that Mr. Barwick had undiagnosed alcohol use disorder?

    A    Well, first of all, there is no -- well, it's undiagnosed.  There was no mention of alcohol there.  You have the pre-existing complaint of "bloating and abdominal pain."

         Then, the "markedly hyperechoic.  Poor penetration" is, you know, very striking to me.  This -- the "ascites" is very striking to me.

         And then, the "Impression."  "Hyperechoic liver; possibly fatty" -- fatty "intration" -- "and/or hepatocellular disease."  So there is the possibility of hepatocellular disease, which is essentially cirrhosis.  And then the "ascites," which is associated with cirrhosis.

    Q    So I was trying to take notes as you were talking there.  And what I have is this October 14th ultrasound that would support your opinions would be bloating and abdominal pain, liver is markedly hyperechoic, poor penetration, ascites, and then

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 60 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 60

possible fatty infiltration, and/or hepatocellular

disease.  Is that a fair summary?

A    Also, the "Minimal ascites," which is part

of the "Impression" as well.

Q    So let's take that one by one.  For

"bloating and abdominal pain," what other potential

diagnoses did you consider, prior to alcohol use

disorder?

MS. SHOEMAKER:  Object to form.

A    I don't -- what I do is -- what we

underwriters do, we look at the total picture.  We

don't look at pieces.  So the bloating and abdominal

pain is taken in conjunction with the hyperechoic

liver, in conjunction with the poor penetration, in

conjunction with the ascites, and in conjunction with

the impression of possible, likely hepatocellular

disease.

And it's all -- it's all together as -- as a

whole.  Not -- I don't separate out any other pieces.

That's how we do underwriting.

Q    Would bloating and abdominal pain be

consistent in a person who has a ruptured or

perforated appendix, and is currently septic, and has

necrotizing fasciitis?

MS. SHOEMAKER:  Object to form.  It's

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 61 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 61

outside the scope of her testimony and opinion.

A    No.  I'm -- I'm not looking at any infectious issue.  I am looking to see what the state of his liver is in.  I care about his liver, you know, being hard, and -- and you know, being, like, hyperechoic.  I'm not considering any infectious process.

Q    You wouldn't be qualified to make a diagnosis of any infectious process; correct?

A    I -- I have no opinion about that.  If I were asked to do that as an underwriter, I can do that.  I can do that as an underwriter.  But that's not what's being asked for.

Q    You're not qualified to make a medical diagnosis of a person some sort of infectious disease process?  Is that true or false?

A    I -- I can make an underwriting diagnosis.

Q    I asked, a medical diagnosis?

A    I'm not a medical doctor.  For the, you know, nth time.  I'm an underwriter.

Q    Ma'am, I'm trying to ask you pretty direct questions.  And the question that I'm trying to ask you -- that I'm just asking for a simple "Yes," or "No" -- is, do you believe that you are qualified to make a medical diagnosis of a person having some sort

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 62 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 62

of infectious disease process?  A medical diagnosis?

A    A medical --

MS. SHOEMAKER:  Lee, I'll let her answer "Yes," or "No."  But she is allowed to explain her answer.

A    I am allowed to make an underwriting diagnosis, which is, you know, for the purposes of underwriting.  I'm not -- I don't treat people.  I don't give them medications.  I'm an underwriter, and that's what I'm doing, and as my capacity and expertise as an underwriter.

Q    I understand your testimony that you are an underwriter.  I'm not asking you that question, ma'am.  I'm asking, are you representing here that you're qualified to make a medical diagnosis?  Not an underwriting decision.  But a medical diagnosis of a person having an infectious disease process?

A    I could if -- if someone asked me to do that.  Yes.

Q    You could make a medical diagnosis?

A    Yeah.  I can make a -- yes.  I can make a -- a diagnosis from the same medical information that is available in the -- in the records.

Q    What are the possible conditions that could cause a person to have a hyperechoic liver?

A     The one that is the most likely is cirrhosis.

Q     What are some other ones?

A     Hyperechoic.  For markedly hyperechoic, it -- also in the "Impression," they were saying a "fatty infiltration."  It's possible.  But with all the other things that are going on Mr. Barwick's profile, fatty infiltration is not likely.  Cirrhosis is more -- more likely.

Q     Cirrhosis doesn't appear in this report, does it?

A     It had the -- the equivalent of that -- wait.  Let me scroll down.  Can you scroll down, please?

Q     I'm not asking you about the equivalent, ma'am.  The word "cirrhosis" doesn't appear in this report, does it?

MS. SHOEMAKER:  She's asking to see the rest of the report --

THE WITNESS:  Can -- can I see the rest of the report under the "Impression"?  I can't see if it was a --

MR. GUTSCHENRITTER:  Sure.

THE WITNESS:  "Hepatocellular disease." That is consistent with cirrhosis.  "Ascites."  That

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 64 of 315
Vera F. Dolan, MSPH FALU                          August 26, 2022
Barwick, James v. United States of America

Page 64

is -- is consistent with cirrhosis.

BY MR. GUTSCHENRITTER:

Q    Hepatocellular disease can mean a range of things, one of them being cirrhosis.  But that's not the only cause; correct?

A    Well, cirrhosis is what I've come up with, with his profile, from all the other issues.  You know, I'm not relying on just this imaging.  You -- you realize that I'm relying on a whole lot of other things as well.

Q    Ma'am, I understand that --

A    And the fact that he said --

MS. SHOEMAKER:  Let her finish, Lee.

THE WITNESS:  The fact that he said "hepatocellular disease" means that that doctor recognizes that.  And "Minimal ascites."

You know, he's not -- you know, this guy is just looking at the image.  He's not looking at the rest of the medical records.  I am.

So what this imaging is offering is something very consistent, as an underwriter, with all the other things that are coming up, too.  So it's not just this one thing.  As I say in my report "Indications that collectively provide the underwriting" profession -- "impression."  So this is

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 65 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 65

just one piece of the puzzle.

                    And hepatocellular disease, and ascites, is -- is consistent with cirrhosis, along with all the other stuff that Mr. Barwick has.  So this is only just one piece.

BY MR. GUTSCHENRITTER:

    Q    Ma'am, I understand that.  We're going through what you're relying on in your report, and we're starting with the first piece --

    A    That's --

    Q    And I'm trying to ask you a very simple and direct question.  Does the word "cirrhosis" ever appear on this ultrasound report?  "Yes," or "No"?

    A    No.

    Q    Other than alcohol abuse, what are the other possible conditions that could cause a person to have a hyperechoic liver?

    A    As was what was in the "Impression," he offered two possible issues.  "Fatty infiltration," which would be essentially a consequence of obesity. So he could have -- it's possible, from this -- this "Impression," that he -- he could have just fatty infiltration from obesity.

    Q    Well, on October 14, 2019, Mr. Barwick was obese; correct?

A    I'd have to look that up in my notes.

Q    What role, if any, does diabetes play in raising a person's risk of having a hyperechoic liver?

MS. SHOEMAKER:  Lee, I think she's still looking at her notes for the obesity question. Do you want her to shift?

THE WITNESS:  Okay.

MR. GUTSCHENRITTER:  Yes.

MS. SHOEMAKER:  So you don't want an answer to the last question --

BY MR. GUTSCHENRITTER:

Q    Well, go ahead.

A    Okay.  Well, first of all, you wanted to know if as of that day, Mr. Barwick was -- is obese? And looking my notes under obesity/nutrition, I do see that as of October 11, 2019, his height was six-foot-one.  Weight, 266 pounds with a BMI of 35.09.

Yes.  With a BMI of over 30, he was obese. That's correct.

Q    My next question is what role, if any, does diabetes play in causing a person to develop a hyperechoic liver?

A    When you're talking about a hyperechoic liver, you're talking about possible fatty infiltration.  And diabetes is often associated with

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 67 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 67

obesity.  So it wouldn't be the diabetes, per se.  It would be the obesity.

Q    You also referenced the part of the report where it says "Poor penetration."  What does that mean?

A    It means that the liver tissue was so hard that the -- you know, the examination could not penetrate it.

Q    And do you understand, based on your review of the medical records, that in this moment in time, Mr. Barwick had a ruptured appendix, and was septic, and most likely had necrotizing fasciitis?  Do you dispute that?

A    I have no opinion about that.

Q    Did you make any effort to see whether or not a ruptured appendix, and an acute infectious disease process like sepsis, necrotizing fasciitis, how that could potentially impact a person's liver, and the other findings that we see on this "Ultrasound Report"?

A    In my experience, in my knowledge, and in my training, a hyperechoic liver, a hepatocellular disease, is a chronic condition.  Not an acute condition affected by infectious disease.

So as an underwriter, there's no connection

between this liver finding and infection.  You know, it's -- it's not likely at all.

Q   If a medical doctor gave testimony disputing what you just said, would you have any basis or reason to disagree with that?

A   I have no opinion.

Q   Tell me the potential causes, other than alcohol abuse, of a person developing a small amount of ascites?

A   At this time, the most likely cause of ascites is cirrhosis.

Q   What role, if any, do diabetes play in a person potentially developing ascites?

A   Ascites --

Q   If you know?

A   Again, diabetes does -- you know, we're -- we're talking about an impression.  We're talking -- you know, this is not just my opinion.  This is also the opinion of the interpreting physician.

There, he's talking about "possible fatty infiltration," which would be associated with obesity. "And/or hepatocellular disease," which would be associated with cirrhosis.

All right?  I don't see any diabetes involved in there.  And the only connection with

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 69 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 69

diabetes would be the connection with obesity.

Q    Have you read any peer-reviewed literature, or other types of publication, which talk about the accuracy of ultrasound versus CT in observing the abdomen?

MS. SHOEMAKER:  Object to form.

A    No.  I -- I -- that has never been a -- a study of mine.  I have not conducted that study.

Q    Did we cover everything that you relied on in forming your opinion concerning alcohol use disorder in this October 14th ultrasound?

A    We -- we've covered those pieces of information for this particular record that were of concern to me as an underwriter.  Yes.

MS. SHOEMAKER:  Hey, Lee.  Can we read in the Bates numbers?  If you're not going to enter it as an exhibit, then for clarity in the transcript, can we read in the Bates numbers?

MR. GUTSCHENRITTER:  These records -- well, let me look.  I don't think I "Batesed" these.  But we'll mark the "Ultrasound Report" as Exhibit 2 to the deposition.

(Exhibit 2 was marked for identification.)

MS. SHOEMAKER:  That's fine.  Or even

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 70 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 70

if you want to just identify it by date?  Just for clarity on the record.  I want to be sure we identify the document.  Either way is fine with me.

MR. GUTSCHENRITTER:  I would like to mark it as an exhibit.

THE REPORTER:  Got it.  Thank you.

BY MR. GUTSCHENRITTER:

Q   The next imaging study that you relied on concerning alcohol use disorder was this October 15, 2019, CT scan; correct?

A   That sounds -- yeah.  That sounds consistent with what is in my medical notes right here.  All I have in front of me are -- are my adverse medical conditions notes.

Q   And you understand that this was an abdominal CT that was performed the following day after the ultrasound that we just looked at; correct?

A   I -- that would -- yeah.  It would be on -- October 15 would be the day after October 14th.  Yes. I agree.

Q   What is "liver parenchyma"?

A   Liver parenchyma is essentially the inner tissue of the liver.

Q   What is the significance, if any, in your mind, of the liver -- pronounce that word again for

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 71 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 71

me?

A    Parenchyma --

Q    Parenchyma?

A    Parenchyma.

Q    What's the significance, if any, of the "liver parenchyma" being "unremarkable" on this CT scan, as it relates to your finding of alcohol use disorder?

A    Again, the notes that I'm taught -- that I'm collecting, I don't put down the, you know -- let me rephrase that.  I'm talking about advert -- adverse medical condition notes.  All right?  I'm looking for the adverse medical conditions that would alert me as an underwriter.

I don't put down all the things that look normal.  If I did that, I would have thousands of pages of notes.  I'm only writing down the things that are of -- that show me that there's an adverse medical condition.

Q    Well, the fact that there was a CT scan done 24 hours after the ultrasound was done, that shows the "liver -- is unremarkable," are you saying that's just not something that you consider in determining whether or not a person has alcohol use disorder?

A    I am looking for those things that do pop up

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 72 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 72

as adverse medical conditions.  And what I look at is the totality of that.  Just because something is unremarkable doesn't mean that there's nothing bad going on.  It's just that's the results from that particular scan.  So --

Q    Is it fair to say -- go ahead.  I'm sorry. I didn't mean to cut you off.

A    Yeah.  Just because it's unremarkable doesn't mean that there's no alcohol use disorder. The rest -- you know, the other records that I have show that.  And I have a whole list of them in my report.

Q    So the fact that this CT scan shows that his liver was normal in no way affects your opinion that this man had alcohol use disorder?

A    No.  I don't think you're stating it right. "The liver parenchyma is unremarkable."  That's all it's saying.

Q    In medical terminology, do you know what "unremarkable" means?

A    It -- it means that there isn't any difference from normal.  But that's not consistent with the other stuff.

Q    Well, let's look at the second sentence.  It says "There" is "approximately 4 abscesses adjacent to

Page 73

the surface of the liver."  In your mind, does that constitute evidence supporting your testimony of -- I'll just refer to it as AUD -- alcohol use disorder?

A    No.  That -- that does not speak to alcohol use disorder.  The cirrhosis and ascites speaks to the alcohol use disorder.  And not -- not those things.  I have no opinion.  That is not the part that I'm underwriting.

Q    And I don't want to keep going back and forth on this.  But nowhere in any of the medical records does it ever say or indicate that Mr. Barwick had cirrhosis; correct?

A    I -- yes.  I did not see the word -- the actual word "cirrhosis."

Q    Thank you.  All right.  Do you have an opinion what was causing these "4 abscesses" that were noted to be "adjacent to the surface of the liver"?

A    I have no opinion about that.

Q    In fact, you wouldn't be qualified to read and interpret a CT scan, would you?

A    I let the CT professionals do that.  I read the reports.

Q    You wouldn't be qualified to read and interpret a CT scan; correct?

A    I don't read CT scans.  I don't read ECGs.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 74 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 74

I don't read MRIs.  I let -- I read the reports that the interpreting professionals do.  They --

Q    And I'm --

A    They are the professionals who do that.

Q    You're going to make your lawyer miss her flight home.  I'm just trying to ask you, do you acknowledge that you are not qualified to read and interpret CT scans?  "Yes," or "No"?

A    No.  I don't -- I don't read and interpret CT scans.  I read and --

Q    And you're not qualified to do that; correct?

A    No.  I am not qualify -- I'm qualified as an underwriter.  I'm not qualified as a -- a tech.

Q    The second page of the CT report from October 15.  Do you see there where it says "Ascites: No free fluid"?

A    I see that.

Q    How, if at all, does that affect your opinion that Mr. Barwick has alcohol use disorder?

A    It -- it did not have an effect at all.  I did not -- that was not part of my notes.

Q    So when it says "No free fluid," do you understand that that essentially means normal?

A    I -- I'm not sure what that means.  It means

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 75 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 75

that they couldn't find any free fluid.

Q    Ascites is free fluid; correct?

A    Yes.

Q    Isn't that what it means?  Okay?

A    That's my understanding of that.

Q    Well, how did this factor into your analysis that Mr. Barwick had alcohol use disorder?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A    This is just one piece of other pieces that I'm looking at.  You know, just one, you know, report is not sufficient.  Again, I direct you that these "Indications -- collectively provide the underwriting impression."  I'm not cherry-picking one case -- one particular reading out of all the others.  It's the totality of all these things that give the picture of alcohol use disorder.  Not just one.

Q    The fact that there was "No free fluid" noted on the October 15th CT scan does not support your opinion regarding AUD?  Do you agree or disagree with that?

A    I don't know.  I don't know what had happened between one day and the other.  They may have taken care of the ascites.  They may have treated him to take care of that.  They may have addressed that

Page 76

issue.  So I wouldn't know if that ascites was disappeared because they took care it.

Q    When you say "they took care of it," what do you mean by that?

A    That there was some kind of medical treatment.  I mean there's -- I don't know what other things could have happened to reduce his ascites.  They could have given him, you know -- you know, they have diuresed him some way.

I mean it doesn't take away from the fact that the day before, that they found ascites, and they found the hyperechoic liver.

Q    Ma'am, you --

A    That fact doesn't go away.

Q    Ma'am, you have been provided with all of Mr. Barwick's records.  Do you understand that he did not undergo any medical treatment following the ultrasound until he got this CT on October 15th?  Do you understand that?

A    -- if -- if that happened, it -- you know, that does not matter.  The fact that he did have that finding, the day before, is a very significant issue.  Whether he did -- had it the next day, or not, it -- it doesn't matter as much because he did have it the day before.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 77 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 77

And it's one piece out of many pieces that put together the picture of alcohol use disorder.

Q   The fact that there was no free fluid in no way influences your opinion on whether or not he had AUD?  Is that what you're telling us?

MS. SHOEMAKER:  Object to form.  This has been asked and answered a lot of times.

A   Okay.  You know, this one record doesn't contradict what the other records show.  It doesn't --

Q   Ma'am?

A   -- contradict the other things.

MS. SHOEMAKER:  You need to let her finish, Lee.

THE WITNESS:  Yeah --

BY MR. GUTSCHENRITTER:

Q   Well, respectfully, this CT report directly contradicts the ultrasound report that was done 24 hours earlier; correct?

A   Only in the interpretation of that particular individual at that particular time.

Q   What does that mean?

A   It -- it means, I don't know what else is going on, at that time, to change that.  What I do know is that a finding of the hyperechoic liver, and the ascites, was found.  And that's significant.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 78 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 78

And as an underwriter, I can't ignore that. I cannot ignore that.

Q    Is there anything in the October 15th CT report that you contend supports your opinion regarding AUD?

A    Are you talking about the one that we're looking at here?

Q    Yes.  The October 15th one, which is what we have been talking about.

A    Yeah.  Actually, do I have -- I don't know if I have that in my notes.  I mean I've got the -- let's see.  October 14th one.  And I don't have my -- any mention in my notes of any October 15th one.

Q    Did you not include it in your notes because it doesn't support your opinion regarding AUD?

MS. SHOEMAKER:  Object to form.

A    I'm looking for adverse medical conditions. Okay?  If it's adverse, it -- it definitely gets noted down.

Q    You tell me if this is fair or not.  If it's adverse, you include it in your notes.  If it's not adverse, if it's normal, you don't include it?

A    That's pretty much the -- the case because if I included everything that was normal, I would have thousands, and thousands, and thousands of pages of

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 79 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 79

notes.

You know, I am doing what underwriters traditionally do is to note down the adverse conditions. And then once I have them all down, then evaluate them for -- for his mortality risk profile. And that's informative.

Q    I just want to revise our earlier conversation, then. When we had initially talked -- and you correct me if I'm wrong -- but I thought you told that there were two imaging reports that you rely on in supporting AUD? Those being --

A    Oh. Oh. No. I'm looking --

Q    -- fourteen, and --

A    Sorry. I -- I'm -- I -- I'm looking at the wrong -- I was still looking at the obesity column. Not the substance abuse category. My apologies. Let me go back to where -- under the substance abuse records. Yes. Okay. Okay. Yes. Sorry. My apologies. I was under the -- I was in the wrong category.

Yes. In -- under substance abuse, in the category -- this is page 69- of 77 pages. I -- I do have the abnormal ultrasound suggesting possible "cholestytus" with minimal ascites.

Yeah. The -- the ascites part was the --

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 80 of 315
Vera F. Dolan, MSPH FALU   August 26, 2022
Barwick, James v. United States of America

Page 80

the issue that -- of note in the October 15th [sic] --

Q   Ma'am?  Ma'am?

A   Yes?

Q   You just referenced the ultrasound on October 14th that we first talked about?

A   Let's see.  The minimal ascites.  Let's see.  Can you --

Q   It's directly on your --

A   -- all right.  I'm -- I'm looking on -- under -- let's see.  The Bates USA 2399.  Abnormal ultrasound suggests possible "cholestytus" with minimal ascites.  And it's also Bates USA 2, page 17.  I think that's the same record, referred to again.

So minimal ascites was mentioned in those reports -- in those records, according to my notes.

Q   And do you understand that right now, we're looking at a CT report that's dated October 15th?  Are you able to see that on your screen?

A   I see that.  Yes.

Q   And if you look down on page 2 of that report, it says "Ascites: No free fluid."  And we talked about that earlier.  And if you look further down on page 3 of the report, it says "Ascites/free fluid:  None."  Do you see that?

A   I see that.

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 81

Q    And you didn't list that in your chronology that you just referenced; correct?

A    No.  No.  Because I'm listing the -- the issues -- wet -- the instances where ascites is mentioned.

Q    You're not listing normal findings; correct?

A    Well, no.  The -- the -- those are not useful.  I -- I need to know what the adverse ones are in order to figure out what's going on with him.

Q    Do you acknowledge that there is absolutely nothing on the October 15th CT scan that would indicate that this man suffered from alcohol use disorder?

A    That particular little piece does not have the kinds of red flags on it that indicate -- oh.  Wow.  "Lower left rib fractures."  Wow.  I -- I should have noticed that.  He's got "Old healed lower left rib fractures."  I'm noticing that now.  From injuries.

If you're asking for any indication of alcohol use disorder -- "Old healed lower left rib fractures" consistent with injuries and falls, that would be an indication.

I don't know if I have that in my notes.  But now that you -- I see that -- yeah.  That's

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 82 of 315
Vera F. Dolan, MSPH FALU                        August 26, 2022
Barwick, James v. United States of America

Page 82

something of significance.

Q    I just want to be very clear.  Are you saying that the fact that this man had broken ribs is evidence, in your mind, that he suffers from alcohol use disorder?

A    It's one piece of many pieces to a puzzle that all point to alcohol use disorder.  I do mention fractures, and falls, and injuries.  That's consistent with alcohol use disorder.  This would consistent.

Q    The fact that there was "No free fluid" noted, and the fact that the liver was noted to be "unremarkable," that information would be inconsistent with the finding of alcohol use disorder?  Do you agree or disagree with that, ma'am?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A    I have no opinion because, you know, I don't know what -- I have no opinion about that.

Q    We're going to go on to another imaging report.  This is an abdominal CT that was done on October 28, 2019.  Do you see that?

A    Yes.

Q    Do you see where my cursor is?

A    Yes.  I see.

MS. SHOEMAKER:  I don't.  Where is it?

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 83 of 315
Vera F. Dolan, MSPH FALU            August 26, 2022
Barwick, James v. United States of America

Page 83

There it is --

THE WITNESS:  Right there.

BY MR. GUTSCHENRITTER:

Q    Do you see the sentence that reads "No abnormality of the liver spleen stomach pancreas, adrenals, or kidneys"?  Do you see that?

A    Yeah.  This is beyond the scope of my examination.  This is October 23rd [sic].  Not October 9.

Q    There is nothing that says anything about cirrhosis, or anything like that, on this CT scan, is there?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her examination --

A    It's out the -- yeah.  This is -- this is beyond October 9th.  I'm -- I'm looking at everything up to October 9th.

Q    Do you acknowledge that there's nothing here to indicate, or support your opinion, that Mr. Barwick has alcohol use disorder?

MS. SHOEMAKER:  Object to form.

A    I --

MS. SHOEMAKER:  -- outside the scope of her report.

THE WITNESS:  I haven't examined this

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 84 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 84

document.  I'm -- you know, there's nothing -- you know, I -- I cannot say, right now, what's going on with it.  I have no opinion.

BY MR. GUTSCHENRITTER:

Q    Can't say what's going on with it.  The sentence that says, in part "No abnormality of the liver."  That would certainly be inconsistent with a diagnosis of AUD; correct?

A    I --

MS. SHOEMAKER:  -- to form.

A    I have -- I have no opinion about that.

Q    You don't have any opinion about that?

A    No.  I don't have an opinion of -- of that.

MR. GUTSCHENRITTER:  For the record, well, we'll mark this as exhibit --

Madam Court Reporter, are we on Exhibit No. 3, I think?

THE REPORTER:  We are.

MS. SHOEMAKER:  Lee, are we marking the CT report that you used previously?

MR. GUTSCHENRITTER:  We are.  Yes.  We are.

MS. SHOEMAKER:  So 2 is the "Ultrasound Report."  Three will be the CT report.  And then, 4 will be this report --

Page 85

MR. GUTSCHENRITTER:  Yes.

So for the record, Exhibit 2 will be the October 14th ultrasound.  Exhibit 3 will be the October 15th CT report.  And Exhibit 4 will be the October 28, 2019, abdominal CT.

(Exhibit 3 and Exhibit 4 were marked for identification.)

MR. ABERNETHY:  While we're on this, I missed Exhibit 1.  Do we know what that is?  Is that the notice?

MR. GUTSCHENRITTER:  No.  It was --

MS. SHOEMAKER:  -- expert report.

MR. ABERNETHY:  Okay.  Thank you.

BY MR. GUTSCHENRITTER:

Q   So just to be clear.  We have obviously not gotten to the lab reports that you apparently relied on.  As it relates to imaging reports, based on the exchange we just had, am I correct in understanding that the only imaging study that you relied on to support your opinion regarding AUD would be the October 14th ultrasound?

A   There was also the mention of ascites as well.

Q   Tell me if I'm wrong.  I believe that that was in the October 14th ultrasound?

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 86 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 86

A    I've -- well, again, all I have in front of me are my adverse medical condition notes.  There was the ultrasound, from 10/14, mentioned -- from Phoebe Putt -- Phoebe Putney.

But then, there were also medical records from Albany Area, and from October 15th as well, that mention ascites as well.

So those are the two documents that mention ascites, which is associated with cirrhosis, which is associated with alcohol use disorder, which is part -- you know, one piece of the many other pieces that I reviewed and found, as an underwriter, in Mr. Barwick's medical records.

Q    Yes.  And to be clear, for the CT report that was done on October 15th, you simply did not consider that report in reaching a determination on AUD; correct?

MS. SHOEMAKER:  Object to form.

A    No.  I -- I reviewed the record.  I mean -- so I saw it.  But I didn't make any adverse notes from it.

Q    Other than the broken ribs that you mentioned on the October 15th report, is there anything else in the October 15th CT report that you contend supports your testimony regarding AUD?

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 87 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 87

A    I have to go -- I -- all I -- the reason why I saw the broken ribs is because it was right there on the page, right -- right above the "Impression."  So it came -- so reading that as we speak, right now, that leapt out at me.

But I have not examined the rest of that, you know, to determine that.  So I have no opinion.

Q    So before today, had you even looked at the October 15th CT report?  Did you hear me?

A    -- can you repeat --

Q    I'm sorry.  I want to make sure we're on the same page.  Before today, had you looked at the October 15th CT report?

A    I -- I'm sure I did.  If it was a record that was given to me, I looked at it.

Q    And that CT report, if I understand you correctly, is not mentioned in your report because it doesn't show any adverse notes regarding Mr. Barwick's liver?  Do I understand correctly?

A    Yeah.  It -- it did not speak to any abnormality, or adverse issues related to his cirrhosis.

Q    So because that report said that his liver was "unremarkable," you simply excluded that from your analysis concerning AUD?  Is that fair?

Page 88

A    It -- it --

MS. SHOEMAKER:  Object to form --

A    No -- no.  I collected adverse medical condition notes.  There were no adverse medical conditions related to his liver, cirrhosis, or ascites in that report.  So I did not make a note of that from that report because it didn't have it.

But it did have the broken bones.  I'm -- I don't know if I made a note of those broken bones, or not.

Q    So you read the CT report.  But because it said the liver was normal, or "unremarkable," you chose not to include that in your report concerning AUD?  Is that right?

MS. SHOEMAKER:  Object to form --

A    No --

MS. SHOEMAKER:  -- testimony of the witness.

THE WITNESS:  These notes are adverse medical conditions.  All right?  These are the one -- these are exactly the kind of notes that underwriters take when they go through medical records.  Okay?  We don't -- there -- if I wrote down everything that's normal, we would have thousands and thousands of notes.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 89 of 315
Vera F. Dolan, MSPH FALU                        August 26, 2022
Barwick, James v. United States of America

Page 89

But in order to understand what his mortality risk profile is, I need to see what the adverse conditions are for him, so I can put together his profile.

BY MR. GUTSCHENRITTER:

Q    Let's keep moving.  If you go back to your report on page 3 -- just keep going through these subparagraphs.  Subparagraph "b.," says "Abnormal liver function test results."  Tell me what those are, please?

A    They essentially would be elevated liver function tests.  Let me get back to the substance abuse category in my notes.  And let's see.  They would essentially be elevated levels of the liver enzymes AST, and elevated levels of the liver enzyme ALT.

Q    AST, and ALT?

A    Correct.

Q    Are there any other significant lab values that you looked for in determining whether or not my client had alcohol use disorder?

A    Yes.  He had low serum creatinine as well.  And he had low levels of electrolytes.  So he has a -- a number of lab test results beyond the liver function test results.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 90 of 315
Vera F. Dolan, MSPH FALU                  August 26, 2022
Barwick, James v. United States of America

Page 90

Q    What are those other lab test results?

A    I just had -- they would be -- let's see.
Let me look.  Low chloride.  Low sodium.  Low
creatinine.  Low -- a low alkaline phosphatase.

Q    I guess I'll start by asking you this way.
Do you acknowledge that all of the lab values that you
just described to us, could be -- well, strike that.

Do you acknowledge that all of the lab
values you just told us about are lab values that can
be affected, one way or the other, by persons who are
diabetics?

A    Not -- not the elevated liver enzymes.  No.

Q    I didn't see where you --

A    No.  Yeah.

Q    You're --

A    No.  You know, and -- and the electrolyte
disturbances, that's not a feature that's commonly
characterized diabetes.  And -- and the low creatinine
is -- is not associated -- normally associated with
diabetes.

The lab tests associated with diabetes would
be the elevated glucose, and the elevated hemoglobin
A1C.  Those are diabetes markers.

Q    Persons who are diabetic are more prone to
have lower levels of sodium, chloride, decreased

Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 91

electrolytes?  Do you agree or disagree with that?

        A    I have no opinion about that.

        Q    Did you consider that?  Whether diabetes
could have affected readings for those values instead
of my client abusing alcohol?

        A    No.  That -- that would be of -- so unusual
that it -- it didn't even cross my mind because that's
not an association with diabetes.  The -- the
hemoglobin A1C, and the elevated glucose, those are
the lab values that are associated with diabetes.

        Q    Have you reviewed peer-reviewed literature
which states that diabetics are more prone to have
lower levels of sodium, electrolytes, and chloride?
Are you aware that that literature exists?

                    MS. SHOEMAKER:  Object to form.

        A    I -- no.  I -- I have not examined that
literature.  You know, and -- and I'm not sure that
what you're saying is true.

        Q    You're saying you don't know, one way or the
other; correct?

        A    No.  I have no opinion.

        Q    People who suffer from diabetes are more
prone to dehydration?  Do you agree or disagree with
that?

        A    I have no --

MS. SHOEMAKER:  Object to form.

A    I have no opinion.

Q    Dehydration can cause an increased bone creatinine ratio?  Do you agree or disagree with that?

A    I have no opinion.

Q    You agree that a low AG Ratio is correlated -- or strike that.

Do you acknowledge that a low AG Ratio can be caused by insulin insufficiency?

A    I have no opinion about that.

Q    In other words, is that something that you considered, or analyzed, or investigated in reaching your conclusions regarding AUD?

A    I have -- I have no opinion about that.

Q    Any other lab values or abnormal values that you're relying on in supporting your opinions?

A    They would be in my list that I would have under "Alcohol use disorder."  And I think "b." speaks to "Abnormal" function liver "test results."  Let's see.  "K." talks about "Chronic electrolyte imbalance (abnormal low sodium, low chloride, low potassium" --

Q    Ms. Dolan, will you tell me what page you're on?

A    Page 4.

Q    Of what?

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 93

A    My report.  So we went from on page 3, subparagraph "b.," with the "liver function test results."  And then, we're going to page 4.  And we're -- we're talking just those things that mention lab values.

On page 4.  "K. Chronic electrolyte imbalance (abnormal low sodium, low chloride, low potassium" --

Q    Can I stop you there, and ask you about --

A    Okay.  Sure.  Sure.

Q    So for "k. -- abnormal low sodium." Diabetics who have high blood sugar are prone to have abnormally low sodium.  Do you agree or disagree with that?

A    I --

MS. SHOEMAKER:  Object to form.

A    I -- I have no opinion.

Q    People who are diabetic are more prone to have low levels of chloride.  Do you agree or disagree with that?

A    I have no opinion.

Q    There's a correlation between people who are diabetic and low potassium levels.  Do you agree or disagree with that?

A    I have no opinion.

Q    Did you do any type of research or
investigation whatsoever to determine if these
abnormally low values that we see in subparagraph "k."
could have possibly be caused by a medical condition
other than AUD?

A    Can you repeat the question?

MR. GUTSCHENRITTER:  Can you read it
back, the court reporter, please?

(The reporter read the record as

requested.)

THE WITNESS:  I did not do that
research.  No.

BY MR. GUTSCHENRITTER:

Q    Let's keep going down the list, or let's
sort of go back towards the top of page 4.  In
subparagraph "f.," there's a "2017 motor vehicle
accident" listed.  Do you see that?

A    Yes.  I do.

Q    And you don't have any evidence to suggest
that alcohol was a contributing factor in any way in
that collision, do you?

A    I don't know.  I don't know any -- much more
information than that.  The fact that there was an MVA
is something that is significance to an underwriter
when looking at alcohol use disorder.

Page 95

You know, that piece taken in conjunction, collectively, with the other pieces form an impression that there was alcohol use disorder with Mr. Barwick.

Q   Who was at-fault in that wreck?  Do you know?

A   Excuse me?

Q   Who was at-fault in the wreck in 2017?

A   I do not have that information.

Q   The next one is "fall off a ladder causing broken bones."  Any indication whatsoever that alcohol played any roles in causing or contributing to that incident?

A   I didn't have that information.  But falling off -- from heights, falling from a ladder, is also part the -- the signs and symptoms of issues associated with alcohol use disorder.

This is one piece in a totality, collectively, that show that Mr. Barwick, more likely than not, had alcohol use disorder.

MS. SHOEMAKER:  Hey, Lee.  I don't mean to interrupt you again.  But I may need another break. We have been going since 9:30, I think.  So about an hour and a half.  Get to the end of whatever questions you have, and we can take a -- no rush.  I just want to flag that for you.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 96 of 315
Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 96

MR. GUTSCHENRITTER:  I have a lot more.
So yeah.  Now's a good time for a break.  Is ten
minutes okay?

MS. SHOEMAKER:  -- that's perfect.
That's all we need.

THE WITNESS:  Okay.

THE REPORTER:  All right.  We are off
the record at 1:56 p.m.

(Off the record.)

THE REPORTER:  We are back on the
record at 2:08 p.m.

BY MR. GUTSCHENRITTER:

Q    We're on page 4 of your expert report.

A    Yep.

Q    And I just want to run through this list
with you.  Let's go to subparagraph "g."  That states
"Chronic lower back pain from fall and pain from
broken bones."  How does that affect, or support, in
your mind, your opinion about AUD?

A    Okay.  Let me direct your attention to the
document that I shared with counsel yesterday that got
to sent to you last night.  And it would be the
Academy of Life Underwriting chapter on underwriting
alcohol use disorder.

And if you turn to the page that shows the

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 97 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 97

list of conditions associated with alcohol use disorder that put an underwriter on alert, I'm just following that standard operating procedure -- that template -- in evaluating Mr. Barwick for his alcohol use disorder, as an underwriter.

This is straight out of the Academy of Life Underwriting, and this is what the life underwriters use and refer to as the kind of things that we should look for in -- in the way of adverse medical conditions that help indicate that there's alcohol use disorder present.

Q    And the paper that you referred to, was that a two-page document that I think was sent to me last night?

MS. SHOEMAKER:  Lee, is it okay?  I confess, we don't have a hard copy.  But I have pulled it up on my phone.  Is it okay if I share that with her, so she can read the title?

MR. GUTSCHENRITTER:  Sure.

THE WITNESS:  Yeah.  It's -- it's -- the -- the author is Percival.  And -- yeah.  It's tiny print.  Well, okay.

MS. SHOEMAKER:  -- need to see it.

THE WITNESS:  Okay.

Do you have that, sir?

Vera F. Dolan, MSPH FALU                          August 26, 2022
Barwick, James v. United States of America

Page 98

          MR. GUTSCHENRITTER:  I don't need to

see it.  I looked at it.

BY MR. GUTSCHENRITTER:

     Q    That article, is it peer-reviewed, and

hadn't been vetted by any organization?  Is that

correct?

     A    Hell, no.  That is not true at all.  This is

one of the founding, you know, documents of the

Academy of Life Underwriting.  This is not in the

medical domain.  This is in the life insurance

industry.  This is one of the things that we get

tested on.

          So no.  This is definitely the kinds of

things -- a whole industry, you know, relies on this

information to do our business.

     Q    To be clear, you're saying the insurance

industry relies on that?  Not the medical industry;

correct?

     A    I don't know what the medical industry

relies on.  But as an underwriter, I have to go by

standard, accepted principles in the life insurance

industry.  That is the basis of my expertise.  That is

why, and how, I'm doing this life expectancy analysis.

     Q    "H.  Chronic lack of employment and on

disability."  How, if at all, does that support your

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 99 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 99

opinion that Mr. Barwick had undiagnosed AUD?

A    That's also part of the underwriting profile.  Someone who has an alcoholic lifestyle is -- has issues with employability, and -- and work, and income.  You know, that's part of what we see with alcoholics.

Q    What percentage of people on disability are alcoholics?  Do you know?

A    I have --

MS. SHOEMAKER:  -- object to form. It's outside the scope of her testimony.

A    I have no idea.  I have no -- I have no opinion about that.

Q    What percentage of people who have what you term as "Chronic lack of employment," suffer from alcohol abuse?

MS. SHOEMAKER:  Object to form.  It's outside --

A    I -- I don't know.  It -- it's -- that's not necessary for me to make my assessment.  This is a standard underwriting procedure, and these are the things that we look for.  And these are red flags that if collectively put together, give the picture of alcohol use disorder.

Q    Subparagraph "i.," you write "No insurance

Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 100

through work and relies on Medicaid for health insurance."  How, if at all, does that support your opinion that Mr. Barwick had undiagnosed AUD?

A    That's one of this -- the pieces that -- of the puzzle that collectively show that Mr. Barwick is not actively employed.  He does not have, you know, insurance through work, and he relies on the State for his health insurance.

Just one of the different -- one of the many things that go into the profile of employability issues and income issues associated with the profile associated with alcohol use disorder.

Q    Is there any specific publication, or article, or otherwise that supports your opinion that the fact that Mr. Barwick had no insurance through work, and was a Medicaid recipient, would be an indicator of alcohol use disorder?

A    Yes.  It's -- it's part of the income issues from the underwriting guideline for alcohol use disorder that I -- I, you know, shared with you before.

Q    What, specifically?  Point me to something, anywhere, that says that a person who has no insurance through work, and is a Medicaid recipient, that that is in any way an indication of alcohol use disorder?

Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 101

Is there any literature, specifically?

A    I -- again, I'm talking about this is a collective thing.  You know?  This is -- we have many issues associated with Mr. Barwick that all collectively point to this issue.  Not one, in and of itself, is standing.  I'm saying this is as a collective group.

And this is consistent with life underwriting guidelines generally accepted by the industry for detecting and identifying substance use disorder.

Q    I'll ask it to you again.  I understand your testimony that you have to look at all of this in its totality.  But specifically, you wrote that not having "insurance through work," and being on Medicaid, is an indication that Mr. Barwick has alcohol use disorder.

Ma'am, I'm asking you a very specific question.  Can you point to a single publication or article -- tell us what that is -- that I can go to, that will say that no insurance through work, and being a Medicaid recipient, is in any way an indicator for AUD?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A    I don't have that article for you.  But I

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 102 of 315
Vera F. Dolan, MSPH FALU                            August 26, 2022
Barwick, James v. United States of America

Page 102

can tell you that since it is a piece of his lack of employment, and his lack of work -- consistent with alcohol use disorder.  You know, this is one part of the -- the total picture that gives me that underwriting impression.

Q   But you can't point to any publication that supports that testimony?  Is that correct?

MS. SHOEMAKER:  Object to form.  Asked and answered.

A   Not --

MR. GUTSCHENRITTER:  She's not answering the question.

MS. SHOEMAKER:  Lee, she said she didn't have it for you.  She said --

THE WITNESS:  I don't.

MS. SHOEMAKER:  "I don't have that" publication right now.  She's already given that answer.

MR. GUTSCHENRITTER:  Okay.

MS. SHOEMAKER:  She said not at --

BY MR. GUTSCHENRITTER:

Q   Let's go on to "j."  It says "Lives on family farm paying no rent, admits under oath that he moved there because he 'needed to get away from Sacramento.'"  Can you point to any piece of

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 103 of 315
Vera F. Dolan, MSPH FALU                              August 26, 2022
Barwick, James v. United States of America

Page 103

literature, or any sort of authoritative material, to support that what's contained in subparagraph "j." is in any way an indication for AUD?

A    Again, I'm directing you to the life underwriting guidance that talks about mental issues, work issues, income issues, employability issues that are associated with the alcohol lifestyle.

And this is just one piece that fits in with the others that's consistent with alcohol use disorder.

Q    Can you give me one specific publication that supports what you write in subparagraph "j."? "Yes," or "No"?

A    Other than the AUL -- the Academy of Life Underwriting thing, not at this time.

Q    AUL?

A    The Academy of Life Underwriting.  That's right.  That's the document authored by Percival that you received last night.

Q    I asked you about "k."  I'm not going to ask you that again.  "L.  Chronic dehydration."  Do you understand that diabetics are more prone to have issues with dehydration as compared to the normal population?

MS. SHOEMAKER:  Object to form.  It's

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 104 of 315
Vera F. Dolan, MSPH FALU                              August 26, 2022
Barwick, James v. United States of America

Page 104

outside the scope of her testimony.

A    I think already responded that I have no opinion about that.

Q    As part of your expert work on this case, did you do anything to determine whether or not dehydration, in Mr. Barwick's case, could be attributable to the fact that he's a diabetic instead of having undiagnosed AUD?

A    No.  That -- that -- dehydration is not consistent with the top issues associated with diabetes.  But dehydration is an issue associated with alcohol use disorder.

Q    I have asked you about subsection "m."  Now, let's go to "n."  And that says "Muscle cramps (alcohol associated rhabdomyolysis) and family history of muscle cramps."  Let's start with "alcohol associated" rhabdo.  You acknowledge that Mr. Barwick was never diagnosed with alcohol-associated rhabdo; correct?

A    He -- rhabdo was mentioned in his medical records, associated with a -- a short bout of work that he did on his car.  So that was something that was mentioned in his records.  So rhabdo was actually mentioned.  But it was associated with exercise.  It wasn't directly associated with alcohol.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 105 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 105

But rhabdo is associated with alcohol use disorder.

Q   I'll ask it again.  Mr. Barwick was never diagnosed, by anyone, with alcohol-associated rhabdo; correct?

A   He was associated with rhabdo.  But not with this alcohol-associated rhabdo.  That's correct.

Q   Do you understand that there is no question in this case that Mr. Barwick never had rhabdo?

A   No.  I don't understand.  I -- I have no opinion about that.

Q   Who diagnosed him with rhabdo?

A   Let's see.  I don't know who did.  I'd have to find that entry into -- in my notes to see where that is.  That would probably be under --

Q   Well, can I ask it to you a different way, Ms. Dolan?

A   Okay.  Sure.

Q   I want you to assume that Dr. Poulos is the one who put a diagnosis of rhabdo in the medical record.  Okay?

A   Okay.

Q   And I also want you to assume that Dr. Poulos testified under oath that he was mistaken, and that Mr. Barwick never actually had rhabdo?

Vera F. Dolan, MSPH FALU          August 26, 2022
Barwick, James v. United States of America

Page 106

A    Okay.

Q    Assuming those things to be true, you would acknowledge that what's contained in subsection "n.," concerning rhabdo wouldn't be applicable at all to any of your opinions concerning AUD; correct?

MS. SHOEMAKER:  Object to form.  It calls for speculation.

A    Well, rhabdo was not the only thing mentioned.  Rhabdo is a very specific diagnosis.

But muscle cramps, which can be associated with rhabdo, was mentioned consistently through the records.  So muscle cramps is actually what I was focusing on.  And not only did Mr. Barwick have muscle cramps, but he also said that his grandfather, his father, and -- and his father had them as well.

Q    And what's your understanding of all of the different medical conditions that could cause a person to have muscle cramps?

MS. SHOEMAKER:  Object to form.

Outside the scope of her opinion.

A    Again, I'm looking at what is actually in the adverse medical condition notes.  I'm actually looking at what Mr. Barwick actually has.  I'm not making a differential diagnosis.  I'm doing an underwriting assessment of what he actually has.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 107 of 315
Vera F. Dolan, MSPH FALU                 August 26, 2022
Barwick, James v. United States of America

Page 107

And the muscle cramps are consistent with electrolyte imbalance, which is consistent alcohol use disorder.

Q   Well, you wrote in subsection "n." that he had "Muscle cramps," and then "alcohol associated" rhabdo?

A   Right.

Q   And you understand that he never had rhabdo, let alone alcohol-associated rhabdo; correct?

A   I don't know.  I mean the alcohol-associated rhabdo is essentially an underwriting, you know, conclusion that I'm putting in.  You know, that's -- that's my analysis of what -- what he had.

And that's consistent with the totality of his pattern and is consistent with the underwriting profile that's connected to alcohol use disorder.

Q   But you're not qualified to diagnose anyone with rhabdo, or alcohol-associated rhabdo, are you?

A   I'm not a medical doctor.  We've gone over this before.  I am an underwriter.  And as an underwriter, I can make diagnoses, as an underwriter, to form the -- you know, the mortality risk profile that every underwriter is supposed to do.

And we underwriters have to do that.  It's our job to detect and identify undisclosed alcohol

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 108

abuse.  We are -- that's what we are supposed to do.

And the underwriting guide -- the Academy of Life Underwriting guide about detecting alcohol abuse is very specific that people who abuse alcohol don't disclose it to their doctors.  All right?  And -- and they don't disclose to other people.  So as underwriters, we have to pick up on issues like these adverse medical conditions in order to determine that alcohol -- undisclosed alcohol use disorder is there.

And Mr. Barwick's profile is very consistent with the profile that the Academy of Life Underwriting puts out.  So I'm being -- I'm using standard operating procedure, standard operating interpretations.  And -- and I have to come up with that conclusion.  I can't not.

Q   Is it your testimony that Mr. Barwick, at any point in time, ever had alcohol-associated rhabdo?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

MR. GUTSCHENRITTER:  No.  I'm reading what she --

BY MR. GUTSCHENRITTER:

Q   "Alcohol associated" rhabdo is in your report, ma'am.  Is it your testimony that you believe Mr. Barwick had alcohol-associated rhabdo?

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 109 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 109

A    I think because of his -- the severity of his muscle cramps, the -- the frequency of his muscle cramps, the cramps that his grandfather had, the "thad" -- the cramps that his father had, they are consistent with alcohol-associated, you know, rhabdo.

Q    Are you --

A    They're consistent --

MS. SHOEMAKER:  Wait.  Can I interrupt quickly?  Kevin's been dropped, and he has to be let back in by the host.

MR. GUTSCHENRITTER:  Go ahead.

MS. SHOEMAKER:  Sorry to interrupt.

MR. GUTSCHENRITTER:  It's okay. Yeah -- he's back.  Okay.

BY MR. GUTSCHENRITTER:

Q    Going to subsection "o.  Family history of muscle cramps indicates family history of alcohol use disorder."  I assume that you're basing that on Mr. Barwick's testimony that his father, at some point in time in his life, also had muscle cramps?  Is that right?

A    Yeah.  He testified that both his grandfather and his father had muscle cramps.  And his grandfather's muscle cramps were very severe and chronic.

Page 110

Q    Are you testifying that you believe that my client's father had alcohol use disorder?

A    If you read the Academy of Life Underwriting guidance -- okay?  A family history of alcohol use disorder is something that is, you know -- something that is well-accepted.  And it -- it would be more -- no.  It would be consistent with muscle cramps in the family, alcohol use disorder in the family.

There's no reason for me to believe that -- that there is no family history of alcoholism in Mr. Barwick's family.

Q    When you get on the stand and testify in front of a judge, are you going to tell the judge that you believe that Mr. Barwick's father had alcohol use disorder?

MS. SHOEMAKER:  Object to form.

A    Mr. Barwick's father and grandfather had symptoms -- muscle cramps -- consistent with alcohol use disorder.  And you know, I -- I have to say that. I have to.  I can't not say it.

Q    Do you know that Mr. Barwick's father has never drank alcohol on any regular basis in his entire life?  Do you know that?

MS. SHOEMAKER:  Object to form.

A    I know that people who abuse alcohol are not

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 111 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 111

truthful about their consumption of alcohol.  So I have no reason to believe that what I'm being told is the truth.

Q    Do you know that Mr. Barwick's father volunteered, and went, and fought in the Vietnam War?

MS. SHOEMAKER:  Object to form.  Lee, this is getting a little bit outside bounds.  But --

MR. GUTSCHENRITTER:  You can answer.

THE WITNESS:  I have no -- I do not know --

BY MR. GUTSCHENRITTER:

Q    Do you know?

A    I do not know that, and it is not material to my analysis.

Q    Are you aware that Mr. Barwick's father is a proud American, and considers himself a patriot?

MS. SHOEMAKER:  Object to form.  This is irrelevant.

A    It has nothing to do with my analysis.

Q    Well, do you know how it makes my client feel, and his father feel, that the U.S. Government has hired a person like you to testify that his father suffers from alcohol use disorder?

MS. SHOEMAKER:  Lee --

MR. ABERNETHY:  -- we're starting to

Page 112

badger the witness.

MS. SHOEMAKER:  I have got it, Kevin.

It's not acceptable.  I'm not going to let you talk to her like that.  You can move on, or we can end the deposition.

BY MR. GUTSCHENRITTER:

Q    Other than the muscle cramps that Mr. Barwick's father had, is there anything else that you base your opinion that his father had alcohol use disorder, on?  Anything other than the muscle cramps?

A    Not directly because I don't have more information about his father.  But that's the only --

Q    So you're --

A    -- information that I have at this time.

Q    Let's go to subparagraph "p."  It says "Acute kidney injury associated with alcohol associated" rhabdo -- "and insistent use of nephrotoxic quinine as treatment for muscle cramps." Tell me how that supports your opinions?

A    Okay.  Well, we know he has muscle cramps. And muscle cramps are associated with alcohol-associated cardiomyopathy.  And there is literature that indicates that -- no.  When you have muscle dissolving, you've got myoglobin, and that is a kidney toxin.

Page 113

And also as a home remedy, Mr. Barwick has been using quinine -- quinine -- as a remedy for his muscle cramps.  And he was warned explicitly not to use it because of his injuries -- injuries to his kidneys.  And his kidneys do show damage, and he does have acute -- acute kidney injury.

So that's consistent with alcohol use disorder.  And that's part of the pattern of -- that's fits in with alcohol use disorder for Mr. Barwick.

Q    So it's possible that the nephrotoxic quinine could be the cause of his acute kidney injury; correct?

A    It could be one of them.  It could be.

MS. SHOEMAKER:  Is it okay if we take a break for just a second?  I'm a little flustered from our last exchange.  I need a minute.

MR. GUTSCHENRITTER:  Sure.

MS. SHOEMAKER:  Thanks.

THE REPORTER:  All right.  We are off the record at 2:33 p.m.

(Off the record.)

THE REPORTER:  We are back on the record at 2:36 p.m.

BY MR. GUTSCHENRITTER:

Q    Let's skip down subparagraph "v.," which

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 114 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 114

states "Negative 2016 breath test for H. pylori."  How does that factor into your opinions?

A    Okay.  Helicobacter pylori is a bug that's been associated with gastroesophageal reflux disease, GERD.  And so, that is one possible cause of GERD.

But when you have a negative test for the bug, there has to be something else causing the GERD.  And so essentially, the bug has been ruled out as a possible cause of his GERD.  And what's left is standing is his alcohol exposure as his cause -- the underlying cause of his GERD.

Q    If you'll flip over to the top of page 5?  If you look at paragraph [sic] "cc.," which is "Pain syndromes including acute sciatic nerve irritation, low back pain" and "noncardiac chest pain," how do those medical conditions support that he had undiagnosed AUD?

A    Again, this "acute sciatic nerve irritation" has to do with physical mobility and physical issues.  Low back pain associated with accidents and injuries.  Noncardiac chest pain -- again, pain is something that you see with people who have alcohol use disorder.

As a matter of fact, Mr. Barwick actually mentioned that he used alcohol to treat pain.  So you know, it's -- you know, the fact that he has pain, and

Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 115

he has admitted that he uses alcohol to treat it, is a -- a concerning thing, and then a red flag for alcohol use disorder.

Q    Well, you have seen all of the entries in the medical records.  And I think I skipped past it, and I didn't ask you it.  But it's in the first part of your opinions, under subparagraph "d.," which states "Denial of consumption of any alcohol during" 2017, through 2019.  How does Mr. Barwick denying drinking alcohol support your opinion that he had undiagnosed AUD?

A    If you read the Academy of Life Underwriting guidelines, it is taken as a given that people who abuse alcohol do not disclose it to their own doctors. And in my opinion -- experience with other cases as well, there are people -- you know, the people who had alcohol use disorder, did not disclose their alcohol use to their doctors.

So the fact that he denied consumption of any alcohol whatsoever -- not even a beer.  Nothing. Just said "No alcohol at all" -- is a very telling sign that -- that he has alcohol use disorder.  That's very consistent.

Q    It is also possible that he did not, in fact, consume alcohol in the years 2017, through 2019?

Page 116

A     That does not -- is not consistent with his physical findings.

Q     If you exclude this opinion about undiagnosed AUD, and just remove that from your life expectancy calculation, what would Mr. Barwick's life expectancy be, with that removed from the equation?

A     Then, we're down to the diabetes with comorbidities, and the current smoking.

Q     Yes.  How would that affect his life expectancy?

A     I would have to recalculate everything.  You know, put together -- you know, remove the AUD risk factor.  And then, use just the diabetes and the smoking risk factors, put them together as one, and then readjust, you know -- rerun the analysis that you -- life tables to get those numbers.

Q     How long would it take you to do that?

A     An hour.

Q     I obviously didn't go through and ask you about every single one of the subparagraphs that we were just discussing on your report on AUD.  And I'm not going to.

But I will ask, are there any other indications, as you have characterized them, that support your opinion of undiagnosed AUD that aren't

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 117 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 117

listed in these subparagraphs here, and that we haven't discussed otherwise in the deposition?

A   No.  What I did see, in the new records from Emory, is that he was supposed to come in, you know, December 2020.  But then, he waited all the way till May 2022, to come in.  And personal neglect of one's medical conditions is associated with alcohol use disorder.  So that was consistent with that.

Q   Did you review Mr. Barwick's deposition testimony where he said that the reason he didn't go in was because everything was closed due to the COVID-19 pandemic?

A   I did not read that in the deposition.  You know, I didn't see that.  It -- it -- I have no opinion about that.

Q   Liver cirrhosis is a permanent and incurable condition; correct?

A   That is my understanding.  Yes.

Q   A trained medical professional would expect to see evidence of liver cirrhosis on an abdominal CT scan?  Do you agree or disagree with that statement?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A   I have no opinion about that.

Q   If a medical doctor reviewed the two CT

Page 118

images and reports that we talked about earlier, and testified under oath that there was absolutely no question in his mind that Mr. Barwick did not have cirrhosis of the liver, would you have any reason to disagree with that sworn testimony from a medical doctor?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I don't know.  I don't know.  The way that you really definitively define cirrhosis would be by a liver biopsy.  So a CT scan would be one -- you know, would be one form of verification.  But to really find out whether he had cirrhosis or not, he would have to have a liver punch.

MR. GUTSCHENRITTER:  Let's take a five-minute break, and we'll come back, please.

MS. SHOEMAKER:  Sure.

THE WITNESS:  Okay.  Sure.

THE REPORTER:  All right.  We are off the record at 2:45 p.m.

(Off the record.)

THE REPORTER:  We are back on the record at 2:54 p.m.

BY MR. GUTSCHENRITTER:

Q    Ms. Dolan, you're not aware of any instance,

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 119 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 119

or any doctor has ever treated Mr. Barwick for liver cirrhosis; correct?

A    I've never -- I never saw that in the record.  No.

Q    And Bowen told us earlier, you reviewed the Emory records as well.  And no doctor at Emory has ever indicated that treatment for liver cirrhosis would be indicated; correct?

A    I -- I didn't see any mention of that.  No.

Q    And you have never seen where any doctor has ever indicated that a liver biopsy would be warranted; correct?

A    I did not see that.  No.

Q    And do you agree that ascites, or free fluid, as we discussed earlier, is something that has to be treated medically?  It is not something that simply resolves on its own?

MS. SHOEMAKER:  Object to form.  It's outside the scope of her testimony.

A    I have no opinion about that.

Q    I'm going to turn your attention to another case where you served as an expert in.  And I know that you have been questioned about this before.  But you were hired by a person named Orly Taitz to serve as an expert in a case?  Is that right?

Page 120

A    Orly Taitz.  Yes.

Q    Taitz?  Is that how you pronounce it?

A    That's my understanding.  Yes.

Q    And Dr. Taitz paid you to serve as an expert on her behalf?  Right?

A    Yes.  That was an epidemiology case.  That was my specialty as an epidemiologist.

Q    Yes.  And Dr. Taitz was the plaintiff in the lawsuit; correct?

A    That's correct.

Q    And who were the defendants in the lawsuit?

A    Homeland Security.  Jeh Johnson.

Q    And was Barack Obama also a defendant?

A    I -- he probably was.  I don't remember all the defendants on that.

Q    I have the complaint.  We'll look at it in a minute.  But do you recall that the Secretary of HHS was also individually named as a defendant in that case?

A    All I remember is Jeh Johnson being the first one.  I don't recall who the rest of them were.

Q    What did that case involve?  What were the allegations in that case?

MS. SHOEMAKER:  Object to form.  Relevance.

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 121 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

Page 121

A    Dr. Taitz is a -- a dentist, and a provider to, you know, immigrant children coming over the Mexican border.  And her contention is that she caught a disease from treating these people that just come over the -- the border, and people like her were in imminent danger from such people.

And she wanted something to be done, essentially.  Either to shut down the border, or to stop these people from coming over.

Q    And we'll go through it, but you offered an affidavit in support of those opinions; correct?

A    Yes.

Q    And you offered affidavit testimony that you believe that African nationals should be prevented from traveling to the United States; correct?

A    Under the -- if -- if you read my -- if you read my affidavit, it was very specific about the terms and conditions for that.

There was an Ebola epidemic going on in Africa.  And someone from Africa, with Ebola, flew to a Texas -- you know, flew into the United States, went to an "atec" -- a Texas ER facility, and he -- a -- a nurse contracted Ebola from that man.

So that essentially was the issue there.  That Africans who were at risk of carrying Ebola

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 122 of 315
Vera F. Dolan, MSPH FALU                           August 26, 2022
Barwick, James v. United States of America

Page 122

should not be allowed into the United States.

Q   And I have that affidavit, and I'll show it to you in a moment.  Dr. Taitz has been referred to as the queen of the Birther Movement?  Is that correct?

MS. SHOEMAKER:  Let me object to form. We're not offering her as an epidemiology expert here.

MR. GUTSCHENRITTER:  No.  But it's relevant to her credibility as an expert, and I think I'm entitled to explore it.

MS. SHOEMAKER:  But she's not being offered for epidemiology.  That wasn't an life expectancy opinion.

MR. GUTSCHENRITTER:  This goes to her credibility as an expert witness.  She made certain representations to a federal judge in the Southern District of Texas.  And I think that those representations, which I will go through in a moment, are highly relevant to her credibility to come into a federal courtroom and testify as an expert witness in any capacity.  And I think I'm entitled --

MS. SHOEMAKER:  -- sure --

MR. GUTSCHENRITTER:  You can have a standing objection, if you like?

MS. SHOEMAKER:  If you'll let me finish, I was going to say that I would like to make a

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 123

standing objection that we think any information about her testimony as an expert in a case about epidemiology is completely irrelevant to her qualifications as an expert witness in the field of life expectancy, which is where we have offered her.

MR. GUTSCHENRITTER:  Okay.  Your objection is noted.

BY MR. GUTSCHENRITTER:

Q    So Dr. Taitz has been referred to as the queen of the Birther Movement?  Have you heard that before?

A    I have no opinion about that --

Q    I had just asked if you had heard about it before?

A    No.  I haven't.  And I pick cases based on whether the facts support the case or not.  And the facts did support Dr. Taitz.  And if -- if you can see in my affidavit that I recited the facts, came to my conclusion, and I spoke to that issue.

Q    This case was in 2014?  Right?

A    I recall.  Yes.  This was 2014.

Q    Well, let's look at your affidavit.  By the way, did you disclose your involvement in this case to the U.S. Attorneys who hired you here?

A    Well, it's -- well, yeah.  It's -- it's part

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 124 of 315
Vera F. Dolan, MSPH FALU                  August 26, 2022
Barwick, James v. United States of America

Page 124

of my Rule 26.  Yeah.  It's -- it's part of my "dest"
-- testimony and deposition.  I mean it's there.

                    MS. SHOEMAKER:  I'll qualify that, Lee.
We produced only the last four years of testimony as
we're required to do under the Federal Rules.  She
provided a case list to us that was more fulsome.

                    MR. GUTSCHENRITTER:  Understood.

BY MR. GUTSCHENRITTER:

        Q    Did you disclose in your CV, Ms. Dolan,
where you listed all the law firms that had retained
you, and represented all the testimony, or expert
witness involvement, you had ever been given, did you
list Dr. Taitz's law firm?

        A    No.  Because it was understand -- my
understanding that she was retaining me, personally.
You know, I got a personal check from her.

        Q    Well, you also gave an expert affidavit?
Right?

        A    Yes.

        Q    And you actually testified in that case?

        A    Yes.

        Q    And represented yourself -- expert; correct?

        A    Yes.

        Q    So do you recognize this as being the
"Affidavit" that you submitted on Dr. Taitz's behalf?

A    Yes.  I think that -- it -- I had actually two affidavits.  And I -- I'd -- I'd have to see the second page to determine if it was -- this is the first, or the second one.  If it's the one dealing with Ebola.

Q    This is the one about Ebola --

A    Yeah.  Then, this is the second one.  Yes.

Q    And just to be clear.  In the underlying case, there was never allegation that Dr. Taitz was ever infected or exposed to Ebola; correct?

A    No.  I don't think there was -- she had -- we don't know if she was exposed to Ebola or not.  But she was -- the possibility of exposure to Ebola was very concerning.

Q    Well, you put in your report that she developed a persistent cough.  But I just want to be clear.  There's no evidence that she, herself, was ever exposed to Ebola, or anything like that?  Right?

A    I don't know.  This is -- I'm going directly from Dr. Taitz's personal conversation with me.  Her reporting this to me.

Q    In other words, you didn't review any medical records, or anything like that; correct?

A    There were no medical records -- records offered to me.  She stated -- she stated that, but she

Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 126

never sent me any medical records.

MR. GUTSCHENRITTER:  And we're going to mark this "Affidavit" as an exhibit to your deposition.  I think that this would be Exhibit No. 5?

(Exhibit 5 was marked for identification.)

THE REPORTER:  It is.

BY MR. GUTSCHENRITTER:

Q    So you said some things in your "Conclusions" that I wanted to ask you about.  The first sentence says "An African national was able to fly from Africa to -- United States, knowing -- he was exposed to Ebola."  Did that ever happen?

A    Yes.  Yes.  A -- a nurse in Texas actually came down with Ebola because of that.  It was a huge stink.  A huge disruption.

Q    Yes.  I remember.  I read The New York Times article, and some other publications about that.  None of them say he did, knowing he was exposed to Ebola, did they?

A    That was my understanding that he -- that was the reason why he came to the United States was because he had Ebola, and he was looking for the cure.  That was my understanding of the reason why he was there.

Vera F. Dolan, MSPH FALU              August 26, 2022
Barwick, James v. United States of America

Page 127

Q    And then if you go down to the third sentence of this paragraph, you put in your sworn "Affidavit," it's "my belief that because of the international media coverage of the cure for Ebola. that's "only available" -- you believed "that African nationals will attempt to travel to the United States in any way possible, once they believe they have been exposed to Ebola."  Did I read that correctly?

A    Yes.  And that's consistent with that case in Texas.

Q    And based on this one case where referenced the State of Texas, you represented in your "Affidavit" that you believe that African nationals should be prevented from entering the United States, and that the Mexican border should be closed; correct?

MS. SHOEMAKER:  Object to form.  Is that in the report [sic]?

MR. GUTSCHENRITTER:  It is.

THE WITNESS:  Yes.  Yes.  That was -- as a -- as a public health person, as an epidemiologist, for policy -- yes.  When you have a -- a deadly epidemic that can cross the border, you need to shut it down, or establish some kind of quarantine procedure.

//

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 128 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 128

BY MR. GUTSCHENRITTER:

Q    And if you look down here at this paragraph that I'm highlighting, it states "The potential of a threat of an Ebola epidemic arriving via illegal immigration from Mexico is serious and grave, and needs to be addressed by -- closure of the Mexican border"; correct?

A    Yes.

Q    Did I read that correctly?

A    Yes.

Q    And at that time, were you aware of any evidence at all that there were people, who had been exposed to the Ebola virus, coming over from the Mexican border?

A    It was a risk, and -- and there was speculation in the papers of that risk as well.

And I would like to point out that when COVID was an issue, President Trump closed down the borders of Mexico, and restricted flying, due to fear of COVID.  So the whole idea of shutting down borders, and restricting travel, is a very familiar one, and -- and standard practice in public health.

I'm not suggesting anything that's anything different than what is in the manuals.  I pointed to the Control of Communicable Diseases.  I brought it to

Page 129

court and talked about it.  They talked about quarantines.  They talked about isolating people.

Very consistent, standard practice in epidemiology and public health.

Q    And was this "Affidavit" attached to the complaint that was filed with the lawsuit?

A    I have no idea.

Q    I'm just reading through this.  But anyway, do you stand by all the statements that are in this "Affidavit," today?

A    Sure.  Sure.  I mean President Trump did this for COVID.  This -- this Ebola issue was a very scary kind of thing, and Dr. Taitz was scared.  And you know, I was admitted to court, and I spoke about it in -- in court.  And the judge talked about tuberculosis as an issue that he was concerned about, with people coming over the border as well.

Q    And -- you understand --

A    So --

Q    I'm sorry.  Go ahead.

A    So you know, Ebola was the -- was one of the concerns.  But there are other diseases like tuberculosis that Judge Hanen actually mentioned as something that he was personally concerned about.  He didn't -- he said he didn't want his people to con --

Page 130

come down with tuberculosis from this untreated immigrant people coming over the border.

Q    And he threw this case out, didn't he?  This case was --

MS. SHOEMAKER:  Object --

BY MR. GUTSCHENRITTER:

Q    -- dismissed on summary judgment; correct?

A    I have no idea.  I have no idea what happened.

Q    So the complaint in this case was filed on July 14th in 2014.  And if we just look at the allegations in the complaint, the first paragraph reads, in the "Statement of Facts," is "A group of billionaires led by George Soros and -- Zuckerberg have been major donors and benefactors of Barack Obama's -- campaign for -- President.  In exchange for their de facto underwriting of Obama's campaign, large donors are seeking actions by Obama in bringing cheap and obedient labor to the U.S. in order to increase profits."

There's a lot of other things in this complaint.  I assume that you reviewed this complaint, at some point, while you were serving as an expert; correct?

A    Actually, I didn't.  This was an

Page 131

epidemiology issue.  I didn't do that.  And as far as I was concerned, all I was asked to do was render an epidemiological opinion as to the danger that Dr. Taitz was in, from untreated immigrants that come straight across the border, and into her examination room.  That's all I was asked to do, and that's what I spoke to.

Q   Well, earlier at the start of the deposition, you testified and told me that you reviewed the complaint in every matter where you are an expert witness, did you not?

A   I -- I do not recall seeing this one.  This was -- well, look.  I -- I told you that I do life expectancies, and I do life underwriting.  All right?

And the reason why I asked for the complaint in the life expectancy is because I want to see if there is any admission or stipulation to pre-existing medical conditions.  That's what I look at the complaint for.

It didn't need -- I didn't need to look at this complaint.  I don't even recall seeing this complaint.

What I do recall is Dr. Taitz telling me what's going on with her, and the danger, and she said "Could you render an expert opinion for me about the

Page 132

danger from these immigrants coming over the -- the Mexican border with these diseases?"  And I wrote my affidavit, and I spoke to the issue, and that's all I've done.

Q    This was case was filed January [sic] 14th, and I'll represent to you that you went and testified in federal court on October 29th.  Well, are you saying that between this lawsuit being filed and you taking the stand in federal court, you never looked at this complaint?

A    I don't recall seeing this complaint.  And it was not -- and it was not important to me because I wasn't rendering a life expectancy -- an opinion, and I'm not looking for pre-existing conditions disclosed by the party.

Q    And so, assume you would have read this complaint.  Just the few paragraphs that we have looked at so far.  Would you still have been comfortable going and testifying on behalf of Dr. Taitz in this matter?

A    I have no idea.  I have no idea.

Q    Would you be able to provide a copy of your first affidavit to Bowen?

A    I'd have to go find it.  I -- probably. Yeah.

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 133 of 315
Vera F. Dolan, MSPH FALU    August 26, 2022
Barwick, James v. United States of America

Page 133

Q    If you don't mind e-mailing a copy of that September 2014, affidavit to Bowen to share with us, I would appreciate it.

MS. SHOEMAKER:  All of this is still under my standing objection, Lee.  So she's welcome to send it to me, but to the extent that we find it irrelevant, or I would object to the production, then we'll take that up at the time.

MR. GUTSCHENRITTER:  Okay.

BY MR. GUTSCHENRITTER:

Q    What was different between your first affidavit and your second affidavit, if you remember, ma'am?

A    Ebola was not mentioned in the first one. Ebola was the center of concern in the second one.

Q    What was the concern in the first one?

A    I can't recall.

Q    But in the first one, you were concerned about illegal immigrants bringing in one type of medical condition?  And in the second affidavit, a month later, you were concerned about illegal immigrants bringing in Ebola?  Is that accurate?

A    I would have to go back and take a look.  I -- I don't have -- I -- I can't tell you right now.

Q    There was one other thing I meant to ask you

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 134 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 134

about.  You advertise on one of the websites where you pay to advertise as a litigation expert.  You advertise that a benefit of using an expert like you is that a party is able to bring in evidence that would otherwise be excluded for being prejudicial; correct?

A    That's correct.

Q    And I just want to show you that.

MR. GUTSCHENRITTER:  I want to mark the complaint that we just looked at as an exhibit.  I think it would be Exhibit 6.  And then, I'll mark this document that we're looking at right now as Exhibit 7.

(Exhibit 6 and Exhibit 7 were marked
for identification.)

BY MR. GUTSCHENRITTER:

Q    Are you able to see my screen, Ms. Dolan?

A    Yes, sir.

Q    And is this, in fact, a publication authored by you?

A    Yes, sir.

Q    And if we go down here to the second page of your, what looks like, 18-page paper, you advertise that hiring someone like you would be "A way to admit excluded evidence using Rule 703."  Is that correct?

A    Yes.  I'm explaining to attorneys that, you

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 135 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 135

know, they can get evidence in through my report --

from my underwriting report -- that they wouldn't

necessarily be able to do, otherwise.

Q    And typically, that information that you're

referring to would be information that would be

prejudicial to the other party; correct?

A    I don't know whether it's prejudicial or

not.  But it would more complete revealing of

information.  Whether it -- I -- whether it's

"prudicial" or not, I -- I have no opinion about that.

Q    In one example that you talk about in

here -- that I don't know if it's on this page or not.

But by involving you in the case, a party was able to

get in evidence of the person having a narcotic or

opioid addiction at some point in time in their life;

correct?

A    That's correct.

Q    And you advertise that that was a benefit of

using someone like you as you can then get that

information in front of a judge or jury, when

otherwise, it would be excluded for being prejudicial,

and perhaps, irrelevant; correct?

MS. SHOEMAKER:  Object to form.

A    I'm -- I wouldn't characterize that way.

But basically, what I do is, as an underwriting

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 136 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 136

expert, is get all the information in.

Q    Here, where my cursor is, you describe a case where due to your involvement, numerous medical conditions were able to be shown to the jury.  And then you say it was "a complete verdict for the" defendant, and "After the trial, jury members said, 'It's a good thing he died.  His wife remarried a rich man.'"

A    That actually happened.

MR. GUTSCHENRITTER:  Just give me about two minutes.  I think that I'm done.  But just me give me two minutes, please.

THE REPORTER:  Would you like to go off the record?

MR. GUTSCHENRITTER:  Yes.

THE REPORTER:  All right.  We are off the record at 3:20 p.m.

(Off the record.)

THE REPORTER:  We are back on the record at 3:24 p.m.

BY MR. GUTSCHENRITTER:

Q    Ms. Dolan, what percentage of your total income is derived from your work in your capacity as an expert witness versus the other activities that we discussed earlier?

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 137 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 137

A    Well, right now, I haven't been able to place the patent.  So I'm seek -- seeking out that.  So I haven't derived any money from that.  And because of COVID, I haven't been able to work in the life insurance industry as an independent consultant.

So within the last year or so, because of COVID, the only that I've had come through my door has been the expert witness work.  But I am hopeful that with placing the patent, that situation is definitely going to change.

Q    Well, I guess COVID's been going on for about two years now.  How long has expert work been your only source of income?

A    Let's see.  Well, for sure, I -- I left CRL in 2017, to pursue the patent.  So since 2017, I haven't had gigs other than, you know, expert witness because I've been focused all on making sure the patent gets out and done.

Q    Is it fair to say that in the past five years, 100 percent of your income has come from serving as an expert witness in litigation cases?  Would that be a fair --

A    If not 100 percent, then a -- a pretty fair -- high level of that.  Be -- but I expect that to change.

Page 138

MR. GUTSCHENRITTER:  That's all the questions I have.

Thank you.

THE WITNESS:  Thank you.

MS. SHOEMAKER:  No questions from me.

THE WITNESS:  No questions?

MS. SHOEMAKER:  I'm going to try to dash and make a flight.  So Kevin's going to stay on to finish up any details.  Is that okay with everybody?

MR. GUTSCHENRITTER:  It is.  Yeah.

And I assume, for the court reporter, Kevin can probably take care of orders, and stuff like that.  So you guys can get going.

MR. ABERNETHY:  Yeah.

MS. SHOEMAKER:  That was my hope. Okay.  Thanks, everybody.

MR. GUTSCHENRITTER:  All right.  Thank you.

THE REPORTER:  All right.  Okay.  I -- I didn't realize that Ms. Dolan would also be --

MR. WISEBRAM:  She left, too.  Oh.  No.

MR. ABERNETHY:  Because it was Bowen. They used her computer, so.

THE REPORTER:  Okay.  All right.  Well,

she did tell me, in the beginning, that she would definitely read and sign.  And so the next order of business would be orders.

So Mr. Abernethy, I -- I believe that ball is in your court to decide if you're going to place an order for the transcript?

MR. ABERNETHY:  Yeah.  We'll place an order both in electronic and hard copy, please.

THE REPORTER:  Okay.

And Mr. Gutschenritter?

MR. GUTSCHENRITTER:  We'll just do an E-tran copy, please.

THE REPORTER:  Okay.  All right.

MR. GUTSCHENRITTER:  And Ms. Flanders, would you mind?  I got a little disorganized as we were going.  Would you mind sending me an e-mail of my exhibits, and I will get that right back to you?

THE REPORTER:  Yes, sir.  I will definitely do that as soon as we're off the record.

And I'm going to try my best to get the proper noun spellings from the exhibits because Ms. Dolan is no longer with us to help me with that.  Do you think that that's a good solution?  I think that most of them should be available in the exhibits.  Is that correct?

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 140

MR. GUTSCHENRITTER:  Well, I think so.
Yes.  I think the answer to that is "Yes."  And to the
extent that you have questions, I mean you could send
an e-mail to Bowen, and myself, and we could help you.
For sure.

THE REPORTER:  All right.  I will
definitely do that.  All right.  So thank you for
that.  And I'll go over the exhibits with you once
we're off the record.

But we are off the record at 3:29 p.m.

(Signature reserved.)

(Whereupon, at 12:29 p.m. PDT/

3:29 p.m. EDT, the proceeding was

concluded.)

Page 141

CERTIFICATE OF DEPOSITION OFFICER

I, LATICE FLANDERS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Latice S. Mitchell*

                    LATICE FLANDERS

                    Notary Public in and for the

                    State of Georgia


[X] Review of the transcript was requested.

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 142

CERTIFICATE OF TRANSCRIBER

I, CORA SMITH, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CORA SMITH

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 143 of 315
Vera F. Dolan, MSPH FALU                        August 26, 2022
Barwick, James v. United States of America

Page 143

Vera Dolan, MSPH, FALU

dolanvp@consultancy.com

September 13, 2022

RE:    Barwick, James v. United States Of America

8/26/2022, Vera F. Dolan, MSPH FALU (#5379088)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-southeast@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 144

Barwick, James v. United States Of America

Vera F. Dolan, MSPH FALU (#5379088)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Vera F. Dolan, MSPH FALU                            Date

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 145 of 315
Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

Page 145

Barwick, James v. United States Of America

Vera F. Dolan, MSPH FALU (#5379088)

ACKNOWLEDGEMENT OF DEPONENT

I, Vera F. Dolan, MSPH FALU, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____    _____

Vera F. Dolan, MSPH FALU                      Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20___.



                    _____

                    NOTARY PUBLIC

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

**[06/15/2020 - 5379088]**                                    Page 1

| | | | |
|---|---|---|---|
| **0** | | | |

**06/15/2020** 5:5
**07/08/2022** 4:9
**07/14/2014** 4:23
**09/2014** 5:11

**1**

**1** 4:7 5:10 12:5,7 85:9
**10** 26:16 31:11
**10/10/2014** 4:20
**10/14** 86:3
**10/14/2019** 4:12
**10/15/2019** 4:15
**10/28/2019** 4:18
**100** 45:16,25 46:9,12 137:20 137:23
**11** 66:16
**11.1** 47:21,25
**11:18** 1:14 6:5
**11:35** 18:12,15
**11:45** 24:25
**11:47** 25:3
**12** 4:9
**120** 28:4
**126** 4:20
**12:13** 43:18
**12:29** 140:12
**12:30** 43:12
**12:33** 43:21
**13** 143:3
**13.9** 47:22,23
**132** 5:11
**134** 4:23 5:5
**14** 57:7 58:7,18 65:24

**144** 1:8
**14th** 57:12,17 59:22 69:11 70:19 78:12 80:5 85:3,21,25 130:11 132:5
**15** 26:16 43:12 58:8 70:9,19 74:16
**15th** 57:13,18 75:19 76:18 78:3,8,13 80:1 80:17 81:11 85:4 86:6,15,23 86:24 87:9,13
**16.9** 47:21,25
**17** 80:12
**18** 5:5 12:15 22:25 23:3 134:22
**19** 117:12
**1980s** 27:17,19 27:25 28:5
**1981** 13:5
**1998** 13:10
**1:21** 1:8
**1:56** 96:8

**2**

**2** 4:10,12 19:13 32:21 42:17 69:21,23 80:12 80:20 84:23 85:2
**20** 21:2 145:15
**2014** 123:20,21 130:11 133:2

**2016** 42:18 114:1
**2017** 14:21 15:2 94:16 95:7 115:9,25 137:15 137:15
**2019** 35:17 36:4 36:11 48:9,19 49:16 52:25 57:7,13 58:18 65:24 66:16 70:10 82:21 85:5 115:9,25
**2020** 26:23 29:5 44:10 117:5
**2022** 1:13 6:8 117:6 143:3
**229** 2:6
**2399** 80:10
**23rd** 83:8
**24** 12:16 71:21 77:17
**2500** 2:6
**25552** 141:16
**26** 1:13 6:8 9:12 11:23 24:17 25:7 32:11 42:14,17 124:1
**26421** 142:14
**266** 66:17
**27th** 24:19
**28** 22:9 82:21 85:5
**29th** 24:19 132:7
**2:08** 96:11
**2:33** 113:20
**2:36** 113:23
**2:45** 118:20

**2:54** 118:23

**3**

**3** 4:13,18 51:3 80:23 84:17 85:3,6 89:7 93:1
**30** 32:15 35:12 45:4 66:18 143:17
**300** 2:18 22:1,3,9 22:13
**30303-1701** 2:7
**31202** 2:19
**333** 1:17
**35.09.** 66:17
**350** 45:9,10
**3:20** 136:17
**3:24** 136:20
**3:29** 140:10,13

**4**

**4** 4:16 72:25 73:16 84:24 85:4,6 92:24 93:3,6 94:15 96:13
**400** 2:18 19:5,12
**404** 2:10
**46** 4:9 11:14 12:4
**478** 2:22

**5**

**5** 4:19,20 114:12 126:4,5
**500** 19:5,12
**5000** 1:18
**52** 4:23
**5379088** 1:21 143:5 144:2

800.808.4958                                            770.343.9696

Case 1:21-cv-00144-LAG Document 21-4 Filed 02/13/23 Page 147 of 315
Vera F. Dolan, MSPH FALU
August 26, 2022
Barwick, James v. United States of America

**[5379088 - admitted]**

| | | | |
|---|---|---|---|
| 145:2 | 70:16 82:20 85:5 117:20 | **academy** 13:9 96:23 97:6 98:9 103:14,17 108:2 108:11 110:3 115:12 | 142:12 |
| **6** | **abernethy** 2:15 7:7 10:1 18:5,9 30:17 31:20 85:8,13 111:25 138:15,23 139:4 139:7 | | **actions** 130:18 |
| **6** 4:15,21 44:10 134:11,13 | | | **active** 22:5 23:5 |
| **621-2630** 2:22 | | | **actively** 15:2 16:16 100:6 |
| **658-9070** 2:10 | | **accept** 17:14 42:8 | **activities** 13:13 14:10,11 15:25 16:12 136:24 |
| **69** 4:12 79:22 | | **acceptable** 112:3 | |
| **7** | **ability** 141:10 142:7 | **accepted** 17:16 42:7,9,22 98:21 101:9 110:6 | **activity** 16:16,18 |
| **7** 5:3 134:12,13 | **able** 23:3 37:18 39:25 58:14 80:18 126:11 132:22 134:4,16 135:3,13 136:4 137:1,4 | | **actual** 32:9 73:14 |
| **703** 134:24 | | **accident** 94:17 | **acute** 49:12 67:16,23 112:16 113:6,6,11 114:14,18 |
| **77** 55:23 79:22 | | **accidents** 114:20 | |
| **8** | | **accommodate** 8:22 | |
| **8** 4:3 35:17 36:4 36:11 42:18 48:9,19 49:16 | **abnormal** 27:15 28:21 29:17 79:23 80:10 89:8 92:15,19,21 93:7,11 | **account** 49:11 | **add** 17:24 33:22 |
| | | **accuracy** 69:4 143:9 | **addiction** 135:15 |
| **8/26/2022** 143:5 | | **accurate** 12:13 12:17 22:2 133:22 141:9 142:5 | **additional** 11:2 34:15,23 46:12 48:12 |
| **80** 20:25 | | | |
| **80s** 28:1 | **abnormality** 83:5 84:6 87:21 | | **additionally** 6:14 |
| **85** 4:15,18 | | **acknowledge** 49:25 51:17,21 74:7 81:10 83:18 90:6,8 92:8 104:17 106:3 | **additions** 12:19 145:6 |
| **89101** 1:19 | **abnormally** 93:13 94:3 | | |
| **8:18** 1:14 | | | **addressed** 31:4 75:25 128:6 |
| **8th** 36:6 37:1 49:3 50:3 | **abscesses** 72:25 73:16 | | |
| | | | **adjacent** 72:25 73:17 |
| **9** | **absent** 6:14 | **acknowledge...** 145:3 | |
| **9** 83:9 | **absolutely** 81:10 118:2 | **acknowledgm...** 143:12 | **adjusted** 9:11 48:16 |
| **9:30** 43:15 95:22 | | | |
| **9th** 83:16,17 | **abuse** 53:7 56:18 65:15 68:8 79:16,17,21 89:13 99:16 108:1,3,4 110:25 115:14 | **acknowledgm...** 6:11 | **administer** 6:11 |
| **a** | | | **admission** 131:17 |
| **a.m.** 1:14,14 6:5 18:12,15 24:25 25:3 | | **acquiring** 14:24 | **admit** 134:23 |
| | | **acronym** 30:12 | **admits** 102:23 |
| **a1c** 90:23 91:9 | | **action** 1:6 141:12,16 142:8 | **admitted** 34:12 115:1 129:14 |
| **abdomen** 55:20 69:5 | **abusing** 91:5 | | |
| **abdominal** 59:11 59:24 60:6,12,21 | | | |

Vera F. Dolan, MSPH FALU
August 26, 2022
Barwick, James v. United States of America

**[adrenals - apparently]**

Page 3

**adrenals** 83:6
**adult** 30:1,2
**advantage** 5:4
**adverse** 9:13
  55:22 56:24
  70:13 71:11,13
  71:18 72:1
  78:17,18,21,22
  79:3 81:8 86:2
  86:20 87:18,21
  88:3,4,19 89:3
  97:9 106:22
  108:8
**advert** 71:11
**advertise** 17:7
  17:20 18:19
  134:1,2,3,22
  135:18
**affect** 36:9 74:19
  96:18 116:9
**affidavit** 4:19
  5:10 121:11,13
  121:17 122:2
  123:18,22
  124:17,25 126:3
  127:3,13 129:5
  129:10 132:3,23
  133:2,12,12,20
**affidavits** 125:2
**africa** 121:20,20
  126:12
**african** 121:14
  126:11 127:5,13
**africans** 121:25
**ag** 92:6,8
**age** 27:25 28:10
  28:17 29:16
  30:2

**agent** 41:14
**ago** 55:23 58:21
**agree** 6:12,16
  39:2,4 70:20
  75:20 82:14
  91:1,23 92:4,6
  93:13,19,23
  117:21 119:14
**agreement** 7:25
**ahead** 24:25
  49:8 66:12 72:6
  109:11 129:20
**al** 4:22
**albany** 1:3 32:24
  32:25 33:3
  57:10,13 86:6
**alcohol** 40:14,15
  42:6 44:14
  51:14,17 52:1,8
  52:15 53:5,7,13
  53:23 54:5,13,16
  54:21 55:4,10,13
  57:24 59:7,9
  60:7 65:15 68:8
  69:10 70:9 71:7
  71:24 72:9,15
  73:3,4,6 74:20
  75:7,17 77:2
  81:12,21 82:4,7
  82:9,13 83:20
  86:10 89:21
  91:5 92:18
  94:20,25 95:3,10
  95:16,19 96:24
  97:1,4,10 99:16
  99:24 100:12,17
  100:19,25
  101:16 102:3

103:7,9 104:12
104:15,16,18,25
105:1,4,7 107:2
107:5,9,10,16,18
107:25 108:3,4,9
108:9,17,23,25
109:5,17 110:2,4
110:8,14,18,22
110:25 111:1,23
112:9,16,22
113:7,9 114:10
114:22,24 115:1
115:3,8,10,14,17
115:17,20,21,22
115:25 117:7
**alcoholic** 99:3
**alcoholics** 99:6,8
**alcoholism** 42:3
  42:5 110:10
**alert** 71:13 97:2
**alex** 29:1
**alkaline** 90:4
**allegation** 125:9
**allegations** 24:7
  120:23 130:12
**allotted** 143:20
**allowed** 7:25
  28:8 62:4,6
  122:1
**allows** 28:9
**alm** 18:23 19:10
  19:11
**alt** 89:16,17
**ama** 52:10
**america** 1:8 2:12
  6:8 7:8 143:4
  144:1 145:1

**american** 44:9
  51:25 52:2,5
  111:16
**amount** 68:8
**analyses** 29:17
**analysis** 15:22
  16:13 27:22
  28:10 48:22
  75:6 87:25
  98:23 107:13
  111:14,19
  116:15
**analyze** 37:13
**analyzed** 92:12
**analyzing** 27:20
**annual** 18:25
  19:2,3
**answer** 8:18,24
  37:1 38:14 42:1
  62:4,5 66:10
  102:18 111:8
  140:2
**answered** 24:10
  50:5 55:7 75:9
  77:7 82:16
  101:24 102:9
**answering**
  102:12
**answers** 8:21
  11:24
**anticipate** 50:25
**anybody** 28:9
**anyway** 129:8
**apologies** 79:16
  79:19
**apparently**
  85:16

Vera F. Dolan, MSPH FALU                                    August 26, 2022
Barwick, James v. United States of America

**[appear - aware]**                                                    Page 4

| | | | |
|---|---|---|---|
| **appear** 15:15 63:10,16 65:13 | 74:16 75:2,24 76:1,7,11 77:25 | 104:18,21,24,25 105:1,4,6,7 | **attorneys** 15:13 23:14 123:24 |
| **appears** 16:24 55:10 | 79:24,25 80:6,12 80:14,21,23 81:4 | 106:10 107:5,9 107:10,18 | 134:25 **attributable** |
| **appended** 145:7 | 85:22 86:7,9 | 108:17,23,25 | 104:7 |
| **appendicitis** 50:16 | 88:5 119:14 **aside** 16:10 | 109:5 112:16,17 112:21,22 114:4 | **aud** 73:3 75:20 77:5 78:5,15 |
| **appendix** 35:22 48:20 49:2,10,15 | **asked** 11:6 15:23 24:9 32:3 35:15 | 114:20 117:7 **association** | 79:11 84:8 85:20 86:17,25 |
| 49:19 50:2,16,22 51:1 60:23 | 40:12,13 43:24 50:4 55:6 61:11 | 51:25 52:2,6 91:8 | 87:25 88:14 92:13 94:5 |
| 67:11,16 **applicable** 6:20 | 61:13,18 62:18 75:8 77:7 82:15 | **assume** 8:4,25 105:19,23 | 96:19 99:1 100:3 101:22 |
| 106:4 143:8 **applied** 48:13 | 101:23 102:8 103:20 104:13 | 109:18 130:22 132:16 138:12 | 103:3 104:8 106:5 114:17 |
| **appreciate** 133:3 **approximately** | 123:13 131:2,6 131:15 | **assuming** 106:2 **ast** 89:15,17 | 115:11 116:4,12 116:21,25 |
| 19:3 21:16 22:13,23 23:4 | **asking** 8:16 16:15 41:3,5 | **atec** 121:22 **atlanta** 2:7 25:17 | **audio** 141:8 142:3 |
| 72:25 | 47:2,3 48:3 49:25 55:21 | 41:10 **attached** 5:6 | **august** 1:13 6:8 24:19 42:18 |
| **area** 57:10,13 86:6 | 61:23 62:13,14 63:15,18 81:20 | 129:5 143:11 **attempt** 127:6 | **aul** 103:14,16 **author** 97:21 |
| **areas** 38:16 **arie** 32:24,25 | 90:5 101:17 **asserting** 31:23 | **attend** 39:13 47:6 | **authored** 24:2 44:11 103:18 |
| **arrive** 48:5 **arriving** 128:4 | **assessment** 99:20 106:25 | **attendance** 7:2 **attention** 36:2 | 134:18 **authoring** 22:14 |
| **art** 40:25 **article** 98:4 | **assigned** 6:3 **assignment** | 96:20 119:21 **attorney** 10:15 | **authoritative** 103:1 |
| 100:14 101:19 101:25 126:18 | 49:23,25 50:12 **associated** 27:9 | 17:10 32:1 34:18,24 41:13 | **authority** 30:5,7 **authorized** 6:10 |
| **articles** 9:20,22 9:25 10:3,7,23 | 59:20 66:25 68:21,23 86:9,10 | 141:14 142:10 143:13 | **automated** 16:4 **available** 54:4 |
| 10:24 11:2 **ascites** 55:18,20 | 90:19,19,21 91:10 95:16 | **attorney's** 1:16 2:16 3:4 6:9 | 62:23 127:5 139:24 143:6 |
| 58:5 59:14,19,25 60:3,15 63:25 | 97:1 100:11,12 101:4 103:7 | 9:22 10:10 30:24 34:22 | **aware** 33:8 36:15 91:14 |
| 64:16 65:3 68:9 68:11,13,14 73:5 | 104:10,11,15,17 | | 111:15 118:25 |

800.808.4958                                                    770.343.9696

**[aware - bringing]**                                                      Page 5

128:11

**b**

**b**  4:5 5:1 89:8
  92:18 93:2
**ba**  39:14
**back**  8:20 18:14
  25:2 27:6 28:1
  30:15 32:17
  43:20 73:9
  79:17 89:6,12
  94:8,15 96:10,17
  109:10,14
  113:22 114:15
  114:20 118:16
  118:22 133:23
  136:19 139:17
**bad**  72:3
**badger**  112:1
**bag**  36:16,20
  37:6,21
**ball**  139:5
**barack**  120:13
  130:15
**barwick**  1:5 2:2
  4:11,14,17 6:7
  9:15,17 33:6,9
  35:16,21 36:16
  38:6 47:20 48:6
  49:1 50:2 51:6
  51:14 52:23
  53:20 54:5
  55:13 58:17
  59:6 65:4,24
  66:14 67:11
  73:11 74:20
  75:7 83:19 95:3
  95:18 97:4 99:1

100:3,5,15 101:4
101:16 104:17
105:3,9,25
106:13,23
108:16,25 113:1
113:9 114:23
115:9 118:3
119:1 143:4
144:1 145:1
**barwick's**  9:18
  33:3,5,13 48:19
  53:12 54:16
  63:7 76:16
  86:13 87:18
  104:6 108:10
  109:19 110:11
  110:14,17,21
  111:4,15 112:8
  116:5 117:9
**base**  28:3 48:14
  112:9
**based**  54:3 67:9
  85:17 123:15
  127:11
**basically**  15:18
  29:6 42:4
  135:25
**basing**  109:18
**basis**  31:23 37:9
  68:4 98:22
  110:22
**bates**  69:16,18
  80:10,12
**batesed**  69:20
**beer**  115:20
**beginning**  139:1
**behalf**  2:2,12 7:4
  22:20 120:5

124:25 132:19
**belief**  127:3
**believe**  11:15
  21:7 23:9,12
  30:22 37:19
  44:20 53:1 54:5
  54:19 55:3
  61:24 85:24
  108:24 110:1,9
  110:14 111:2
  121:14 127:7,13
  139:4
**believed**  127:5
**believes**  52:12
**benefactors**
  130:15
**benefit**  134:3
  135:18
**best**  139:20
  141:10 142:6
**better**  45:7
  54:20
**beyond**  10:24
  83:7,16 89:24
**big**  28:10
**bill**  45:14
**billable**  45:8
**billed**  45:2,5,6
**billing**  31:13
  32:7
**billionaires**
  130:14
**bills**  31:3,16
**biopsy**  118:11
  119:11
**birther**  122:4
  123:10

**bit**  111:7
**bloating**  59:11
  59:24 60:6,12,21
**blood**  27:5,21,22
  93:12
**bmi**  66:17,18
**bone**  92:3
**bones**  88:8,9
  95:10 96:18
**border**  121:3,5,8
  127:15,22 128:7
  128:14 129:17
  130:2 131:5
  132:2
**borders**  128:19
  128:20
**bottom**  42:17
  47:25
**boulevard**  1:17
**bounded**  47:24
**bounds**  111:7
**bout**  104:21
**bowen**  2:13 7:6
  18:6 119:5
  132:23 133:2
  138:23 140:4
**bowen.shoema...**
  2:20
**break**  43:8,12
  95:21 96:2
  113:15 118:16
**breath**  114:1
**breezed**  26:8
**briefly**  23:17
**bring**  134:4
**bringing**  130:18
  133:19,22

**[broken - chronic]**

Page 6

**broken** 82:3 86:22 87:2 88:8 88:9 95:10 96:18

**broker** 17:11

**brokers** 17:5

**brought** 128:25

**bug** 114:3,7,8

**burwell** 42:18,19

**business** 14:1,6 15:1 52:3 98:15 139:3

**businesses** 17:19

**c**

**c** 2:1 3:1 5:8 6:1

**calculated** 9:18

**calculates** 9:11

**calculating** 16:17

**calculation** 16:12 48:15 116:5

**calculator** 16:5

**california** 42:20

**call** 41:11

**called** 7:18 27:11

**calls** 106:7

**campaign** 130:16,17

**capacity** 16:13 20:11 21:6,11,12 21:17 38:17 41:16 62:10 122:20 136:23

**car** 104:22

**cardiomyopathy** 112:22

**care** 32:25 36:12 57:11 61:4 75:24,25 76:2,3 138:13

**career** 8:11 20:16

**carolina** 13:4

**carrying** 121:25

**case** 11:16 20:6 22:15 23:23 24:8 25:6,8,23 32:14,22 33:10 33:17 34:13,21 37:17 40:14 42:11,25 44:7,8 44:11,12,14,17 44:18,21,22,24 45:2,3,14 46:22 47:18 54:3 75:14 78:23 104:4,6 105:9 119:22,25 120:6 120:19,22,23 123:2,16,20,23 124:6,20 125:9 127:9,11 130:3,4 130:10 132:5 135:13 136:3

**cases** 18:20 19:14 20:20,25 21:2,4,9 22:3,5,7 22:9,11,13,17,23 23:5,7,11,13,15 23:18,22,25 24:3 44:2 47:11 115:15 123:15 137:21

**cat** 4:13

**category** 79:16 79:20,22 89:13

**caught** 121:3

**cause** 62:25 64:5 65:16 68:10 92:3 106:17 113:11 114:5,9 114:10,11

**caused** 92:9 94:4

**causes** 38:3,4,4 68:7

**causing** 66:21 73:16 95:9,11 114:7

**cc** 114:13

**center** 32:25 33:2 133:15

**certain** 30:2 56:1 122:14

**certainly** 32:5 53:21 84:7

**certainty** 28:19

**certificate** 141:1 142:1

**certification** 12:25 13:11

**certifications** 12:23 14:23

**certified** 6:17

**certify** 141:4 142:2

**change** 8:20 16:21 77:23 137:10,25 144:4 144:7,10,13,16 144:19

**changed** 30:5,5

**changes** 12:19 143:10 145:6

**chapel** 13:4

**chapter** 96:23

**characterize** 135:24

**characterized** 90:18 116:24

**charge** 17:11,24 18:25 19:12 45:18,19,25 46:8 46:13

**charges** 19:8

**charlson** 9:17

**charts** 28:16

**cheap** 130:18

**check** 12:14 20:2 25:12 124:16

**checking** 12:14

**cherry** 75:14

**chest** 114:15,21

**chief** 29:1

**children** 30:2 121:2

**chloride** 90:3,25 91:13 92:21 93:7,19

**cholesterol** 27:6 27:8,12,14 29:18

**cholestytus** 79:24 80:11

**chose** 88:13

**chronic** 67:23 92:20 93:6 96:17 98:24 99:15 103:21 109:25

**[chronology - conditions]**                                          Page 7

chronology  81:1
circumstances
  34:14
cirrhosis  55:19
  58:5 59:19,20
  63:2,8,10,16,25
  64:1,4,6 65:3,12
  68:11,23 73:5,12
  73:14 83:11
  86:9 87:22 88:5
  117:16,20 118:4
  118:10,13 119:2
  119:7
cited  10:23 11:4
city  23:10,13,19
  24:4,8
civil  1:6 8:1
claim  44:16,19
  55:25
clarify  10:19
  57:16,22
clarifying  34:4
clarity  69:17
  70:2
classes  39:13
classical  54:16
clear  38:18
  40:20 82:2
  85:15 86:14
  98:16 125:8,17
clears  20:2
cleo  30:9,10,13
clerk  3:6
client  33:6 89:21
  91:5 111:20
client's  33:8
  110:2

clients  14:8
  19:22
clinic  33:2
closed  117:11
  127:15 128:18
closely  36:2
closure  128:6
clsi  30:8,10
collected  28:1
  88:3
collecting  71:10
collective  101:3
  101:7
collectively
  64:24 75:13
  95:2,18 99:23
  100:5 101:5
college  27:20
collision  94:21
columbus  23:9
  23:13,19 24:5
column  79:15
come  29:3 35:15
  43:12 45:13
  46:23 47:6
  48:15 64:6
  108:14 117:4,6
  118:16 121:4
  122:18 130:1
  131:4 137:7,20
comes  27:6
comfortable
  132:19
coming  64:22
  121:2,9 128:13
  129:17 130:2
  132:1

committing
  53:13
common  33:19
  34:7
commonly  90:17
communicable
  128:25
communications
  32:1
community
  52:11
comorbidities
  51:15 116:8
comorbidity
  9:17
companies  15:15
  15:16,17,19
  28:23
company  18:3
  18:19
compared  36:21
  103:23
compensation
  32:6
complaint  32:23
  33:16,18 34:6,7
  34:21 59:10
  120:16 129:6
  130:10,12,22,22
  131:10,15,19,21
  131:22 132:10
  132:11,17
  134:10
complete  135:8
  136:5 145:8
completed
  143:17

completely
  123:3
comprehensive
  20:9
computer
  138:24
computer's  43:9
con  129:25
concept  29:2
concern  53:21
  69:14 133:15,16
concerned  44:14
  54:25 129:16,24
  131:2 133:18,21
concerning
  69:10 70:9
  87:25 88:13
  106:4,5 115:2
  125:14
concerns  129:22
concluded
  140:14
conclusion  12:3
  47:18 107:12
  108:15 123:19
conclusions
  92:13 126:10
condition  50:11
  51:18,19,22 52:1
  52:15 55:22
  56:25 67:23,24
  71:12,19 86:2
  88:4 94:4
  106:22 117:17
  133:20
conditions  9:13
  34:11 36:6,12,14
  37:12 48:13

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 153 of 315
Vera F. Dolan, MSPH FALU          August 26, 2022
Barwick, James v. United States of America

**[conditions - court]**

Page 8

49:13 62:24
65:16 70:14
71:13 72:1
78:17 79:4 88:5
88:20 89:3 97:1
97:10 106:17
108:8 114:16
117:7 121:18
131:18 132:14
136:4
**conducted**  69:8
**confess**  97:16
**conjunction**
15:11,12 60:13
60:14,15,15 95:1
**connected**  33:17
107:16
**connection**  18:6
32:22 67:25
68:25 69:1
**consequence**
65:20
**consider**  36:5,8
48:20 60:7
71:23 86:16
91:3
**considered**
27:13,15 92:12
**considering**  61:6
**considers**  111:16
**consistent**  36:13
44:23 57:20
58:22 60:22
63:25 64:1,21
65:3 70:11
72:22 81:22
82:8,9 101:8
102:2 103:9

104:10 107:1,2
107:14,15
108:10 109:5,7
110:7,18 113:7
115:23 116:1
117:8 127:9
129:3
**consistently**
106:11
**consists**  55:25
**constitute**  6:24
73:2
**constitutes**  30:4
**consult**  22:16
**consultancy.com**
143:2
**consultant**  14:2
22:17 137:5
**consulted**  10:3
**consulting**  13:22
13:24 14:1,12,15
**consume**  115:25
**consumption**
111:1 115:8,19
**cont'd**  3:1 5:1
**contained**  103:2
106:3
**contend**  55:12
78:4 86:25
**contention**  121:3
**contestable**
44:16,19
**continuing**  13:12
13:19
**contracted**
121:23
**contradict**  77:9
77:11

**contradicts**
77:17
**contributed**  24:4
**contributing**
94:20 95:11
**control**  128:25
**conversation**
79:8 125:20
**copies**  56:22
143:14
**copy**  5:10 11:18
12:13,17 97:16
132:22 133:1
139:8,12
**cora**  142:2,15
**correct**  8:5
12:20 16:25
17:1 19:15 20:8
20:17,18 22:21
33:14,15 35:17
35:18,23 38:19
38:23 39:18,22
40:2,10,23 41:12
44:12,13,15
45:12 46:23
47:7,8,22 49:17
49:18 50:9,17
52:25 53:3,7,8
55:15 58:21
61:9 64:5 65:25
66:19 70:10,17
73:12,24 74:12
75:2 77:18 79:9
81:2,6 84:8
85:18 86:17
89:18 91:20
98:6,18 102:7
104:19 105:5,7

106:5 107:9
113:12 117:17
119:2,8,12 120:9
120:10 121:11
121:15 122:4
124:22 125:10
125:23 127:15
128:7 130:7,24
134:6,7,24 135:6
135:16,17,22
139:25 145:8
**corrections**
145:6
**correctly**  51:10
87:17,19 127:8
128:9
**correlated**  92:6
**correlation**
93:22
**cough**  125:16
**counsel**  7:22,25
10:16 96:21
141:11,14 142:7
142:10 143:14
**count**  19:22 22:2
**county**  42:20
**couple**  20:15
32:18
**course**  8:11
31:25 35:3,19
50:6
**court**  1:1 8:13
12:3 21:22
23:11 24:13,14
34:17 41:18,24
42:4,7,19,22
43:3,4 47:10,12
52:14 84:16

**[court - depositions]**                                          Page 9

| | | | |
|---|---|---|---|
| 94:8 129:1,14,15 132:7,9 138:12 139:5 | **crum** 25:18 | **damage** 113:5 | **define** 118:10 |
| **courthouse** 46:22 47:4 | **cs** 143:15 | **danger** 121:6 131:3,24 132:1 | **definitely** 78:18 98:13 137:9 139:2,19 140:7 |
| **courtroom** 122:19 | **ct** 57:17 69:4 70:10,16 71:6,20 72:13 73:20,21 73:24,25 74:8,10 74:15 75:19 76:18 77:16 78:3 80:17 81:11 82:20 83:11 84:20,24 85:4,5 86:14,24 87:9,13,16 88:11 117:20,25 118:11 | **dash** 138:8 | **definitively** 118:10 |
| **cover** 69:9 | | **data** 28:1,7,10 | **degree** 13:1 |
| **coverage** 127:4 | | **date** 1:13 12:15 12:15,20 20:14 31:18 36:11 48:21 50:17 70:1 144:24 145:12 | **degrees** 12:23 |
| **covered** 69:12 | | | **dehydration** 91:23 92:3 103:21,23 104:6 104:9,11 |
| **covid** 28:24 29:5 29:5,8 45:16,17 45:18,20 46:1,3 117:12 128:18 128:20 129:12 137:4,7 | | **dated** 80:17 | **denial** 115:8 |
| | | **day** 26:23 29:4 48:17 49:11,13 66:14 70:16,19 75:23 76:11,22 76:23,25 145:15 | **denied** 115:19 |
| **covid's** 137:11 | **cure** 126:23 127:4 | | **dentist** 121:1 |
| **cramps** 104:14 104:16 106:10 106:12,14,18 107:1,5 109:2,3 109:3,4,17,20,23 109:24 110:7,18 112:7,10,18,20 112:21 113:3 | **curiosity** 31:24 | **days** 55:23 143:17 | **denying** 115:9 |
| | **current** 16:15,16 16:18 29:14,19 51:15 116:8 | **de** 130:17 | **department** 30:21 |
| | | **deadly** 127:22 | **depend** 48:16 |
| | **currently** 23:5 29:9 60:23 | **deal** 28:24 | **depended** 15:23 |
| | | **dealing** 125:4 | **depending** 34:22 |
| | **cursor** 82:23 136:2 | **decades** 37:18 | **depo** 11:1 |
| **creatinine** 89:22 90:4,18 92:4 | | **deceased** 42:8 | **deponent** 143:13 145:3 |
| | **customers** 28:23 | **december** 117:5 | |
| **credential** 13:7,8 13:14 | **cut** 8:19 45:10 72:7 | **decide** 139:5 | **deposed** 22:9 23:24 |
| | | **decision** 62:16 | |
| **credentials** 38:16 | **cv** 1:8 9:12 11:18 11:22 12:10,13 12:17,19 13:22 16:23 17:7 19:14 124:9 | **declare** 145:4 | **deposing** 143:13 |
| | | **decrease** 37:5,20 | **deposition** 1:11 6:6,22 7:24 8:8 12:4 19:21,25 31:10 33:4,5,9 33:13 44:9 48:7 51:6 69:22 112:5 117:2,9,13 124:2 126:4 131:9 141:1 |
| **credibility** 122:8 122:14,18 | | **decreased** 36:21 90:25 | |
| **critical** 56:3 | | **deemed** 145:6 | |
| | **d** | **defendant** 1:9 2:12 120:13,18 136:6 | |
| **crl** 137:14 | | | |
| **cross** 91:7 127:22 | **d** 2:15 4:1 5:8,8 6:1 115:7 | | |
| | | **defendants** 120:11,15 | **depositions** 8:11 21:16 33:13 |

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

**[derive - disorganized]**                                      Page 10

**derive** 14:17
**derived** 136:23
  137:3
**describe** 136:2
**described** 15:25
  21:10 26:25
  29:12 90:7
**description** 4:6
  5:2,9 32:3
**designed** 16:4
**dest** 124:1
**detail** 37:14
**detailed** 57:19
**details** 35:14
  138:9
**detect** 107:25
**detecting** 101:10
  108:3
**determination**
  86:16
**determine** 50:15
  54:12 87:7 94:2
  104:5 108:8
  125:3
**determining**
  71:23 89:20
**develop** 15:10
  40:6 66:21
**developed** 15:12
  125:16
**developing**
  26:10 68:8,13
**development**
  14:6,6 15:19,21
**devon** 3:6 7:7
**diabetes** 9:18
  51:15 66:2,21,25
  67:1 68:12,16,24

69:1 90:18,20,21
90:23 91:3,8,10
91:22 104:11
116:7,13
**diabetic** 90:24
  93:18,23 104:7
**diabetics** 90:11
  91:12 93:12
  103:22
**diagnose** 41:8
  53:14,22 107:17
**diagnosed** 35:21
  35:23 51:6
  52:16 53:5
  104:18 105:4,12
**diagnoses** 38:23
  39:1,18 60:7
  107:21
**diagnosis** 15:9
  39:3,6 41:19,25
  42:6,22,25 52:8
  53:10,12 54:21
  55:2,4 61:9,15
  61:17,18,25 62:1
  62:7,15,16,20,22
  84:8 105:20
  106:9,24
**diagnostic** 4:16
**died** 136:7
**difference** 72:22
**different** 9:16
  14:9 28:15
  29:18 36:1
  52:24 53:2,2
  55:3 100:9
  105:16 106:17
  128:24 133:11

**differential**
  106:24
**digital** 141:8
  142:3
**direct** 61:21
  65:12 75:12
  96:20
**directed** 10:15
**directing** 103:4
**directly** 77:16
  80:8 104:25
  112:11 125:19
**disability** 98:25
  99:7
**disagree** 39:4,5,8
  54:6 68:5 75:20
  82:14 91:1,23
  92:4 93:13,19,24
  117:21 118:5
**disappeared**
  76:2
**disclose** 108:5,6
  115:14,17
  123:23 124:9
**disclosed** 54:17
  132:14
**disclosure** 33:25
**disclosures**
  31:14
**discovery** 28:8
  29:23 34:16
**discussed** 35:20
  117:2 119:15
  136:25
**discussing**
  116:21
**disease** 59:17,18
  60:2,17 61:15

62:1,17 63:24
64:3,15 65:2
67:17,23,24
68:22 114:4
121:4
**diseases** 128:25
  129:22 132:2
**dismissed** 130:7
**disorder** 42:6
  44:15 51:15,18
  52:1,8,15 53:6
  53:13,23 54:6,13
  54:17,21 55:5,10
  55:13 57:24
  59:7 60:8 69:11
  70:9 71:8,24
  72:9,15 73:3,5,6
  74:20 75:7,17
  77:2 81:13,21
  82:5,7,9,13
  83:20 86:10
  89:21 92:18
  94:25 95:3,16,19
  96:24 97:2,5,11
  99:24 100:12,17
  100:20,25
  101:11,16 102:3
  103:10 104:12
  105:2 107:3,16
  108:9 109:18
  110:2,5,8,15,19
  111:23 112:10
  113:8,9 114:22
  115:3,17,22
  117:8
**disorders** 33:2
**disorganized**
  139:15

**[dispute - entirety]**

dispute 67:13
disputed 34:9
  44:19
disputing 68:3
disruption
  126:16
dissolving
  112:24
distended 55:20
distinct 21:15
distinguish 43:3
district 1:1,2
  2:17 30:24,25
  45:14 122:16
disturbances
  90:17
diuresed 76:9
division 1:3
doctor 38:18
  39:3,10 40:8,22
  41:6,7 50:8,18
  52:7,16 54:12,20
  54:22 55:4
  61:19 64:15
  68:3 107:19
  117:25 118:6
  119:1,6,10
doctors 53:5,10
  54:2,23,24 108:5
  115:14,18
document 11:12
  11:15,18 35:8
  55:23 59:2 70:3
  84:1 96:21
  97:13 103:18
  134:12
documented
  53:6

documents 4:21
  9:3 32:20 86:8
  98:8
doing 14:20
  28:17 39:9
  54:15 56:17
  62:10 79:2
  98:23 106:24
dolan 1:12 4:8
  4:19 5:3,11 6:6
  7:9,9,15,15,17
  7:24 8:4 9:4
  10:22 11:10,13
  12:6 25:5 32:13
  43:23 56:16
  92:22 105:17
  118:25 124:9
  134:16 136:22
  138:21 139:22
  143:1,5 144:2,24
  145:2,4,12
dolanvp 143:2
domain 98:10
donors 130:15
  130:18
door 137:7
dr 105:19,23
  120:4,8 121:1
  122:3 123:9,17
  124:13,25 125:9
  125:20 129:13
  131:3,23 132:19
drank 110:22
drew 27:21
drinking 115:10
drive 38:5
dropped 109:9

due 117:11
  128:19 136:3
duly 7:18 141:5
duties 52:20,21

**e**

e 2:1,1 3:1,1 4:1
  4:5 5:1,8,8,8,8
  6:1,1 12:3 31:5
  31:9,18 133:1
  139:12,16 140:4
  144:3,3,3
earlier 26:9,25
  29:12 43:24
  47:9 77:18 79:7
  80:22 118:1
  119:5,15 131:8
  136:25
east 32:25
ebola 121:19,20
  121:23,25 125:5
  125:6,10,12,13
  125:18 126:13
  126:15,19,23
  127:4,8 128:4,13
  129:12,21
  133:14,15,22
ecgs 73:25
edt 1:14 140:13
education 13:13
  13:19 14:7,22
ee 55:12
effect 29:5 74:21
effort 15:1 67:15
eight 21:18,19
  21:20
eighteen 23:1

either 17:10,23
  23:24 24:13
  44:1 70:3 121:8
election 26:22
  29:4
electrolyte 90:16
  92:20 93:6
  107:2
electrolytes
  89:23 91:1,13
electronic 139:8
elevated 89:11
  89:14,15 90:12
  90:22,22 91:9
emory 33:24,25
  35:4 117:4
  119:6,6
employability
  99:4 100:10
  103:6
employed 100:6
  141:11,14 142:8
  142:11
employee 141:13
  142:10
employees 14:14
  14:16
employment
  14:18 98:24
  99:15 102:2
ends 11:22
engaged 16:19
enter 47:5 69:16
entering 127:14
entire 110:22
entirely 47:15
entirety 11:15
  20:16

Case 1:21-cv-00144-LAG   Document 21-4   Filed 02/13/23   Page 157 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

[entitled - export]                                    Page 12

**entitled** 31:24 32:5 122:9,20
**entries** 115:4
**entry** 105:14
**enzyme** 89:15
**enzymes** 89:15 90:12
**epidemic** 121:19 127:22 128:4
**epidemiological** 131:3
**epidemiologist** 21:6,12 120:7 127:21
**epidemiology** 13:3,18 21:3 120:6 122:6,11 123:3 129:4 131:1
**equation** 116:6
**equivalent** 63:12 63:15
**er** 121:22
**errata** 143:11,13 143:17
**es** 141:4
**esquire** 2:3,4,13 2:15
**essentially** 15:7 16:20 17:13 28:14 35:15 59:18 65:20 70:22 74:24 89:11,14 107:11 114:8 121:8,24
**establish** 127:23
**estimate** 23:4 47:21

**estimated** 47:19
**et** 4:22
**evaluate** 79:5
**evaluates** 50:19
**evaluating** 97:4
**evaluation** 48:18 56:3
**everybody** 138:10,17
**evidence** 54:4 73:2 82:4 94:19 117:20 125:17 128:12 134:4,24 135:1,14
**evidentiary** 6:21
**exactly** 28:20,20 88:21
**examination** 4:2 8:2 67:7 83:8,14 131:5
**examine** 38:21 38:24 39:17 50:14
**examined** 7:20 53:20 83:25 87:6 91:16
**examines** 50:18
**example** 135:11
**exams** 40:17
**excess** 51:8,9,12
**exchange** 85:18 113:16 130:16
**exclude** 116:3
**excluded** 47:15 87:24 134:5,24 135:21
**excuse** 8:6 56:6 95:6

**exercise** 104:24
**exhibit** 4:7,10,13 4:16,19,21 5:3 12:5,7 31:10 69:17,21,23 70:5 84:15,16 85:2,3 85:4,6,6,9 126:3 126:4,5 134:10 134:11,12,13,13
**exhibits** 5:6 139:17,21,24 140:8
**existing** 34:11 36:13 37:12 49:13 59:10 131:17 132:14
**exists** 91:14
**expect** 117:19 137:24
**expectancies** 9:11 16:17 23:21 37:16 131:14
**expectancy** 5:4 16:1,2,4,9,12,14 20:22,24 21:13 35:16 36:3,9,10 36:18,21 37:1,5 37:20 44:18 47:20,24 48:16 98:23 116:5,6,10 122:12 123:5 131:16 132:13
**experience** 15:14 37:13,15 67:21 115:15
**expert** 4:7 7:10 11:13,20 16:11

17:3,5,8,14,17 17:20 18:3,20 19:18,20,23 20:10,11,16,21 21:6,17,22,25 22:4,14,19,24 24:2 25:22 26:11 30:15 31:14 32:1 33:20 34:8 36:18,25 38:15 38:17 43:1 47:15 85:12 96:13 104:4 119:22,25 120:4 122:6,8,14,19 123:2,4 124:11 124:17,22 130:23 131:11 131:25 134:2,3 136:1,24 137:8 137:12,16,21
**expertise** 14:3 21:1,3 62:11 98:22
**expertises** 20:24
**experts.com** 19:11
**experts.com.** 18:23
**explain** 62:4
**explained** 49:24
**explaining** 134:25
**explicitly** 113:3
**explore** 122:9
**export** 12:5

Vera F. Dolan, MSPH FALU

August 26, 2022

Barwick, James v. United States of America

**[exposed - flanders]**

Page 13

**exposed** 125:10 125:12,18 126:13,19 127:8 128:13
**exposure** 114:10 125:13
**expound** 8:20
**expressed** 44:23
**extensive** 37:15
**extent** 42:1 133:6 140:3
**extra** 17:12

**f**

**f** 1:12 4:8 5:3,11 6:6 7:17,24 11:13 12:5 94:16 143:5 144:2,24 145:2,4 145:12
**facility** 121:22
**fact** 36:15 49:20 52:1,14 54:3 64:12,14 71:20 72:13 73:19 75:18 76:10,14 76:21 77:3 82:3 82:10,11 94:23 100:15 104:7 114:23,25 115:19,25 134:18
**facto** 130:17
**factor** 9:19 48:21 75:6 94:20 114:2 116:13

**factors** 9:16 48:12,14 116:14
**facts** 123:16,17 123:18 130:13
**failed** 53:12,22
**failing** 53:14
**fails** 143:19
**fair** 9:1 20:19 34:23 49:21 56:1 60:2 72:6 78:20 87:25 137:19,22,24
**fall** 32:10 95:9 96:17
**falling** 95:13,14
**falls** 81:22 82:8
**false** 61:16
**falu** 1:12 4:8 7:17 13:6,11 143:1,5 144:2,24 145:2,4,12
**familiar** 27:2 58:19 128:21
**family** 102:23 104:15 109:16 109:17 110:4,8,8 110:10,11
**far** 21:4 24:1 54:24 131:1 132:18
**farm** 102:23
**fasciitis** 35:23 38:10 60:24 67:12,17
**father** 33:8 106:15,15 109:4 109:19,23 110:2 110:14,17,21

111:4,15,21,22 112:8,9,12
**fatty** 59:16,16 60:1 63:6,8 65:19,22 66:24 68:20
**fault** 95:4,7
**fear** 128:19
**feature** 90:17
**february** 44:10
**federal** 8:1 23:11 24:13 42:24 43:3 46:22 47:4 122:15,19 124:5 132:7,9
**fee** 17:10,22,23 17:24,25 19:1,1 19:2,4,7
**feel** 32:18 111:21 111:21
**fellow** 13:9
**fetal** 40:14,15
**field** 14:3 21:1 37:18 39:23 123:4
**fifteen** 21:23
**figure** 81:9
**figures** 48:5
**file** 1:7 34:16
**filed** 4:23 129:6 130:10 132:5,8
**financially** 141:15 142:11
**finch** 2:5
**finchmccranie....** 2:8,9
**find** 48:11 53:9 75:1 105:14

118:12 132:24 133:6
**finder's** 17:24
**finding** 16:19 68:1 71:7 76:22 77:24 82:13
**findings** 53:21 67:19 81:6 116:2
**fine** 69:25 70:3
**finish** 8:18 64:13 77:13 122:25 138:9
**finished** 24:6
**firm** 20:1,6,9 124:13
**firms** 16:25 17:2 17:6,18 19:15,17 19:19,21 124:10
**first** 5:10 7:18 13:21 15:5 16:4 25:16 26:22 27:7,19 29:3 32:17 55:16 56:5 59:8 65:9 66:13 80:5 115:6 120:21 125:4 126:11 130:12 132:23 133:11,14,16,18
**fits** 103:8 113:9
**five** 21:7 118:16 137:19
**fix** 29:23
**flag** 95:25 115:2
**flags** 81:15 99:22
**flanders** 1:20 6:3 139:14 141:2,17

**flew** 121:20,21
**flight** 74:6 138:8
**flip** 12:10 16:22
  32:17 114:12
**fluctuates** 26:12
**fluid** 74:17,23
  75:1,2,18 77:3
  80:21,24 82:10
  119:15
**flustered** 113:15
**fly** 126:12
**flying** 128:19
**focus** 36:3
**focused** 137:17
**focusing** 58:2
  106:13
**following** 26:24
  70:16 76:17
  97:3
**follows** 7:20
**foot** 66:17
**foregoing** 141:3
  141:4 142:4
  145:5
**form** 22:18 24:9
  36:23 37:8,22
  38:11 41:20
  46:6,18,25 49:4
  50:4 52:9,18
  53:16,24 54:7
  55:6 60:9,25
  69:6 75:8 77:6
  78:16 82:15
  83:13,21 84:10
  86:18 88:2,15
  91:15 92:1
  93:16 95:2
  99:10,17 101:23

102:8 103:25
106:6,19 107:22
108:18 110:16
110:24 111:6,17
117:22 118:7,12
119:18 120:24
122:5 127:16
135:23
**forming** 69:10
**forth** 73:10
**forward** 32:19
**fought** 111:5
**found** 30:19
  76:11,12 77:25
  86:12
**founding** 98:8
**four** 21:7,7
  124:4
**fourteen** 79:13
**fractures** 81:16
  81:18,22 82:8
**free** 32:18 46:2
  74:17,23 75:1,2
  75:18 77:3
  80:21,23 82:10
  119:14
**frequency** 109:2
**friday** 1:13 6:8
**front** 9:3,23
  11:12,19 12:1
  17:23 18:1
  31:18 56:23
  70:13 86:1
  110:13 135:20
**frozen** 24:21,22
  24:23 26:3
**fullness** 33:25

**fulsome** 124:6
**function** 89:9,12
  89:24 92:19
  93:2
**further** 15:14
  19:13 80:22
  141:13 142:9

**g**

**g** 6:1 96:16
**ga** 2:7,19
**gary** 42:19
**gastroesophag...**
  114:4
**general** 44:3
**generally** 15:3
  101:9
**generation** 28:12
**genesis** 27:18
**george** 130:14
**georgia** 1:2 2:17
  6:12 23:8 24:13
  25:7 30:24,25
  33:3 41:10
  141:19
**gerd** 114:5,5,7,9
  114:11
**getting** 26:14
  39:14 111:7
**gigs** 137:16
**give** 8:18 23:3
  48:4 50:22 55:2
  62:9 75:16
  99:23 103:11
  136:10,11
**given** 8:10 21:17
  24:12 76:8
  87:15 102:17

115:13 124:12
145:9
**gives** 102:4
**global** 48:4
**glucose** 90:22
  91:9
**go** 8:12,20 12:22
  18:7 24:25,25
  25:15 29:2
  32:19 39:11
  49:7 66:12 72:6
  76:14 79:17
  82:19 87:1
  88:22 89:6
  94:15 96:16
  98:20 100:10
  101:19 102:22
  104:14 109:11
  112:15 116:19
  117:10 121:10
  122:17 127:1
  129:20 132:24
  133:23 134:21
  136:13 140:8
**goes** 41:15
  122:13
**going** 8:17,25
  12:2 24:24 28:6
  31:12,15 32:17
  34:12 43:5,8
  46:24 49:14
  54:18 56:17
  58:12 63:7 65:7
  69:16 72:4 73:9
  74:5 77:23 81:9
  82:19 84:2,5
  89:7 93:3 94:14
  95:22 103:20

Vera F. Dolan, MSPH FALU
Barwick, James v. United States of America

August 26, 2022

**[going - hospital]**

Page 15

109:16 110:13 112:3 116:22 119:21 121:19 122:25 125:19 126:2 131:24 132:19 137:10 137:11 138:7,8 138:14 139:5,16 139:20

**good** 6:2 22:10 26:16 96:2 136:7 139:23

**gotten** 26:19 85:16

**government** 22:24 45:3 111:21

**grandfather** 106:14 109:3,23 110:17

**grandfather's** 109:24

**grave** 128:5

**great** 43:8

**group** 101:7 130:13

**groups** 16:7

**guess** 22:8 46:9 90:5 137:11

**guidance** 103:5 110:4

**guide** 108:2,3

**guideline** 100:19

**guidelines** 101:9 115:13

**gutschenritter** 2:3 4:3 7:3,4,23 8:3 10:21 11:8,9

12:2,9 18:16 24:21,23 25:4,13 25:19,21 26:6,7 31:6,22 32:12 33:21 34:3,5 38:7 41:21 42:10,23 43:11 43:22 47:1 51:2 56:11,14 63:23 64:2 65:6 66:8 66:11 69:19 70:4,7 77:15 83:3 84:4,14,21 85:1,11,14 89:5 94:7,13 96:1,12 97:19 98:1,3 102:11,19,21 108:20,22 109:11,13,15 111:8,11 112:6 113:17,24 118:15,24 122:7 122:13,22 123:6 123:8 124:7,8 126:2,8 127:18 128:1 130:6 133:9,10 134:9 134:15 136:10 136:15,21 138:1 138:11,18 139:10,11,14 140:1

**guy** 64:18

**guys** 138:14

**h**

**h** 4:5 5:1 98:24 114:1 144:3

**half** 95:23

**hand** 7:13

**handle** 17:12

**handy** 25:7

**hanen** 129:23

**happen** 17:16 126:13

**happened** 75:23 76:7,20 130:9 136:9

**happens** 36:11

**happy** 8:22 10:19

**hard** 61:5 67:6 97:16 139:8

**healed** 81:17,21

**health** 13:3,18 14:3 16:8 32:25 39:14 46:25 47:2 48:19 57:10 100:1,8 127:20 128:22 129:4

**hear** 87:9

**heard** 30:13 123:10,13

**hearing** 7:11 41:4,5

**height** 66:16

**heights** 95:14

**held** 41:18,24 42:24

**helicobacter** 114:3

**hell** 98:7

**help** 97:10 139:22 140:4

**helps** 50:23

**hemoglobin** 90:22 91:9

**hepatocellular** 59:17,18 60:1,16 63:24 64:3,15 65:2 67:22 68:22

**hereto** 141:15 142:11 145:7

**hey** 69:15 95:20

**hhs** 120:17

**high** 27:9 93:12 137:24

**highest** 13:8

**highlighting** 128:3

**highly** 122:18

**hill** 13:5

**hired** 25:8 111:22 119:24 123:24

**hiring** 134:23

**history** 55:19 104:15 109:16 109:17 110:4,10

**hold** 12:23 31:21

**holloway** 3:6 7:8

**home** 16:19 33:3 74:6 113:1

**homeland** 120:12

**hope** 138:16

**hopeful** 137:8

**hopkins** 39:14

**hospital** 33:1 41:11 57:12

**[host - injury]**                                              Page 16

**host** 109:10

**hour** 43:6 45:9
  45:11 95:23
  116:18

**hourly** 45:8

**hours** 32:8,13,16
  35:12 45:4
  71:21 77:18

**huge** 126:15,16

**hyperechoic**
  55:18 59:12,15
  59:25 60:13
  61:6 62:25 63:4
  63:4 65:17 66:3
  66:22,23 67:22
  76:12 77:24

**i**

**idea** 99:12
  128:20 129:7
  130:8,8 132:21
  132:21

**identification**
  12:8 69:24 85:7
  126:6 134:14

**identified** 51:13
  51:14

**identify** 7:2 70:1
  70:2 107:25

**identifying**
  101:10

**ignore** 78:1,2

**ileostomy** 36:16
  36:20 37:6,21
  38:6,9

**illegal** 128:4
  133:19,21

**image** 64:18

**images** 118:1

**imaging** 4:16
  39:25 41:11
  55:25 56:2,6,20
  56:22 57:4,23
  58:3,4,6,8,13
  64:8,20 70:8
  79:10 82:19
  85:17,19

**imbalance** 92:20
  93:7 107:2

**immediately**
  57:15

**immigrant** 121:2
  130:2

**immigrants**
  131:4 132:1
  133:19,22

**immigration**
  128:5

**imminent** 121:6

**impact** 67:18

**impairments**
  36:8 51:7

**important** 8:14
  132:12

**impression**
  59:15 60:4,16
  63:5,21 64:25
  65:18,22 68:17
  75:14 87:3 95:2
  102:5

**improve** 15:6

**inappropriately**
  29:22

**incident** 95:12

**include** 29:10
  32:2 78:14,21,22
  88:13

**included** 31:10
  31:13 78:24

**including** 32:24
  114:14

**income** 14:17
  99:5 100:11,18
  103:6 136:23
  137:13,20

**inconsistent**
  82:12 84:7

**inconvenience**
  46:9

**increase** 37:5,20
  130:19

**increased** 36:20
  92:3

**incurable** 117:16

**independent**
  14:2 137:5

**indicate** 73:11
  81:12,15 83:19
  97:10

**indicated** 119:7
  119:8,11

**indicates** 58:5
  109:17 112:23

**indicating** 55:19
  55:20

**indication** 81:20
  81:23 95:10
  100:25 101:16
  103:3

**indications**
  55:12 64:24
  75:13 116:24

**indicator** 100:17
  101:21

**individual** 77:20

**individually**
  120:18

**industries** 14:4

**industry** 13:8
  16:3,5 28:8
  52:22 98:11,14
  98:17,17,19,22
  101:10 137:5

**infected** 125:10

**infection** 68:1

**infectious** 61:3,6
  61:9,15 62:1,17
  67:16,24

**infiltration** 60:1
  63:6,8 65:19,23
  66:25 68:21

**influences** 77:4

**information**
  10:12,17 31:13
  32:6 40:6 52:6
  62:22 69:13
  82:12 94:23
  95:8,13 98:15
  112:12,14 123:1
  135:4,5,9,20
  136:1

**informative** 79:6

**initially** 79:8

**initials** 11:14
  12:24

**injuries** 81:19,22
  82:8 113:4,4
  114:20

**injury** 49:12
  112:16 113:6,11

inner 70:22
innovation 29:6
insistent 112:17
instance 47:9
  118:25
instances 81:4
insufficiency
  92:9
insulin 92:9
insurability 42:8
insurance 13:7
  14:4 15:16 21:1
  28:8 52:22
  98:10,16,21
  99:25 100:2,7,8
  100:15,23
  101:15,20 137:5
intended 6:19
interested
  141:15 142:12
international
  127:4
interpret 73:20
  73:24 74:8,9
interpretation
  77:19
interpretations
  108:14
interpreting
  68:19 74:2
interrupt 10:19
  95:21 109:8,12
interval 27:12
  27:15 28:12
  29:20 30:4
intervals 15:7
  27:3,18,23 28:4
  28:10 29:20

intration 59:16
investigated
  92:12
investigation
  94:2
invoices 31:12
  31:16,24 32:2,10
involve 16:14
  44:5 120:22
involved 22:6,18
  25:8 28:19
  68:25
involvement
  123:23 124:12
  136:3
involves 20:21
involving 135:13
irrelevant 46:19
  111:18 123:3
  133:7 135:22
irritation 114:14
  114:18
isolating 129:2
issue 44:14 61:3
  76:1,22 80:1
  101:5 104:11
  121:24 123:19
  128:18 129:12
  129:16 131:1
  132:3
issues 44:3 49:2
  64:7 65:19 81:4
  87:21 95:15
  99:4 100:11,11
  100:18 101:4
  103:5,6,6,6,23
  104:10 108:7
  114:19

items 31:9

**j**

j 102:22 103:2
  103:12
jackson 25:17,24
james 1:5 2:2
  4:11,14,17 6:7
  9:14 33:6,9,13
  143:4 144:1
  145:1
january 132:5
jeh 120:12,20
job 1:21 52:20
  52:21 54:15
  107:25
johns 39:13
johnson 4:22
  120:12,20
jones 3:3 7:7
  9:21
judge 42:24 44:2
  110:13,13
  122:15 129:15
  129:23 135:20
judgment 130:7
judicial 52:14
july 130:11
june 12:16
jurispro 18:24
  19:7,11
jury 135:20
  136:4,6
justice 30:21

**k**

k 92:20 93:6,11
  94:3 103:20

katayev 29:1
keep 73:9 89:6,7
  94:14
kern 42:20
kevin 2:15 7:7
  31:17 112:2
  138:13
kevin's 109:9
  138:8
kevin.abernethy
  2:21
kidney 112:16
  112:25 113:6,11
kidneys 83:6
  113:5,5
kind 10:12 49:21
  76:5 88:21 97:8
  127:23 129:13
kinds 81:15
  98:13
know 8:10,17,21
  10:11,13 11:3
  16:20 17:10
  22:11,17 23:12
  28:20 29:6,8,17
  29:21 30:19
  31:17 33:11
  34:9,11 35:13
  38:25 40:12,24
  42:4 43:24
  46:20 48:24
  49:9,12,22 50:23
  52:19 57:11
  59:13 61:4,5,20
  62:7 64:8,17,17
  66:14 67:7 68:1
  68:15,16,18
  71:10 72:10,19

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 163 of 315

Vera F. Dolan, MSPH FALU

August 26, 2022

Barwick, James v. United States of America

[know - little]

Page 18

75:11,11,22,22
76:1,6,8,8,20
77:8,22,24 78:10
79:2 81:8,24
82:17,18 84:1,2
85:9 86:11 87:7
88:9 90:16
91:17,19 94:22
94:22 95:1,5
98:8,14,19 99:5
99:8,19 100:6,20
101:3 102:3
105:13 107:10
107:11,12,22
109:5 110:5,19
110:21,23,25
111:4,10,12,13
111:20 112:20
114:25,25
115:16 116:12
116:12,15 117:4
117:14 118:9,9
118:11 119:22
121:2,21 124:16
125:12,19
129:14,21 135:1
135:7,12 137:16

**knowing** 126:12
126:19
**knowledge** 22:4
47:11,13,14
67:21 141:10
142:6

**l**

**l** 103:21
**lab** 15:7 27:2,17
27:17,23 28:3,5

28:12,24,25
29:20 56:1,2,5
58:1 85:16
89:19,24 90:1,6
90:8,9,21 91:10
92:15 93:5
**labcorp** 28:25
29:15,25
**labor** 130:19
**laboratory** 15:6
**labs** 29:14
**lack** 98:24 99:15
102:1,2
**ladder** 95:9,14
**lag** 1:9
**large** 27:19 29:9
130:17
**las** 1:17,19 6:9
**latice** 1:20 6:3
141:2,17
**law** 3:6 16:24
17:2 19:15,17,19
20:1,6,9 41:18
41:24 44:4,6
124:10,13
**laws** 6:21
**lawsuit** 120:9,11
129:6 132:8
**lawyer** 25:25
74:5
**leapt** 87:5
**learned** 11:2
**led** 130:14
**lee** 2:3,8 7:3
10:18 25:10
31:4 43:5 50:21
55:7 62:3 64:13
66:4 69:15

77:13 84:19
95:20 97:15
102:13 111:6,24
124:3 133:5
**left** 81:16,17,21
114:9 137:14
138:22
**legal** 143:23
**level** 137:24
**levels** 89:14,15
89:23 90:25
91:13 93:19,23
**license** 14:25
**licensing** 26:17
**life** 5:4 9:11 13:7
13:8,9 14:3 16:1
16:2,3,4,5,7,9,12
16:14,17 20:21
20:24 21:1,12
23:20 25:17,24
28:8 35:16 36:3
36:9,10,18,21
37:1,4,15,20
44:17,17,18
47:20,23 48:14
48:16 52:11,21
53:9,20 96:23
97:6,7 98:9,10
98:21,23 101:8
103:4,14,17
108:3,11 109:20
110:3,23 115:12
116:4,5,9,16
122:11 123:5
131:13,14,16
132:13 135:15
137:4

**lifestyle** 51:19
99:3 103:7
**likelihood** 47:24
48:1
**likewise** 8:19
**limited** 44:1,5
47:10,12
**line** 41:16 43:7
144:4,7,10,13,16
144:19
**list** 9:12 16:24
19:15 20:1,1
25:16 72:11
81:1 92:17
94:14 96:15
97:1 124:6,13
**listed** 14:9 18:3
20:6 33:23 35:2
55:10 56:19,20
94:17 117:1
124:10
**listing** 17:6 20:9
81:3,6
**lists** 19:15
**literature** 9:15
48:11 69:2
91:11,14,17
101:1 103:1
112:23
**litigation** 14:7
16:10,17 18:20
20:20 21:25
22:5,6,18 23:5
36:7 134:2
137:21
**little** 57:19 58:25
81:14 111:7
113:15 139:15

**[live - means]**                                                    Page 19

live  45:13
liver  55:18 59:16
  59:24 60:14
  61:4,4 62:25
  65:17 66:3,22,24
  67:6,18,22 68:1
  70:21,22,23,25
  71:6,22 72:14,17
  73:1,17 76:12
  77:24 82:11
  83:5 84:7 87:19
  87:23 88:5,12
  89:9,11,14,15,24
  90:12 92:19
  93:2 117:16,20
  118:4,11,14
  119:1,7,11
lives  102:22
llp  2:5
location  1:15
long  116:17
  137:12
longer  139:22
look  32:20 34:24
  34:25 36:10
  37:10 38:2
  49:23 57:3,7
  60:11,12 66:1
  69:20 71:15
  72:1,24 80:20,22
  90:3 97:9 99:22
  101:13 114:13
  120:16 123:22
  128:2 130:11
  131:13,18,20
  133:23
looked  33:17
  55:22 70:17

87:8,12,15 89:20
98:2 132:9,18
134:10
looking  13:21
  15:14 17:19
  19:13 42:13,15
  48:7 52:3 55:9
  58:4 61:2,3
  64:18,18 66:5,15
  71:12,25 75:11
  78:7,17 79:12,14
  79:15 80:9,17
  83:16 94:25
  106:21,23
  126:23 132:14
  134:12
looks  58:19,22
  134:22
lookup  28:16
lost  18:6
lot  14:9 22:11
  26:13 64:9 77:7
  96:1 130:21
low  27:9 89:22
  89:23 90:3,3,3,4
  90:4,18 92:6,8
  92:21,21,21 93:7
  93:7,7,11,13,19
  93:23 94:3
  114:15,20
lower  81:16,17
  81:21 90:25
  91:13 96:17

**m**

m  5:8 104:13
m.d.  33:1

ma'am  12:10
  18:18 50:8
  58:14 61:21
  62:13 63:16
  64:11 65:7
  76:13,15 77:10
  80:2,2 82:14
  101:17 108:24
  133:13
machines  27:20
macon  2:19 23:8
madam  84:16
mail  12:3 31:5,9
  31:18 139:16
  140:4
mailing  133:1
maintain  13:14
major  130:15
majority  20:19
  22:13 35:13
  45:5
making  106:24
  137:17
malpractice
  53:14
man  72:15 81:12
  82:3 121:23
  136:8
manner  6:22
  40:22
manuals  128:24
marcie  44:8
mark  12:4 69:21
  70:5 84:15
  126:3 134:9,11
marked  12:7
  69:23 85:6
  126:5 134:13

markedly  59:12
  59:24 63:4
markers  90:23
market  14:5
marketing  16:20
  26:11,17
marking  84:19
marriage  42:18
mask  46:7
masks  45:22,24
master's  13:2,17
match  17:10
material  103:1
  111:13
materials  9:5,7,9
  10:4,14 11:17,19
  11:25 32:21,23
matter  6:7 15:4
  15:24 20:21
  21:25 23:17
  76:21,24 114:23
  131:10 132:20
matters  16:14
mccranie  2:5
mean  19:25 27:1
  30:11 41:24
  45:21 64:3 67:5
  72:3,7,9 76:4,6
  76:10 77:21
  78:11 86:19
  95:20 107:10
  124:2 129:11
  140:3
means  6:23
  29:21 64:15
  67:6 72:20,21
  74:24,25,25 75:4
  77:22

**[meant - necessary]**                                                    Page 20

| | | | |
|---|---|---|---|
| **meant** 19:10 133:25 | 126:1 131:18 133:20 136:3 | **mine** 69:8 | **mulberry** 2:18 |
| **media** 127:4 | **medically** 119:16 | **minimal** 60:3 64:16 79:24 80:6,12,14 | **multinational** 14:8 |
| **medicaid** 100:1 100:16,24 101:15,21 | **medications** 38:22 39:22 62:9 | **minute** 16:21 43:12 113:16 118:16 120:17 | **multiple** 4:21 16:23 17:3 |
| **medical** 9:13,14 29:6 32:24,25 33:3 35:1,8,20 38:18,22 39:2,3 39:10,11,13,18 40:1,3,8,21 41:6 41:6,19,25 42:25 48:7,11,25 49:13 50:7,8,11,13,18 50:19 51:5,18,19 51:22,25 52:1,2 52:5,7,15,16 53:2,5,9 54:2,4 54:12,20,22,24 55:4,22,24 56:24 57:12 61:14,18 61:19,25 62:1,2 62:15,16,20,22 64:19 67:10 68:3 70:12,13 71:12,13,18 72:1 72:19 73:10 76:5,17 78:17 86:2,5,13 88:3,4 88:20,22 94:4 97:9 98:10,17,19 104:20 105:20 106:17,22 107:19 108:8 114:16 115:5 117:7,19,25 118:5 125:23,24 | **medicine** 15:8 27:17 | **minutes** 96:3 136:11,12 | **muscle** 104:14 104:16 106:10 106:12,13,18 107:1,5 109:2,2 109:17,20,23,24 110:7,18 112:7 112:10,18,20,21 112:24 113:3 |
| | **members** 136:6 | **missed** 85:9 | **mva** 94:23 |
| | **memorial** 33:1 | **misspoke** 56:6 | **myoglobin** 112:24 |
| | **men** 29:19,19 30:1 | **mistaken** 105:24 | |
| | **mental** 103:5 | **mobility** 114:19 | |
| | **mention** 59:9 78:13 82:7 85:22 86:7,8 93:4 119:9 | **moment** 58:21 67:10 122:3,17 | **n** |
| | **mentioned** 14:22 80:14 81:5 86:3 86:23 87:17 104:20,23,24 106:9,11 114:24 129:23 133:14 | **money** 17:20,24 18:3,19 137:3 | **n** 2:1 3:1 4:1 5:8 6:1 104:14 106:3 107:4 |
| | | **month** 133:21 | **name** 6:2 7:14 11:14 12:24 25:25 |
| | | **monthly** 19:1 | |
| | **mexican** 121:3 127:15 128:6,14 132:2 | **morning** 6:2 48:9 | **named** 33:9 119:24 120:18 |
| | | **mortality** 9:16 14:4 38:5 40:6 48:8,10,17 49:10 51:8,9,13 79:5 89:2 107:22 | **narcotic** 135:14 |
| | **mexico** 128:5,19 | **motor** 94:16 | **national** 25:17 25:24 126:11 |
| | **middle** 1:2 2:17 30:23,25 45:14 47:21 51:4 | **move** 112:4 | **nationals** 121:14 127:6,13 |
| | | **moved** 102:24 | |
| | **mike** 26:2 | **movement** 122:4 123:10 | **nature** 13:25 15:16 |
| | **miller** 26:2 | **moving** 89:6 | |
| | **mind** 23:22 70:25 73:1 82:4 91:7 96:19 118:3 133:1 139:15,16 | **mris** 74:1 | **necessarily** 135:3 |
| | | **msph** 1:12 4:8 7:17 12:24 143:1,5 144:2,24 145:2,4,12 | **necessary** 99:20 145:6 |

**necrotizing** 35:23 38:9 60:24 67:12,17

**need** 18:7 34:9 34:10,11 40:5 41:14 77:12 81:8 89:2 95:21 96:5 97:23 98:1 113:16 127:22 131:20,20

**needed** 10:12 102:24

**needs** 128:6

**negative** 114:1,6

**neglect** 117:6

**neither** 141:11 142:7

**nephrotoxic** 112:18 113:10

**nerve** 114:14,18

**network** 43:10

**nevada** 6:9

**never** 22:17 47:16 69:7 104:18 105:3,9 105:25 107:8 110:22 119:3,3 119:10 125:9 126:1 132:9

**new** 15:6 117:3 126:17

**nexus** 33:2

**night** 9:21 10:2 96:22 97:14 103:19

**noncardiac** 114:15,21

**normal** 27:14 28:20 29:17 46:8 71:16 72:14,22 74:24 78:22,24 81:6 88:12,24 103:23

**normally** 90:19

**north** 13:4

**northeast** 2:6

**northside** 41:11

**notary** 1:20 6:10 141:18 145:13 145:19

**note** 8:12 9:13 56:25 79:3 80:1 88:6,9 143:10

**noted** 73:17 75:19 78:18 82:11,11 123:7 145:7

**notes** 9:13 24:6 56:25 57:20 58:11 59:21 66:1,5,15 70:12 70:14 71:9,12,17 74:22 78:11,13 78:14,21 79:1 80:15 81:24 86:2,20 87:18 88:4,19,21,25 89:13 105:14 106:22

**notice** 7:24 31:10 52:14 85:10

**noticed** 81:17

**noticing** 81:18

**noun** 139:21

**now's** 96:2

**nth** 61:20

**number** 9:20 22:20 27:7,9,10 32:7 52:24 89:24

**numbers** 27:7,8 27:13 30:11 69:16,18 116:16

**numerous** 55:11 136:3

**nurse** 121:23 126:14

**nutrition** 66:15

**nv** 1:19

**o**

**o** 5:8 6:1 109:16

**oath** 102:23 105:24 118:2

**oaths** 6:11

**obama** 120:13 130:18

**obama's** 130:16 130:17

**obedient** 130:19

**obese** 65:25 66:14,18

**obesity** 65:20,23 66:5,15 67:1,2 68:21 69:1 79:15

**object** 24:9 36:23 37:8,22 38:11 41:20 46:18,24 49:4 50:4 52:9,18

53:16,24 54:7 55:6 60:9,25 69:6 75:8 77:6 78:16 82:15 83:13,21 86:18 88:2,15 91:15 92:1 93:16 99:10,17 101:23 102:8 103:25 106:6,19 108:18 110:16,24 111:6 111:17 117:22 118:7 119:18 120:24 122:5 127:16 130:5 133:7 135:23

**objection** 6:14 7:12 41:22 122:23 123:1,7 133:5

**objective** 56:3

**observing** 69:4

**obtained** 12:25

**obviously** 11:11 85:15 116:19

**october** 35:16 36:4,6,11 37:1 48:9,19 49:2,16 50:3 52:24 57:6 57:12,13,17,18 58:7,8,17 59:22 65:24 66:16 69:11 70:9,19,19 74:16 75:19 76:18 78:3,8,12 78:13 80:1,5,17 81:11 82:21 83:8,8,16,17

85:3,4,5,21,25
86:6,15,23,24
87:9,13 132:7
**offer** 38:16
42:25 49:14,21
50:1
**offered** 44:21
65:19 121:10,13
122:11 123:5
125:25
**offering** 50:21
50:25 64:20
122:6
**office** 1:16 2:16
3:4 6:9 9:22
10:1,10 30:24
**officer** 141:1,2
**official** 30:3
**oh** 9:11 19:9
26:5,21 42:16
45:9 79:12,12
81:15 138:22
**ohio** 23:9 24:5
**okay** 8:22 11:8
11:24 16:15
18:7 20:3 25:19
26:5 27:5 31:22
37:24 42:16
43:13,17 55:9,9
57:19 66:7,13
75:4 77:8 78:18
79:18,18 85:13
88:22 93:10
96:3,6,20 97:15
97:17,22,24
102:19 105:18
105:21,22 106:1
109:13,14 110:4

112:20 113:14
114:3 118:18
123:6 133:9
138:9,17,20,25
139:9,13
**oklahoma** 23:10
23:13,18 24:4,8
**old** 29:18 81:17
81:21
**once** 20:2 48:10
79:4 127:7
140:8
**one's** 23:8,8
117:6
**ones** 63:3 81:8
**ongoing** 13:13
15:1
**operating** 97:3
108:13,13
**opine** 36:25
**opinion** 36:19,24
37:3,4,23 38:8
38:14 49:5
52:19 53:18
54:1,9,10,25
55:8 57:24 59:6
61:1,10 67:14
68:6,18,19 69:10
72:14 73:7,16,18
74:20 75:20
77:4 78:4,15
82:17,18 83:19
84:3,11,12,13
85:20 87:7 91:2
91:21 92:2,5,10
92:14 93:17,21
93:25 96:19
99:1,13 100:3,14

104:3 105:11
106:20 112:9
115:10,15 116:3
116:25 117:15
117:24 119:20
122:12 123:12
131:3,25 132:13
135:10
**opinions** 44:23
59:23 92:16
106:5 112:19
114:2 115:7
121:11
**opioid** 135:15
**opt** 47:6
**order** 11:18
39:25 40:4,5,7,9
40:17,17,21,21
41:9,11,15 47:5
81:9 89:1 108:8
130:19 139:2,6,8
**ordering** 41:17
**orders** 138:13
139:3
**organization**
98:5
**orly** 119:24
120:1
**outcome** 141:16
142:12
**outside** 6:13
14:18 27:14
28:23 29:14
36:24 37:23
38:12 49:5
53:17,25 54:8
61:1 83:14,23
99:11,18 104:1

106:20 108:19
111:7 117:23
118:8 119:19
**overall** 48:4
**overlap** 21:10

**p**

**p** 2:1,1 3:1,1 6:1
112:15
**p.m.** 43:18,21
96:8,11 113:20
113:23 118:20
118:23 136:17
136:20 140:10
140:12,13
**packet** 11:21,23
25:11
**page** 4:2,6 5:2,9
11:12,14 12:4,15
13:21 16:22
19:13 24:18
25:12 32:21
42:17 51:3
55:23 58:25
59:1,2 74:15
79:22 80:12,20
80:23 87:3,12
89:7 92:22,24
93:1,3,6 94:15
96:13,25 97:13
114:12 125:3
134:21,22
135:12 144:4,7
144:10,13,16,19
**pages** 4:9,12,15
4:18,20,23 5:5
32:18 35:4,11
71:17 78:25

Vera F. Dolan, MSPH FALU

August 26, 2022

Barwick, James v. United States of America

**[pages - picture]**

Page 23

79:22

**paid** 19:19,21 20:10 120:4

**pain** 33:2 59:11 59:24 60:6,13,21 96:17,17 114:13 114:15,15,20,21 114:21,24,25

**pancreas** 83:5

**pandemic** 117:12

**paper** 56:22 97:12 134:22

**papers** 56:12 128:16

**paragraph** 51:4 114:13 127:2 128:2 130:12

**paragraphs** 132:17

**paralegal** 3:3 9:21

**parenchyma** 70:21,22 71:2,3 71:4,6 72:17

**part** 24:6 29:10 31:9 42:7 44:1 60:3 67:3 73:7 74:22 79:25 84:6 86:10 95:15 99:2,5 100:18 102:3 104:4 113:8 115:6 123:25 124:1

**particular** 50:16 69:13 72:5 75:15 77:20,20

81:14

**parties** 6:12,15 141:12,14 142:8 142:11

**partner** 16:6

**party** 132:15 134:4 135:6,13

**patent** 14:21 15:5,13 26:9,14 26:18,19,22,23 29:3,4 137:2,9 137:15,18

**patented** 28:11

**patents** 14:24,25 15:4,10 16:19 26:11,22 28:13 28:23 29:8

**patient** 39:17 50:14,15

**patients** 38:22 38:24 40:1,3 50:19

**patriot** 111:16

**pattern** 107:15 113:8

**pay** 17:19,22,23 18:3,19 36:2 134:2

**paying** 19:24 102:23

**payment** 17:25

**pays** 18:1

**pdf** 11:14 12:4

**pdt** 1:14 140:12

**peachtree** 2:6

**peer** 69:2 91:11 98:4

**pending** 23:7

**penetrate** 67:8

**penetration** 59:13,25 60:14 67:4

**people** 10:13 17:9,13,16,17,18 17:23 28:4,5 29:18,19,21 62:8 91:22 93:18,22 99:7,14 108:4,6 110:25 114:22 115:13,16,16 121:4,5,6,9 128:12 129:2,17 129:25 130:2

**percent** 20:25 21:2 26:16 137:20,23

**percentage** 16:11 26:10 99:7,14 136:22

**percival** 97:21 103:18

**perfect** 96:4

**perforated** 35:21 49:16 60:23

**performed** 58:17 70:16

**permanent** 117:16

**permitted** 6:19

**persistent** 125:16

**person** 15:19 36:19 37:17 40:14 47:7 52:7 54:13 60:22

61:15,25 62:17 62:25 65:16 66:21 68:8,13 71:24 100:23 106:17 111:22 119:24 127:20 135:14

**person's** 66:3 67:18

**personal** 46:25 47:2 117:6 124:16 125:20

**personally** 124:15 129:24

**persons** 90:10,24

**pertain** 16:1,12

**pertains** 11:16 48:18 57:24

**phillip** 33:1

**phoebe** 33:1,2 57:11,12 86:3,4

**phone** 97:17

**phosphatase** 90:4

**physical** 114:19 114:19 116:2

**physically** 39:17

**physician** 53:19 68:19

**physician's** 59:1

**physicians** 52:24 53:12

**pick** 108:7 123:15

**picking** 58:10 75:14

**picture** 60:11 75:16 77:2

Veritext Legal Solutions

800.808.4958

770.343.9696

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

[picture - produced]                                              Page 24

99:23 102:4
**piece** 65:1,5,9
  75:10 77:1
  81:14 82:6
  86:11 95:1,17
  102:1,25 103:8
**pieces** 56:3
  60:12,19 69:12
  75:10 77:1 82:6
  86:11 95:2
  100:4
**place** 16:16 40:9
  47:4 137:2
  139:6,7
**placing** 29:7
  137:9
**plaintiff** 1:6 2:2
  120:8
**plaintiffs** 7:5
**plan** 43:12
**play** 66:2,21
  68:12
**played** 95:11
**pleadings** 33:17
  34:15,16,23
**please** 7:2,13
  8:17 10:21
  12:10 51:4
  63:14 89:10
  94:8 118:16
  136:12 139:8,12
**plus** 17:12
**point** 8:19 30:12
  82:7 100:22
  101:5,18 102:6
  102:25 108:17
  109:19 128:17
  130:23 135:15

**pointed** 128:24
**policy** 46:2,5
  47:3 127:21
**poor** 59:12,25
  60:14 67:4
**pop** 71:25
**population**
  36:22 103:24
**position** 31:11
  32:9 49:1 55:25
**positions** 14:18
**possibility** 59:17
  125:13
**possible** 60:1,16
  62:24 63:6
  65:16,19,21
  66:24 68:20
  79:23 80:11
  113:10 114:5,9
  115:24 127:7
**possibly** 59:16
  94:4
**post** 37:13
**potassium** 92:21
  93:8,23
**potential** 60:6
  68:7 128:3
**potentially**
  67:18 68:13
**poulos** 33:1
  105:19,24
**pounds** 66:17
**practice** 27:16
  33:19 34:7
  128:22 129:3
**pre** 34:11 36:13
  37:12 49:13
  59:10 131:17

132:14
**preamble** 8:12
**precious** 28:2
**precise** 29:21
**precision** 15:9
**predicting** 37:15
**preference** 34:22
**prejudicial**
  134:5 135:6,7,21
**prep** 11:1,5
**preparation**
  10:4,5,8
**prepared** 23:23
  142:3
**prescribe** 38:22
  38:25 39:21
**presence** 6:13
**present** 3:2
  97:11
**president** 128:18
  129:11 130:16
**pretty** 19:15
  61:21 78:23
  137:23
**prevented**
  121:14 127:14
**previously** 11:3
  84:20
**primarily** 15:25
  16:2
**primary** 32:24
  51:7,9,12 57:10
**principal** 13:22
  14:19
**principles** 98:21
**print** 97:22
**printed** 9:3

**prior** 52:24 60:7
  141:5
**privilege** 32:10
**privileged** 32:1
**probability**
  28:19
**probably** 8:16
  22:1 105:15
  120:14 132:24
  138:13
**problem** 29:13
  53:6
**problems** 29:13
**procedural** 6:20
**procedure** 8:1
  97:3 99:21
  108:13 127:24
**procedures** 40:9
  40:22
**proceed** 7:22
  41:15
**proceeding** 1:15
  6:4,18 42:3
  47:10 140:13
  142:4
**proceedings**
  141:3,5,6,9
  142:6
**process** 17:15
  26:20 45:6 61:7
  61:9,16 62:1,17
  67:17
**produce** 10:9
  31:12
**produced** 6:17
  25:11 55:23
  124:4

**[product - read]**                                                    Page 25

**product**  14:5
  15:20
**production**
  133:7
**profession**  64:25
**professional**
  14:10,11,23
  16:11 117:19
**professionals**
  73:21 74:2,4
**professors**  27:20
**profile**  38:5 40:6
  48:8,10,17 49:11
  54:16 63:8 64:7
  79:5 89:2,4 99:3
  100:10,11
  107:16,22
  108:10,11
**profits**  130:20
**prone**  90:24
  91:12,23 93:12
  93:18 103:22
**pronounce**  70:25
  120:2
**proof**  29:2
**proper**  139:21
**proprietary**
  29:11
**proud**  111:16
**provide**  9:25
  11:7 31:16
  64:24 75:13
  132:22
**provided**  10:23
  11:12 19:22
  76:15 124:6
**provider**  121:1

**providers**  53:3
**providing**  14:3
**prudicial**  135:10
**pruitt**  42:19
**public**  1:20 13:2
  13:17 39:14
  127:20 128:22
  129:4 141:18
  145:19
**publication**  5:3
  69:3 100:13
  101:18 102:6,17
  103:11 134:18
**publications**
  126:18
**published**  52:6
**pull**  31:20
**pulled**  97:16
**punch**  118:14
**purposes**  7:25
  62:7
**pursuant**  7:24
**pursue**  137:15
**pursuing**  14:21
  15:2 26:17
**put**  71:10,15
  77:2 89:3 97:2
  99:23 105:20
  116:12,14
  125:15 127:2
**putney**  33:1
  57:11,13 86:4
**puts**  108:12
**putt**  86:4
**putting**  26:13
  107:12
**puzzle**  65:1 82:6
  100:5

**pylori**  114:1,3

**q**

**qualification**
  17:15
**qualifications**
  123:4
**qualified**  17:17
  38:21 39:3,17,21
  39:24 41:19
  42:25 49:20
  50:1,6,14 52:7
  54:11,14,20,23
  55:2,3 61:8,14
  61:24 62:15
  73:19,23 74:7,11
  74:13,14 107:17
  141:7
**qualify**  74:13
  124:3
**quarantine**
  127:23
**quarantines**
  129:2
**queen**  122:4
  123:10
**quest**  29:25
**question**  8:16,17
  8:24,25 11:25
  12:12 18:18
  20:13 41:2,25
  43:25 54:19,19
  55:2 61:22
  62:13 65:12
  66:5,10,20 94:6
  101:18 102:12
  105:8 118:3

**questioned**
  119:23
**questioning**  43:7
**questions**  31:15
  58:13 61:22
  95:23 138:2,5,6
  140:3
**quickly**  109:9
**quinine**  112:18
  113:2,2,11

**r**

**r**  2:1 3:1 5:8 6:1
  144:3,3
**raise**  7:13
**raising**  66:3
**range**  47:24 48:1
  64:3
**ranges**  28:14,15
  29:14 30:1
**rate**  17:12,12
  32:7 45:8,8
**ratio**  92:4,6,8
**rays**  40:12
**reached**  32:15
**reaching**  86:16
  92:12
**read**  8:5,7 48:3
  48:25 51:9 69:2
  69:15,18 73:19
  73:21,23,25,25
  74:1,1,7,9,10
  88:11 94:7,9
  97:18 110:3
  115:12 117:13
  121:16,17
  126:17 127:8
  128:9 132:16

**[read - repeat]**                                                    Page 26

139:2 143:9
145:5
**reading** 75:15
87:4 108:20
129:8
**readings** 91:4
**readjust** 116:15
**reads** 11:12 83:4
130:13
**ready** 29:2
**realize** 64:9
138:21
**really** 22:10 27:4
43:2 118:10,12
**reason** 22:8 68:4
87:1 110:9
111:2 117:10
118:4 126:22,24
131:15 143:11
144:6,9,12,15,18
144:21
**recalculate**
116:11
**recall** 30:11 31:7
43:2 45:4
120:17,21
123:21 131:12
131:21,23
132:11 133:17
**receipt** 143:18
**received** 9:20
13:3,10 50:13
103:19
**recipient** 100:16
100:24 101:21
**recited** 123:18
**recognize** 51:24
53:14 58:16

124:24
**recognizes** 64:16
**record** 6:4,5,15
7:2,14 9:8 12:5
18:8,11,13,15,17
24:25 25:1,3
35:7,8 43:18,19
43:21 57:3,7
69:13 70:2 77:8
80:13 84:14
85:2 86:19
87:14 94:9 96:8
96:9,11 105:21
113:20,21,23
118:20,21,23
119:4 136:14,17
136:18,20
139:19 140:9,10
141:9 142:5
**recorded** 6:22
141:6
**recording** 6:17
141:8 142:4
**records** 9:14
32:24 33:24,25
35:1,4,5,11,20
40:15 48:7,25
50:7,20 51:5
53:2,9 54:4,16
55:24 56:18,19
57:1,9,10 62:23
64:19 67:10
69:19 72:10
73:11 76:16
77:9 79:18
80:15 86:5,13
88:22 104:21,23
106:12 115:5

117:3 119:6
125:23,24,24
126:1
**red** 81:15 99:22
115:2
**reduce** 76:7
**reduced** 141:7
**refer** 24:17
32:19 33:6 73:3
97:8
**reference** 15:6
27:3,12,18,23
28:3,10,12,14
29:14,20 30:1,4
**referenced** 11:5
67:3 80:4 81:2
127:11 143:6
**referencing**
11:10,20 56:15
58:21
**referred** 30:20
80:13 97:12
122:3 123:9
**referring** 57:15
135:5
**reflected** 32:2
**reflecting** 48:16
**reflux** 114:4
**regarding** 75:20
78:5,15 85:20
86:25 87:18
92:13
**regular** 110:22
**regulated** 44:4
**regulating** 30:5
30:7
**reichert** 2:13 7:6

**reinsurers** 29:10
**rejected** 44:1
**related** 14:4
45:18 50:25
87:21 88:5
141:11 142:7
**relates** 37:17
71:7 85:17
**relative** 141:13
142:10
**relevance** 120:25
**relevant** 122:8
122:18
**relied** 11:3 69:9
70:8 85:16,19
**relies** 98:14,17
98:20 100:1,7
**rely** 79:10
**relying** 57:5,6,23
58:9 64:8,9 65:8
92:16
**remarried** 136:7
**remedy** 113:1,2
**remember** 24:11
120:14,20
126:17 133:12
**remote** 1:15 8:13
**remotely** 6:13
**remove** 116:4,12
**removed** 116:6
**render** 39:18
52:7 54:21 55:4
131:2,25
**rendering**
132:13
**rent** 102:23
**repeat** 87:10
94:6

Vera F. Dolan, MSPH FALU                     August 26, 2022
Barwick, James v. United States of America

**[rephrase - right]**                                                  Page 27

**rephrase** 71:11
**replace** 28:9
**report** 4:7,10,13
  9:5,6,8,10 10:4,8
  10:24 11:4,11,13
  11:16,20,22 12:5
  22:14 24:5 27:6
  32:18,21 33:23
  34:1 44:11,22,24
  47:19 48:2,3
  51:3 53:22 57:4
  58:17,20 59:5
  63:10,17,19,21
  64:23 65:8,13
  67:3,20 69:21
  72:12 74:15
  75:11 77:16,17
  78:4 80:17,21,23
  82:20 83:24
  84:20,24,24,25
  85:4,12 86:14,16
  86:23,24 87:9,13
  87:16,17,23 88:6
  88:7,11,13 89:7
  93:1 96:13
  108:24 116:21
  125:15 127:17
  135:1,2
**reported** 1:20
**reporter** 6:2,3
  7:11,21 8:13
  12:3 18:7,11,14
  24:22,24 25:2
  43:17,20 70:6
  84:16,18 94:8,9
  96:7,10 113:19
  113:22 118:19
  118:22 126:7

136:13,16,19
138:12,20,25
139:9,13,18
140:6
**reporting** 125:21
**reports** 22:10
  24:2 56:1,1,2,2,5
  56:7,23 57:23
  58:1,8,13 73:22
  74:1 79:10
  80:15 85:16,17
  118:1
**represent** 48:12
  57:2 132:6
**representations**
  122:15,17
**represented** 51:7
  124:11,22
  127:12
**representing**
  62:14
**request** 31:11
**requested** 31:9
  94:10 141:21
**require** 40:24
  41:1
**required** 13:12
  124:5 145:13
**requirement**
  13:15,19 45:24
  46:15,22
**requirements**
  30:3 45:22,22,23
  46:12
**rerun** 116:15
**research** 14:5,5
  15:18,20 94:1,12

**researched**
  37:16
**reserved** 140:11
**resolves** 119:17
**respectfully**
  77:16
**responded** 104:2
**responses** 34:16
**rest** 63:19,20
  64:19 72:10
  87:6 120:21
**restricted**
  128:19
**restricting**
  128:21
**restrictions**
  45:17
**result** 27:8,12,14
  36:1 37:5,20
  38:9
**resulted** 36:6
**results** 72:4 89:9
  89:24,25 90:1
  92:19 93:3
**retained** 17:2
  19:18 20:10
  21:24 22:4,24
  23:14 25:22
  26:1,2 30:23
  36:25 124:10
**retaining** 10:16
  124:15
**retentions** 16:24
**return** 143:13,17
**revealing** 135:8
**review** 34:7,15
  34:18,23 35:7,13
  36:7 51:5 54:3

67:9 117:9
125:22 141:21
143:7
**reviewed** 10:5
  32:22 33:12,16
  33:24 34:1,6
  35:2,3 40:15
  69:2 86:12,19
  91:11,11 98:4
  117:25 119:5
  130:22 131:10
**reviewing** 35:11
  35:19 47:18
**revise** 79:7
**revolution** 15:8
  28:12
**revolutionary**
  27:1
**rhabdo** 104:17
  104:18,20,23
  105:1,4,6,7,9,12
  105:20,25 106:4
  106:8,9,11 107:6
  107:8,9,11,18,18
  108:17,23,25
  109:5 112:17
**rhabdomyolysis**
  104:15
**rib** 81:16,18,21
**ribs** 82:3 86:22
  87:2
**rich** 136:7
**right** 7:13 13:23
  16:18 23:22
  24:24 25:14
  26:15,20 31:22
  35:5 39:12
  41:18 43:14,16

Veritext Legal Solutions

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 173 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

**[right - sent]**                                                    Page 28

55:14 57:8,18 58:9,11 68:24 70:12 71:12 72:16 73:15 80:9,16 83:2 84:2 87:2,3,3,4 88:14,20 96:7 102:17 103:18 107:7 108:5 109:21 113:19 118:19 119:25 120:5 123:20 124:18 125:18 131:14 133:24 134:12 136:16 137:1 138:18,20 138:25 139:13 139:17 140:6,7

**risk** 9:16,18 38:5 40:6 48:8,10,11 48:12,13,17 49:10 51:8 66:3 79:5 89:2 107:22 116:12 116:14 121:25 128:15,16

**risks** 51:9,12

**role** 14:18 66:2 66:20 68:12

**roles** 95:11

**room** 8:14 131:6

**roughly** 22:3

**rule** 9:12 11:23 24:17 25:7 32:11 42:14,17 124:1 134:24

**ruled** 114:8

**rules** 6:21 8:1 29:8 124:5

**run** 96:15

**ruptured** 35:22 48:20 49:16 50:2,16 60:22 67:11,16

**rush** 43:6 95:24

**s**

**s** 2:1 3:1 4:5 5:1 5:8,8 6:1 144:3

**sacramento** 102:25

**salopek** 44:8,9

**saw** 35:20,24 53:2 54:15 86:20 87:2 119:3

**saying** 39:16 47:4 52:6 63:5 71:22 72:18 82:3 91:18,19 98:16 101:6 132:8

**says** 16:23 25:15 67:4 72:25 74:16,23 80:21 80:23 83:10 84:6 89:8 100:23 102:22 104:14 112:15 126:11

**scan** 4:13 70:10 71:7,20 72:5,13 73:20,24 75:19 81:11 83:11 117:21 118:11

**scans** 73:25 74:8 74:10

**scarce** 28:2

**scared** 129:13

**scary** 129:13

**school** 39:11,13

**sciatic** 114:14,18

**science** 13:2

**scientific** 15:8

**scientist** 29:1

**scope** 36:24 37:23 38:12 49:5 50:12 53:17,25 54:8 61:1 83:7,14,23 99:11 104:1 106:20 108:19 117:23 118:8 119:19

**score** 9:18

**screen** 17:14 58:12,14 80:18 134:16

**scroll** 63:13,13

**scrolling** 58:24

**se** 67:1

**search** 17:5

**second** 4:19 16:22 26:23 58:25 72:24 74:15 113:15 125:3,4,7 133:12 133:15,20 134:21

**secretary** 120:17

**section** 56:18

**security** 120:12

**see** 18:9 25:12 25:13,19 29:10 34:10,11 35:25 42:12 51:4 56:11 57:9,9,15 58:14,25 59:3 61:3 63:18,20,21 66:15 67:15,19 68:24 73:13 74:16,18 78:12 80:6,6,10,18,19 80:24,25 81:25 82:21,23,24 83:4 83:6 89:2,13 90:2,13 92:20 94:3,17 97:23 98:2 99:5 105:13,14 114:22 117:3,14 117:20 119:9,13 123:17 125:2 131:16 134:16 137:14

**seeing** 31:7 131:12,21 132:11

**seek** 137:2

**seeking** 130:18 137:2

**seen** 115:4 119:10

**selling** 28:22

**send** 133:6 140:3

**sending** 139:16

**sends** 34:18,25

**sent** 31:8 96:22 97:13 126:1 143:14

**[sentence - sorry]**                                         Page 29

| | | | |
|---|---|---|---|
| **sentence** 72:24 | **shared** 96:21 | 124:3 127:16 | **simply** 53:22 |
| 83:4 84:6 | 100:20 | 130:5 133:4 | 86:15 87:24 |
| 126:11 127:2 | **sheet** 143:11 | 135:23 138:5,7 | 119:17 |
| **separate** 30:1 | **shift** 66:6 | 138:16 | **single** 19:14 |
| 60:19 | **shoemaker** 2:13 | **short** 104:21 | 101:18 116:20 |
| **sepsis** 38:9 67:17 | 7:6,7 10:1,18,22 | **show** 71:18 | **sir** 8:6 97:25 |
| **september** 133:2 | 24:9 25:10 26:4 | 72:11 77:9 | 134:17,20 |
| 143:3 | 30:16 31:4,8,25 | 87:18 95:18 | 139:18 |
| **septic** 35:22 | 33:22 36:23 | 100:5 113:5 | **sit** 36:18 |
| 60:23 67:11 | 37:8,22,25 38:11 | 122:2 134:8 | **sitting** 39:16 |
| **serious** 128:5 | 41:20,23 42:13 | **shown** 136:4 | **situation** 15:22 |
| **serum** 89:22 | 43:5,13,15 46:18 | **shows** 48:15 | 16:21 27:16 |
| **serve** 119:24 | 46:24 49:4 50:4 | 71:21 72:13 | 137:9 |
| 120:4 | 50:21 52:9,18 | 96:25 | **six** 66:17 |
| **served** 20:20 | 53:16,24 54:7 | **shut** 29:6 121:8 | **skills** 141:10 |
| 21:5 22:19 | 55:6 56:8 60:9 | 127:23 | 142:6 |
| 119:22 | 60:25 62:3 | **shutting** 128:20 | **skip** 113:25 |
| **service** 17:11 | 63:18 64:13 | **sic** 19:10 80:1 | **skipped** 115:5 |
| **services** 17:7,21 | 66:4,9 69:6,15 | 83:8 114:13 | **sleep** 33:2 |
| 18:20 19:20,23 | 69:25 75:8 77:6 | 127:17 132:5 | **small** 68:8 |
| 45:9,11 | 77:12 78:16 | **side** 34:12 | **smith** 142:2,15 |
| **serving** 34:8 | 82:15,25 83:13 | **sign** 8:5,7 115:22 | **smoking** 51:16 |
| 43:1 130:23 | 83:21,23 84:10 | 139:2 143:12 | 116:8,14 |
| 137:21 | 84:19,23 85:12 | **signature** 59:1 | **snapshot** 20:15 |
| **set** 27:22 48:2 | 86:18 88:2,15,17 | 140:11 141:16 | **sneak** 50:24 |
| **sets** 57:10 | 91:15 92:1 | 142:14 | **sodium** 90:3,25 |
| **setting** 16:10 | 93:16 95:20 | **signed** 143:20 | 91:13 92:21 |
| **settle** 22:11 | 96:4 97:15,23 | **significance** 17:6 | 93:7,11,13 |
| **settlement** 16:3 | 99:10,17 101:23 | 70:24 71:5 82:1 | **solution** 139:23 |
| 16:5 | 102:8,13,16,20 | 94:24 | **solutions** 143:23 |
| **settlements** 16:8 | 103:25 106:6,19 | **significant** 14:24 | **soon** 139:19 |
| **severe** 109:24 | 108:18 109:8,12 | 19:15 76:22 | **soros** 130:14 |
| **severity** 109:1 | 110:16,24 111:6 | 77:25 89:19 | **sorry** 13:25 19:9 |
| **sex** 28:11,17 | 111:17,24 112:2 | **signs** 95:15 | 33:21 46:3 49:8 |
| **share** 10:12,14 | 113:14,18 | **similar** 22:14 | 56:6 72:6 79:14 |
| 58:12 97:17 | 117:22 118:7,17 | **simple** 61:23 | 79:18 87:11 |
| 133:2 | 119:18 120:24 | 65:11 | 109:12 129:20 |
| | 122:5,10,21,24 | | |

**[sort - successful]**                                                      Page 30

| | | | |
|---|---|---|---|
| **sort** 13:13,18 16:23 26:8 47:17 48:4,4 50:22 53:6 61:15,25 94:15 103:1 | 35:13 45:1,3 | **statements** 129:9 | **studies** 40:1 |
| | **spleen** 83:5 | **states** 1:1,8,16 2:12,16 3:4 6:8 7:8 22:20 23:14 51:5 52:2 91:12 96:16 114:1 115:8 121:15,21 122:1 126:12,22 127:6,14 128:3 143:4 144:1 145:1 | **study** 37:10,12 38:3 41:12 69:8 69:8 70:8 85:19 |
| | **split** 20:23 | | **stuff** 65:4 72:23 138:13 |
| | **spoke** 123:19 129:14 131:7 132:3 | | **subheading** 19:14 55:9 |
| **sorting** 56:12 | **spring** 26:24 | | **subject** 15:4,24 16:14 20:21 23:17 36:7 |
| **sounds** 70:11,11 | **stand** 54:9 110:12 129:9 132:9 | | |
| **source** 137:13 | | **stating** 72:16 | **subjects** 21:10 |
| **sources** 9:15 | **standard** 27:16 27:23 28:2 46:6 46:8 97:3 98:21 99:21 108:12,13 128:22 129:3 | **statistical** 27:21 48:15 | **submitted** 31:3 44:22 124:25 |
| **south** 1:17 | | **status** 46:25 47:3 48:19 | **subparagraph** 55:11,17 89:8 93:2 94:3,16 96:16 99:25 103:2,12 112:15 113:25 115:7 |
| **southeast** 143:15 | | | |
| **southern** 122:15 | | **stay** 138:8 | |
| **speak** 44:3,4 50:6,10 56:19 58:6 73:4 87:4 87:20 | **standing** 101:6 114:10 122:23 123:1 133:5 | **stenographic** 6:23 | |
| | | **sterling** 25:17 | **subparagraphs** 55:11 89:8 116:20 117:1 |
| | **stands** 12:25 | **steve** 7:4 | |
| | **stapled** 11:23 | **steven** 2:4 | |
| **speaking** 28:25 49:18 | **start** 55:16,21 90:5 104:16 131:8 | **stink** 126:16 | **subscribed** 145:14 |
| **speaks** 73:5 92:18 | | **stipulation** 6:24 34:10 131:17 | **subsection** 104:13 106:3 107:4 109:16 |
| **specialist** 40:15 | **started** 27:19 | **stomach** 83:5 | |
| **specialty** 120:7 | **starting** 65:9 111:25 | **stop** 93:9 121:9 | **subsequently** 35:22 |
| **specific** 28:17 43:25 56:9,9 100:13 101:17 103:11 106:9 108:4 121:17 | **starts** 11:21 | **straight** 97:6 131:5 | **substance** 56:18 79:16,17,21 89:12 101:10 |
| | **state** 6:11 7:14 24:12,13 25:6 42:20 43:3 44:4 44:6 61:3 100:7 127:12 141:19 | **street** 2:6,18 | |
| | | **strike** 90:7 92:7 | |
| | | **striking** 59:13 59:14 | |
| **specifically** 15:5 56:4 100:22 101:1,14 | | **structured** 16:8 | **substitute** 28:15 28:16 |
| | **stated** 42:4 51:25 125:25,25 | **students** 27:21 | |
| **speculation** 106:7 128:16 | **statement** 39:4,5 39:8 117:21 130:13 | **studied** 37:11 38:13 | **successful** 28:22 29:7 |
| **spellings** 139:21 | | | |
| **spend** 35:10 | | | |
| **spending** 14:24 | | | |
| **spent** 26:10,13 26:17 32:13 | | | |

**[suffer - testify]** Page 31

**suffer** 91:22 99:15

**suffered** 81:12

**suffers** 82:4 111:23

**sufficient** 75:12

**sugar** 93:12

**suggest** 94:19

**suggesting** 79:23 128:23

**suggests** 80:11

**suite** 1:18 2:6,18

**summarized** 35:2

**summarizing** 56:25

**summary** 48:5 60:2 130:7

**summering** 56:25

**superior** 42:19

**support** 14:8 57:23 59:23 75:19 78:15 83:19 85:20 96:18 98:25 100:2 103:2 114:16 115:10 116:25 121:11 123:16,17

**supporting** 9:6,7 9:17 73:2 79:11 92:16

**supports** 55:25 59:6 78:4 86:25 100:14 102:7 103:12 112:19

**supposed** 107:23 108:1 117:4

**supreme** 52:13

**surcharge** 45:16 45:20,25

**sure** 10:22 20:14 40:11 43:9 50:24 63:23 70:2 74:25 87:11,14 91:17 93:10,10 97:19 105:18 113:17 118:17,18 122:21 129:11 129:11 137:14 137:17 140:5

**surface** 73:1,17

**surgeries** 36:1

**surveys** 15:21

**swear** 6:12 7:12

**swisebram** 2:9

**sworn** 6:15 7:18 118:5 127:2 141:5 145:14

**symptoms** 95:15 110:18

**syndromes** 114:14

**t**

**t** 4:5,11,14,17 5:1,8,8 33:13 144:3,3

**table** 48:14

**tables** 48:14 116:16

**tailored** 15:6

**taitz** 4:22 119:24 120:1,2,4,8 121:1 122:3 123:9,17 125:9 129:13 131:4,23 132:20

**taitz's** 124:13,25 125:20

**take** 6:4,10 37:10 43:7,11 56:4 59:21 60:5 75:25 76:10 88:22 95:24 113:14 116:17 118:15 133:8,23 138:13

**taken** 6:7 7:24 49:23 52:14 60:13 75:24 95:1 115:13 141:3,12 142:9

**talk** 8:15 10:24 47:17 54:18 56:5 69:3 112:4 135:11

**talked** 37:14 38:15 43:23 45:1 47:9 79:8 80:5,22 118:1 129:1,1,2,15

**talking** 19:9 26:9 26:15 29:9 56:9 59:22 66:23,24 68:17,17,20 71:11 78:6,9 93:4 101:2

**talks** 92:20 103:5

**taught** 71:9

**tech** 74:14

**technology** 14:6

**tell** 7:19 9:8 12:24 15:3,16 17:6 23:17 25:8 27:1 29:13 32:21 37:19 45:20 57:4,8 59:5 68:7 78:20 85:24 89:9 92:22 101:19 102:1 110:13 112:19 133:24 139:1

**telling** 25:5 77:5 115:21 131:23

**template** 97:4

**ten** 35:25 96:2

**term** 40:25 99:15

**terminology** 72:19

**terms** 49:15 50:1 55:24 121:18

**test** 27:2,17,23 28:3,5,12,18 29:20 89:9,24,25 90:1 92:19 93:2 114:1,6

**tested** 27:6 98:12

**testified** 7:20 21:11,21 25:6 105:24 109:22 118:2 124:20 131:9 132:6

**testify** 25:9 45:13 46:23

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 177 of 315
Vera F. Dolan, MSPH FALU                August 26, 2022
Barwick, James v. United States of America

[testify - treat]                                                    Page 32

54:2 110:12 111:22 122:19
**testifying** 23:18 37:25 47:15 110:1 132:19 141:5
**testimony** 9:12 10:5 24:12 36:24 37:23 38:12,17 42:7 43:25 44:5,12,21 47:6,10,12 49:14 49:21 50:1,22 53:11,17,19,25 54:6,8 61:1 62:12 68:3 73:2 86:25 88:17 99:11 101:13 102:7 104:1 108:16,19,24 109:19 117:10 117:23 118:5,8 119:19 121:13 123:2 124:2,4,11 143:9,18 145:8
**testing** 45:23
**tests** 28:18 40:5 40:7,13,22 41:1 89:12 90:21
**texas** 121:21,22 122:16 126:14 127:10,12
**thad** 109:4
**thank** 7:11,21 8:23 11:8,24 34:3 70:6 73:15 85:13 138:3,4,18 140:7

**thanks** 34:4,4 113:18 138:17
**thing** 64:23 101:3 103:15 106:8 115:2 129:13 133:25 136:7
**things** 16:8 38:5 39:6 40:1,5,17 40:18,20,21 41:9 63:7 64:4,10,22 71:15,17,25 73:6 75:16 76:7 77:11 93:4 97:8 98:11,14 99:22 100:10 106:2 126:9 130:21
**think** 11:24,25 18:5 22:6 25:10 25:11 26:15 29:12 30:20 31:1,1 32:15 45:5,10 54:11 55:1 66:4 69:20 72:16 80:13 84:17 92:18 95:22 97:13 104:2 109:1 115:5 122:8,16 122:20 123:1 125:1,11 126:4 134:11 136:11 139:23,23 140:1 140:2
**third** 21:2 127:1
**thought** 19:10 79:9

**thousand** 24:20 35:4
**thousands** 35:11 71:16 78:25,25 78:25 88:24,24
**threat** 128:4
**three** 9:15,16 20:24 21:9 23:6 23:7 27:7 38:16 51:14 84:24
**threw** 130:3
**till** 117:5
**time** 1:14 7:1 8:19 11:6 14:20 14:24,25 19:21 19:25 24:1,11 26:10,13,17 28:18,18 35:10 37:3 40:7 45:1,3 45:15,18 53:20 61:20 67:10 68:10 77:20,23 96:2 103:15 108:17 109:20 112:14 128:11 133:8 135:15 143:19
**timeframe** 143:8
**times** 8:16 17:3 21:5,7,21,24 22:9,11,20 77:7 126:17
**timesheets** 31:3
**tiny** 97:22
**tissue** 67:6 70:23
**title** 97:18
**today** 9:4 10:6 28:3 36:19 87:8

87:12 129:10
**told** 55:1 79:10 90:9 111:2 119:5 131:9,13
**tools** 29:11
**top** 16:23 17:24 47:25 94:15 104:10 114:12
**total** 60:11 102:4 136:22
**totality** 72:2 75:16 95:17 101:14 107:14
**touch** 52:20,21 58:2
**toxin** 112:25
**traditionally** 79:3
**trained** 117:19
**training** 14:7 39:19,20 50:13 67:22
**tran** 139:12
**transcriber** 142:1
**transcript** 6:17 69:17 139:6 141:21 142:3,5 143:6,20 145:5,8
**transcriptionist** 141:8
**travel** 45:15,17 45:18,20 46:1,2 46:4,6,8,14 127:6 128:21
**traveling** 121:15
**treat** 62:8 114:24 115:1

Vera F. Dolan, MSPH FALU                    August 26, 2022

Barwick, James v. United States of America

**[treated - united]**                                   Page 33

**treated** 29:22
51:6 52:23
75:24 119:1,16
**treating** 121:4
**treatment** 38:25
39:6 76:6,17
112:18 119:7
**trial** 24:19 25:16
25:16 42:18
47:7 136:6
**true** 12:12,16
61:16 91:18
98:7 106:2
141:9 142:5
145:8
**trump** 128:18
129:11
**truth** 7:19,19,20
111:3
**truthful** 111:1
**try** 43:8 138:7
139:20
**trying** 14:25
50:23,24 59:21
61:21,22 65:11
74:6
**tuberculosis**
129:16,23 130:1
**turn** 51:3 56:5
96:25 119:21
**turned** 31:2
**twenty** 21:18,19
21:20
**two** 24:18,19
27:8,13 28:18
55:23 57:9,22
65:19 79:10
86:8 97:13

117:25 125:2
136:11,12
137:12
**type** 94:1 133:19
**types** 69:3
**typewriting**
141:7
**typical** 53:8
**typically** 135:4

**u**

**u** 5:8,8
**u.s.** 6:9 9:21
10:10 30:21,24
48:14 52:13
111:21 123:24
130:19
**ultimate** 47:18
**ultrasound** 4:10
55:19 57:6,17
58:16 59:2,23
65:13 67:19
69:4,11,21 70:17
71:21 76:18
77:17 79:23
80:4,11 84:23
85:3,21,25 86:3
**ultrasounds**
57:14
**umbrella** 14:11
**unclear** 41:23
**undergo** 76:17
**underlying** 24:7
38:3,4,4 114:11
125:8
**understand** 6:16
20:5 34:20
37:14,16 41:2,4

41:5 44:20
45:19 47:5,19
49:7 51:24 52:5
52:13,17,23 53:4
58:1,7 62:12
64:11 65:7 67:9
70:15 74:24
76:16,19 80:16
87:16,19 89:1
101:12 103:22
105:8,10 107:8
124:14 129:18
**understanding**
75:5 85:18
106:16 117:18
120:3 124:15
126:21,24
**understands**
42:1
**understood** 8:25
34:20 124:7
**underwent**
35:25
**underwrite** 48:6
54:22
**underwriter**
39:1,10 40:12,19
41:7,13 50:10,19
52:4,20 54:14,15
54:24 61:11,12
61:20 62:9,11,13
64:21 67:25
69:14 71:14
74:14 78:1
86:12 94:24
97:2,5 98:20
107:20,21,21,23

**underwriters**
40:7,25 41:8,9
53:9 54:23
60:11 79:2
88:21 97:7
107:24 108:7
**underwriting**
13:9,10 14:5,7
21:1 29:11 40:4
42:21 44:3,18
52:11,22 54:10
60:20 61:17
62:6,8,16 64:25
73:8 75:13
96:23,23 97:7
98:9 99:2,21
100:19 101:9
102:5 103:5,15
103:17 106:25
107:11,15 108:2
108:3,11 110:3
115:12 130:17
131:14 135:2,25
**undiagnosed**
42:3,5 59:6,9
99:1 100:3
104:8 114:17
115:11 116:4,25
**undisclosed**
107:25 108:9
**uni** 29:16
**unisex** 27:25
29:16
**united** 1:1,8,16
2:12,16 3:4 6:7
7:8 22:20 23:14
121:15,21 122:1
126:12,22 127:6

Case 1:21-cv-00144-LAG    Document 21-4    Filed 02/13/23    Page 179 of 315

Vera F. Dolan, MSPH FALU

August 26, 2022

Barwick, James v. United States of America

[united - went]

Page 34

| | | | |
|---|---|---|---|
| 127:14 143:4 144:1 145:1 | 110:2,4,8,14,19 111:23 112:9,17 | 145:12 | 95:24 96:15 105:19,23 |
| **university** 13:4 | 113:4,7,9 114:22 | **verbatim** 48:3 | 125:16 129:25 |
| **unremarkable** | 115:3,17,18,22 | **verdict** 136:5 | 131:16 134:8,9 |
| 71:6,22 72:3,8 | 116:13 117:7 | **verification** | **wanted** 15:20,20 |
| 72:17,20 82:12 | **useful** 81:8 | 118:12 | 15:21,22 20:14 |
| 87:24 88:12 | **uses** 6:19 115:1 | **verify** 143:9 | 33:22 66:13 |
| **untreated** 130:1 | **usual** 8:12 46:6 | **veritext** 6:4 | 121:7 126:10 |
| 131:4 | **usually** 10:13 | 143:14,23 | **wants** 52:10 |
| **unusual** 91:6 | 53:9 | **veritext.com** | **war** 111:5 |
| **update** 12:16 | | 143:15 | **warned** 113:3 |
| **updated** 5:5 | **v** | **veronica** 3:3 7:7 | **warranted** |
| **updates** 12:19 | | **versus** 16:13 | 119:11 |
| **usa** 80:10,12 | **v** 1:7 4:22 6:7 | 26:11 42:19 | **way** 15:6 19:20 |
| **usdoj.gov** 2:20 | 25:17 44:9 | 69:4 136:24 | 20:5 22:6,12 |
| 2:21 | 113:25 143:4 | **vetted** 98:5 | 25:15 27:24 |
| **use** 40:25 42:6 | 144:1 145:1 | **vfd** 13:24,25 | 37:19 42:17 |
| 44:15 51:15,17 | **vaccinated** 46:17 | 14:1,11,16,19 | 45:7 55:12 70:3 |
| 52:1,8,15 53:5 | 46:20 47:5 | **videoconference** | 72:14 76:9 77:4 |
| 53:13,23 54:5,13 | **vaccination** | 1:11 2:3,4,14,15 | 90:5,10 91:19 |
| 54:17,21 55:5,10 | 45:23 46:11,15 | 3:5,6 | 94:20 97:9 |
| 55:13 57:24 | 46:21 | **vietnam** 111:5 | 100:25 101:21 |
| 59:7 60:7 69:10 | **vague** 41:25 | **view** 29:13 | 103:3 105:16 |
| 70:9 71:7,24 | **values** 89:19 | **virtual** 11:11 | 117:5 118:9 |
| 72:9,15 73:3,5,6 | 90:6,9,9 91:4,10 | **virtually** 6:18 | 123:23 127:7 |
| 74:20 75:7,17 | 92:15,15 93:5 | **virus** 128:13 | 134:23 135:24 |
| 77:2 81:12,21 | 94:3 | **volunteered** | **we've** 40:12 |
| 82:5,7,9,13 | **various** 15:25 | 111:5 | 69:12 107:19 |
| 83:20 86:10 | **vast** 20:19 22:12 | | **wear** 46:7 |
| 89:21 92:18 | 35:12 | **w** | **websites** 18:2,18 |
| 94:25 95:3,16,19 | **vdf** 13:22 14:14 | | 18:22,25 19:4 |
| 96:24 97:1,5,8 | **vegas** 1:17,19 | **wait** 8:18 10:9 | 134:1 |
| 97:10 99:24 | 6:9 | 63:13 109:8 | **weight** 66:17 |
| 100:12,17,19,25 | **vehicle** 94:16 | **waited** 117:5 | **welcome** 31:14 |
| 101:10,16 102:3 | **vera** 1:12 4:8,19 | **waiting** 29:3 | 32:6 133:5 |
| 103:9 104:12 | 5:3,11 6:6 7:9 | **want** 8:20 10:18 | **went** 22:18 29:1 |
| 105:1 107:2,16 | 7:15,17,24 11:13 | 10:19 47:17 | 48:11 93:1 |
| 108:9 109:17 | 12:5 143:1,5 | 49:7 56:4 66:6,9 | 111:5 121:21 |
| | 144:2,24 145:2,4 | 70:1,2 73:9 79:7 | |
| | | 82:2 87:11 | |

Vera F. Dolan, MSPH FALU                    August 26, 2022
Barwick, James v. United States of America

**[went - zurich]**                                                    Page 35

132:6
**wet** 81:4
**whatsoever** 94:2
95:10 115:20
**wife** 136:7
**wisebram** 2:4
7:4 138:22
**witness** 6:13,15
6:16 7:12,18
16:11 17:3,5
18:4,20 19:18
20:10,11,16,21
21:6,25 22:4,19
25:14 26:3,5
30:15 34:8
37:24 38:2,17
42:2,15 43:1,14
43:16 56:13
63:20,24 64:14
66:7 77:14 83:2
83:25 88:18,19
94:11 96:6
97:20,24 102:15
111:9 112:1
118:18 122:14
122:19 123:4
124:12 127:19
131:11 136:24
137:8,16,21
138:4,6 141:4
143:8,10,12,19
**women** 29:19
30:2
**word** 63:16
65:12 70:25
73:13,14
**words** 12:18
19:24 21:10

34:15 51:21
92:11 125:22
**work** 15:17
16:10 19:1 26:9
26:11 28:7,15
30:15 32:3 99:4
100:1,7,16,24
101:15,20 102:2
103:6 104:4,21
136:23 137:4,8
137:12
**worked** 30:16
32:8
**working** 24:5
26:10 32:14
45:2
**worksheet** 9:10
**world** 29:7
**wow** 81:16,16
**wreck** 95:4,7
**write** 99:25
103:12
**writing** 71:17
**written** 6:24
11:16 32:18
44:22,24
**wrong** 57:8 79:9
79:15,19 85:24
**wrote** 88:23
101:14 107:4
132:2

**x**

**x** 4:1,5 5:1 40:12
141:21

**y**

**yeah** 12:14 15:5
17:9 18:9 24:19
25:14 26:21
31:8,21,25 34:25
42:16,21 43:13
49:7 53:1,1 57:9
58:4,22 62:21
70:11,18 72:8
77:14 78:10
79:25 81:25
83:7,15 87:20
90:14 96:2
97:20,21 109:14
109:22 123:25
124:1 125:7
132:25 138:11
138:15 139:7
**year** 19:6,12
137:6
**years** 20:15
47:21,21,22,23
53:21 115:25
124:4 137:12,20
**yep** 25:13 96:14
**yesterday** 10:9
11:1 96:21
**york** 126:17
**young** 29:18

**z**

**zuckerberg**
130:14
**zurich** 44:9

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by paragraph (1) of subsection (f) of this Code section whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed. If the deposition is not reviewed and signed by the witness within 30 days of its submission to him or her, the officer shall sign it and state on the record that the deposition was not reviewed and signed by the deponent within 30 days. The deposition may then be used as fully as though signed unless, on a motion to suppress under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Expert Report of
# Vera F. Dolan, MSPH FALU

EXHIBIT

1



Vera F. Dolan, MSPH FALU
VFD Consulting, Inc.
4788 Diza Court
Las Vegas, Nevada 89122-7574
702.476.8500
dolanvp@consultancy.com

July 8, 2022

E. Bowen Reichert Shoemaker
Assistant United States Attorney
Middle District of Georgia
300 Mulberry St., Suite 400
Macon, GA 31201

Re: Life expectancy of James Barwick as of October 8, 2019, Barwick v. USA

Dear Ms. Shoemaker,

You asked me to calculate the life expectancy of Mr. James Barwick as of the morning of his visit to Albany Area Primary Health Care on October 8, 2019, when he was 48 years old.  The methods I used to assess Mr. Barwick's mortality risk are the same as those used in life insurance underwriting.  The calculations I used to derive his life expectancy are the same as those used in life settlements.

Based on a reasonable degree of life underwriting and life settlement certainty, and the medical and other records I reviewed, Mr. Barwick's primary mortality risks were alcohol use disorder, type 2 diabetes with comorbidities, and current smoking.  A statistical life expectancy was calculated that indicates Mr. Barwick had a lower life expectancy than the **31.6** years expected for the average 48 year old U.S. non-Hispanic white male, with a middle estimate of **13.9** years (lower limit of **11.1** years and an upper limit of **16.9** years).

The steps used to calculate the life expectancy for Mr. Barwick as of October 8, 2019 are:
1. Determine Mr. Barwick's age as of October 8, 2019.
2. Select an appropriate life table to estimate Mr. Barwick's life expectancy as if he had the same overall health status as the general U.S. non-Hispanic white male population.

3. Determine from Mr. Barwick's medical and other records if there were any medical impairments[1] or risks that would affect his life expectancy as of October 8, 2019.

4. Determine which medical impairments and risks would have had the most impact on Mr. Barwick's life expectancy as of October 8, 2019.

5. Obtain reasonable estimates from the medical literature of mortality risks at or close to Mr. Barwick's status of these medical impairments and risks.

6. Extract these mortality risks as factors that can be applied to the selected life table.

7. Calculate the adjusted life expectancy for Mr. Barwick, using the selected life table adjusted by the factors described in step 6.

The materials that I reviewed and relied on for Mr. Barwick's personal medical history as of October 8, 2019 were:

1. Complaint;

2. Medical records from Mr. Barwick's health care providers including: Albany Area Primary Health Care, East Albany Medical Center, Phoebe Putney Memorial Hospital, Philip Poulos MD, Phoebe Sleep Disorders Clinic, Nexus Pain Center of Albany, Georgia Home Medical; and

3. Mr. Barwick's deposition.

In my investigation and review of these materials, I found that James Barwick was a non-Hispanic white male born on February 22, 1971.  As of October 8, 2019, Mr. Barwick was 48 years old.

The life table to be used in this life expectancy calculation for Mr. Barwick is the 2018 life table for U.S. general population non-Hispanic white males.[2]  This is the most current available life table for U.S. general population non-Hispanic white males.  The life expectancies in the 2018 U.S. general population non-Hispanic white male life table represent the average mortality risk of this sex- and race-specific demographic group.

---

1. The term "impairment" is used in the life insurance industry to indicate any medical or other condition that can elevate mortality risk.
2. https://www.cdc.gov/nchs/data/nvsr/nvsr69/nvsr69-12-508.pdf, pp 24-25

According to this life table, the life expectancy for an average U.S. non-Hispanic white male at age 48 is **31.6** years, with an average expected age of death of 48 + 31.6 = **79.6** years.  Based on a reasonable degree of life underwriting certainty, Mr. Barwick's mortality risk was **not** average; he had health risks and conditions that indicate a lower life expectancy than would be expected of the average U.S. non-Hispanic white male.

I made notes of Mr. Barwick's adverse medical conditions while reviewing his medical records and deposition.  These adverse medical condition notes are being produced with my report because they document my review and show the factual basis for my life expectancy opinions.

From a review of his medical records and deposition, Mr. Barwick has been diagnosed and treated for many impairments, some that represented a primary excess risk of mortality, and some that were not primary excess risks of mortality.  As indicated in Step 3, these impairments evaluated for excess risk of mortality as of October 8, 2019 include:

1.  Alcohol use disorder (AUD): Based on a reasonable degree of life underwriting certainty, Mr. Barwick has alcohol use disorder.  Life underwriters have a duty to detect and identify undisclosed and undiagnosed alcohol use disorder as part of their job responsibilities.  This generally accepted practice is being followed in this case by assessing all available information about Mr. Barwick, including his medical conditions, laboratory test results, family history and personal behavior. Information that indicates that Mr. Barwick more likely than not has AUD is sufficient to assess him as having AUD.  Indications that collectively provide the underwriting impression that Mr. Barwick has AUD include the following:
    a.  Ascites and hyperechoic liver on ultrasound (cirrhosis), history of distended abdomen (ascites);
    b.  Abnormal liver function test results;
    c.  Chronic reflux esophagitis, gastroesophageal reflux disease (GERD), heartburn and chronic noncardiac chest pain;
    d.  Denial of consumption of any alcohol during 2019, 2018 and 2017;
    e.  Denial under oath of history of GERD;

f.  History of 2017 motor vehicle accident, fall off a ladder causing broken bones, and second degree burn from fireworks accident;

g.  Chronic lower back pain from fall and pain from broken bones;

h.  Chronic lack of employment and on disability (cited underlying causes of disability are vague, variable and inconsistent);

i.  No insurance through work and relies on Medicaid for health insurance;

j.  Lives on family farm paying no rent, admits under oath that he moved there because he "needed to get away from Sacramento, too."

k.  Chronic electrolyte imbalance (abnormal low sodium, low chloride, low potassium)

l.  Chronic dehydration;

m.  Low serum creatinine, low total protein and low albumin;

n.  Muscle cramps (alcohol associated rhabdomyolysis) and family history of muscle cramps (paternal grandfather);

o.  Family history of muscle cramps indicates family history of alcohol use disorder;

p.  Acute kidney injury associated with alcohol associated rhabdomyolysis (myoglobin nephrotoxicity) and insistent use of nephrotoxic quinine as treatment for muscle cramps;

q.  History of abscessed teeth and gums, and neglect of dental care;

r.  Asks for medication refills without following up with office visit or keeping appointments;

s.  Does not show up for scheduled medical appointments and does not notify office to cancel;

t.  Admits under oath to having children with two women, and states under oath at the age of 48 he is currently married for "22 or 23 years, something like that" but was with the other woman for "10 years or so."  Medical records show that current partner describes herself as a "girlfriend."

u.  Admits a history of drinking alcohol to control pain;

v.  Negative 2016 breath test for H. pylori;

w.  History of oral thrush, skin rashes from non-fungal dermatitis, and folliculitis;

x.  Vague and nonspecific assertions of smoking due to being "stressed";

y.  Vague and nonspecific assertions of "being stressed" and "working excessively";

z.  History of anxiety, mild depression, fatigue and malaise;

aa.  Inconsistent reports of smoking history and habits;

bb.  Will not trim beard to comply with CPAP fit;

     cc.  Pain syndromes including acute sciatic nerve irritation, low back pain, noncardiac chest pain;

     dd.  Inconsistent attendance at pain management clinics, switching providers, stopping pain management treatment, history of losing pain medications, vague and nonspecific negative assertions regarding pain management care providers; and

     ee.  Repeated requests to replace equipment such as blood glucose analyzers and CPAP machines with the assertion that they are "broken" or don't work.

2. <u>Type 2 diabetes mellitus (DM2) with comorbidities</u>: Mr. Barwick has Type 2 diabetes mellitus that is controlled with both insulin and oral medications.  Other conditions associated with Mr. Barwick's DM2/comorbidities include: benign essential hypertension, morbid obesity, elevated microalbumin, acute kidney injury, hyperlipidemia, familial hypercholesterolemia, tachycardia, pitting edema lower extremities, family history of Type 1 and Type 2 diabetes, ear infection.

3. <u>Current smoking</u>: Mr. Barwick is a current smoker of cigarettes.  Other conditions associated with Mr. Barwick's current smoking include: chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA) syndrome, organic sleep apnea, bronchitis, inconsistent reports of smoking habits; use of smokeless tobacco, restless legs at night, daytime fatigue, sleep disturbances, accidents and injuries.

4. <u>Other conditions</u>: gallstones, cholecystitis, seasonal allergies, allergic rhinitis due to pollen, disc disease, spondylosis, sacroiliitis, intervertebral disc disorders with radiculopathy.

Based on a reasonable degree of life underwriting certainty, Mr. Barwick's primary excess mortality risks as of October 8, 2019 were his AUD, DM2/comorbidities and current smoking impairment groups. The risks presented by Mr. Barwick's AUD, DM2/comorbidities and current smoking impairment groups will be represented by the best studies in the medical literature that come closest to Mr. Barwick's characteristics.

A search was conducted using the National Library of Medicine's PubMed facility[3] for mortality study articles in the peer-reviewed medical literature that provide reasonable estimates from the medical literature of mortality risks at or close to Mr. Barwick's status for these medical impairment groups.

---

3. http://www.ncbi.nlm.nih.gov/sites/entrez

Criteria for selection of the best studies to represent Mr. Barwick's primary causes of excess mortality risk included reasonable estimates of the long-term relative mortality risk associated with his AUD, DM2/comorbidities and current smoking impairment groups.

No literature source used in this life expectancy calculation indicates the specific risk of an individual with Mr. Barwick's precise characteristics.  The mortality risk estimates closest to Mr. Barwick's impairment and risk factor status were selected from mortality study articles based on a reasonable degree of life underwriting certainty.

1. Alcohol use disorder (AUD): A meta-analysis of 15 to 20 clinical studies of men with alcohol use disorders excluding Veteran affairs samples best represents Mr. Barwick's statistical mortality risk from his AUD impairment group.[4]  In Table 3 of this study, relative risk for age 40 to 49 is **5.90**, with **4.43** and **7.86** respectively as the lower and upper 95% confidence interval for this relative risk estimate; relative risk for age 50 to 59 is **3.80**, with **3.05** and **4.74** respectively as the lower and upper 95% confidence interval; and relative risk for age 60+ is **2.14**, with **1.63** and **2.81** respectively as the lower and upper 95% confidence interval.

2. Type 2 diabetes mellitus (DM2) and comorbidities: An 8-year follow-up study of 8,334 patients clinically diagnosed with Type 2 diabetes and treated in 10 U.S. managed health care plans best represents Mr. Barwick's risk from his Type 2 diabetes with comorbidities impairment groups.[5]  In Table 1 of this study, the fully adjusted relative risk for Type 2 diabetic patients with a Charlson Comorbidity Index score of 4 or more is **2.61**, with **1.53** and **4.46** respectively as the lower and upper 95% confidence intervals for this relative risk estimate.  This fully adjusted relative risk indicates the increased mortality risk attributable to being a Type 2 diabetic with a Charlson Comorbidity Index score of 4 or more that is independent of demographic factors including age, sex and race.

---

4. Roerecke M and R Jürgen, Alcohol use disorders and mortality: a systematic review and meta-analysis. *Addiction*. 2013;108:1562-1578. Table 3, men excluding Veteran affairs samples, ages 40 to 60+.
5. McEwen LN. Predictors of mortality over 8 years in Type 2 diabetic patients; Translating Research into Action for Diabetes (TRIAD). *Diabetes Care*. 2012;35:1301-1309. Table 1, Charlson Index ≥4.

To document the proper calculation of Mr. Barwick's Charlson Comorbidity Index (CCI) score (a commonly used indicator of the mortality risk from severe comorbid conditions), I used an online CCI calculator that was originally built for the purpose of estimating the prognosis of dialysis patients.[6]  This CCI calculator required the entry of Mr. Barwick's age (48) and his serum albumin reading (2.7 g/dL, collected 10/8/2019).  With 1 point for Mr. Barwick's COPD, 2 points each for moderate/severe renal disease (acute kidney injury, electrolyte imbalance) and diabetes with end-organ damage (nephropathy/microalbuminuria), and 3 points for moderate/severe liver disease (cirrhosis with ascites), Mr. Barwick's CCI score is 8.

3. Current smoking: A pooled study of 5 contemporary cohorts of people examining smoking status and all cause death best represents Mr. Barwick's statistical mortality risk as a current smoker.[7]  In Table 3, the relative risk of male current smokers is **2.80**, with **2.72** and **2.88** respectively as the lower and upper 95% confidence intervals for this relative risk estimate.

The calculation of the mortality risk factors that represent Mr. Barwick's combined mortality risks is shown in **Table 2A** (age 48 to 49), **Table 2B** (age 50 to 59) and **Table 2C** (age 60+).  The method for converting different independent mortality risks into a single factor that is used to adjust a life table that provides life expectancies is based on long-established life underwriting practice.  This involves assigning to the baseline ("standard") risk a value of 1.  "Unfavorable risk factors, conditions or impairments expected to produce excess mortality risk are added to that baseline risk."[8]  In essence, any mortality risk attributable to an unfavorable risk factor is the increased risk above 1; increased risk values are added to the baseline risk of 1.

6. Fadem SZ. Charlson Comorbidity Scoring System, estimating prognosis for dialysis patients. http://touchcalc.com/calculators/cci_js
7. Thun MJ, et al. 50-year trends in smoking-related mortality in the United States. *N Engl Med J*. 2013;368:351-364. Table 3, death from all causes, current smoker, contemporary cohort, multivariable-adjusted RR.
8. Kita MW. The rating of substandard lives. Chapter 5. In: Medical Selection of Life Risks, 5th Edition. Brackenridge RCD, Croxson RS, MacKenzie R, eds. Palgrave Macmillan, New York, NY. 2006 p 72.

**Table 2A.** Combined mortality risk factors for James Barwick, age 48 to 49

| Impairment Group | Mortality Risk (middle) | Mortality Risk (lower limit) | Mortality Risk (upper limit) |
|---|---|---|---|
| AUD age 48 to 49 | 4.90 | 3.43 | 6.86 |
| DM2 w/ comorbidities | 1.61 | 0.53 | 3.46 |
| Current smoker | 1.80 | 1.72 | 1.88 |
| Baseline risk | 1.00 | 1.00 | 1.00 |
| **Combined mortality risk factors** | **9.31** | **6.68** | **13.20** |

**Table 2B.** Combined mortality risk factors for James Barwick, age 50 to 59

| Impairment Group | Mortality Risk (middle) | Mortality Risk (lower limit) | Mortality Risk (upper limit) |
|---|---|---|---|
| AUD age 50 to 59 | 2.80 | 2.05 | 3.74 |
| DM2 w/ comorbidities | 1.61 | 0.53 | 3.46 |
| Current smoker | 1.80 | 1.72 | 1.88 |
| Baseline risk | 1.00 | 1.00 | 1.00 |
| **Combined mortality risk factors** | **7.21** | **5.30** | **10.08** |

**Table 2C.** Combined mortality risk factors for James Barwick, age 60+

| Impairment Group | Mortality Risk (middle) | Mortality Risk (lower limit) | Mortality Risk (upper limit) |
|---|---|---|---|
| AUD age 60+ | 1.14 | 0.63 | 1.81 |
| DM2 w/ comorbidities | 1.61 | 0.53 | 3.46 |
| Current smoker | 1.80 | 1.72 | 1.88 |
| Baseline risk | 1.00 | 1.00 | 1.00 |
| **Combined mortality risk factors** | **5.55** | **3.88** | **8.15** |

The combined mortality risk factor representing Mr. Barwick's AUD, DM2/comorbidities and current smoking impairment groups will be used to adjust the 2018 U.S. general population non-Hispanic white male mortality rates to produce Mr. Barwick's expected mortality rates. These adjusted rates in turn will be used to produce life tables with Mr. Barwick's statistically based life expectancy as of October 8, 2019, using the same methods used in life settlements.

Appendix A shows the calculation of Mr. Barwick's life expectancy after adjusting the 2018 U.S. general population non-Hispanic white male life table with the **middle** (**9.31** age 48-49, **7.21** age 50-59,

**5.55** age 60+) mortality risk factor representing Mr. Barwick's primary excess risk of mortality.  This calculation provides the **middle** life expectancy estimate for Mr. Barwick as of October 8, 2019.

Appendix B shows the calculation of Mr. Barwick's life expectancy after adjusting the 2018 U.S. general population non-Hispanic white male population life table with the **upper limit** (**13.20** age 48-49, **10.08** age 50-59, **8.15** age 60+) mortality risk factor representing Mr. Barwick's primary excess risk of mortality.  This calculation provides the **lower limit** life expectancy estimate for Mr. Barwick as of October 8, 2019.

Appendix C shows the calculation of Mr. Barwick's life expectancy after adjusting the 2018 U.S. general population non-Hispanic white male population life table with the **lower limit** (**6.68** age 48-49, **5.30** age 50-59, **3.88** age 60+) mortality risk factor representing Mr. Barwick's primary excess risk of mortality.  This calculation provides the **upper limit** life expectancy estimate for Mr. Barwick as of October 8, 2019.

The 2018 life expectancy for an average U.S. non-Hispanic white male at age 48 is **31.6** years.  This means that for the average U.S. non-Hispanic white male at age 48, the most likely expected age of death is 48 + 31.6 = **79.6** years.  As of October 8, 2019, Mr. Barwick's statistical middle life expectancy was **13.9** years, with a lower limit of **11.1** and an upper limit of **16.9** years.  This means that Mr. Barwick's most likely expected age of death was **61.9** years, with a lower limit of **59.1** years and upper limit of **64.9** years.

The following are my opinions, based on a reasonable degree of life underwriting and life settlement certainty:

1. As of October 8, 2019, Mr. Barwick's primary excess statistical risk of mortality was associated with his AUD, DM2/comorbidities and current smoking impairment groups.
2. As of October 8, 2019, Mr. Barwick had a statistical middle life expectancy of **13.9** years; his lower limit life expectancy was **11.1** years, and his upper limit life expectancy was **16.9** years.

A copy of my current CV (which includes my publications) is being produced with my report.  As my CV reflects, I am qualified to offer an opinion as to Mr. Barwick's life expectancy based upon my

education and experience. Among other things, I have been accepted in federal court as a life expectancy expert on many occasions. I have extensive training as a life insurance underwriter, have done extensive work researching and writing life underwriting manuals, and have been a life underwriter from 1982 to present. I have extensive experience in the life settlement and structured settlement industries and routinely provide my expertise in life expectancy calculation methods. In various capacities, I have served as an expert witness since 2006.

A list of cases in which I have testified at trial or deposition as an expert is being produced with my report. I am compensated at the rate of $350 per hour for all services related to this case, including the review of documents, preparation of this report, and any testimony I may give.

Vera F. Dolan, MSPH FALU

**Appendix A.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Middle Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 0-1 | 0.005076 | 1.000 | 0.0050760 | 100,000 | 508 | 99,558 | 5,981,200 | 59.8 |
| 1-2 | 0.000407 | 1.000 | 0.0004068 | 99,492 | 40 | 99,472 | 5,881,642 | 59.1 |
| 2-3 | 0.000301 | 1.000 | 0.0003006 | 99,452 | 30 | 99,437 | 5,782,170 | 58.1 |
| 3-4 | 0.000221 | 1.000 | 0.0002211 | 99,422 | 22 | 99,411 | 5,682,733 | 57.2 |
| 4-5 | 0.000180 | 1.000 | 0.0001799 | 99,400 | 18 | 99,391 | 5,583,322 | 56.2 |
| 5-6 | 0.000157 | 1.000 | 0.0001569 | 99,382 | 16 | 99,374 | 5,483,931 | 55.2 |
| 6-7 | 0.000135 | 1.000 | 0.0001355 | 99,366 | 13 | 99,360 | 5,384,557 | 54.2 |
| 7-8 | 0.000119 | 1.000 | 0.0001192 | 99,353 | 12 | 99,347 | 5,285,198 | 53.2 |
| 8-9 | 0.000106 | 1.000 | 0.0001062 | 99,341 | 11 | 99,336 | 5,185,851 | 52.2 |
| 9-10 | 0.000098 | 1.000 | 0.0000975 | 99,330 | 10 | 99,325 | 5,086,515 | 51.2 |
| 10-11 | 0.000098 | 1.000 | 0.0000977 | 99,320 | 10 | 99,315 | 4,987,190 | 50.2 |
| 11-12 | 0.000114 | 1.000 | 0.0001137 | 99,310 | 11 | 99,305 | 4,887,875 | 49.2 |
| 12-13 | 0.000153 | 1.000 | 0.0001534 | 99,299 | 15 | 99,292 | 4,788,571 | 48.2 |
| 13-14 | 0.000221 | 1.000 | 0.0002211 | 99,284 | 22 | 99,273 | 4,689,279 | 47.2 |
| 14-15 | 0.000311 | 1.000 | 0.0003112 | 99,262 | 31 | 99,247 | 4,590,006 | 46.2 |
| 15-16 | 0.000411 | 1.000 | 0.0004108 | 99,231 | 41 | 99,211 | 4,490,760 | 45.3 |
| 16-17 | 0.000514 | 1.000 | 0.0005142 | 99,190 | 51 | 99,165 | 4,391,549 | 44.3 |
| 17-18 | 0.000627 | 1.000 | 0.0006267 | 99,139 | 62 | 99,108 | 4,292,385 | 43.3 |
| 18-19 | 0.000747 | 1.000 | 0.0007472 | 99,077 | 74 | 99,040 | 4,193,277 | 42.3 |
| 19-20 | 0.000873 | 1.000 | 0.0008727 | 99,003 | 86 | 98,960 | 4,094,237 | 41.4 |

**Appendix A.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Middle Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 20-21 | 0.001002 | 1.000 | 0.0010018 | 98,917 | 99 | 98,868 | 3,995,277 | 40.4 |
| 21-22 | 0.001130 | 1.000 | 0.0011298 | 98,818 | 112 | 98,762 | 3,896,409 | 39.4 |
| 22-23 | 0.001248 | 1.000 | 0.0012485 | 98,706 | 123 | 98,645 | 3,797,647 | 38.5 |
| 23-24 | 0.001352 | 1.000 | 0.0013518 | 98,583 | 133 | 98,517 | 3,699,003 | 37.5 |
| 24-25 | 0.001441 | 1.000 | 0.0014413 | 98,450 | 142 | 98,379 | 3,600,486 | 36.6 |
| 25-26 | 0.001525 | 1.000 | 0.0015246 | 98,308 | 150 | 98,233 | 3,502,107 | 35.6 |
| 26-27 | 0.001605 | 1.000 | 0.0016052 | 98,158 | 158 | 98,079 | 3,403,874 | 34.7 |
| 27-28 | 0.001680 | 1.000 | 0.0016805 | 98,000 | 165 | 97,918 | 3,305,795 | 33.7 |
| 28-29 | 0.001753 | 1.000 | 0.0017534 | 97,835 | 172 | 97,749 | 3,207,878 | 32.8 |
| 29-30 | 0.001827 | 1.000 | 0.0018267 | 97,663 | 178 | 97,574 | 3,110,129 | 31.8 |
| 30-31 | 0.001901 | 1.000 | 0.0019007 | 97,485 | 185 | 97,393 | 3,012,555 | 30.9 |
| 31-32 | 0.001975 | 1.000 | 0.0019752 | 97,300 | 192 | 97,204 | 2,915,162 | 30.0 |
| 32-33 | 0.002051 | 1.000 | 0.0020511 | 97,108 | 199 | 97,009 | 2,817,958 | 29.0 |
| 33-34 | 0.002127 | 1.000 | 0.0021267 | 96,909 | 206 | 96,806 | 2,720,950 | 28.1 |
| 34-35 | 0.002201 | 1.000 | 0.0022010 | 96,703 | 213 | 96,597 | 2,624,144 | 27.1 |
| 35-36 | 0.002286 | 1.000 | 0.0022856 | 96,490 | 221 | 96,380 | 2,527,547 | 26.2 |
| 36-37 | 0.002373 | 1.000 | 0.0023729 | 96,269 | 228 | 96,155 | 2,431,168 | 25.3 |
| 37-38 | 0.002444 | 1.000 | 0.0024445 | 96,041 | 235 | 95,924 | 2,335,013 | 24.3 |
| 38-39 | 0.002496 | 1.000 | 0.0024960 | 95,806 | 239 | 95,687 | 2,239,089 | 23.4 |
| 39-40 | 0.002541 | 1.000 | 0.0025409 | 95,567 | 243 | 95,446 | 2,143,403 | 22.4 |

**Appendix A.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Middle Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 40-41 | 0.002598 | 1.000 | 0.0025981 | 95,324 | 248 | 95,200 | 2,047,957 | 21.5 |
| 41-42 | 0.002689 | 1.000 | 0.0026888 | 95,076 | 256 | 94,948 | 1,952,757 | 20.5 |
| 42-43 | 0.002820 | 1.000 | 0.0028203 | 94,820 | 267 | 94,687 | 1,857,809 | 19.6 |
| 43-44 | 0.002995 | 1.000 | 0.0029949 | 94,553 | 283 | 94,412 | 1,763,123 | 18.6 |
| 44-45 | 0.003201 | 1.000 | 0.0032010 | 94,270 | 302 | 94,119 | 1,668,711 | 17.7 |
| 45-46 | 0.003433 | 1.000 | 0.0034331 | 93,968 | 323 | 93,807 | 1,574,592 | 16.8 |
| 46-47 | 0.003686 | 1.000 | 0.0036862 | 93,645 | 345 | 93,473 | 1,480,786 | 15.8 |
| 47-48 | 0.003959 | 1.000 | 0.0039587 | 93,300 | 369 | 93,116 | 1,387,313 | 14.9 |
| 48-49 | 0.004259 | 9.310 | 0.0396536 | 92,931 | 3,685 | 91,089 | 1,294,198 | 13.9 |
| 49-50 | 0.004602 | 9.310 | 0.0428460 | 89,246 | 3,824 | 87,334 | 1,203,109 | 13.5 |
| 50-51 | 0.004967 | 7.210 | 0.0358135 | 85,422 | 3,059 | 83,893 | 1,115,775 | 13.1 |
| 51-52 | 0.005381 | 7.210 | 0.0387977 | 82,363 | 3,195 | 80,766 | 1,031,883 | 12.5 |
| 52-53 | 0.005893 | 7.210 | 0.0424882 | 79,168 | 3,364 | 77,486 | 951,117 | 12.0 |
| 53-54 | 0.006504 | 7.210 | 0.0468937 | 75,804 | 3,555 | 74,027 | 873,631 | 11.5 |
| 54-55 | 0.007169 | 7.210 | 0.0516854 | 72,249 | 3,734 | 70,382 | 799,605 | 11.1 |
| 55-56 | 0.007832 | 7.210 | 0.0564672 | 68,515 | 3,869 | 66,581 | 729,223 | 10.6 |
| 56-57 | 0.008482 | 7.210 | 0.0611536 | 64,646 | 3,953 | 62,670 | 662,642 | 10.3 |
| 57-58 | 0.009151 | 7.210 | 0.0659817 | 60,693 | 4,005 | 58,691 | 599,973 | 9.9 |
| 58-59 | 0.009863 | 7.210 | 0.0711109 | 56,688 | 4,031 | 54,673 | 541,282 | 9.5 |
| 59-60 | 0.010626 | 7.210 | 0.0766118 | 52,657 | 4,034 | 50,640 | 486,610 | 9.2 |

**Appendix A.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Middle Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 60-61 | 0.011452 | 5.550 | 0.0635579 | 48,623 | 3,090 | 47,078 | 435,970 | 9.0 |
| 61-62 | 0.012308 | 5.550 | 0.0683089 | 45,533 | 3,110 | 43,978 | 388,892 | 8.5 |
| 62-63 | 0.013163 | 5.550 | 0.0730522 | 42,423 | 3,099 | 40,874 | 344,914 | 8.1 |
| 63-64 | 0.013999 | 5.550 | 0.0776919 | 39,324 | 3,055 | 37,797 | 304,040 | 7.7 |
| 64-65 | 0.014846 | 5.550 | 0.0823937 | 36,269 | 2,988 | 34,775 | 266,244 | 7.3 |
| 65-66 | 0.015747 | 5.550 | 0.0873953 | 33,281 | 2,909 | 31,827 | 231,469 | 7.0 |
| 66-67 | 0.016844 | 5.550 | 0.0934849 | 30,372 | 2,839 | 28,953 | 199,642 | 6.6 |
| 67-68 | 0.018017 | 5.550 | 0.0999964 | 27,533 | 2,753 | 26,157 | 170,690 | 6.2 |
| 68-69 | 0.019337 | 5.550 | 0.1073220 | 24,780 | 2,659 | 23,451 | 144,533 | 5.8 |
| 69-70 | 0.020871 | 5.550 | 0.1158355 | 22,121 | 2,562 | 20,840 | 121,083 | 5.5 |
| 70-71 | 0.022427 | 5.550 | 0.1244700 | 19,559 | 2,435 | 18,342 | 100,243 | 5.1 |
| 71-72 | 0.024018 | 5.550 | 0.1333020 | 17,124 | 2,283 | 15,983 | 81,901 | 4.8 |
| 72-73 | 0.026452 | 5.550 | 0.1468102 | 14,841 | 2,179 | 13,752 | 65,919 | 4.4 |
| 73-74 | 0.028594 | 5.550 | 0.1586942 | 12,662 | 2,009 | 11,658 | 52,167 | 4.1 |
| 74-75 | 0.031490 | 5.550 | 0.1747684 | 10,653 | 1,862 | 9,722 | 40,510 | 3.8 |
| 75-76 | 0.034416 | 5.550 | 0.1910084 | 8,791 | 1,679 | 7,952 | 30,788 | 3.5 |
| 76-77 | 0.038177 | 5.550 | 0.2118810 | 7,112 | 1,507 | 6,359 | 22,836 | 3.2 |
| 77-78 | 0.042325 | 5.550 | 0.2349054 | 5,605 | 1,317 | 4,947 | 16,478 | 2.9 |
| 78-79 | 0.046248 | 5.550 | 0.2566760 | 4,288 | 1,101 | 3,738 | 11,531 | 2.7 |
| 79-80 | 0.051102 | 5.550 | 0.2836134 | 3,187 | 904 | 2,735 | 7,794 | 2.4 |

**Appendix A.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Middle Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 80-81 | 0.056288 | 5.550 | 0.3123972 | 2,283 | 713 | 1,927 | 5,059 | 2.2 |
| 81-82 | 0.062478 | 5.550 | 0.3467517 | 1,570 | 544 | 1,298 | 3,132 | 2.0 |
| 82-83 | 0.069313 | 5.550 | 0.3846888 | 1,026 | 395 | 829 | 1,834 | 1.8 |
| 83-84 | 0.076720 | 5.550 | 0.4257962 | 631 | 269 | 497 | 1,006 | 1.6 |
| 84-85 | 0.086706 | 5.550 | 0.4812181 | 362 | 174 | 275 | 509 | 1.4 |
| 85-86 | 0.096170 | 5.550 | 0.5337433 | 188 | 100 | 138 | 234 | 1.2 |
| 86-87 | 0.105892 | 5.550 | 0.5877009 | 88 | 52 | 62 | 96 | 1.1 |
| 87-88 | 0.119068 | 5.550 | 0.6608252 | 36 | 24 | 24 | 34 | 0.9 |
| 88-89 | 0.133492 | 5.550 | 0.7408820 | 12 | 9 | 8 | 10 | 0.8 |
| 89-90 | 0.149188 | 5.550 | 0.8279952 | 3 | 2 | 2 | 3 | 0.8 |
| 90-91 | 0.166155 | 5.550 | 0.9221592 | 1 | 1 | 1 | 1 | 0.5 |
| 91-92 | 0.184363 | 5.550 | 1.0232167 | 0 | 0 | 0 | 0 | 0.0 |
| 92-93 | 0.203755 | 5.550 | 1.1308404 | 0 | 0 | 0 | 0 | 0.0 |
| 93-94 | 0.224238 | 5.550 | 1.2445213 | 0 | 0 | 0 | 0 | 0.0 |
| 94-95 | 0.245687 | 5.550 | 1.3635648 | 0 | 0 | 0 | 0 | 0.0 |
| 95-96 | 0.267946 | 5.550 | 1.4870990 | 0 | 0 | 0 | 0 | 0.0 |
| 96-97 | 0.290828 | 5.550 | 1.6140934 | 0 | 0 | 0 | 0 | 0.0 |
| 97-98 | 0.314124 | 5.550 | 1.7433886 | 0 | 0 | 0 | 0 | 0.0 |
| 98-99 | 0.337610 | 5.550 | 1.8737374 | 0 | 0 | 0 | 0 | 0.0 |
| 99-100 | 0.361054 | 5.550 | 2.0038509 | 0 | 0 | 0 | 0 | 0.0 |
| 100+ | 1.00000 | 1.000 | 1.0000000 | 0 | 0 | 0 | 0 | 0.0 |

**Appendix B.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Lower Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 0-1 | 0.005076 | 1.000 | 0.0050760 | 100,000 | 508 | 99,558 | 5,717,191 | 57.2 |
| 1-2 | 0.000407 | 1.000 | 0.0004068 | 99,492 | 40 | 99,472 | 5,617,633 | 56.5 |
| 2-3 | 0.000301 | 1.000 | 0.0003006 | 99,452 | 30 | 99,437 | 5,518,161 | 55.5 |
| 3-4 | 0.000221 | 1.000 | 0.0002211 | 99,422 | 22 | 99,411 | 5,418,724 | 54.5 |
| 4-5 | 0.000180 | 1.000 | 0.0001799 | 99,400 | 18 | 99,391 | 5,319,313 | 53.5 |
| 5-6 | 0.000157 | 1.000 | 0.0001569 | 99,382 | 16 | 99,374 | 5,219,922 | 52.5 |
| 6-7 | 0.000135 | 1.000 | 0.0001355 | 99,366 | 13 | 99,360 | 5,120,548 | 51.5 |
| 7-8 | 0.000119 | 1.000 | 0.0001192 | 99,353 | 12 | 99,347 | 5,021,189 | 50.5 |
| 8-9 | 0.000106 | 1.000 | 0.0001062 | 99,341 | 11 | 99,336 | 4,921,842 | 49.5 |
| 9-10 | 0.000098 | 1.000 | 0.0000975 | 99,330 | 10 | 99,325 | 4,822,506 | 48.6 |
| 10-11 | 0.000098 | 1.000 | 0.0000977 | 99,320 | 10 | 99,315 | 4,723,181 | 47.6 |
| 11-12 | 0.000114 | 1.000 | 0.0001137 | 99,310 | 11 | 99,305 | 4,623,866 | 46.6 |
| 12-13 | 0.000153 | 1.000 | 0.0001534 | 99,299 | 15 | 99,292 | 4,524,562 | 45.6 |
| 13-14 | 0.000221 | 1.000 | 0.0002211 | 99,284 | 22 | 99,273 | 4,425,270 | 44.6 |
| 14-15 | 0.000311 | 1.000 | 0.0003112 | 99,262 | 31 | 99,247 | 4,325,997 | 43.6 |
| 15-16 | 0.000411 | 1.000 | 0.0004108 | 99,231 | 41 | 99,211 | 4,226,751 | 42.6 |
| 16-17 | 0.000514 | 1.000 | 0.0005142 | 99,190 | 51 | 99,165 | 4,127,540 | 41.6 |
| 17-18 | 0.000627 | 1.000 | 0.0006267 | 99,139 | 62 | 99,108 | 4,028,376 | 40.6 |
| 18-19 | 0.000747 | 1.000 | 0.0007472 | 99,077 | 74 | 99,040 | 3,929,268 | 39.7 |
| 19-20 | 0.000873 | 1.000 | 0.0008727 | 99,003 | 86 | 98,960 | 3,830,228 | 38.7 |

**Appendix B.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Lower Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 20-21 | 0.001002 | 1.000 | 0.0010018 | 98,917 | 99 | 98,868 | 3,731,268 | 37.7 |
| 21-22 | 0.001130 | 1.000 | 0.0011298 | 98,818 | 112 | 98,762 | 3,632,400 | 36.8 |
| 22-23 | 0.001248 | 1.000 | 0.0012485 | 98,706 | 123 | 98,645 | 3,533,638 | 35.8 |
| 23-24 | 0.001352 | 1.000 | 0.0013518 | 98,583 | 133 | 98,517 | 3,434,994 | 34.8 |
| 24-25 | 0.001441 | 1.000 | 0.0014413 | 98,450 | 142 | 98,379 | 3,336,477 | 33.9 |
| 25-26 | 0.001525 | 1.000 | 0.0015246 | 98,308 | 150 | 98,233 | 3,238,098 | 32.9 |
| 26-27 | 0.001605 | 1.000 | 0.0016052 | 98,158 | 158 | 98,079 | 3,139,865 | 32.0 |
| 27-28 | 0.001680 | 1.000 | 0.0016805 | 98,000 | 165 | 97,918 | 3,041,786 | 31.0 |
| 28-29 | 0.001753 | 1.000 | 0.0017534 | 97,835 | 172 | 97,749 | 2,943,869 | 30.1 |
| 29-30 | 0.001827 | 1.000 | 0.0018267 | 97,663 | 178 | 97,574 | 2,846,120 | 29.1 |
| 30-31 | 0.001901 | 1.000 | 0.0019007 | 97,485 | 185 | 97,393 | 2,748,546 | 28.2 |
| 31-32 | 0.001975 | 1.000 | 0.0019752 | 97,300 | 192 | 97,204 | 2,651,153 | 27.2 |
| 32-33 | 0.002051 | 1.000 | 0.0020511 | 97,108 | 199 | 97,009 | 2,553,949 | 26.3 |
| 33-34 | 0.002127 | 1.000 | 0.0021267 | 96,909 | 206 | 96,806 | 2,456,941 | 25.4 |
| 34-35 | 0.002201 | 1.000 | 0.0022010 | 96,703 | 213 | 96,597 | 2,360,135 | 24.4 |
| 35-36 | 0.002286 | 1.000 | 0.0022856 | 96,490 | 221 | 96,380 | 2,263,538 | 23.5 |
| 36-37 | 0.002373 | 1.000 | 0.0023729 | 96,269 | 228 | 96,155 | 2,167,159 | 22.5 |
| 37-38 | 0.002444 | 1.000 | 0.0024445 | 96,041 | 235 | 95,924 | 2,071,004 | 21.6 |
| 38-39 | 0.002496 | 1.000 | 0.0024960 | 95,806 | 239 | 95,687 | 1,975,080 | 20.6 |
| 39-40 | 0.002541 | 1.000 | 0.0025409 | 95,567 | 243 | 95,446 | 1,879,394 | 19.7 |

**Appendix B.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Lower Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 40-41 | 0.002598 | 1.000 | 0.0025981 | 95,324 | 248 | 95,200 | 1,783,948 | 18.7 |
| 41-42 | 0.002689 | 1.000 | 0.0026888 | 95,076 | 256 | 94,948 | 1,688,748 | 17.8 |
| 42-43 | 0.002820 | 1.000 | 0.0028203 | 94,820 | 267 | 94,687 | 1,593,800 | 16.8 |
| 43-44 | 0.002995 | 1.000 | 0.0029949 | 94,553 | 283 | 94,412 | 1,499,114 | 15.9 |
| 44-45 | 0.003201 | 1.000 | 0.0032010 | 94,270 | 302 | 94,119 | 1,404,702 | 14.9 |
| 45-46 | 0.003433 | 1.000 | 0.0034331 | 93,968 | 323 | 93,807 | 1,310,583 | 13.9 |
| 46-47 | 0.003686 | 1.000 | 0.0036862 | 93,645 | 345 | 93,473 | 1,216,777 | 13.0 |
| 47-48 | 0.003959 | 1.000 | 0.0039587 | 93,300 | 369 | 93,116 | 1,123,304 | 12.0 |
| 48-49 | 0.004259 | 13.200 | 0.0562221 | 92,931 | 5,225 | 90,319 | 1,030,189 | 11.1 |
| 49-50 | 0.004602 | 13.200 | 0.0607484 | 87,706 | 5,328 | 85,042 | 939,870 | 10.7 |
| 50-51 | 0.004967 | 10.080 | 0.0500694 | 82,378 | 4,125 | 80,316 | 854,828 | 10.4 |
| 51-52 | 0.005381 | 10.080 | 0.0542415 | 78,253 | 4,245 | 76,131 | 774,513 | 9.9 |
| 52-53 | 0.005893 | 10.080 | 0.0594010 | 74,008 | 4,396 | 71,810 | 698,382 | 9.4 |
| 53-54 | 0.006504 | 10.080 | 0.0655601 | 69,612 | 4,564 | 67,330 | 626,572 | 9.0 |
| 54-55 | 0.007169 | 10.080 | 0.0722592 | 65,048 | 4,700 | 62,698 | 559,242 | 8.6 |
| 55-56 | 0.007832 | 10.080 | 0.0789445 | 60,348 | 4,764 | 57,966 | 496,544 | 8.2 |
| 56-57 | 0.008482 | 10.080 | 0.0854963 | 55,584 | 4,752 | 53,208 | 438,578 | 7.9 |
| 57-58 | 0.009151 | 10.080 | 0.0922462 | 50,832 | 4,689 | 48,488 | 385,370 | 7.6 |
| 58-59 | 0.009863 | 10.080 | 0.0994171 | 46,143 | 4,587 | 43,850 | 336,883 | 7.3 |
| 59-60 | 0.010626 | 10.080 | 0.1071078 | 41,556 | 4,451 | 39,331 | 293,033 | 7.1 |

**Appendix B.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Lower Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 60-61 | 0.011452 | 8.150 | 0.0933328 | 37,105 | 3,463 | 35,374 | 253,703 | 6.8 |
| 61-62 | 0.012308 | 8.150 | 0.1003094 | 33,642 | 3,375 | 31,955 | 218,329 | 6.5 |
| 62-63 | 0.013163 | 8.150 | 0.1072749 | 30,267 | 3,247 | 28,644 | 186,375 | 6.2 |
| 63-64 | 0.013999 | 8.150 | 0.1140881 | 27,020 | 3,083 | 25,479 | 157,731 | 5.8 |
| 64-65 | 0.014846 | 8.150 | 0.1209925 | 23,937 | 2,896 | 22,489 | 132,253 | 5.5 |
| 65-66 | 0.015747 | 8.150 | 0.1283372 | 21,041 | 2,700 | 19,691 | 109,764 | 5.2 |
| 66-67 | 0.016844 | 8.150 | 0.1372796 | 18,341 | 2,518 | 17,082 | 90,073 | 4.9 |
| 67-68 | 0.018017 | 8.150 | 0.1468415 | 15,823 | 2,323 | 14,662 | 72,991 | 4.6 |
| 68-69 | 0.019337 | 8.150 | 0.1575990 | 13,500 | 2,128 | 12,436 | 58,329 | 4.3 |
| 69-70 | 0.020871 | 8.150 | 0.1701007 | 11,372 | 1,934 | 10,405 | 45,893 | 4.0 |
| 70-71 | 0.022427 | 8.150 | 0.1827802 | 9,438 | 1,725 | 8,576 | 35,488 | 3.8 |
| 71-72 | 0.024018 | 8.150 | 0.1957497 | 7,713 | 1,510 | 6,958 | 26,913 | 3.5 |
| 72-73 | 0.026452 | 8.150 | 0.2155861 | 6,203 | 1,337 | 5,535 | 19,955 | 3.2 |
| 73-74 | 0.028594 | 8.150 | 0.2330374 | 4,866 | 1,134 | 4,299 | 14,420 | 3.0 |
| 74-75 | 0.031490 | 8.150 | 0.2566419 | 3,732 | 958 | 3,253 | 10,121 | 2.7 |
| 75-76 | 0.034416 | 8.150 | 0.2804898 | 2,774 | 778 | 2,385 | 6,868 | 2.5 |
| 76-77 | 0.038177 | 8.150 | 0.3111406 | 1,996 | 621 | 1,686 | 4,483 | 2.2 |
| 77-78 | 0.042325 | 8.150 | 0.3449512 | 1,375 | 474 | 1,138 | 2,798 | 2.0 |
| 78-79 | 0.046248 | 8.150 | 0.3769207 | 901 | 340 | 731 | 1,660 | 1.8 |
| 79-80 | 0.051102 | 8.150 | 0.4164774 | 561 | 234 | 444 | 929 | 1.7 |

**Appendix B.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Lower Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 80-81 | 0.056288 | 8.150 | 0.4587454 | 327 | 150 | 252 | 485 | 1.5 |
| 81-82 | 0.062478 | 8.150 | 0.5091939 | 177 | 90 | 132 | 233 | 1.3 |
| 82-83 | 0.069313 | 8.150 | 0.5649034 | 87 | 49 | 63 | 101 | 1.2 |
| 83-84 | 0.076720 | 8.150 | 0.6252683 | 38 | 24 | 26 | 38 | 1.0 |
| 84-85 | 0.086706 | 8.150 | 0.7066536 | 14 | 10 | 9 | 12 | 0.9 |
| 85-86 | 0.096170 | 8.150 | 0.7837852 | 4 | 3 | 3 | 3 | 0.8 |
| 86-87 | 0.105892 | 8.150 | 0.8630202 | 1 | 1 | 1 | 1 | 0.5 |
| 87-88 | 0.119068 | 8.150 | 0.9704010 | 0 | 0 | 0 | 0 | 0.0 |
| 88-89 | 0.133492 | 8.150 | 1.0879619 | 0 | 0 | 0 | 0 | 0.0 |
| 89-90 | 0.149188 | 8.150 | 1.2158848 | 0 | 0 | 0 | 0 | 0.0 |
| 90-91 | 0.166155 | 8.150 | 1.3541616 | 0 | 0 | 0 | 0 | 0.0 |
| 91-92 | 0.184363 | 8.150 | 1.5025614 | 0 | 0 | 0 | 0 | 0.0 |
| 92-93 | 0.203755 | 8.150 | 1.6606035 | 0 | 0 | 0 | 0 | 0.0 |
| 93-94 | 0.224238 | 8.150 | 1.8275403 | 0 | 0 | 0 | 0 | 0.0 |
| 94-95 | 0.245687 | 8.150 | 2.0023519 | 0 | 0 | 0 | 0 | 0.0 |
| 95-96 | 0.267946 | 8.150 | 2.1837580 | 0 | 0 | 0 | 0 | 0.0 |
| 96-97 | 0.290828 | 8.150 | 2.3702452 | 0 | 0 | 0 | 0 | 0.0 |
| 97-98 | 0.314124 | 8.150 | 2.5601112 | 0 | 0 | 0 | 0 | 0.0 |
| 98-99 | 0.337610 | 8.150 | 2.7515242 | 0 | 0 | 0 | 0 | 0.0 |
| 99-100 | 0.361054 | 8.150 | 2.9425918 | 0 | 0 | 0 | 0 | 0.0 |
| 100+ | 1.00000 | 1.000 | 1.0000000 | 0 | 0 | 0 | 0 | 0.0 |

**Appendix C.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Upper Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 0-1 | 0.005076 | 1.000 | 0.0050760 | 100,000 | 508 | 99,558 | 6,258,457 | 62.6 |
| 1-2 | 0.000407 | 1.000 | 0.0004068 | 99,492 | 40 | 99,472 | 6,158,899 | 61.9 |
| 2-3 | 0.000301 | 1.000 | 0.0003006 | 99,452 | 30 | 99,437 | 6,059,427 | 60.9 |
| 3-4 | 0.000221 | 1.000 | 0.0002211 | 99,422 | 22 | 99,411 | 5,959,990 | 59.9 |
| 4-5 | 0.000180 | 1.000 | 0.0001799 | 99,400 | 18 | 99,391 | 5,860,579 | 59.0 |
| 5-6 | 0.000157 | 1.000 | 0.0001569 | 99,382 | 16 | 99,374 | 5,761,188 | 58.0 |
| 6-7 | 0.000135 | 1.000 | 0.0001355 | 99,366 | 13 | 99,360 | 5,661,814 | 57.0 |
| 7-8 | 0.000119 | 1.000 | 0.0001192 | 99,353 | 12 | 99,347 | 5,562,455 | 56.0 |
| 8-9 | 0.000106 | 1.000 | 0.0001062 | 99,341 | 11 | 99,336 | 5,463,108 | 55.0 |
| 9-10 | 0.000098 | 1.000 | 0.0000975 | 99,330 | 10 | 99,325 | 5,363,772 | 54.0 |
| 10-11 | 0.000098 | 1.000 | 0.0000977 | 99,320 | 10 | 99,315 | 5,264,447 | 53.0 |
| 11-12 | 0.000114 | 1.000 | 0.0001137 | 99,310 | 11 | 99,305 | 5,165,132 | 52.0 |
| 12-13 | 0.000153 | 1.000 | 0.0001534 | 99,299 | 15 | 99,292 | 5,065,828 | 51.0 |
| 13-14 | 0.000221 | 1.000 | 0.0002211 | 99,284 | 22 | 99,273 | 4,966,536 | 50.0 |
| 14-15 | 0.000311 | 1.000 | 0.0003112 | 99,262 | 31 | 99,247 | 4,867,263 | 49.0 |
| 15-16 | 0.000411 | 1.000 | 0.0004108 | 99,231 | 41 | 99,211 | 4,768,017 | 48.0 |
| 16-17 | 0.000514 | 1.000 | 0.0005142 | 99,190 | 51 | 99,165 | 4,668,806 | 47.1 |
| 17-18 | 0.000627 | 1.000 | 0.0006267 | 99,139 | 62 | 99,108 | 4,569,642 | 46.1 |
| 18-19 | 0.000747 | 1.000 | 0.0007472 | 99,077 | 74 | 99,040 | 4,470,534 | 45.1 |
| 19-20 | 0.000873 | 1.000 | 0.0008727 | 99,003 | 86 | 98,960 | 4,371,494 | 44.2 |

**Appendix C.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Upper Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 20-21 | 0.001002 | 1.000 | 0.0010018 | 98,917 | 99 | 98,868 | 4,272,534 | 43.2 |
| 21-22 | 0.001130 | 1.000 | 0.0011298 | 98,818 | 112 | 98,762 | 4,173,666 | 42.2 |
| 22-23 | 0.001248 | 1.000 | 0.0012485 | 98,706 | 123 | 98,645 | 4,074,904 | 41.3 |
| 23-24 | 0.001352 | 1.000 | 0.0013518 | 98,583 | 133 | 98,517 | 3,976,260 | 40.3 |
| 24-25 | 0.001441 | 1.000 | 0.0014413 | 98,450 | 142 | 98,379 | 3,877,743 | 39.4 |
| 25-26 | 0.001525 | 1.000 | 0.0015246 | 98,308 | 150 | 98,233 | 3,779,364 | 38.4 |
| 26-27 | 0.001605 | 1.000 | 0.0016052 | 98,158 | 158 | 98,079 | 3,681,131 | 37.5 |
| 27-28 | 0.001680 | 1.000 | 0.0016805 | 98,000 | 165 | 97,918 | 3,583,052 | 36.6 |
| 28-29 | 0.001753 | 1.000 | 0.0017534 | 97,835 | 172 | 97,749 | 3,485,135 | 35.6 |
| 29-30 | 0.001827 | 1.000 | 0.0018267 | 97,663 | 178 | 97,574 | 3,387,386 | 34.7 |
| 30-31 | 0.001901 | 1.000 | 0.0019007 | 97,485 | 185 | 97,393 | 3,289,812 | 33.7 |
| 31-32 | 0.001975 | 1.000 | 0.0019752 | 97,300 | 192 | 97,204 | 3,192,419 | 32.8 |
| 32-33 | 0.002051 | 1.000 | 0.0020511 | 97,108 | 199 | 97,009 | 3,095,215 | 31.9 |
| 33-34 | 0.002127 | 1.000 | 0.0021267 | 96,909 | 206 | 96,806 | 2,998,207 | 30.9 |
| 34-35 | 0.002201 | 1.000 | 0.0022010 | 96,703 | 213 | 96,597 | 2,901,401 | 30.0 |
| 35-36 | 0.002286 | 1.000 | 0.0022856 | 96,490 | 221 | 96,380 | 2,804,804 | 29.1 |
| 36-37 | 0.002373 | 1.000 | 0.0023729 | 96,269 | 228 | 96,155 | 2,708,425 | 28.1 |
| 37-38 | 0.002444 | 1.000 | 0.0024445 | 96,041 | 235 | 95,924 | 2,612,270 | 27.2 |
| 38-39 | 0.002496 | 1.000 | 0.0024960 | 95,806 | 239 | 95,687 | 2,516,346 | 26.3 |
| 39-40 | 0.002541 | 1.000 | 0.0025409 | 95,567 | 243 | 95,446 | 2,420,660 | 25.3 |

**Appendix C.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Upper Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 40-41 | 0.002598 | 1.000 | 0.0025981 | 95,324 | 248 | 95,200 | 2,325,214 | 24.4 |
| 41-42 | 0.002689 | 1.000 | 0.0026888 | 95,076 | 256 | 94,948 | 2,230,014 | 23.5 |
| 42-43 | 0.002820 | 1.000 | 0.0028203 | 94,820 | 267 | 94,687 | 2,135,066 | 22.5 |
| 43-44 | 0.002995 | 1.000 | 0.0029949 | 94,553 | 283 | 94,412 | 2,040,380 | 21.6 |
| 44-45 | 0.003201 | 1.000 | 0.0032010 | 94,270 | 302 | 94,119 | 1,945,968 | 20.6 |
| 45-46 | 0.003433 | 1.000 | 0.0034331 | 93,968 | 323 | 93,807 | 1,851,849 | 19.7 |
| 46-47 | 0.003686 | 1.000 | 0.0036862 | 93,645 | 345 | 93,473 | 1,758,043 | 18.8 |
| 47-48 | 0.003959 | 1.000 | 0.0039587 | 93,300 | 369 | 93,116 | 1,664,570 | 17.8 |
| 48-49 | 0.004259 | 6.680 | 0.0284518 | 92,931 | 2,644 | 91,609 | 1,571,455 | 16.9 |
| 49-50 | 0.004602 | 6.680 | 0.0307424 | 90,287 | 2,776 | 88,899 | 1,479,846 | 16.4 |
| 50-51 | 0.004967 | 5.300 | 0.0263261 | 87,511 | 2,304 | 86,359 | 1,390,947 | 15.9 |
| 51-52 | 0.005381 | 5.300 | 0.0285198 | 85,207 | 2,430 | 83,992 | 1,304,588 | 15.3 |
| 52-53 | 0.005893 | 5.300 | 0.0312327 | 82,777 | 2,585 | 81,485 | 1,220,596 | 14.7 |
| 53-54 | 0.006504 | 5.300 | 0.0344711 | 80,192 | 2,764 | 78,810 | 1,139,111 | 14.2 |
| 54-55 | 0.007169 | 5.300 | 0.0379934 | 77,428 | 2,942 | 75,957 | 1,060,301 | 13.7 |
| 55-56 | 0.007832 | 5.300 | 0.0415085 | 74,486 | 3,092 | 72,940 | 984,344 | 13.2 |
| 56-57 | 0.008482 | 5.300 | 0.0449534 | 71,394 | 3,209 | 69,790 | 911,404 | 12.8 |
| 57-58 | 0.009151 | 5.300 | 0.0485025 | 68,185 | 3,307 | 66,532 | 841,615 | 12.3 |
| 58-59 | 0.009863 | 5.300 | 0.0522729 | 64,878 | 3,391 | 63,183 | 775,083 | 11.9 |
| 59-60 | 0.010626 | 5.300 | 0.0563166 | 61,487 | 3,463 | 59,756 | 711,901 | 11.6 |

**Appendix C.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Upper Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 60-61 | 0.011452 | 3.880 | 0.0444333 | 58,024 | 2,578 | 56,735 | 652,145 | 11.2 |
| 61-62 | 0.012308 | 3.880 | 0.0477547 | 55,446 | 2,648 | 54,122 | 595,410 | 10.7 |
| 62-63 | 0.013163 | 3.880 | 0.0510707 | 52,798 | 2,696 | 51,450 | 541,288 | 10.3 |
| 63-64 | 0.013999 | 3.880 | 0.0543143 | 50,102 | 2,721 | 48,742 | 489,838 | 9.8 |
| 64-65 | 0.014846 | 3.880 | 0.0576013 | 47,381 | 2,729 | 46,017 | 441,097 | 9.3 |
| 65-66 | 0.015747 | 3.880 | 0.0610980 | 44,652 | 2,728 | 43,288 | 395,080 | 8.8 |
| 66-67 | 0.016844 | 3.880 | 0.0653552 | 41,924 | 2,740 | 40,554 | 351,792 | 8.4 |
| 67-68 | 0.018017 | 3.880 | 0.0699074 | 39,184 | 2,739 | 37,815 | 311,238 | 7.9 |
| 68-69 | 0.019337 | 3.880 | 0.0750287 | 36,445 | 2,734 | 35,078 | 273,424 | 7.5 |
| 69-70 | 0.020871 | 3.880 | 0.0809805 | 33,711 | 2,730 | 32,346 | 238,346 | 7.1 |
| 70-71 | 0.022427 | 3.880 | 0.0870168 | 30,981 | 2,696 | 29,633 | 206,000 | 6.6 |
| 71-72 | 0.024018 | 3.880 | 0.0931913 | 28,285 | 2,636 | 26,967 | 176,367 | 6.2 |
| 72-73 | 0.026452 | 3.880 | 0.1026349 | 25,649 | 2,632 | 24,333 | 149,400 | 5.8 |
| 73-74 | 0.028594 | 3.880 | 0.1109430 | 23,017 | 2,554 | 21,740 | 125,067 | 5.4 |
| 74-75 | 0.031490 | 3.880 | 0.1221805 | 20,463 | 2,500 | 19,213 | 103,327 | 5.0 |
| 75-76 | 0.034416 | 3.880 | 0.1335338 | 17,963 | 2,399 | 16,764 | 84,114 | 4.7 |
| 76-77 | 0.038177 | 3.880 | 0.1481258 | 15,564 | 2,305 | 14,412 | 67,350 | 4.3 |
| 77-78 | 0.042325 | 3.880 | 0.1642222 | 13,259 | 2,177 | 12,171 | 52,939 | 4.0 |
| 78-79 | 0.046248 | 3.880 | 0.1794420 | 11,082 | 1,989 | 10,088 | 40,768 | 3.7 |
| 79-80 | 0.051102 | 3.880 | 0.1982739 | 9,093 | 1,803 | 8,192 | 30,681 | 3.4 |

**Appendix C.** 2018 U.S. General Population NonHispanic White Male Life Table
Life Expectancies Adjusted for James Barwick's Excess Mortality Risk
As of October 8, 2019 - **Upper Limit Life Expectancy**

| Age (years) | Basic Mortality $q_x$ | Mortality Risk Factor | Adjusted Mortality $q_x$ | Population at Risk $l_x$ | Deaths $d_x$ | Interval Person-years $L_x$ | Cumulative Person-years $T_x$ | Life Expectancy $\dot{e}_x$ |
|---|---|---|---|---|---|---|---|---|
| 80-81 | 0.056288 | 3.880 | 0.2183966 | 7,290 | 1,592 | 6,494 | 22,489 | 3.1 |
| 81-82 | 0.062478 | 3.880 | 0.2424138 | 5,698 | 1,381 | 5,008 | 15,995 | 2.8 |
| 82-83 | 0.069313 | 3.880 | 0.2689356 | 4,317 | 1,161 | 3,737 | 10,988 | 2.5 |
| 83-84 | 0.076720 | 3.880 | 0.2976737 | 3,156 | 939 | 2,687 | 7,251 | 2.3 |
| 84-85 | 0.086706 | 3.880 | 0.3364192 | 2,217 | 746 | 1,844 | 4,565 | 2.1 |
| 85-86 | 0.096170 | 3.880 | 0.3731395 | 1,471 | 549 | 1,197 | 2,721 | 1.8 |
| 86-87 | 0.105892 | 3.880 | 0.4108612 | 922 | 379 | 733 | 1,524 | 1.7 |
| 87-88 | 0.119068 | 3.880 | 0.4619823 | 543 | 251 | 418 | 792 | 1.5 |
| 88-89 | 0.133492 | 3.880 | 0.5179500 | 292 | 151 | 217 | 374 | 1.3 |
| 89-90 | 0.149188 | 3.880 | 0.5788507 | 141 | 82 | 100 | 158 | 1.1 |
| 90-91 | 0.166155 | 3.880 | 0.6446806 | 59 | 38 | 40 | 58 | 1.0 |
| 91-92 | 0.184363 | 3.880 | 0.7153299 | 21 | 15 | 14 | 18 | 0.8 |
| 92-93 | 0.203755 | 3.880 | 0.7905695 | 6 | 5 | 4 | 4 | 0.7 |
| 93-94 | 0.224238 | 3.880 | 0.8700437 | 1 | 1 | 1 | 1 | 0.5 |
| 94-95 | 0.245687 | 3.880 | 0.9532669 | 0 | 0 | 0 | 0 | 0.0 |
| 95-96 | 0.267946 | 3.880 | 1.0396296 | 0 | 0 | 0 | 0 | 0.0 |
| 96-97 | 0.290828 | 3.880 | 1.1284112 | 0 | 0 | 0 | 0 | 0.0 |
| 97-98 | 0.314124 | 3.880 | 1.2188014 | 0 | 0 | 0 | 0 | 0.0 |
| 98-99 | 0.337610 | 3.880 | 1.3099281 | 0 | 0 | 0 | 0 | 0.0 |
| 99-100 | 0.361054 | 3.880 | 1.4008903 | 0 | 0 | 0 | 0 | 0.0 |
| 100+ | 1.00000 | 1.000 | 1.0000000 | 0 | 0 | 0 | 0 | 0.0 |

# Vera F. Dolan

4788 Diza Court, Las Vegas, Nevada 89122-7574
702.476.8500 / dolanvp@consultancy.com

## EDUCATION and PROFESSIONAL CERTIFICATIONS

MSPH  University of North Carolina at Chapel Hill, Epidemiology, 1981
BA       The Johns Hopkins University, Public Health, 1979
FALU  Fellow of the Academy of Life Underwriting, 1998
ELS     Editor in the Life Sciences, 2003
United States Patent No. US 10,825,102 "Reference Interval Generation" November 3, 2020
United States Patent No. US 11,010,449 "Multi-Dimensional Data Analysis and Database Generation" May 18, 2021

## EXPERIENCE

Principal, VFD Consulting, Inc., 1989 to Present
Providing life and health insurance and related industries mortality and underwriting research, market research, product development, business development and technology, underwriting education and training, and litigation support to multinational clients, including:

AIG American General Life Cos.
American Family Life Insurance Co.
AVS Underwriting
Bank of America
Calypte Biomedical
Canada Life Reinsurance
Charles Schwab & Co.
Clinical Reference Laboratory
decydeWARE
Drinker, Biddle & Reath
Edwards Lifesciences
EMSI (formerly PMSI)
Farmers Mutual Insurance Co.
FaxWatch
Federal Home Loan Bank (San Francisco)
First Financial Underwriting Services
General American Life Insurance Co.
Golden Gateway Financial
Hank George, Inc.
Health Net of California
Heritage Labs
HSBC Insurance Services
Independent Order of Foresters
Insure.com

Lab*One*
Life Settlement Consulting & Management
Los Angeles County Crime Laboratories
MetLife Canada
MIB Group
Millennium Pharmaceuticals
Mutual of Omaha
North Coast Opportunities
*On The Risk – The Journal of the Academy of Life Underwriting*
PartnerRe Life (formerly Winterthur Life Reinsurance)
Pacific Blue Cross
PPO Oklahoma
Protective Life Insurance Co.
Safe Harbor Resources
Sagicor Financial Corporation
Society of Actuaries
Thomson Management Solutions
21st Services
Wells Fargo Bank
Western Reserve Life Assurance Co. of Ohio
Xcelerate Corporation

1

**Vera F. Dolan**
Curriculum Vitae, continued

Expert witness services provided to the following:

Multiple retentions:

Andres Andres & Moore, Santa Ana, CA
Barger & Wolen, Irvine, CA and New York, NY
Carmody Torrance Sandak Hennessey, Waterbury, CT
County of Hawaii, Hilo, HI
Cozen O'Connor, Wilmington, DE and Philadelphia, PA
Donahue Horrow, El Segundo, CA
German Gallagher & Murtagh, Philadelphia, PA
David G. Hill & Associates, Glastonbury, CT
Hinshaw & Culbertson, Los Angeles, CA

Kantor & Kantor, Northridge, CA
Law Offices of Michael Jay Green, Honolulu, HI
Lewis & Roca, Phoenix, AZ
Low McKinley & Salenko, Sacramento, CA
Mansell Engel & Cole, Oklahoma City, OK
McCue-Pauley & Associates, Dallas, TX
Taylor Anderson, Denver, CO
U.S. Department of Justice
Wilson Elser Moskowitz Edelman & Dicker, Los Angeles and San Diego, CA

Expert witness brokers and search firms:

AMFS / Medical Experts Nationwide
Consolidated Consultants
Expert Institute
Insurance Expert Network
ForensisGroup

LITILI
Medical Advisors, Inc
Medical Consultant Services
The TASA Group
Thomson Reuters Expert Witness Service

Single cases:

Alaska Attorney General, Anchorage AK
Andrews Kurth, Dallas, TX
The Bainbridge Law Firm, Plymouth Meeting, PA
Bolt Keenley Kim, Berkeley, CA
Busse Busse & Grassé, Chicago, IL
Campano Law Group, Lancaster, CA
Carlin & Buchsbaum, Long Beach, CA
Carlton Fields, Washington, DC
City of Torrance, Torrance, CA
Clapp Ingram & Olheiser, Casper, WY
Coffey Burlington, Miami, FL
Cohen Johnson Parker Edwards, Las Vegas, NV
Corr Cronin Michelson Baumgardner Preece, Seattle, WA
Coughlin Law Firm, San Diego, CA
Crammer Bishop & O'Brien, Absecon, NJ
Daniels Fine Israel Schonbuch & Lebovits, Los Angeles, CA

Deitchman & Deitchman, Placerville, CA
DeKoter Thole Dawson & Rockman, Sibley, IA
Demas Law Group, Sacramento, CA
Didriksen Saucier Woods & Pichon, New Orleans, LA
Dressler Law Office, New Haven, CT
Egan & Pechtel, Kennewick, WA
Elkus & Sisson, Greenwood Village, CO
Epstein Becker & Green, Los Angeles, CA
Ervin Cohen & Jessup, Beverly Hills, CA
Fairchild Price Haley & Smith, Nacogdoches, TX
Fallgatter Farmand & Catlin, Jacksonville, FL
Fergeson Skipper Shaw Keyser Baron & Tirabassi, Sarasota, FL
Finley Law Firm, Des Moines, IA
Evan Freirich, Boulder, CO
Freund Freeze & Arnold, Dayton, OH
Friedman Rubin & White, Anchorage, AK

2

**Vera F. Dolan**
Curriculum Vitae, continued

Single cases, continued:

Galloway Lucchese Everson & Picchi, Pleasant Hill, CA

Gilchrist & Rutter, Santa Monica, CA

Grabhorn Law, Louisville, KY

Graves & King, Riverside, CA

Greenberg Traurig, Denver, CO

Greene Broillet & Wheeler, Santa Monica, CA

GWC Injury Lawyers, Chicago, IL

Hanna Campbell & Powell, Akron, OH

Hansen Reynolds, Milwaukee, WI

Head Law, Murray, UT

The Healy Law Firm, Chicago, IL

Hoagland Fitzgerald & Pranaitis, Alton, IL

Holman Law, Tacoma, WA

Diana Holt, Columbia, SC

Jackson & Campbell, Washington, DC

Jackson Kelly, Charleston, WV

Jardine Law Office, DeForest, WI

Kent D. Jensen Law Office, Burley, ID

Johnson Schachter & Lewis, Sacramento, CA

David Jones Law, Grapevine, TX

Kaplan Cottner, Las Vegas, NV

Katten Muchin Rosenman, Los Angeles, CA

Kennedy Johnson Schwab & Roberge, New Haven, CT

Keogh Cox & Wilson, Baton Rouge, LA

Kitch Drutchas Wagner Valitutti & Sherbrook, Detroit, MI

Knapp Petersen Clarke, Glendale, CA

Koch Degn & Gomez, Visalia, CA

Lang Richert & Patch, Fresno, CA

Law Office of Andy Basseri, Beverly Hills, CA

Law Offices of Benjamin Blakeman, Los Angeles, CA

Law Offices of Robert A. Brenner, Woodland Hills, CA

Law Office of Sean Brew, San Diego, CA

Law Offices of James Matthew Brown, San Diego, CA

Law Offices of Clyde I. Butts, Walnut Creek, CA

Law Office of Raymond Chandler, Santa Barbara, CA

Law Offices of Steven C. Laird, Ft. Worth, TX

Law Office of Katherine MacKinnon, St. Louis Park, MN

Law Office of Stephen W. Penn, Morgan Hill, CA

Law Office of Charles M. Ray, Newport Beach, CA

Law Office of Kenneth U. Reyes, Los Angeles, CA

Law Offices of Cary T. Tanaka, Honolulu, HI

Law Office of Edward J. Thomas, Bakersfield, CA

Law Firm of Roger "Rocky" Walton, Arlington, TX

The Lawrence Law Firm, Roanoke, VA

Lederer Weston Craig, West Des Moines, IA

Littler Mendelson, San Jose, CA

MacMorris & Carbone, Stockton, CA

Magdalena Law Group, San Jose, CA

Daniel Q. Mahone, Frederick, MD

Marks Gray, Jacksonville, FL

Marquis Aurbach Coffing, Las Vegas, NV

Percy Martinez, Coral Gables, FL

The Matiasic Firm, San Francisco, CA

McArdle Frost & Brinton, Chicago, IL

McCollum Crowley Moschet Miller & Laak, Minneapolis, MN

McDermott Will & Emery, Chicago, IL

McDowell & Osburn, Manchester, NH

McFall Burnett & Brinton, Manteca, CA

McGinn Montoya Love & Curry, Albuquerque, NM

Meagher + Geer, Minneapolis, MN

Meyers McConnell Reisz Siderman, Los Angeles, CA

Milavetz Gallop & Milavetz, Edina, MN

Morris Polich & Purdy, San Francisco, CA

Morrison Mahoney, Hartford, CT

Murphy Pearson Bradley & Feeney, San Francisco, CA

Myers & Gomel, Las Vegas, NV

Nash Spindler Grimstad & McCracken, Manitowoc, WI

Nicholas & Tomasevic, San Diego, CA

Norton Rose Fulbright US, Houston, TX

Ogden Murphy Wallace, Seattle, WA

Pettiette Armand Dunkelman Woodley Byrd & Cromwell, Shreveport, LA

Pinkert Law Firm, Sturgeon Bay, WI

Poling Law, Columbus, OH

Pollara Law Group, Sacramento, CA

Pyle Sims Duncan & Stevenson, San Diego, CA

3

**Vera F. Dolan**
Curriculum Vitae, continued

Single cases, continued:

Rankin Shuey Ranucci Mintz Lampasona & Reynolds, Oakland, CA
Rawlings Law Firm, Sioux City, IA
Renaud Cook Drury Mesaros, Phoenix, AZ
Riverside County Public Defender, Riverside, CA
Roberts Carroll Feldstein & Pierce, Providence, RI
Roberts & Stevens, Asheville, NC
Rutan & Tucker, Costa Mesa, CA
Saur Law Office, Laguna Hills, CA
Schmid & Voiles, Orange, CA
Schneider & Onofry, Phoenix, AZ
Schumacher Francis & Nelson, Charleston, WV
Segal and Kirby, Sacramento, CA
Seyfarth Shaw, Chicago, IL
SGH Martineau, London, England
Sheuerman Martini Tabari Zenere & Garvin,
San Jose, CA
Shook Hardy & Bacon, Kansas City, MO
Shun Chen Law Office, Irvine, CA
Sigelman Law Corporation, Beverly Hills, CA
Smith Gambrell & Russell, Jacksonville, FL
Smith Hulsey & Busey, Jacksonville, FL
Snell & Wilmer, Phoenix, AZ
South Carolina Commission on Indigent Defense,
Columbia, SC
Stanley Law Offices, Syracuse, NY
State of Alaska Department of Corrections,
Anchorage, AK
Stennett & Casino, San Diego, CA
Stinson, Kansas City, MO
Stitzel Page & Fletcher, Burlington, VT
Strickland Diviney Segura & Byrd, Roanoke, VA
Sussman Shank, Portland, OR
Thirteenth Judicial District, Greenville, SC
TroyGould, Los Angeles, CA
Vaka Law Group, Tampa, FL
Walker Hamilton & Koenig, San Francisco, CA
Warner Sechrest & Butts, Gainesville, FL
Webb Bordson Law Group, San Diego, CA
Whitfield & Eddy, Des Moines, IA
David K. Wilson & Associates, Sherman, TX
Winters & Associates, San Diego, CA
Wood Smith Henning & Berman, Los Angeles, CA

Yoder Ainlay Ulmer & Buckingham, Goshen, IN

4

**Vera F. Dolan**
Curriculum Vitae, continued

Consulting Projects – Underwriting
- Life Underwriting Requirements Research, 2004 to 2017 Provided methodologies, analysis and write-up of insurance testing laboratory data to initiate new products and services. Conducted cohort mortality studies to improve life underwriting risk assessment.
- Life Policy and Procedures Manual, 2014 Revised and updated life insurance policy and procedures manual based on current underwriting and business operations.
- Health Medical Underwriting Manual, 2010 Adapted medical underwriting manual for supplemental health insurance products.
- Structured Settlement Underwriting Manual, 2008 Developed underwriting manual for structured settlements based on current processes.
- Life Claims Audit, 2007 Performed random selection of cases and designed case data extraction sheet for large life insurance claims study.
- Critical Illness and Disability Income Training, 2006 Prepared and presented training to life underwriters in critical illness and disability income underwriting.
- Underwriting Manual Research and Writing, 2006 Adapted traditional life underwriting manual for simplified life, disability and waiver of premium products.
- Life Settlement Experience Analysis, 2006 Analysis of life settlement mortality to determine predictive factors.
- Life Underwriting Research, 2001 to 2003 Constructed life tables from medical literature to validate life underwriting guidelines. Produced quantitative and qualitative life underwriting manual guidance.
- Life Settlement Underwriting Research, 1998 to 2004 Provided model and design of automated life expectancy calculation system, data collection instruments, evaluation scoring and impairment risk factor weights.
- Insurance Services Product Development, 1997 to 1998 Provided analysis of disease mortality, incidence and prevalence to develop new insurance services product.
- Pension Underwriting Research, 1994 Provided biostatistical research basis to a multinational consortium for a new type of impaired risk European pension product.

Consulting Projects - Business Development and Technology
- Simplified Products Survey and Report, 2005 Conducted survey of top-selling simplified products for underwriting and business process lessons learned.
- New Business Process Review and Optimization, 2004 to 2005 Examined current life new business processes to identify opportunities for decreasing redundancies, handoffs, and inefficiencies.
- Underwriting Decision Software Development, 2004 to 2005 Product and market development of life underwriting software that uses advanced logic engine
- Freelance Writing and Editing, 2004 Editing and writing summaries of medical articles, medical conferences, and insurance topics for physicians and consumers.
- Underwriting Operations Annual Report, 2004 Assisted in editing, writing and analysis of metrics presented in life underwriting operations report for 2003.
- Business Process Improvement, 2003 Interviewed underwriting and business support staff to prepare future improvement in life insurance business process workflow.

5

**Vera F. Dolan**
Curriculum Vitae, continued

Consulting Projects - Banking

- <u>Enterprise Technology Plan, 2000</u> Collaborated on design of three-year technology plan for a Federal bank.
- <u>Financial Services Experience Analysis and Strategy, 1995 to 1998</u> Provided statistical analysis and models to select business and consumer customers for acquisition and retention programs.  Estimated bank account life expectancies using actuarial life table methods.
- <u>Human Resources Automation Plan, 1993</u> Collaborated in development of plan and prototype for automated human resources management.

Certificate of Appreciation for 30 Years of Contribution, *On The Risk - Journal of the Academy of Life Underwriting,* May 4, 2016
Associate Editor, *On The Risk - Journal of the Academy of Life Underwriting*, 2004-Present
Contributing Editor, *On The Risk - Journal of the Academy of Life Underwriting*, 1994-1997

<u>Kaiser Foundation Health Plan, Oakland, California</u>
Medical Economics and Statistics, 1988 to 1989
Converted community-based pricing approach to experience-based rating for a $2.5 billion premium enterprise. Conducted underwriting market study of 20,000 employers. Conducted analyses to determine competitive pricing for 2+ million member optical and pharmaceutical programs.

<u>Transamerica Occidental Life Insurance Company, Los Angeles, California</u>
New Business Underwriting Research, 1985 to 1988
Provided analysis of company data and medical literature to support management and underwriting decisions. Developed original methods for actuarial analyses now used for automated systems underwriting $1.5 billion in annual business.

<u>Lincoln National Reinsurance, Ft. Wayne, Indiana</u>
Underwriting Research, 1982 to 1985
Provided analysis of company data and medical literature to support management and underwriting decisions.

<u>University of North Carolina, Chapel Hill, North Carolina</u>
Department of Biostatistics, 1981 to 1982
Performed statistical analyses for multinational clinical trials.

<u>National Institute of Occupational Safety and Health, Cincinnati, Ohio</u>
Industrywide Studies Branch, Biometry Section, Summer 1980
Performed proportionate mortality analysis of death certificate data for evidence of excess brain tumors among petrochemical workers.  Performed analysis of medical records for evidence of excess birth anomalies among railroad workers exposed to dioxin.

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE

"Advantages of a Life Expectancy Using Life Insurance Underwriting and Life Settlement Methods in the Legal Setting" VFD Consulting, Inc.

"Interview with a Leader: Peter Komsthoeft" On The Risk – Journal of the Academy of Life Underwriting, Vol. 38, No. 2, 2022

"Low Serum Creatinine as a Marker for Undisclosed Alcohol Abuse" J. Insurance Medicine, Vol. 49, No. 2, 2022

"Interview with a Leader: Regina Rosace" On The Risk – Journal of the Academy of Life Underwriting, Vol. 38, No. 1, 2022

"The Shift to Full-Time Virtual Employment in the Face of COVID-19" On The Risk – Journal of the Academy of Life Underwriting, Vol. 36, No. 3, 2020

"2014 CRL Build Study of Life Insurance Applicants" J. Insurance Medicine, Vol. 46, No. 1, 2016, with Michael Fulks and Robert L. Stout

"Highlights of the 2016 CLIMOA Annual Scientific Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 32, No. 4, 2016

"Hemoglobin Screening Independently Predicts All-Cause Mortality" J. Insurance Medicine, Vol. 45, No. 2, 2015, with Michael Fulks and Robert L. Stout

"Adjusting Measured Creatinine for Low Serum Glucose to Improve Mortality Prediction" On The Risk - Journal of the Academy of Life Underwriting, Vol. 31, No. 3, 2015, with Michael Fulks and Robert L. Stout

"Changing the 'Normal Range' for Blood Pressure from 140/90 to 130/any Improves Risk Assessment" J. Insurance Medicine, Vol. 45, No. 1, 2015, with Michael Fulks and Robert L. Stout

"2014 CRL Blood Pressure Study of Life Insurance Applicants" J. Insurance Medicine, Vol. 45, No. 1, 2015, with Michael Fulks and Robert L. Stout

"Which eGFR Calculation Offers the Best Mortality Prediction for Insurance?" On The Risk - Journal of the Academy of Life Underwriting, Vol. 31, No. 2, 2015, with Michael Fulks and Robert L. Stout

"Using Urine Protein Creatinine Ratio Alone or Reflexing to Urine Albumin in the Applicant with HbA1c Elevation" On The Risk - Journal of the Academy of Life Underwriting, Vol. 31, No. 1, 2015, with Michael Fulks and Robert L. Stout

"Basic Laboratory Testing" In: <u>Basic Life Insurance Underwriting, ALU 101 Textbook, Sixth Ed</u>. Academy of Life Underwriting, 2014, with Michael Fulks and Robert L. Stout

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Evaluating the Risk of Renal Disease Using Urine Proteinuria or Urine Albuminuria in the Applicant with HbA1c Elevation" On The Risk - Journal of the Academy of Life Underwriting, Vol. 30, No. 4, 2014, with Michael Fulks and Robert L. Stout

"Advantages of a Life Expectancy Using Life Insurance Underwriting and Life Settlement Methods in the Legal Setting" Defense Research Institute Life, Health and Disability Newsletter, Vol. 25, Issue 2, June 26, 2014

"Serum Globulin Predicts All-Cause Mortality for Life Insurance Applicants" J. Insurance Medicine, Vol. 44, No. 2, 2014, with Michael Fulks and Robert L. Stout

"NT-proBNP as a Predictor of All-Cause Mortality in a Population of Insurance Applicants" On The Risk - Journal of the Academy of Life Underwriting, Vol. 30, No. 2, 2014, with Michael Clark, Valerie Kaufman, Michael Fulks and Robert L. Stout

"Beware That Low Urine Creatinine!" On The Risk - Journal of the Academy of Life Underwriting, Vol. 30, No. 1, 2014, with Michael Fulks and Robert L. Stout

"NT-proBNP as a Predictor of All-Cause Mortality in a Population of Insurance Applicants" J. Insurance Medicine, Vol. 44, No. 1, 2014, with Michael Clark, Valerie Kaufman, Michael Fulks and Robert L. Stout

"Scoring Life Insurance Applicants' Laboratory Results, Blood Pressure and Build to Predict All-Cause Mortality Risk" J. Insurance Medicine, Vol. 43, No. 3, 2012, with Michael Fulks and Robert L. Stout

"Urine Protein/Creatinine Ratio as a Risk Predictor in Non-Diabetics with Normal Renal Function" J. Insurance Medicine, Vol. 43, No. 2, 2012, with Michael Fulks and Robert L. Stout

"Trends in Mortality of Insurance Applicants with HIV Infection" J. Insurance Medicine, Vol. 43, No. 2, 2012, with Robert L. Stout and Michael Fulks

"PSA: What Values Predict Increased Mortality Risk?" On The Risk - Journal of the Academy of Life Underwriting, Vol. 27, No. 3, 2011, with Michael Fulks and Robert L. Stout

"Letter to the Editor: The Use of Modeling for Associating Test Values and Mortality Risk" J. Insurance Medicine, Vol. 43, No. 1, 2012, with Michael Fulks and Robert L. Stout

"Isolated Hematuria as a Mortality Risk Predictor" On The Risk - Journal of the Academy of Life Underwriting, Vol. 27, No. 4, 2011, with Michael Fulks and Robert L. Stout

"Highlights of the 2011 AHOU Annual Conference" On The Risk - Journal of the Academy of Life Underwriting, Vol. 27, No. 3, 2011

**Vera F. Dolan**
Curriculum Vitae, continued

**PUBLICATIONS - INSURANCE, continued**

"Correction to article: Association of Cholesterol, LDL, HDL, Cholesterol/HDL and Triglyceride with All-Cause Mortality in Life Insurance Applicants" J. Insurance Medicine, Vo1. 42, No. 2-4, 2011, with Michael Fulks and Robert L. Stout

"CDT and Serum Alcohol: What Is the Risk?" On The Risk - Journal of the Academy of Life Underwriting, Vol. 27, No. 1, 2011, with Robert L. Stout and Michael Fulks

"Albumin and All-Cause Mortality Risk in Insurance Applicants" J. Insurance Medicine, Vol. 42, No. 1, 2010, with Michael Fulks and Robert L. Stout

"Mortality Associated with Positive Hepatitis C and B Test Results" On The Risk - Journal of the Academy of Life Underwriting, Vol. 26, No. 3, 2010, with Robert L. Stout and Michael Fulks

"Glucosuria as a Mortality Risk Predictor When Blood Is Not Collected" On The Risk - Journal of the Academy of Life Underwriting, Vol. 26, No. 2, 2010, with Robert L. Stout and Michael Fulks

"Mortality Associated with Positive Cocaine Test Results" On The Risk - Journal of the Academy of Life Underwriting, Vol. 26, No. 1, 2010, with Robert L. Stout and Michael Fulks

"Association of Cholesterol, LDL, HDL, Cholesterol/HDL and Triglyceride with All-Cause Mortality in Life Insurance Applicants" J. Insurance Medicine, Vol. 41, No. 4, 2009, with Michael Fulks and Robert L. Stout

"Letter to the Editor: The Authors Reply" J. Insurance Medicine, Vol. 41, No. 3, 2009, with Michael Fulks and Robert L. Stout

"Underwriting Implications of Elevated Carcinoembryonic Antigen" On The Risk - Journal of the Academy of Life Underwriting, Vol. 25, No. 3, 2009, with Robert L. Stout and Michael Fulks

"Mortality Associated with Bilirubin Levels in Insurance Applicants" J. Insurance Medicine, Vol. 41, No. 1, 2009, with Michael Fulks and Robert L. Stout

"Non-Cigarette Tobacco Use – What is the Risk?" On The Risk - Journal of the Academy of Life Underwriting, Vol. 25, No. 2, 2009, with Robert L. Stout and Michael Fulks

"Hemoglobin A1c and Mortality in Insurance Applicants: A 5-Year Follow-Up Study", On The Risk - Journal of the Academy of Life Underwriting, Vol. 25, No. 1, 2009, with Robert L. Stout and Michael Fulks

"Using Liver Enzymes as Screening Tests to Predict Mortality Risk" J. Insurance Medicine, Vol. 40, No. 4, 2008, with Michael Fulks and Robert L. Stout

"Underwriting Integrity: Lessons from the Subprime Mortgage Crisis" On The Risk - Journal of the Academy of Life Underwriting, Vol. 24, No. 4, 2008

9

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Highlights from the 2007 AHOU Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 24, No. 1, 2008

"Increased Mortality Associated with Elevated Carcinoembryonic Antigen in Insurance Applicants" J. Insurance Medicine, Vol. 39, No. 4, 2007, with Robert L. Stout, Michael Fulks, Mark E. Magee and Luis Suarez

"Relationship of Hemoglobin A1c to Mortality in Nonsmoking Insurance Applicants" J. Insurance Medicine, Vol. 39, No. 3, 2007, with Robert L. Stout, Michael Fulks, Mark E. Magee and Luis Suarez

"Highlights from the 2006 AHOU Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 23, No. 1, 2007

"The Reproductive System" In: Intermediate Medical Life Insurance Underwriting ALU 201, 1st ed., Education Committee of the Academy of Life Underwriting, chapter 4, 2006

"Highlights from the 2006 CIU Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 22, No. 3, 2006

"Improvements in Cotinine Testing of Insurance Applicants" On The Risk - Journal of the Academy of Life Underwriting, Vol. 22, No. 2, 2006 with Robert L. Stout and Mark Magee

"Highlights from the LOMA Emerging Technology Conference: Understanding How to Use New Technology" On The Risk - Journal of the Academy of Life Underwriting, Vol. 22, No. 2, 2006

Panelist, "Contemplating Pandemic Risk" by Steven C. Siegel, The Actuary, Vol. 3, Issue 3, 2006

"Highlights of the 2005 AHOU Conference" On The Risk - Journal of the Academy of Life Underwriting, Vol. 22, No. 1, 2006

"Simplified Products: Something Old, Something New, and Something That May Just Make You Blue!" On The Risk - Journal of the Academy of Life Underwriting, with Ernest A. Testa, Vol. 22, No. 1, 2006

"2005 Simplified Product Survey: Final Report" for MIB Group, with Ernest A. Testa, January 2006

"Highlights of the 2005 CIU Conference" On The Risk - Journal of the Academy of Life Underwriting, Vol. 21, No. 4, 2005

"Underwriting for the New Millennium: Simplified Product Survey" NewsDirect, September 2005

"Sleep Problems and Accidents" On The Risk - Journal of the Academy of Life Underwriting, Vol. 21, No. 1, 2005

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Customer Relationship Management: A Reinsurer's Experience" On The Risk - Journal of the Academy of Life Underwriting, Vol. 20, No. 2, 2004

"Current Concepts in the Insulin Resistance Syndrome" On The Risk - Journal of the Academy of Life Underwriting, with Robert Weir, Vol. 20, No. 1, 2004

"Highlights of the 2003 AAIM" On The Risk - Journal of the Academy of Life Underwriting, Vol. 20, No. 1, 2004

"Current Concepts in Multiple Sclerosis" On The Risk - Journal of the Academy of Life Underwriting, with Robert Weir, Vol. 19, No. 4, 2003

"Multiple Sclerosis" Canada Life Review Online, Third Quarter 2003, with Robert Weir

"Highlights of the 2003 CIU Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 19, No. 3, 2003

"Web-Assisted Inspection Reports: Part 2 of 2" On The Risk - Journal of the Academy of Life Underwriting, Vol. 19, No. 3, 2003

"Keynote Presentation to the Annual Meeting, Canadian Institute of Underwriters" Canada Life Review Online, Second Quarter 2003

"Web-Assisted Inspection Reports: Part 1 of 2" On The Risk - Journal of the Academy of Life Underwriting, On The Risk - Journal of the Academy of Life Underwriting, Vol. 19, No. 2, 2003

"Highlights of the 2002 AAIM" On The Risk - Journal of the Academy of Life Underwriting, Vol. 19, No. 1, 2003

Project Manager, "Report of the 2002 Automated Risk Assessment System Study" Thomson Management Solutions, February 2003

"Insulin Resistance Syndrome" Canada Life Review Online, Fourth Quarter 2002

"The New Paradigm of Coronary Artery Disease: Part 1. The Pathophysiology of Vulnerable Plaque" On The Risk - Journal of the Academy of Life Underwriting, with Robert Weir, Vol. 18, No. 4, 2002

"Orthostatic Hypotension" On The Risk - Journal of the Academy of Life Underwriting, with Robert Weir, Vol. 18, No. 3, 2002

"Highlights of the 2002 CLIMOA" On The Risk - Journal of the Academy of Life Underwriting, Vol. 18, No. 3, 2002

11

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Treatment of Localized Prostate Cancer" On The Risk - Journal of the Academy of Life Underwriting, Vol. 18, No. 2, 2002

"Privacy Rules and Regulations: An Interview with Linda S. Kaiser, Esq." On The Risk - Journal of the Academy of Life Underwriting, Vol. 18, No. 1, 2002

"Treated Cholesterol; A Preferred Risk?" Canada Life Review Online, First Quarter 2002, with Robert Weir

"Body Mass Index and Mortality" On The Risk - Journal of the Academy of Life Underwriting, Vol. 17, No. 4, 2001, with Robert Weir

"Innovations in Underwriting Build" Canada Life Review No. 2, 2001

"Honoring Past HOLUA Presidents" On The Risk - Journal of the Academy of Life Underwriting, Vol. 17, No. 3, 2001

"Highlights of the 2001 HOLUA: An Underwriter's Odyssey" On The Risk - Journal of the Academy of Life Underwriting, Vol. 17, No. 3, 2001

"Genetic Testing Provides Challenge to Insurers" American Clinical Laboratory, Vol. 20, No. 4, 2001 pp. 18-9

"Highlights of the Spring 2001 Risk Appraisal Forum" On The Risk - Journal of the Academy of Life Underwriting, Vo1. 17, No. 2, 2001

"Highlights of the 2000 IHOU: Gateway to Change" On The Risk- Journal of the Academy of Life Underwriting, Vol. 17, No. 1, 2001

"Progress in Establishing the Association of Home Office Underwriters" On The Risk - Journal of the Academy of Life Underwriting, Vol. 17, No. 1, 2001

"Innovative Technologies for Detecting Alcohol Abuse and Monitoring Drinking Status" American Clinical Laboratory, Vol. 20, No. 1, 2001

"Highlights of the 2000 CIU: Take a Risk!" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 4, 2000

"Alternative/Complementary Medicine" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 4, 2000

"Life Settlements" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 4, 2000, with Chris Cook

12

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Underwriting Settlements" In: Viatical and Life Settlements: The Challenge Facing the Life Insurance Industry, Jean Gora, ed., Life Office Management Association, Chapter 4, 2000

"Detecting Alcohol Abuse and Monitoring Drinking Status" Lab*One* Insight, Fall 2000

"Building Corporate E-Commerce" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 3, 2000

"Highlights of the 2000 HOLUA: Brave New World" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 3, 2000

"Progress Report on the Formation of the New Underwriting Organization" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 3, 2000

"Highlights of the Spring 2000 Risk Appraisal Forum" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 2, 2000

"Les Grubin Hosts Risk Appraisal Forum in the City by the Bay" Broker World, Vol. 20, No. 6, 2000

"Highlights of the 1999 IHOU" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 1, 2000

"A Substandard Life Brokerage Agent's Perspective on Underwriting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 16, No. 1, 2000

"Liquid Gold: What Urine Can Do for You" NAILBA Magazine, Winter 2000, with Kip Whitefield

"Highlights of the 1999 CIU" On The Risk - Journal of the Academy of Life Underwriting, Vol. 15, No. 4, 1999

"Highlights of the 2nd International Underwriting Congress" On The Risk - Journal of the Academy of Life Underwriting, Vol. 15, No. 3, 1999

"Highlights of the 1999 HOLUA Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 15, No. 3, 1999

"Predicting Motor Vehicle Accidents Among the Elderly" Underwriter Alert, Vol. 9, No. 2, 1999

"Risk Factors for Elder Abuse" Journal of Insurance Medicine, Vol. 31, No. 1, 1999, pp 13-20

"Insurance Securitization" On The Risk - Journal of the Academy of Life Underwriting, Vol. 15, No. 1, 1999

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Highlights of the 1998 HOLUA: Capitol Crossfire" On The Risk - Journal of the Academy of Life Underwriting, Vol. 14, No. 3, 1998

"DNA Typing for Individual Identification" On The Risk - Journal of the Academy of Life Underwriting, Vol. 14, No. 2, 1998

"DNA Typing for Individual Identification" FALU Paper, 1998

Highlights of the 1997 IHOU: Remember Our Mission" On The Risk - Journal of the Academy of Life Underwriting, Vol. 14, No. 1, 1998

"Underwriting and Risk Classification" Society of Actuaries' International Section News, No. 15, February 1998, with Chris Cook

"Highlights of the 1997 CIU: Reach for the Top" On The Risk - Journal of the Academy of Life Underwriting, Vol. 13, No. 4, 1997

"Highlights of the 1997 HOLUA: The Heat Is On" On The Risk - Journal of the Academy of Life Underwriting, Vol. 13, No. 3, 1997

"First International Underwriting Congress" Society of Actuaries' International Section News, No. 14, August 1997, with Chris Cook

"Highlights of the 1997 International Underwriting Congress" On The Risk - Journal of the Academy of Life Underwriting, Vol. 13, No. 2, with Chris Cook

"International Outlook: Highlights of the 1997 International Underwriting Congress" Resources, Vol. 17, No. 6 Supplement, 1997, with Chris Cook

"Highlights of the 1996 IHOU: Building Bridges" On The Risk - Journal of the Academy of Life Underwriting, Vol. 13, No. 1, 1997

"Medical Studies: Where Do They Come From?  Transferring Medical Knowledge to Risk Selection" (Part 2 of 2)" Underwriter Alert, Vol. 6, No. 6, 1997

"Elevated GGT, Hypertension and Obesity" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 4, 1996

"Clinical Trials and Population Studies (Part 1 of 2)" Underwriter Alert, Vol. 6, No. 5, 1996

"Highlights of the 1996 HOLUA: Navigating the Waves of Change" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 3, 1996

14

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Underwriting Cultural Markets: Focus on Asian Indian Ethnicity" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 3, 1996

"Highlights of the Spring 1996 Risk Appraisal Forum" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 2, 1996

"Tobacco and User/Abstainer Pricing" Product Development News Society of Actuaries, Issue 40, May 1996

"Underwriting Research Resources Among Life Insurers: A Survey" VFD Consulting, Inc. 1996

"Highlights of the 1995 ICLAM/AAIM Conference" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 1, 1996, with John J. Krinik

"The Quest for Excellence: Highlights of the 1995 IHOU" On The Risk - Journal of the Academy of Life Underwriting, Vol. 12, No. 1, 1996

"Conference Review: 1995 Nucleic Acid-Based Technologies" On The Risk - Journal of the Academy of Life Underwriting, Vol. 11, No. 4, 1995

"Scaling New Peaks - Highlights of the 1995 HOLUA Annual Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 11, No. 3, 1995

"OTR Meeting Review: 1995 Society of Insurance Research Planning and Economics Conference" On The Risk - Journal of the Academy of Life Underwriting, Vol. 11, No. 3, 1995

"Tobacco and User/Abstainer Pricing" On The Risk - Journal of the Academy of Life Underwriting Vol. 11, No. 2, 1995

"OTR Meeting Review: Highlights of the 1994 IHOU" On The Risk - Journal of the Academy of Life Underwriting, Vol. 11, No. 1, 1995

"Underwriting Marital Violence" On The Risk - Journal of the Academy of Life Underwriting, Vol. 10, No. 5, 1994

"Highlights of the 1994 HOLUA Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 10, No. 4, 1994

"How Agents Can Cope With Reluctance to Sell DI" National Underwriter, Vol. 97, No. 49, 1993

"Both 'Supply' and 'Demand' Causing Sales Doldrums" National Underwriter, Vol. 97, No. 44, 1993

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS - INSURANCE, continued

"Sailing for Success: Highlights of the 1993 IHOU Meeting" On The Risk - Journal of the Academy of Life Underwriting, Vol. 10, No. 2, 1994

"Moderate Alcohol Intake and Reduced Mortality: Illusion or Preferred Risk?" On The Risk - Journal of the Academy of Life Underwriting, Vol. 10, No. 1, 1993

"Expanding Horizons: Highlights of the 1993 HOLUA" On The Risk - Journal of the Academy of Life Underwriting, Vol. 9. No. 4, 1993

"Underwriters Urged to Tap More Into Elderly Mkt" National Underwriter, Vol. 97, No. 23, 1993

Contributing Analyst, Medical Risks: Trends in Mortality by Age and Time Elapsed, Edward Lew and Jerzy Gajewski, Praeger Publishers, New York, 1990 (as Vera F. Kelly)

"Notes on Breast Cancer" On The Risk - Journal of the Academy of Life Underwriting, Vol. 4, No. 3, 1988 (as Vera F. Kelly)

"Underwriting Epilepsy" On The Risk - Journal of the Academy of Life Underwriting, Vol. 2, No. 4, 1986 (as Vera F. Kelly)

## PUBLICATIONS – BUSINESS, HEALTH and OTHER

"Three-Dimensional Comparative Analysis of Large Populations to Determine Data Relationships: An Alternative to Statistics" In: Transactions on Computational Science and Computational Intelligence, Springer, in press.

"Selling Our Children in the U.S.: An Interview with Russ Combs" The Voice: The Journal of the Domestic Violence Movement, Winter 2005

Contributor, After the Guns Fall Silent: The Enduring Legacy of Landmines, S. Roberts and J. Williams, Vietnam Veterans of America Foundation, Washington, D.C. 1995

Editor, The Politics of Information Systems, Paul Strassmann, Information Economics Press, New Canaan, CT, 1994

Invited Editorial Response, American Programmer, January, 1993

Editor-Producer, Win Some, Lose Some: My 40 Years in Corporate America, John Titsworth, Information Economics Press, New Canaan, CT, 1992

Editor, The Business Value of Computers, Paul Strassmann, Information Economics Press, New Canaan, CT, 1990

**Vera F. Dolan**
Curriculum Vitae, continued

## PUBLICATIONS – BUSINESS, HEALTH and OTHER, continued

Editor, Information Payoff: The Transformation of Work in the Electronic Age, Paul Strassmann, Macmillan Free Press, NY, 1985 (as Vera F. Kelly)

"A Proportionate Mortality Study of an Oil, Chemical and Atomic Workers Local in Texas City, Texas" Annals of the New York Academy of Sciences, 381(1982): 54-61, with Reeve, Waxweiler, Thomas and Itaya (as Vera F. Kelly)

## PRESENTATIONS

"Life Expectancy for Litigation" Collegium of Pecuniary Damage Experts, Las Vegas, Nevada, March 31, 2017

"Juvenile Life Without Parole Sentencing and Resentencing Case Update" CLE presentation (4.5 hours, course no. 168516), University of South Carolina School of Law, Columbia, South Carolina, December 16, 2016

"Isolated Hematuria: What Is the Risk?" Northern California Life Insurance Association, Walnut Creek, California, May 10, 2012

"Positive Cocaine Tests and Mortality" Northern California Life Insurance Association, Berkeley, California, September 17, 2009

"Actuaries and Public Health: From Analysis to Action" Society of Actuaries Health Spring Meeting, Los Angeles, California, May 28, 2008, with Grady Catterall and Dana Goldman

"Research Results: Potential Impact of a Pandemic on the U.S. Health Insurance System" Society of Actuaries Health Spring Meeting, Los Angeles, California, May 28, 2008, with Jim Toole and Jim Walbridge

"How the World Has Changed, and How Medical Underwriting Will Benefit Your Applicants and Your Companies' Bottom Line" Annual Product Development Actuary Symposium, Denver, Colorado, June 26, 2007, with Robert L. Stout

"Non-Underwritten Life Products – Do They Work?" Annual Product Development Actuary Symposium, Denver, Colorado, June 25, 2007, with Jack Simon

"Pandemics and Extreme Events" Actuarial Society of Greater New York Annual Meeting, New York City, New York, November 9, 2006, with Janet Carstens

"Underwriting Simplified Issue Life Insurance Products" Group Underwriting Association of America, San Diego, California, October 31, 2006, with Ernie Testa

"The Life Settlements Market" Society of Actuaries Annual Meeting, Chicago, Illinois, October 18, 2006, with Tony Duscio and Jay Vadiveloo

17

**Vera F. Dolan**
Curriculum Vitae, continued

## PRESENTATIONS, continued

"Preparing for Extreme Events" Society of Actuaries Annual Meeting, Chicago, Illinois, October 18, 2006, with Janet Carstens and Max Rudolph

"Pandemic Exposure and Risk Management Strategies in Asia as Compared to the United States" Society of Actuaries Life Spring Meeting, Hollywood, Florida, May 24, 2006, with Ronald Klein

"Current Trends in Distribution Channels: New Underwriting for a New Millennium" Society of Actuaries Life Spring Meeting, New Orleans, Louisiana, May 23, 2005, with Jim McArdle and Ernie Testa

"Gynecologic and Obstetric Disorders" Institute of Caribbean Home Office Underwriters, Almond Beach Resort, Barbados, September 14, 2004

"Sleep Dysfunction and Disorders" Institute of Caribbean Home Office Underwriters, Almond Beach Resort, Barbados, September 13, 2004

"Sleep Dysfunction and Disorders" Western Home Office Underwriters Association, Colorado Springs, Colorado, June 3, 2004

"Nail a Front Door on Your Back Room" Social Enterprise Alliance, San Francisco, California, March 5, 2004, with David Allburn and Russ Combs

"Multiple Sclerosis" Northern California Life Insurance Association, Emeryville, California, October 22, 2003

"Post-Stroke Morbidity" Northern California Life Insurance Association, San Rafael, California, March 21, 2001

"Variable Life Insurance – The New Frontier!" National Association of Variable Annuities, Palm Beach, Florida, November 6, 2000, with Mark Daley

"Analysis of Profitability by Customer: Banking Case Study" Society of Actuaries, Orlando, Florida, June 19, 1997, with Rex Atwood and Nancy Church

"Establishing Underwriting Guidelines Using General Population Data" International Underwriting Congress, Mexico City, Mexico, February 25, 1997, with Rick Bergstrom

"They Came for AIDS; They Stayed for Liver" Society of Actuaries, Orlando, Florida, October 28, 1996, with Rick Bergstrom and Hank George

"Detecting and Evaluating Marital Violence" Western Home Office Underwriters Association, Squaw Valley, California, June 9, 1995

Last update June 24, 2022

**Rule 26 Trial and Deposition Testimony for Vera F. Dolan, MSPH FALU**

Deposition, June 17, 2022, Tina Sizemore v. Transamerica Life Insurance Company, et al, Commonwealth of Kentucky, Letcher Circuit Court (18-CI-00160)

Deposition, December 17, 2021, PR Life Settlements v. Lincoln National Life Insurance Company, US District Court for the Northern District of Texas Ft. Worth Division (4:21-cv-00528-P)

Deposition, July 9, 2021, Randy Kohorst v. Thomas Polking, et al, Iowa District Court in and for Polk County, Iowa (LACL145805)

Deposition, May 27, 2021, Komal Patel v. Washington Township Healthcare System, et al, Superior Court of the State of California, County of Alameda (RG17882545)

Deposition, May 11, 2021, Sten Kordon v. Andrew Iding, et al., State of Wisconsin District Court, Door County (18-CV-146)

Deposition, April 6, 2021, Kyra Bernhardt v. County of Hawaii, et al., US District Court for the District of Hawaii (CV 19-00209 DKW-KJM)

Deposition, February 6, 2020, Marcie Salopek v. Zurich American Life Insurance Co., US District Court for the District of New Mexico (2:18-cv-00339-JAP-CG)

Deposition, September 17, 2019, Patterson v. Connecticut Institute for the Blind, Superior Court JD of New Haven at New Haven (NNH-CV-16-6060856)

Trial, August 27 and 29, 2019, Jackson National Life Insurance Co. v. Sterling Crum (bench trial), US District Court, Northern District of Georgia, Atlanta Division (1:17-CV-03857-WMR)

Deposition, January 11, 2019, Gary H. Lebbin v. Transamerica Life Insurance Co., US District Court, Southern District of Florida, West Palm Beach Division (18-80558-CV-MIDDLEBROOKS/BRANNON)

Deposition, January 4, 2019, Jackson National Life Insurance Co. v. Sterling Crum, US District Court, Northern District of Georgia, Atlanta Division (1:17-CV-03857-WMR)

Deposition, June 27, 2018, Robin and Melinda Phelan v. Jordan Pastorek MD, et al., District Court, 298th Judicial District, Dallas County, Texas (DC-16-13777)

Deposition, May 3, 2018, Sexton v. Cape Regional Medical Center, Superior Court of New Jersey, State of New Jersey, County of Cape May (file #53155-001)

Trial, February 21, 2018, Thomas Mook v. Patrick Probst, et al., Iowa District Court for O'Brien County (LACV022097)

**Rule 26 Trial and Deposition Testimony for Vera F. Dolan, MSPH FALU, con't**

Deposition, December 19, 2017, Malcolm Weiner v. AXA Equitable Life Insurance Company, et al., US District Court, Southern District of New York (1:16-cv-04019-ER)

Sentencing hearing, December 7, 2017, State of South Carolina v. Michael Smith, State of South Carolina, County of Calhoun, Court of General Sessions for the First Judicial Circuit (2004-GS-09-145 & -202)

Trial, August 31, 2017; Escamilla Sanchez v. San Bernardino School District et al, Superior Court of the State of California, County of San Bernardino (CIVDS1309504)

Trial, August 28, 2017, Arnab K. Chanda v. Amrita Chanda (bench trial), Superior Court of California, County of Santa Clara (17FL001300)

Deposition, May 24, 2017, John W. Thomas v. the Baltimore Life Insurance Company, Circuit Court for Frederick County, State of Maryland (10-C-16-001104 CN)

Deposition, March 1, 2017, In re David Green (debtor) Leslie Gladstone (Chapter 7 trustee) v. Omega Life Fund, et al, United States Bankruptcy Court, Southern District of California (09-90400-CL)

Sentencing hearing, February 17, 2017, State of South Carolina v. Ronald Hakeem Mack, State of South Carolina, County of Williamsburg, Court of Common Pleas for the Third Judicial Circuit (2009-GS-45-180)

Trial, February 3, 2017, Katherine A. Wilhite v. Bernard S. Groves (bench trial), Superior Court of California, County of San Bernardino, Central Branch (FAMSS1200807)

Deposition, January 31, 2017; Maria Carillo et al v. William McIver, Atech Logistics, Superior Court of the State of California, County of Riverside (RIC 1504210)

Trial, November 7, 2016; Jose, Erasto, Iram and Omar Gutierrez v. Alyssa K. Le, Ronald S. Mandel, DO, Superior Court of the State of California, County of Orange, Central Justice Center (30-2015-00797352-CU-MM-CJC)

Deposition, October 28, 2016; Escamilla Sanchez v. San Bernardino School District et al, Superior Court of the State of California, County of San Bernardino (CIVDS1309504)

Deposition, October 21, 2016; Breanna Romero and Darleena Romero v. Robert Prada, Albert Macias, Kashmir Nightclub, City of Imperial, Superior Court of the State of California, County of Imperial, El Centro Division (ECU08320)

Trial, August 8, 2016; In re the Marriage of Becky J. (Burwell) Pruitt and Gary J. Burwell (bench trial), Superior Court of the State of California, County of Kern, Metropolitan Division (S-1501-FL-591767)

**Phoebe Putney Memorial Hosp.**
**Phoebe Putney Memorial**
**417 Third Avenue**
**Albany, GA 31701**

**Ultrasound Report**
**Signed**

Patient: Barwick, James Thomas
DOB: 02/22/1971
Age/Sex: 48 / M
Loc: P.RAD
Attending Dr: Phillip R Poulos MD

MR#: MP02163218
Acct: AP2001312832
ADM Date: 10/14/19
Discharge Date:



Ordering Physician: Poulos, Phillip R MD
Date of Service: 10/14/19
Procedure(s): US abdomen complete
Accession Number(s): A0001569597P

cc: Poulos, Phillip R MD~

HISTORY: 48-year-old male; bloating and abdominal pain

SONOGRAM OF THE ABDOMEN:

No relevant prior studies available for comparison.

Liver is markedly hyperechoic. Poor penetration. Maximum sagittal diameter is 24.5 cm.

Pancreas completely obscured.

Common bile duct measures 3.5 mm.

Gallstones with acoustical shadowing in the gallbladder lumen. Wall thickness is 2.9 mm. Pericholecystic fluid.

Small amount of ascites.

Spleen measures 13.8 x 8.9 cm. Normal echo pattern.

Normal IVC. Aorta largely obscured.

Normal right kidney. Normal left kidney.

IMPRESSION:

Cholelithiasis; pericholecystic fluid raises the question of cholecystitis.

Hyperechoic liver; possible fatty infiltration and/or hepatocellular disease.

Minimal ascites.

Department: Imaging
Report# 1014-0748
Status: Signed
Site: PPMH

**EXHIBIT**

**2**

Phoebe Putney Memorial Hosp.                                                                                                                   2
Patient: Barwick,James Thomas
Acct: AP2001312832
Status: Signed


Dictated By:          Paine,Clarence M. MD
Signed By:            Paine,Clarence M. MD                                                                             10/14/19 1556


DD/DT: 10/14/19 1547
TD/TT: 10/14/19 1547          Transcriptionist: Clarence Mathew Paine, MD


Department: Imaging
Report# 1014-0748
Status: Signed
Site: PPMH

**Phoebe Putney Memorial Hosp.**
Phoebe Putney Memorial
417 Third Avenue
Albany, GA 31701

**Cat Scan Report**
**Signed**

Patient: Barwick, James Thomas
DOB: 02/22/1971
Age/Sex: 48 / M
Loc: P.ED
Attending Dr:

MR#: MP02163218
Acct:AP2001316116
ADM Date: 10/15/19
Discharge Date:

Ordering Physician: Smith, Todd B. MD
Date of Service: 10/15/19
Procedure(s): CT abdomen pelvis w con
Accession Number(s): A0001571364P

cc: Smith, Todd B. MD~

HISTORY: Abdominal pain, swelling, and redness of the right upper quadrant of the abdomen. No history of surgeries of abdomen or pelvis.

PROCEDURE: CT abdomen and pelvis with contrast.

TECHNIQUE: 150 cc of Omnipaque 350 given IV. Oral GI contrast was not given. Coronal and sagittal reformations were performed.

COMPARISON: Ultrasound from yesterday.

FINDINGS:

ABDOMEN:

Liver: The liver parenchyma is unremarkable. There are approximately 4 abscesses adjacent to the surface of the liver: one adjacent to the lateral surface of the lateral segment of the left hepatic lobe measuring 21 x 17 mm; the others are located adjacent to the caudal margin of the right hepatic lobe measuring 23 x 8 mm, 15 x 9 mm, 38 x 23 mm.

Gallbladder: Cholelithiasis is demonstrated. There is no CT evidence that would suggest cholecystitis. No evidence of biliary ductal dilatation.

Spleen: Unremarkable.

Pancreas: Unremarkable.

Kidneys: 12 mm exophytic Bosniak type I cyst right inferior renal pole.

Adrenals: Unremarkable.

Abdominal aorta: Calcifications. No aneurysm. Celiac artery, SMA, IMA are patent.

Department: Imaging
Report# 1015-0792
Status: Signed
Site: PPMH

**EXHIBIT**

3

Phoebe Putney Memorial Hosp.                                                          2
Patient: Barwick, James Thomas
Acct: AP2001316116
Status: Signed

Lymph nodes: No evidence for adenopathy.

GI tract (Abdominal Portion): No evidence for intestinal obstruction. Mild
gaseous distention of portions of the colon and mild fluid distention of the
smooth small bowel loops suggesting an ileus pattern. No evidence for colonic
diverticulosis or diverticulitis.

Ascites: No free fluid.

Pneumoperitoneum: None.

Abdominal wall: No anterior abdominal wall hernia. There are approximately 12
abscesses within the peritoneal cavity with most of these along the anterior
abdominal wall of the right upper quadrant (4 of these are adjacent to the liver
surface as noted above under "liver"). The largest abscess abuts the right
anterior abdominal parietal peritoneum measuring 17.5 x 5.5 cm and demonstrates
communication through disrupted right rectus abdominis muscle with right upper
quadrant subcutaneous soft tissue gas suspicious for necrotizing fasciitis.
Within the abdomen, adjacent to this large abscess is another abscess that
measures 7.1 x 3.4 cm and adjacent to this is an abscess measuring 2.4 x 1.7 cm
and there are additional multiple small abscesses in this same region of the
abdomen.

Limited imaging through lung bases: Very small infiltrate within the right
middle lobe may represent pneumonia, see image 3 of series 3 and image 54 series
200.


IMPRESSION:
1. Multiple intraperitoneal right anterior abdominal abscesses as discussed
above under "abdominal wall" and under "liver". The largest abscess communicates
with right anterior abdominal wall subcutaneous soft tissue gas (which is
concerning for necrotizing fasciitis) through disrupted right rectus abdominis
muscle. See above for details. Exline
2. Cholelithiasis. No CT evidence that would suggest cholecystitis. No biliary
ductal dilatation.
3. 12 mm benign cyst right inferior renal pole.
5. Atherosclerosis.
6. Mild ileus pattern of portions of the the colon and small bowel.
7. Very small infiltrate within the right middle lobe may represent pneumonia,
image reference numbers given above.


PELVIS:

Appendix: The appendix is not identified. The right colon including the cecum is
located amongst the above described inflammatory/infectious processes (cannot
exclude potential etiology for the above abscesses as being the appendix however
surgical correlation would be needed).

Rectosigmoid colon: No abnormalities demonstrated.

Department: Imaging
Report# 1015-0792
Status: Signed
Site: PPMH

Phoebe Putney Memorial Hosp.                                                                                      3
Patient: Barwick,James Thomas
Acct: AP2001316116
Status: Signed


Urinary bladder: No abnormalities demonstrated.

Ascites/free fluid: None.

Lymph nodes: No evidence for adenopathy.

Inguinal hernia: No evidence for inguinal hernia.

Osseous structures:Degenerative changes of the spine. Old healed lower left rib
fractures.


IMPRESSION:
1. The appendix is not identified. The right colon including the cecum is
located amongst the above described inflammatory/infectious processes in the
right upper abdomen (cannot exclude potential etiology for the above abscesses
as being the appendix however surgical correlation would be needed)

Preliminary report regarding the right upper abdominal abscesses and the right
anterior abdominal subcutaneous soft tissue gas suspicious for necrotizing
fasciitis was called to Dr. Smith emergency center on October 15,019 at 9:05 PM.

DoseMonitor Dose Report CTDIvol Mean 21.17/DLP 2577.73



Dictated By:        Deem,Brent S DO
Signed By:          Deem,Brent S DO                                              10/15/19 2126


DD/DT: 10/15/19 2056
TD/TT: 10/15/19 2056        Transcriptionist: Brent S Deem, DO



Department: Imaging
Report# 1015-0792
Status: Signed
Site: PPMH

**Phoebe Putney Memorial Hospital**
417 Third Avenue, Albany, GA 31702
PH: (229) 312-6116, FAX: (229) 312-6152
Teresa J. Bohlmeyer, M.D., Medical Director

## PPMH Surgical Pathology Report

Patient Name: **Barwick,James Thomas**
DOB/Age: 02/22/1971 / 48
Race/Sex: CA / M
Location: P.MICU
Submitting: Davis,John B. Jr MD
Other:

Specimen #: **S19-12095**
Med Rec #: MP02163218
Account #: AP2001316116
Date Taken: 10/16/19
Date Received: 10/16/19
Date Reported: 10/21/19

### SPECIMEN(S) RECEIVED
A. Colon, Segmental Resection - Right colon

### CLINICAL HISTORY
Sepsis.  Necrotizing fasciitis.  Abdominal wall abscess an intra-abdominal abscess.  Perforated appendix.

### FINAL DIAGNOSIS
1. Distal ileum, cecum, ascending colon, appendix and omentum (right hemicolectomy):
   - EXTENSIVE ACUTE SEROSITIS, INVOLVING ILEUM, COLON AND APPENDIX.
   - ACUTE APPENDICITIS WITH ASSOCIATED GROSS DEFECT/DISRUPTION COMPATIBLE
     WITH APPENDICEAL PERFORATION.
   - BENIGN OMENTAL TISSUE WITH FAT NECROSIS AND PROMINENT ACUTE INFLAMMATION.
   - FIVE BENIGN LYMPH NODES.
   - NO DYSPLASIA OR MALIGNANCY IDENTIFIED.

2. Abdominal wall tissue (debridement):
   - MARKED ACUTE INFLAMMATION AND NECROSIS INVOLVING DERMIS AND SUBCUTANEOUS
     ADIPOSE TISSUE AND SKELETAL MUSCLE, CONSISTENT WITH HISTORY OF ABDOMINAL
     WALL ABSCESS AND NECROTIZING FASCIITIS.

**Dictated by:** Deborah Trammell, MD

### MICROSCOPIC DESCRIPTION
Microscopic examination performed. sections of small bowel are lined by benign small bowel mucosa with intact villous architecture sections of colon are lined by benign colonic mucosa with intact crypt architecture.  There is associated vascular congestion, focal interstitial hemorrhage and extensive areas of acute inflammation and necrosis involving the serosal surfaces of the ileum, colon and appendix. Cross sections of appendix adjacent to the area of disruption show focal transmural acute neutrophilic inflammation compatible with acute appendicitis.  Blocks a 19 and a 20 show benign skin and subcutaneous tissue including fibroadipose tissue and skeletal muscle.  These show prominent acute neutrophilic inflammation with associated areas of necrosis. No neoplasia or malignancy identified.

### GROSS DESCRIPTION
Received in a container labeled with the patient's name and "right colon stitch marks proximal and distal" Terminal ileum:
   Length: 24.5 cm
   Circumference: 6 cm
   Wall thickness: 0.3 cm

Barwick,James Thomas          PPMH Surgical Pathology Report          Spec #: S19-12095

Gross appearance: The serosa is tan-red and smooth with focal areas of roughening and white fibrinous exudate. The mucosa is folded and grossly unremarkable. The lumen is neither structure nor dilated.

Appendix:
    Length: 6.2 cm
    Diameter: 0.7 cm
    Serosal surface: The serosa is diffusely covered by a roughened and hemorrhagic mesoappendix.
    Description of cross sections: There is a defect that divides the appendix in half which is 2.5 cm from the appendiceal orifice. The mucosa at this location is hemorrhagic and roughened. The remaining mucosa is tan-pink and grossly unremarkable. The wall thickness is up to 0.3 cm. The distal appendix is not well appreciated and appears fibrotic.

Cecum and ileocecal valve: The cecum has a red-brown and roughened serosa. The cecal mucosa is tan and folded with focal areas of flattening. The ileocecal valve has tan and grossly unremarkable mucosa.

Colon:
    Length: 18 cm
    Largest circumference: 21 cm
    Mucosa: The mucosa is tan and folded with focal areas of flattening within the area of dilation.
    Lumen: The lumen is focally dilated adjacent to the ileocecal valve.
    Wall: 0.3 cm
    Serosal surface: The serosa is red-brown and smooth with focal areas of tan-white exudate.

Mesentery: 25 x 6.5 x 6 cm; there is an attached 18 x 16 x 1.5 cm portion of omentum. The omentum has yellow lobulated adipose tissue with diffuse areas of tan-white fibrinous exudate. Sectioning reveals focal areas of hemorrhage.

Lymph nodes: Six lymph node candidates are identified ranging from 0.6-1.2 cm in greatest dimension.

Additionally received in the same container is a 15 x 17 x 7 cm aggregate of tan-white smooth skin, tan soft tissue and yellow lobulated adipose tissue. There are focal areas of tan-white purulence. There is also a 23 x 21 x 2 cm portion of omentum. The omentum has yellow-red of lobulated adipose tissue with focal areas of tan-white fibrinous exudate. Sectioning reveals focal areas of hemorrhage.

Block summary:
A1-A2 proximal resection margin, en face
A3-A4 distal resection margin, en face
A5 representative terminal ileum with roughened serosa with exudate
A6 appendiceal tip, bisected and submitted entirely
A7 representative cross-sections adjacent to the area of disruption
A8 additional representative appendiceal cross-sections
A9 representative cecum with flattened mucosa, discolored serosa, and roughened serosa
A10 representative colonic serosa with exudate and flattened mucosa
A11 representative omentum with exudate and hemorrhage
A12-A18 lymph node candidates, submitted entirely
    A12-A15 one lymph node candidate, trisected, in each
    A16 possible lymph node candidate, serially sectioned
    A17-A18 one lymph node candidate, serially sectioned
A19-A20 representative additionally received skin, soft tissue, and adipose tissue
A21 representative additionally received omentum with exudate and hemorrhage

RES/DJT

## Pathology Procedures

Barwick,James Thomas          PPMH Surgical Pathology Report          Spec #: S19-12095

**PROCEDURES:**     GML3 88304, GML5 88307

<u>Electronically Signed By: Deborah Trammell, MD MD 10/21/19 1305</u>

```
                              DIAGNOSTIC IMAGING
    DOCTORS HOSPITAL          -      3651 Wheeler Road      -        Augusta, GA 30909
    PHONE #: 706-651-6501                              FAX #: 706-651-3701
--------------------------------------------------------------------------------
PATIENT TYPE: ADM IN            LOC/RM: G.BURN/G.BU07     DOB: 02/22/1971

PATIENT NAME: BARWICK,JAMES THOM  SEX: M            EXAM DATE: 10/28/2019

OD PHYSICIAN: Quinn,Michael W  M  ADM: 10/23/2019    ORDERED: 10/28/2019

MED RECORD #: G000956479             AC#: G00566801417  BATCH #: N/A

REASON: reat: CREAT 10/28/19 0240 0.48 MG/D        RAD: ABDP - Abdomina
--------------------------------------------------------------------------------
ADMISSION CLINICAL DATA: NECROTIZING FASCITIS


   EXAMS:                          Reason for Exam::            CPT CODE:
002318316 CT ABDPEL W/O CONT       ABDP - Abdominal Pain        74176

      HISTORY:
   Necrotizing fasciitis.

   Noncontrasted CT of the abdomen and pelvis from level of the lower
   thorax to the proximal thighs with axial sections as well as sagittal
   and coronal reconstructions.  Very extensive edema of the abdominal
   wall, more on the right side than the left, which would be consistent
   with the history of necrotizing fasciitis.  There is suggestion of a
   open wound right upper ventral wall with a corresponding defect in
   the abdominal wall musculature with quite a bit of air in the in the
   soft tissues in this region.  There is also extensive inflammatory
   change in the adjacent portions of the abdomen with bowel wall
   thickening suggesting possibility of peritonitis.  No intramural air
   or free intraperitoneal air identified.  Stone in the gallbladder
   outlined by radiographic contrast in the gallbladder with mild
   gallbladder wall thickening.  No abnormality of the liver spleen
   stomach pancreas, adrenals or kidneys.  Aorta calcified without
   aneurysm.  No large free fluid collection.  Foley catheter within
   nondistended bladder with small amount of air in the bladder.
   Extensive consolidation in both lung bases with small amount of
   pleural fluid present bilaterally.  Normal heart size.  NG tube tip
   at the level of the body of the stomach.

   Impression:  Large defect of the right upper ventral wall including a
   defect of the ventral wall musculature with extensive air in the soft
   tissues which may be related to the given history of necrotizing
   fasciitis.  Extensive pattern of edema in the right upper quadrant of
   the abdomen anteriorly with quite a bit of bowel wall thickening,
   worrisome for peritonitis.  Bowel ischemia not excluded.  No definite
   intramural air or free air.  No drainable abscess collection
   identified.  Stone in the gallbladder with some gallbladder wall
   thickening which could
   represent secondary inflammation, primary cholecystitis not excluded.
   Air in the bladder is presumably related to Foley placement.
   Pneumonia  and/or atelectasis in the lung bases with small bilateral

   effusions.



PAGE  1                         Signed Report                    (CONTINUED)
```

**BAR01938-DHA**

**EXHIBIT**

**4**

```
                           DIAGNOSTIC IMAGING
      DOCTORS HOSPITAL        -    3651 Wheeler Road    -    Augusta, GA 30909
      PHONE #: 706-651-6501                         FAX #: 706-651-3701
   --------------------------------------------------------------------------
   PATIENT TYPE: ADM IN            LOC/RM: G.BURN/G.BU07     DOB: 02/22/1971

   PATIENT NAME: BARWICK,JAMES THOM  SEX: M          EXAM DATE: 10/28/2019

   OD PHYSICIAN: Quinn,Michael W  M  ADM: 10/23/2019   ORDERED: 10/28/2019

   MED RECORD #: G000956479        AC#: G00566801417  BATCH #: N/A

   REASON: reat: CREAT 10/28/19 0240 0.48 MG/D      RAD: ABDP - Abdomina
   --------------------------------------------------------------------------
   ADMISSION CLINICAL DATA: NECROTIZING FASCITIS


     EXAMS:                        Reason for Exam::        CPT CODE:
   002318316 CT ABDPEL W/O CONT    ABDP - Abdominal Pain    74176
     <Continued>


   ** Electronically Signed by WARREN ELAM MD on 10/28/2019 at 1619 **
                 Reported and signed by: WARREN ELAM,MD
```

```
   CC: Kimberly M Linticum NP; Jonathan Davis MD; Michael W Quinn MD;
       Gabriel J Thornton MD
   DATE: 10/28/2019 (1619) BY: DR.ELAWA
   TECHNOLOGIST: PAYNE,VERONICA
   PAGE  2                        Signed Report
```

**BAR01939-DHA**

```
                              DIAGNOSTIC IMAGING
    DOCTORS HOSPITAL          -     3651 Wheeler Road      -      Augusta, GA 30909
    PHONE #: 706-651-6501                                 FAX #: 706-651-3701
    --------------------------------------------------------------------------
    PATIENT TYPE: ADM IN              LOC/RM: G.BURN/G.BU07     DOB: 02/22/1971

    PATIENT NAME: BARWICK,JAMES THOM  SEX: M          EXAM DATE: 11/08/2019

    OD PHYSICIAN: Quinn,Michael W  M  ADM: 10/23/2019   ORDERED: 11/08/2019

    MED RECORD #: G000956479          AC#: G00566801417  BATCH #: N/A

    REASON:                                            RAD: TUBEC - Tube Ch
    --------------------------------------------------------------------------
    ADMISSION CLINICAL DATA: NECROTIZING FASCITIS


       EXAMS:                       Reason for Exam::         CPT CODE:
    002322818 ABDOMEN/KUB PORT      TUBEC - Tube Check         74018

          HISTORY:
       NG tube

       Comparison:  11/03/2019

       Findings: Single radiograph of the abdomen demonstrates a nasogastric
       tube tip overlying the distal stomach.  Nonobstructive bowel gas
       pattern.  Skin staples and IVC filter are again present.

       Impression:  Nasogastric tube tip overlies the distal stomach.



         ** Electronically Signed by TIMOTHY MARK ADAMS MD **
         **              on 11/08/2019 at 0749            **
                Reported and signed by: TIMOTHY MARK ADAMS,MD
```

CC: Jonathan Davis MD; Michael W Quinn MD; Gabriel J Thornton MD

DATE: 11/08/2019 (0749) BY: DR.ADATI
TECHNOLOGIST: GILLILAND,BETH RT (NIGHTS)
PAGE  1                    Signed Report

**BAR01940-DHA**

**AFFIDAVIT OF EPIDEMIOLOGIST VERA F. DOLAN**

My name is Vera F. Dolan. My business address is 454 Beltrami Dr., Ukiah, California 95482-8745. I am over eighteen years old, I do not suffer from any mental diseases or impairment, and I can competently testify to the following:

I am a graduate of University of North Carolina at Chapel Hill, Master of Science in Public Health (MSPH) in Epidemiology, 1981.

I am a graduate of the John Hopkins University, BA in Public Health, 1979.

I have over 30 years of experience of work as an epidemiologist, including conducting cohort mortality studies and publishing their results in peer-reviewed medical journals. My experience writing underwriting and risk assessment manuals for the life and health insurance industries gives me ongoing and current familiarity with communicable diseases and their risks. I have made several presentations to the Society of Actuaries as an epidemiologist concerning pandemics and their implications for the insurance industry and general population.

As an expert in epidemiology, I have been retained in the following three cases:

1. Defense; Littler Mendelson, San Jose, California; attorney Joan Wakeley. Dennis Loubal vs. City of Half Moon Bay and the Cities Group. Wrote reports analyzing and rebutting the presumption of industrial causation of Hodgkin's disease in a 41-year-old police officer who attributed his Hodgkin's disease to occupational exposure to benzene while pumping gasoline for his police vehicle during the 14 years of his employment with the Half Moon Bay police department.

2. Defense; Shook Hardy & Bacon, Kansas City, Missouri; attorney James T. Newsom. Engle class action cases in the state of Florida against tobacco manufacturers. Provided trial exhibits, data analysis, investigative notes and a review of medical literature in preparation for testimony on the diminishing risk of lung cancer after quitting smoking.

3. Plaintiff; Law Offices of Michael J. Green, Honolulu, Hawaii; attorney Brian Mackintosh. Reviewed and analyzed employment records, medical records and medical literature for plaintiff pesticide worker occupationally exposed to the insecticide Dursban for possible link between that exposure and plaintiff's lung cancer.

Additionally, I have been an expert since 2006 for cases requiring expertise in calculating life expectancies, life insurance bad faith, life insurance underwriting and risk assessment. My testimony as a life expectancy expert has been accepted in both federal and state court, having passed a Daubert challenge for calculating life expectancies using generally accepted life underwriting and life settlement methodology. My retention has been 50% for plaintiff and 50% for the defense.

**EXHIBIT**

5

**Facts of the case**

I consulted with Dr. Orly Taitz on September 2, 2014.  Her case history and statements to me reveal the following:
- Dr. Taitz is a Doctor of Dental Surgery in Rancho Santa Margarita, California.
- Dr. Taitz is a doctor-provider for a number of government programs which provide care for new immigrants.
- A number of such immigrants showed up for treatment in Dr. Taitz's office with persistent cough and upper respiratory diseases.  Patients showed up with multiple relatives, who also suffered from upper respiratory infections and persistent cough.
- After treating these patients and being in close contact with these patients, Dr. Taitz developed a persistent cough.
- Dr. Taitz sought medical treatment from her Internal Medicine doctor, which includes taking antibiotics, undergoing chest X-ray examination to check her lungs for tuberculosis, as well as a sputum test for tuberculosis.
- Due to this persistent cough, Dr. Taitz developed oxygen insufficiency and was ordered by her doctor to use a positive pressure oxygen machine during sleep for the rest of her life.

According to Kenneth J. Rothman, Professor of Epidemiology at Boston University School of Public Health, in his introductory textbook on epidemiology, "Often considered the core science of public health, epidemiology involves the study and determinants of disease frequency, or, put even more simply, the study of the occurrence of illness."[1]  Like other epidemiologists, my opinions rely on the facts related to a case or group of cases in which illness occurs in order to determine the likely causation mechanism and component cause/factors of that illness.

Such facts do not require my direct medical examination of any patient or patients, as the diagnosis provided by a medical professional is sufficient in itself as evidence for my consideration, just as the epidemiologists at the Centers for Disease Control rely on the diagnoses reported to them by direct examining medical professionals across the U.S. for their facts.  I have no reason to believe that Dr. Taitz's statements are untrue; I rely on her statements and her Internal Medicine doctor's diagnosis as an epidemiologist normally does in such cases.

The causal chain of events and factors that leads me as an epidemiologist to conclude that Dr. Taitz was infected during close contact with infected immigrant patients is that:
1. Infected immigrant detainees are being transported by DHS without quarantine or treatment for existing communicable diseases to California, as per documents cited in my affidavit dated September 3, 2014;
2. Dr. Taitz has treated such immigrant detainees and had herself developed illness;
3. The U.S. is experiencing a nationwide wave of serious respiratory infection outbreaks among children with impaired immune systems, particularly the uncommon enterovirus D68, which arose immediately after the widespread transportation by DHS of immigrant detainees who were not quarantined or medically treated.

---

1. Rothman KJ. Epidemiology, An Introduction. Oxford University Press, New York, 2002. p 1.

4. The close association in time between the widespread dispersal of these immigrant detainees, Dr. Taitz's treatment of such detainees, and the respiratory illnesses experienced by Dr. Taitz and enterovirus D68 outbreak patients are sufficient to be considered likely component causes and factors in an epidemiologic chain of causation.

In a search of the peer-reviewed medical literature, I investigated the possibility of the transmission of the Ebola virus through aerosols or fomites produced by coughing and sneezing. It is this type of transmission that would have a strong likelihood of infecting doctor-providers for a number of government programs which provide care for new immigrants like Dr. Taitz.

- In 1995, 316 people became ill with Ebola hemorrhagic fever (EHF) in Kikwit, Democratic Republic of the Congo. After extensive epidemiologic evaluation, the routes of transmission of Ebola for these patients were assessed.[2] There were a group of infected patients who reported no physical contact with someone with suspected EHF. The investigators stated, "Although close contact while caring for an infected person was probably the major route of transmission in this and previous EHF outbreaks, the virus may have been transmitted by touch, droplet, airborne particle or fomite; thus, expansion of the use of barrier techniques to include casual contacts might prevent of mitigate future epidemics."
- A series of research experiments in Canada exposing pigs carrying Zaire-Ebola virus (ZEBOV) to uninfected macaque monkeys showed that the Ebola virus can be transmitted within a room in which these animals were in cages separated by a wire barrier.[3] The investigators stated, "Under conditions of the current study, transmission of ZEBOV could have occurred either by inhalation (of aerosol or larger droplets), and/or droplets generated during the cleaning of the room. Infection of all four macaques in an environment, preventing direct contact between the two species and between the macaques themselves, supports the concept of airborne transmission."

In September, 2014, the United States brought two infected charity workers from Africa to the United States homeland to be treated for Ebola with an experimental cocktail of 3 monoclonal antibodies. The U.S. government and the world media announced that these two relief workers were cured of Ebola with this new treatment. As of today, October 10 , 2014, there are world media reports of several patients being treated in the United States with other experimental drugs to achieve a cure.

Jesse L. Goodman, MD, MPH, formerly the chief scientist at the U.S. Food and Drug Administration, and currently founding director of the Georgetown University Medical Center's Center on Medical Product Access, Safety and Stewardship, in a recent article in the New

---

2. Roels TH, et al. Ebola Hemorrhagic Fever, Kikwit, Democratic Republic of Congo, 1995: Risk Factors for Patients without a Reported Exposure. *J. Infectious Diseases*. 1999;179(Suppl 1):S92-7.
3. Weingartl HM, et al. Transmission of Ebola virus from pigs to non-human primates. *Scientific Reports*. 2012;2:811. doi: 10.1038/srep00811

England Journal of Medicine stated that "using unproven therapies during emergencies, without adequately evaluating their effectiveness, may result in misleading, even harmful conclusions."[4]

**Conclusions**

An African national was able to fly from Africa to the United States, knowing that he was exposed to Ebola.  It is my belief that this individual thought that he would receive the cure for Ebola if he arrived in the United States and showed up for treatment in any hospital or emergency room.  It is my belief that because of the international media coverage of the cure for Ebola that is only available in the United States, that African nationals will attempt to travel to the United States in any way possible, once they believe they have been exposed to Ebola.  I believe these African nationals believe that they will receive the cure for Ebola if they come down with the Ebola disease in the United States.

As of today, the United States does not restrict air travel from Africa to the United States.  As of today, Mexico and many Central American countries do not restrict air travel from Africa to their countries.  It is my belief that African nationals who know they have been exposed to Ebola will try to come to the United States, directly through air travel to the United States or through air travel to Mexico or Central America and then attempt to cross the U.S. border with Mexico, in the belief that they will be cured once they appear in any U.S. hospital.  As Dr. Goodman indicated, these individuals can come to the harmful conclusion that there are sufficient resources in the United States to cure their Ebola illness, yet there is no evidence that this conclusion is accurate.

It is my belief that some of the African nationals who attempt to cross the border into the U.S. from Mexico will become infectious while still in Mexico during the time they are moving from Mexico into the United States, and will pass the Ebola virus on to other immigrant patients who also are seeking entrance into the United States by crossing the border.  This likely infection of immigrants is only enhanced by the potential transmission of Ebola from aerosols and fomites caused by coughing and sneezing, as indicated by the previously cited peer-reviewed medical literature.

The potential of a threat of an Ebola epidemic arriving via illegal immigration from Mexico is serious and grave, and needs to be addressed by the closure of the Mexican border, and strict quarantine and isolation procedures for all immigrants crossing the Mexican border.  In my opinion, any individual who crosses the Mexican border and in particular has visited the Ebola-affected countries of Guinea, Sierra Leone and Liberia should be quarantined for 21 days.

The potential for Ebola arriving into the United States through air travel is now well established.  It is urgent that air travel is restricted from Africa, and the most strict quarantine and isolation procedures for all travelers arriving from Africa's Ebola-affected regions are put into place.  In my opinion, any individual who has visited the Ebola-affected African countries of Guinea,

---

4. Goodman JL. Studying "secret serums" – Toward safe, effective Ebola treatments. *New Engl J Med*. 2014;371:1086-1089.

Sierra Leone and Liberia should be quarantined for 21 days.  Such individuals should be put on a "no-fly" list, to be kept in force until the officially declared end of the current Ebola epidemic.

Merely screening air travelers from Ebola-affected regions for elevated body temperature is an inadequate measure, as these individuals can be early in their incubation period before fever appears, or may take over-the-counter analgesics that reduce fever and mask the presence of infection with Ebola.  As of today, countries such as Great Britain, South Korea and the United Emirates suspended all flights to Ebola-affected countries.  Several African countries, such as Kenya, Namibia and Zambia banned all travel from Ebola-affected regions.  The suspension/ban of travel from Ebola-affected regions is a far more prudent public health barrier to the spread of Ebola from Africa to the United States than the current proposal to simply screen travelers seeking to fly into the United States.

The risk of infection with Ebola from immigrant patients will be the highest among those U.S. medical professionals who are tasked to be the first people to treat these immigrant patients for any reason.  The possible transmission of Ebola through aerosols or fomites in addition to direct personal contact as indicated in the peer-reviewed medical literature presents a dangerous hazard to doctor-providers like Dr. Taitz, who are treating immigrant patients exposed to Ebola who come to the U.S. seeking treatment.

In my opinion, Dr. Taitz is in imminent danger from Ebola and other communicable diseases from any immigrant patient who is not adequately screened, evaluated, isolated or quarantined for Ebola and other communicable diseases at the time of entry into the United States illegally or legally.

I declare that my assessments are true and correct based on my current knowledge.

Vera F. Dolan, MSPH
October 10, 2014

State of California, County of Mendocino
Subscribed and sworn to (or affirmed) before me this
___10___ day of___October___, 20_14_
by___Vera F. Dolan___
proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

M. FITZSIMMONS
COMM. #1972094
NOTARY PUBLIC - CALIFORNIA
MENDOCINO COUNTY
My Comm. Expires Mar. 15, 2016

**LAW OFFICES OF ORLY TAITZ**

**29839 SANTA MARGARITA PKWY, STE 100**

**RANCHO SANTA MARGARITA, CA 92688**

**PH.949-683-5411, FAX 949-766-7603**

**ORLY.TAITZ@HUSHMAIL.COM**

**CA BAR # 233433**

United States District Court
Southern District of Texas
FILED

JUL 1 4 2014

David J. Bradley, Clerk of Court

B-14-119

## US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | |
|---|---|
| **Dr. ORLY TAITZ, ESQ** | ) HON. ANDREW S.  HANEN |
| | ) PRESIDING |
| **PLAINTIFF** | ) |
| **V** | ) DATE OF HEARING |
| **JEH JOHNSON, IN HIS CAPACITY** | ) COURTROOM |
| **OF THE SECRETARY OF DHS,** | ) |
| **SYLVIA BURWELL, IN HER CAPACITY** | ) |
| **OF THE SECRETARY OF HHS,** | ) |
| **BARACK OBAMA, IN HIS CAPACITY** | |

Taitz v Jeh Johnson et al Motion for Emergency Stay                    1

**EXHIBIT**

**6**

**OF THE US PRESIDENT,** )

**U.S. Border Patrol, Rio Grande Valley Section,** )

**Brownsville Station**

**EMERGENCY APPLICATION FOR STAY OF TRANSPORTATION OF ILLEGAL ALIENS FROM THE SOUTHERN DISTRICT OF TEXAS TO CALIFORNIA AND OTHER AREAS AROUND THE COUNTRY DUE TO SERIOUS THREAT TO PUBLIC HEALTH, SPREAD OF INFECTIOUS DISEASES, NATIONAL SECURITY THREAT, CRIME THREAT AND ECONOMIC DAMAGES**

**APPLICATION FOR AN EMERGENCY STAY/INJUNCTION, SEEKING EITHER AN EMERGENCY IMMEDIATE TURNAROUND AND DEPORTATION OF ILLEGAL ALIENS OR THEIR TWO MONTHS QUARANTINE IN AN ENCLOSED TEMPORARY OR PERMANENT FEMA FACILITY DUE TO EPIDEMIC/OUTBREAK/ SPREAD OF INFECTIOUS DISEASES.**

**APPLICATION FOR AN EMERGENCY STAY OF A RELEASE INTO COMMUNITIES, INTO GENERAL PUBLIC, OF ILLEGAL ALIENS WHO DID NOT COMPLETE TWO MONTHS QUARANTINE, WHO DID NOT UNDERGO PROPER MEDICAL SCREENING, WHO DO NOT HAVE A WRITTEN MEDICAL RELEASE, WHO DO NOT HAVE A CLEAN A CRIMINAL RECORD FROM THE COUNTRY OF ORIGIN AND WHO DO NOT HAVE A SIGNED ORDER FROM THE FEDERAL JUDGE STATING THAT THIS ALIEN IS LEGALLY ENTITLED TO LIVE IN THE UNITED STATES.**

**FILED UNDER FRCP 65**

**JURISDICTION AND VENUE**

U.S. District Court has Jurisdiction in this case as the defendants are sued in their official capacity as executives of Federal agencies and the premise of the legal action involves actions of Federal agencies. The subject of this case is transportation of illegal aliens with infectious diseases and criminal record, which originates in the Southern District of Texas, Brownsville area, where illegal aliens are crossing Rio Grande in violation of the U.S. border integrity and U.S. immigration laws.

Additionally, the court has jurisdiction under the diversity of state citizenships.

## PARTIES

Plaintiff, Dr. Orly Taitz ESQ, resident of the California, address 29839 Santa Margarita, Ca 92688. Taitz is both a licensed attorney and a medical professional, a licensed doctor of Dental Surgery and a holder of B. of Med Science. Dr. Taitz is also a President of Defend Our Freedoms Foundation, which is dedicated to the preservation of the Constitutional Freedoms of the U.S. citizens.

Barack Obama is sued in his capacity of the US President.

Jeh Johnson is sued in his capacity as a Secretary of Homeland Security.

Sylvia Burwell is sued in her capacity as the Director of the Health and Human Services.

U.S. Border Patrol, Rio Grande Valley Section, Brownsville station is located at 940 N. FM 511, Olmito, TX 78575

## STATEMENT OF FACTS

1. A group of billionaires lead by George Soros and Mark Zuckerberg have been major donors and benefactors of Barack Obama's (Herein Obama's) campaign for the U.S. President. In exchange for their de facto underwriting of Obama's campaign, large donors are seeking actions by Obama in bringing cheap and obedient labor to the U.S. in order to increase profits.

2. For six years Obama unsuccessfully attempted to push through a mega amnesty of illegal aliens.

3. Tea Party faction of the Republican Party withstood this push for legalization of millions of illegal aliens.

4. In order to repay his donors and benefactors on June 15, 2012 Obama signed a memorandum Deferred Action for Children Arrivals (DACA) to stay deportation of minor illegal aliens for two years. In 2014 DACA was renewed for two more years.

5. Obama and Director of Homeland Security Jeh Johnson (Hereinafter Johnson) knew at all times that such stay of deportations will be a magnet for more illegal aliens to cross the U.S. borders.

6. Six months ago Obama and Johnson created an elaborate plan to effectuate de facto smuggling and trafficking of hundreds of thousands of illegals and hired transportation carriers, medical services, education services, escorts and even nannies to spread all over this nation hundreds of thousands of illegals and dump them on the unsuspecting population.

7. As a direct result of the unlawful and unconstitutional actions of Obama and co-defendants, this nation indeed got flooded by hundreds of thousands of illegal aliens.

8. This flood of illegal aliens created epidemics of multiple infectious diseases, among them: Tuberculosis, Measles, Scabies, Pertussis (Whooping Cough), Lice, Swine Flu, Bacterial Pneumonia and other diseases.

9. Gang members, drug cartel members and suspected terrorist organizations members cross into the US, which endangers National Security. Defendants are transporting these illegals all over the nation and also using commercial carriers and allowing these illegals without any IDs to travel on commercial flights.

10. Plaintiff and other similarly situated individuals are at risk of being infected with contagious diseases transmitted by these illegal aliens or might have already been infected. (Exhibit 2 Declaration of Orly Taitz)

11. A number of border patrol agents have contracted scabies. (Exhibit 1 Scabies infection report by Border Patrol Health officer). There is a reported outbreak of Tuberculosis in California. Plaintiff, who is an immigrant herself and speaks multiple languages, among them Spanish, is a doctor-provider for a number of State and Federal programs, which provide medical care to indigents and immigrants. A number of her patients presented themselves in her office with a persistent cough. Dr. Taitz developed a persistent cough and on 07.09.2014 was examined by her internal medical doctor, Dr. Yolanda Gomez, and had chest X-rays done to be analyzed for Tuberculosis. Immediate evaluation of x-rays by Dr. Gomez was inconclusive and further evaluation by a radiologist is being awaited.

(Exhibit 2, Declaration of Orly Taitz and chest X-Rays record from Dr. Yolanda Gomez). Dr. Taitz and other similarly situated individuals are at risk of being infected or were already infected.

## ARGUMENT

## STANDING

Plaintiff is a health care provider who comes in direct contact with individuals who are affected by multiple infectious diseases, such as Tuberculosis, Scabies, Lice, Measles and so on. Absent quarantine and proper treatment, she is in imminent danger of contracting such diseases.

Additionally she claims standing as an American taxpayer.

### THERE IS JUSTIFICATION FOR GRANTING A STAY

Party seeking a preliminary injunction or stay must show: 1) a likelihood of success on the merits, 2) a thread of irreparable harm, 3) which outweighs any harm to the non-moving party, 4) and that the injunction would not adversely affect the public interest (See Awad v Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012)). Each element favors injunctive relief requested by the Plaintiff.

U.S. District courts routinely issue emergency stays as well as permanent injunctions to existing laws and policies of the federal government which affect national policies and affect the nation as a whole. As an example in LOG CABIN

REPUBLICANS, a non-profit corporation v UNITED STATES of America and Robert M. Gates, Secretary of Defense, in his official capacity Case No. CV 04–08425–VAP (Ex) 716 F.Supp.2d 884 US DC Judge, Virginia Phillips, issued an injunction staying implementation of the "don't ask, don't tell" policy, which affected all US military bases and installations. On October 12, Phillips issued a permanent worldwide injunction ordering the military to immediately "suspend and discontinue any investigation, or discharge, separation, or other proceeding, that may have been commenced" under "don't ask, don't tell".

In the case at hand Plaintiff is seeking an emergency stay/injunction in implementation by the defendants not of a law, but a mere memorandum signed by Barack Obama in 2012, which stays deportation of illegal alien minors, and seeking a two months quarantine of such illegals until the end of medically necessary quarantine period and until the documentation and criminal record of such illegal aliens is received and there is a decision by the federal court granting such illegals a legal status in the US. Such stay is sought due to the outbreak of infectious diseases brought by illegal aliens, due to border crossing of criminals, cartel and gang members and terrorists and due to taking without compensation by the defendants through their actions of the value of real property of the defendant due to infestation of the area with crime, as well as illegal taking/theft of tax payer dollars to care for the illegals instead of turning them around and deporting them.

## PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

Currently defendants are transferring thousands of illegal aliens from the Southern District of Texas to the Central District of California and elsewhere in the country and are simply dumping them on unsuspected communities. When individuals arrive in the U.S. legally, particularly from countries, known for outbreaks of infectious diseases, they are required to undergo health checks, chest X-rays for Tuberculosis, obtain a medical release and provide a criminal record from the country of origin. Currently, with this dumping of illegals, they cross the border without any medical checks. These illegals are undergoing a sham processing, which is done by the border patrol agents who do not have any medical training and who are under orders from the defendants to "stand down", not to deport illegal aliens, who are instructed to do only cursory medical check, to check only for crimes committed in the U.S. and not in the countries of origin and simply release the illegals, to dump them at greyhound bus stations or to individuals who might be illegals themselves and who claim that dozens of illegals from different countries are their children. Illegals are allowed to travel on commercial carriers without any IDs. Illegals are told to travel to where they want to go in the U.S. and seek an ICE office at their point of destination and told to ask for a deportation hearing there. Needless to say that over 90% of illegals never show up for these deportation hearings. Defendants are acting as de facto human traffickers and

smugglers providing shame border control. On 07.10.2014 a U.S. border patrol agent stated to FOX news host Sean Hannity:

"What is happening is that we treat OTMs (other than Mexicans) differently than aliens from Mexico or Canada. Right now what is happening is our government is pretty much releasing and giving these OTMs a free pass into our country. We are very concerned about it. We want our borders to be secure... **Actually what is happening is that the federal government is completing the smuggling cycle.** By having a parent send their child to the US border, having them smuggled, that is only part of the smuggling cycle. Then the federal government steps in. We apprehend them. We process these illegal aliens then we release them to their family members in the US. We just completed that smuggling cycle. Now, why would anybody want to hire a smuggler when the US government is actually doing it for free? http://www.thegatewaypundit.com

Recently former Mayor of San Diego and a syndicated talk show host Roger Hedgecock jokingly noted: "knowing Chicago politics, I hope that Obama gets a cut from the cartels for this."    Roger Hedgecock show, Radio America syndication.

This behavior by the defendants has simply no basis in U.S. laws. Defendants cannot possibly ultimately prevail on the merits because they never articulated any

legal basis for their behavior. As a matter of fact their behavior is so flagrantly lawless and criminal that not only this court should grant this emergency application for STAY, but it should forward evidence provided in this case to the Federal Grand jury convened in the Southern District of Texas for criminal investigation under 18 U.S.C. 3332 which states: "**(a)** It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. <u>Such alleged offenses may be brought to the attention of the grand jury</u> **BY THE COURT** "emphasis added.

Defendants flagrantly engaged and continuously engaging in egregious violation of 8 USC §1324

**(a) Criminal penalties**

**(1)**

**(A)** Any person who—

**(i)** knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or

reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v)

(I) engages in any conspiracy to commit any of the preceding acts, or

(II) aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

**(B)** A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

**(i)** in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

**(ii)** in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

**(iii)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

**(iv)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

**(C)** It is not a violation of clauses [1] (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of

such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

**(2)** Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—

**(A)** be fined in accordance with title 18 or imprisoned not more than one year, or both; or

**(B)** in the case of—

**(i)** an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

**(ii)** an offense done for the purpose of commercial advantage or private financial gain, or

**(iii)** an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

**(3)**

**(A)** Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.

**(B)** An alien described in this subparagraph is an alien who—

**(i)** is an unauthorized alien (as defined in section 1324a (h)(3) of this title), and

**(ii)** has been brought into the United States in violation of this subsection.

**(4)** In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if—

**(A)** the offense was part of an ongoing commercial organization or enterprise;

**(B)** aliens were transported in groups of 10 or more; and

**(C)**

**(i)** aliens were transported in a manner that endangered their lives; or

**(ii)** <u>**THE ALIENS PRESENTED A LIFE-THREATENING HEALTH RISK TO PEOPLE IN THE UNITED STATES. (emphasis added)**</u>

18 U.S. Code § 2381 - Treason

Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States.

According to Whistleblowers, Border Patrol Officers   officers, such as Hector Garza, defendants are clearly violating existing U.S. immigration laws and specifically 8U.S. §1324. They are aiding and abetting and orchestrating an invasion into the U.S.   An allied invasion in Normandy consisted of 150,000 soldiers. This recent invasion of illegals consists of 290,000 according to reposts in NY Times and Washington Post.     This is nothing short of an orchestrated invasion, perpetrated to supply cheap labor for a group of billionaires and flagrantly rob American citizens of their jobs, wages and benefits  and expose them to epidemics of infectious diseases and crime.

"LAREDO, Texas--A glimpse into the reality of the thousands of illegal immigrants being released into the U.S. by the Obama Administration was captured on video in a Greyhound Bus station in Laredo, Texas this weekend. The illegal immigrants who cross as incomplete family units simply enter the U.S. illegally, turn themselves in to U.S. Border Patrol agents, are processed, and then released with a notice to appear at a future date for court proceedings. U.S. taxpayers then fund bus tickets for the illegal immigrants to go to the U.S. city of their choosing. Approximately 95 percent of the illegal immigrants never return as promised for court proceedings, according to Hector Garza, a Border Patrol agent and spokesperson for the National Border Patrol Council (NBPC) Local 2455.

"The majority of these people crossed the border illegally and where then dropped off here at the bus station so they could continue to their final destination, and that destination is an American city near you," said Garza. "This right here is border insecurity at it's best. Our border is not patrolled, it's not being secured ... our federal government is releasing thousands and thousands of illegal aliens into our communities." http://www.dailymail.co.uk/news/article-2654208/Republicans-rally-judge-ruled-Obama-administration-intentionally-fostering-flood-illegal-immigrant-children.html

Defendants are involved in a de facto RICO to violate not only U.S. immigration laws, but also in a RICO to aid and abet in violation of 18 U.S. Code § 2381. They are colluding with criminal cartels, gangs and possibly terrorist organizations in waging the war of terror and a de facto biological weapon attack on the U.S.

They are transporting known members of criminal organizations involved in torture, murder, kidnappings, drug trade and possibly Muslim terrorists.

Further, actions by the defendants in imposing gag orders on employees of detention camps, preventing health care providers from releasing information in relation to outbreaks and epidemics of deadly infectious diseases is akin to bio terrorism on part of the defendants.

"JW has reported extensively on the crisis created by the sudden influx of mostly Central American minors that have crossed into the U.S. through the Mexican border in recent weeks. It has created havoc and will end up costing American taxpayers billions of dollars to house, process, medically treat, feed and inevitably educate the Unaccompanied Alien Children (UAC) which are being dispersed throughout the country. They are bringing in <u>dangerous diseases</u>—including swine flu, dengue fever, Ebola virus and tuberculosis— and occupying our military bases as shelters.

As if all this weren't bad enough, the invasion is also supplying the nation's most dangerous street gangs with new soldiers. The Mara Salvatrucha (MS-13) and the 18th Street gangs are on a recruiting frenzy at the various facilities housing the newly arrived illegal aliens, according to JW's source. The MS-13 is a <u>feared street gang</u> of mostly Central American illegal immigrants that's spread throughout the U.S. and is renowned for drug distribution, murder, rape, robbery, home invasions, kidnappings, vandalism and other violent crimes. The Justice Department's National Gang Intelligence Center (NGIC) says criminal street gangs like the MS-13 are responsible for the majority of violent crimes in the U.S. and are the primary distributors of most illicit drugs.

In May 2014, MS-13 enforcers <u>flew to Minnesota</u> to kidnap and torture two local teens." "MS-13 is actively recruiting illegal alien minors at Obama immigrant

shelters.

Judicial Watch reported:The nation's most violent street gangs—including Mara Salvatrucha—are actively recruiting new members at U.S. shelters housing illegal immigrant minors and they're using Red Cross phones to communicate, a Homeland Security source tells Judicial Watch."
http://www.thegatewaypundit.com

These actions by the defendants created a significant risk to the public at large. Department of Health and Human services under the management of Sylvia Burwell and under the directives of Barack Obama, instead of protecting the public from diseases, is actually spreading diseases all over the country and endangering public health. Department of Homeland Security under Jeh Johnson and under the directive of Obama administration, instead of protecting the public, is acting as a human trafficker and endangering the public and exposing the public to crime, gangs and possible terrorists.

Success on the merits is enhanced by a recent opinion by this court, by the US District Judge Andrew Hanon in the Southern District of TX in *U.S. v Mirtha Veronica Nava-Martinez* B-13-441-1 TXSD. In this case the defendant was convicted in human trafficking. The facts of the case revealed that another illegal alien, Patricia Elixabeth Salmeron Santos paid a human trafficker Nava-Martinez $8,500 for trafficking of her child into the US. Prior to the case against the

trafficker being filed with Judge Hanon, the DHS under defendant herein Jeh Johnson have completed the crime of human trafficking by transporting minor illegal alien to her mother, an illegal alien residing in Virginia. Judge Hanon ruled that actions by the Obama administration, by the Department of Homeland Security are illegal, violate US immigration laws 8USC §1324 (a)(1)(A)(ii) and represent a de -facto criminal human trafficking.

" " This Court is quite concerned with the apparent policy of the Department of Homeland Security (hereinafter "DHS") of completing the criminal mission of individuals who are violating the border security of the United States. " id "The DHS, instead of enforcing our border security laws, actually assisted the criminal conspiracy in achieving its illegal goals...It completes the mission of the conspiracy" id

The recent Fourth of July demonstrations against dumping of illegals showed the U.S. citizens vehemently opposed to this criminal conspiracy by the defendants and carrying signs: "Obama and Jeh Johnson are Human traffickers and smugglers of illegals." "U.S. Senate is the Best Coyote Money can Buy". This is clearly so. The Obama regime is using this excuse of need for processing of illegals in order to transport illegals all over the country and do the job of human traffickers. Clearly such endangerment of the public cannot stand and ultimately

will be enjoined by the court. Plaintiffs are seeking an emergency stay in order to stop spread of dangerous infectious diseases, crime and terrorism until there is a final adjudication on the merits.

## STAY IS A NECESSITY DUE TO SCABIES EPIDEMIC

Human trafficking which is being undertaken by the U.S. President in conjunction with the Secretary of Homeland Security and Health and human services exposes this nation to multiple dangerous infectious diseases and represents a Danger to Public Health.

On July 4, 2014 Ronald Zemeno, Health and Safety Director, National Border Patrol Council, Local 1613, reported Scabies infection and contamination by a Border Patrol Officer in the state of California, which happened after him coming in contact with illegals, who are being dumped in the State of California by the Obama regime. (Exhibit 1). Other reports show that this officer transferred Scabies to another officer working with him and that there is an epidemic of Scabies in the camps where illegals are being processed.

Zemeno report states: **"When a person is infested with scabies mites the first time, symptoms may not appear for up to two months"**. Since there is an epidemic of Scabies in the population of illegals crossing the border, there has to be a **TWO MONTHS quarantine**. During this, two months quarantine period, the Obama administration will have plenty of time for a turnaround of the illegals by

the border patrol or in rare cases, where illegals, crossing Mexican border, have proven to be citizens of other countries, not Mexico, and have proven to be unaccompanied minors with parents legally residing in the US, such minors can have a deportation hearing instead of turnaround within these two months of quarantine.

Such two months mandatory quarantine will protect the public at large from spread of infectious diseases.

## TUBERCULOSIS EPIDEMIC JUSTIFIES AN EMERGENCY STAY

A recent article, http://www.foxnews.com/opinion/2014/07/07/immigration-crisis-tuberculosis-spreading-at-camps/, Exhibit 3, reveals a spread and epidemic of a deadly disease of Tuberculosis with illegals in the camps coughing up blood, constant cough and chest pain.

"...at least a half dozen anonymous sources, including nurses and health care providers who worked at Lackland, allege that the government is covering up what they believe to be a very serious health threat.

Several of my sources tell me that tuberculosis has become a dangerous issue at both the border and the camps.

"The amount of tuberculosis is astonishing," one health care provider told me.
"The nurses are telling us the kids are really sick. The tuberculosis is definitely
there."

"However, nurses at Lackland in San Antonio, said they know of at least four
teenagers in their camp who have tuberculosis.

"The nurses are telling us the kids are really sick," the source told me. "The
tuberculosis is definitely there."

My source said there are children showing classic tuberculosis symptoms --
spitting up blood, a constant cough and chest pain."

Taitz, Plaintiff herein, is a doctor, who speaks several languages and is a doctor-
provider with a number of government programs, where a care is provided to
indigents and illegals. Several of her patients presented themselves with a
persistent cough. Dr. Taitz developed a persistent cough and on 07.09. 2014   was
seen by her family and internal medicine doctor, Dr. Yolanda Gomez, who did a
number of chest x-rays to check for Tuberculosis. Dr. Taitz and other members of

the community are at a grave risk of contracting Tuberculosis or might have already been infected.

## LICE INFESTATION MAKES STAY A NECESSITY

"Todd Starnes told Sean Hannity on FOX News tonight that the illegal immigrant children held at Lackland Air Force base in Oklahoma are bringing diseases into America. The children have tuberculosis, scabies and lice so bad you can see them running down their faces.

"It's one giant emergency room. They tell me tuberculosis has become a very dangerous issue there. **Nurses say the number of children representing symptoms of tuberculosis is 'simply staggering.' Spitting up blood, chest pains, constant coughing.** There are at least three confirmed cases for the illegals in Austin, Texas… The federal government is covering up the threat of the health crisis. They say the kids have scabies. They also say they have chicken pox. **And lice so severe they can be seen crawling down the faces of the children.**"
http://www.thegatewaypundit.com/2014/07/todd-starnes-illegal-immigrant-children-have-lice-so-severe-they-can-be-seen-crawling-down-their-faces-video/

Lice infestation in addition to Tuberculosis, Scabies, Chicken Pox, Measles, Whooping cough, Swine Flu and other infectious diseases demands either a turnaround of the illegals, or, in rare cases where illegals can evade immediate turnaround, they have to be in at least two months quarantine at the border in a

FEMA mobile facility until they are deported. There should not be transportation and dumping of these individuals in the communities without two months quarantine, testing for infectious diseases, treatment and a decision by the judge that they can legally reside in the U.S.

This situation is exacerbated by the fact that this dumping of sick illegals is done by the Department of Health and Human services, which is led by a woman who has **ZERO** medical education. In April of this year, after resignation of Kathleen Sebelius, Barack Obama appointed Sylvia Burwell, who was confirmed by the US Congress last month.

Burwell has a bachelor's degree in government and another bachelors degree in philosophy, politics and economics, zero education in medicine. So, this spread of infectious diseases by the Department of Health and Human Services might be due to a total incompetence of Sylvia Burwell or it might be a political maneuver, since Obama issued executive orders deferring deportation of minor illegals, many of these illegals are hoping for amnesty and path for citizenship, which is a boon for career Democratic party operatives, such as defendants Obama, Johnson and Burwell, as typically illegals are voting for Democrats with a 2:1 margin.

Regardless, whether the defendants are acting due to incompetence or with malice, their actions represent a Public Health threat, which make an emergency STAY a must in order to stop epidemics of infectious and deadly diseases.

Tuberculosis is particularly dangerous as if effective treatment is not given, the death rate is 66% according to Tuberculosis Fact sheet N°104", World Health Organization. November 2010 Retrieved 26 July 2011.

Moreover, many strains of Tuberculosis are drug resistant, which complicates the treatment and lowers the rate of success. Recently, a Tuberculosis epidemic was recorded in California. "A California high school is at the center of a tuberculosis outbreak linked to an infectious student who tested positive for active TB in February, county health officials said Wednesday.

Four more students at Grant Union High School in Sacramento have contracted active TB. Three related tuberculosis cases are considered an outbreak, Sacramento County Department of Health and Human Services spokeswoman Laura McCasland said". ttp://www.sacbee.com/2014/07/02/6528896/tuberculosis-outbreak-at-sacramento.html

Plaintiff Taitz attached a declaration stating that she was present at the meeting with Murrieta and Riverside county, CA officials on July 2, 2014.

Dr. Cameron Keiser, Health Officer with the Department of Public health of Riverside county, announced at the meeting, which was attended by some 300 people and media, that when individuals are coming to the U.S. legally, they have to submit a medical release, which includes radiographs, showing lack of tuberculosis, as well as other blood, sputum and urine tests, however when individuals come to the U.S. illegally and dumped all over the country, such routine testing is not done.

**ILLEGAL ALIEN MINORS SPREADING TB, EBOLA, DENGUE, SWINE FLU**

"The hordes of illegal immigrant minors entering the U.S. are bringing serious diseases—including swine flu, dengue fever, Ebola virus and tuberculosis—that present a danger to the American public as well as the Border Patrol agents forced to care for the kids, according to a U.S. Congressman who is also medical doctor. "

"This has created a "severe and dangerous" crisis, says the Georgia lawmaker, Phil Gingrey. Most of the Unaccompanied Alien Children (UAC) are coming from Central America and they're importing infectious diseases considered to be largely eradicated in this country. Additionally, many of the migrants lack basic vaccinations such as those to prevent chicken pox or measles, leaving America's young children and the elderly particularly susceptible, Gingrey reveals. In a hard-

hitting letter to the director of the Centers for Disease Control and Prevention (CDC), Congressman Gingrey demands that the agency keep Americans informed about its plan to handle the growing public health crisis posed by the influx of minors. "As the unaccompanied children continue to be transported to shelters around the country on commercial airlines and other forms of transportation, I have serious concerns that the diseases carried by these children may begin to spread too rapidly to control," the congressman writes. "In fact, as you undoubtedly know, some of these diseases have no known cure." "http://www.judicialwatch.org/blog/2014/07/illegal-alien-minors-spreading-tb-ebola-dengue-swine-flu/

Gingrey mentions reports of Border Patrol agents contracting diseases through contact with the infected illegal aliens.

## DUMPING OF ILLEGALS REPRESENTS A THREAT TO PUBLIC SAFETY AND NATIONAL SECURITY

It was reported that this dump of illegals includes individuals who are gang members from Mexico and Central America, as well as individuals, who are either members of terrorist organizations or come from countries sponsoring terror. "An

internal summary of Border Patrol operations at the U.S. Customs and Border Protection Nogales (Arizona) Placement Center stated that 16 unaccompanied immigrant children being held at the facility are members of Mara Salvatrucha (MS-13) transnational criminal gang.

The summary, which was obtained by the Townhall online magazine, noted that Border Patrol officials at Nogales were alerted to the MS-13 presence among the detainees when they discovered gang-related graffiti in the walls of the processing center. It stated:

Border Patrol Agents (BPAs) and Customs and Border Protection Officers (CBPOs), assigned to The Nogales Placement Center (NPC), discovered that 16 unaccompanied alien children (13 El Salvadoran males, two Guatemalan males and one Honduran male) currently being held at the NPC are members of Mara Salvatrucha (MS-13). The MS-13 gang members admitted to their gang associations following a discovery of graffiti at the NPC. Homeland Security Investigations (HSI), ICE Enforcement and Removal Operations (ERO), and the Office of Refugee Resettlement (ORR) were notified."

http://www.infowars.com/illegal-immigrant-children-include-ms-13-gang-members/

Farmers in border areas found Qurans and prayer rugs left by illegals, which shows that illegals are not coming only from Mexico and Central America, but also from

Muslim countries, many of which sponsor terrorism and announced Jihad/Fatwa against the U.S.

**DUMPING OF ILLEGALS REPRESENTS THEFT OF JOBS, WAGES, BENEFITS, COMMUNITY RESOURCES AND TAXPAYER DOLLARS FROM THE PLAINTIFFS AND SIMILARLY SITUATED INDIVIDUALS, A WELL AS CITIES, COUNTIES AND STATES.**

Illegals, who crossed the border and are being dumped by Obama regime on unsuspecting communities, are dead poor and need significant expenditure of monies to provide for their food, housing, healthcare, education and other expenses. Former Governor of Alaska Sarah Palin described it best: "Enough is enough of the years of abuse from this president. His unsecured border crisis is the last straw that makes the battered wife say, "no mas."

Without borders, there is no nation. Obama knows this. <u>Opening our borders to a flood of illegal immigrants is deliberate.</u> This is his fundamental transformation of America. It's the only promise he has kept. Discrediting the price paid for America's exceptionalism over our history, he's given false hope and taxpayer's change to millions of foreign nationals who want to sneak into our country illegally. Because of Obama's purposeful dereliction of duty, an untold number of illegal immigrants will kick off their shoes and come on in, competing against Americans for our jobs and limited public services. There is no end in sight as our

president prioritizes parties over doing the job he was hired by voters to do. Securing our borders is obviously fundamental here; it goes without saying that it is *his job*.

The federal government is trillions of dollars in debt, many cities are on the verge of insolvency, our overrun healthcare system, police forces, social services, schools, and our unsustainably generous welfare-state programs are stretched to the max. We average Americans know that. So why has this issue been allowed to be turned upside down with our "leader" creating such unsafe conditions while at the same time obstructing any economic recovery by creating more dependents than he allows producers? His friendly wealthy bipartisan elite, who want cheap foreign labor and can afford for themselves the best "border security" money can buy in their own exclusive communities, do not care that Obama tapped us out.

Have faith that average American workers – native-born and wonderful legal immigrants of all races, backgrounds, and political parties – *do care* because we're the ones getting screwed as we're forced to follow all our government's rules while others are not required to do so. Many now feel like strangers in their own land. It's the American worker who is forced to deal with Obama's latest crisis with our hard-earned tax dollars while middle class wages decrease, sustainable jobs get more scarce, and communities become unrecognizable and bankrupted due to Obama's flood of illegal immigration." Governor Sarah Palin

http://www.breitbart.com/Big-Government/2014/07/08/Exclusive-Sarah-Palin-Time-to-Impeach-President-Obama.

## PLAINTIFFS WILL SUFFER UNDUE HARDSHIP AND IRREPARABLE HARM IF STAY IS NOT GRANTED

Plaintiff incorporates all prior paragraphs as if fully pled herein.

As stated above, plaintiff and similarly situated individuals suffer an undue hardship and will suffer irreparable harm of being exposed to and contracting dangerous and deadly infectious diseases, if emergency stay is not granted.

Further, the plaintiff is affected by the increased crime, drug trafficking and an increased risk of terrorism. As stated above, gang members, cartel members and possible terrorists are crossing the U.S. border illegally and transported to California and elsewhere. Recently Border Patrol Federal Whistleblower Hector Garza, reported that illegal aliens are allowed to travel in the U.S. without any valid IDs. "MCALLEN, Texas—Illegal aliens are being allowed to fly on commercial airliners without valid identification, according to the National Border Patrol Council (NBPC). "The aliens who are getting released on their own recognizance are being allowed to board and travel commercial airliners by simply showing their Notice to Appear forms," NBPC's Local 2455 Spokesman, Hector Garza, told Breitbart Texas.

"This is not the CBP [Customs and Border Protection] or another federal agency renting or leasing an aircraft, these are the same planes that the American public uses for domestic travel," said Garza. "This just adds insult to injury. Not only are we releasing unknown illegal aliens onto American streets, but we are allowing them to travel commercially using paperwork that could easily be reproduced or manipulated on any home computer. The Notice to Appear form has no photo, anyone can make one and manipulate one. They do not have any security features, no watermark, nothing. They are simply printed on standard copy paper based on the information the illegal alien says is the truth."

Spokesman Garza continued, "We do not know who these people are, we often have to solely rely on who they say they are, where they say they came from, and the history they say they have. We know nothing about most of them, ICE releases them into the American public, and now they are boarding aircraft at will with a simple paper document that anyone can easily alter or reproduce themselves." http://www.breitbart.com/Breitbart-Texas/2014/07/11/Exclusive-TSA-Allowing-Illegals-to-Fly-Without-Verifiable-ID-Says-Border-Patrol-Union As such, irreparable harm will stem not only from infectious diseases, but also from an imminent terrorist act.

Furthermore, plaintiff and similarly situated individuals are affected as value of their real estate is going down due the influx in the neighborhoods of illegal aliens,

diseases and crime, as well as depletion of tax payer resources of municipalities and counties. Such actions by the defendants represent a flagrant violation of Plaintiff's 5th and 14 th Amendment Due process rights and represent taking without compensation.

Moreover, Plaintiff and similarly situated individuals are losing quality healthcare when the hospitals are flooded with thousands of indigent illegals, plaintiff is losing quality education for her family members, as schools are flooded by the illegals. Obama administration announced that dumping of illegals in California will continue indefinitely and he actually expects a surge.

## STAY IS A NECESSITY, AS MONETARY COMPENSATION WILL NOT ALLEVIATE IRREPARABLE HARM

As explained above, Plaintiff, as well as similarly situated individuals, are exposed to serious contagious and potentially deadly diseases. Payment of damages cannot compensate and/or deter possible infection with deadly diseases.

## PLAINTIFF WILL IRREPARABLE HARM IF STAY IS NOT GRANTED AND HARDSHIP ON THE PLAINTIFF AND THE COMMUNITY OUTWEIGHS THE HARDSHIP ON THE DEFENDANTS

Plaintiff incorporates all prior paragraphs as if fully pled herein.

Plaintiff, who is a medical provider and a tax payer, will suffer irreparable ongoing harm of exposure to dangerous infectious diseases and crime, as well as taking without compensation of value of her residence, as well as illegal taking, a de facto theft, of her tax payer dollars by a de facto RICO enterprise of the defendants, illegal aliens, human traffickers, gang members and "coyotes" engages in trafficking of illegal aliens.

On the other hand, illegal aliens and the defendants, who are de facto human traffickers, cannot show any hardship. Barack Obama has repeatedly stated to the public that most of the illegals will be deported. As they are in this country illegally, they have no right to reside in the US and in the communities, where they arrive. As they do not have any vested right, they cannot be harmed by the injunction. Recent interview by Senator Tom Coburn revealed that if these illegals were to be given the most expensive first class tickets to travel to their countries of origin, the total cost for the U.S. government to fly them to the countries of origin is 8 million dollars and it is 99.5% lower than 3.7 billion cost of continuing the current policy of the defendants in transporting illegals to different areas of the US and taxpayers paying for all this transportation North and for other expenses of the illegals in the U.S. "Oklahoma U.S. Sen. Tom Coburn says he has a much better solution to fix the problem presented by tens of thousands of illegal Central American immigrants that have been apprehended at the southern U.S. border.

"Look, for $8 million you could put them all on a first-class seat back to their homes," Coburn said on CNN's "Crossfire" on Tuesday.

Coburn was answering a line of questioning concerning the Obama administration's announcement on Tuesday that it would be asking Congress for $3.7 billion to help deal with the 52,000 unaccompanied children and 39,000 mothers with children who have been apprehended since Oct. 1.

The influx has drained resources from border protection and immigration agencies, as well as the Department of Health and Human Services.

The administration's plan to increase spending is "the wrong approach," Coburn said.

He rebutted a claim made by many Democrats and administration officials that the immigrants are flocking here — mostly from Honduras, El Salvador, and Guatemala — to flee rampant violence in those countries.

"This isn't about violence. Some of it is," Coburn said, while pointing out that violence has not changed significantly in two of the three countries, and has actually fallen in one.

Rather, the administration's immigration policies are leading them to believe they can stay in the U.S.

"What changed was the expectation that you could come here, and you wouldn't be sent home," Coburn said.

The Obama administration has adopted a policy of deporting only violent criminals. It has also enacted a program called Deferred Action for Childhood Arrivals, or DACA, which provides amnesty to people who arrived to the U.S. as children." http://dailycaller.com/2014/07/09/senator-offers-cheaper-solution-to-fix-border-surge/#ixzz375W814z6

Additionally, illegals are being sent to live in foster homes, whereby the plaintiff and other taxpayers are paying for it.

**"Exclusive: Ad Promises $6,000 a Month Tax Free To House Immigrant                                                                             Children**

By: **Ben        Swann** Jul              10,              2014              8

Murreita, CA- An ad in the local Penny Saver in Murreita, California caught the attention of residents today. The ad, which was put up by the Crittenton Services and Foster Family Agency or (FFA) claims to be looking for families who will help provide homes for foster children as well as for "unaccompanied refugee                                                                              minors".

Benswann.com called Crittenton FFA, which is located in Orange County and provides services for Los Angeles County Department of Children and Family Services, and found that for those willing to a take in a child under the age of 16, you can receive up to $854.00 tax free per month. For those taking in a child over 16, the total is $1,008.00 per month in reimbursement. If you have a 5 bedroom house and can take in as many as 6 children, you can receive reimbursement of up to $6,054.00 per month tax free.

We questioned the person on the line about the requirements for those who would sign up. Any applicant must pass a criminal background check and take 4 classes, the next of which will be two days from now. As for who is paying for all of this? We were told that for normal foster services, the reimbursement is provided by a series of state and local grants but in the case of the "unaccompanied refugee minors", 100% of the reimbursement will come from the federal government. According to the ad, if all goes well, families will be able to begin housing children for that tax free money within 45 days." http://www.alipac.us/shocking-ad-promises-6-000-month-tax-free-us-taxpayer-money-house-illegal-immigrant-kids-3162/

Further, if for any reason, a small number of these illegals has an exigent circumstance, where they can evade immediate turnaround and deportation, there are alternatives to current policies, alternatives which would not endanger the public at large with infectious diseases and subject the public at large to crime, gangs, drug smugglers and terrorists.

U.S. taxpayers have already spent billions of dollars for FEMA camps and FEMA transportable (temporary) modules. These illegals can be transported either to an emergency FEMA camp, to be erected at the border, or to existing FEMA camps. Those camps are equipped with medical clinics, sleeping quarters, professional medical staff and law enforcement staff. A small number of illegals which are not deported immediately, should be quarantined in FEMA camps for two months until they are either deported or until there is a release signed by a U.S. licensed medical doctor stating that they do not carry any infectious diseases, and there is an order by a magistrate or a judge stating that they can legally reside in the U.S.

## STAY AND/OR INJUNCTION FURTHERS PUBLIC POLICY

**As fully plead above, abatement of epidemics of infectious diseases and crime abatement clearly benefits the public and further public good.**

## CONCLUSION/PRAYER FOR RELIEF

1. Due to the fact that Deferred Action for Children arrivals (DACA ) June 15, 2012 memorandum signed by Barack Obama, as well as 2014 extension of DACA have become a magnet and a reason for illegal invasion, as well as a reason for a large scale of a humanitarian crisis, this court should STAY implementation of DACA until there is a full review of its' constitutionality and applicability.

2. Due to documented epidemic of Scabies, Lice, Tuberculosis and other infectious diseases this court should issue and EMERGENCY STAY of dumping, and/or transportation and/or release of illegal immigrants by Obama administration, by Department of Homeland Security and by the Department of Health and Human Services into any communities until such illegals went through two months incubation/ quarantine period, had proper X-rays, sputum, blood, stool, urine tests and obtained a written release from the U.S. licensed medical doctor that aforementioned illegal aliens do not carry infectious diseases and will not endanger the public at large and public health.

3. Due to evidence of gangs, drug traffickers and terrorists crossing the U.S.-Mexican border with the flow of the illegals, illegal aliens crossing the U.S. border have to be either turned around and deported immediately or kept at a border patrol or FEMA facility not only for two months

quarantine and medical release, but also until and unless there is a criminal record from the country of origin showing that such individuals do not have a criminal record in the country of origin, do not belong to criminal gangs and/or terrorist organizations.

Signed _____ Taitz _____

**Dr. Orly Taitz, ESQ**

**07.10.2014**

**EXHIBIT 1**



# Y. ANDA P GOMEZ, M.D., INC.

*Family Practice and Internal Medicine*

22342 Avenida Empresa Ste. 195  ~  Rancho Santa Margarita, California 92688  ~  Phone (949) 713-9705  ~  Fax (949) 858-3826

## WORK AND STATUS REPORT

Date: __7/9/14__     Patient Name or Employee: __ORLY TAITZ__

Employer or School: _____

Regular work or school: _____

No work or school: _____

LITE work: _____

   no physical education: _____

Disability: _____

Discharged: _____

Comments: _____
_____ PT HAD CXR DONE TODAY — READING PENDING RADIOLOGIST

Return to clinic: _____

Doctor's Signature: _____

## EXHIBIT 2

Declaration of Orly Taitz

I, Orly Taitz, have personal knowledge and can attest to the following:

1. I am a licensed Attorney and a Licensed Doctor of Dental Surgery, additionally I have 3 years of Medical School training.

2. I have successfully completed Internal medicine and infectious diseases courses.

3. I was present at the Town Hall meeting with Mayor Long, Chairman of the Board of Supervisors of Riverside County Jeff Stone and Health Officer of the Riverside County Department of Health, Dr. Cameron Keiser in Murrieta, CA on July 2, 2014.

4. In the presence of some 300 residents and multiple members of the media Dr. Keiser advised the public that legal immigrants have to undergo mandatory X-rays and bio-medical tests for Tuberculosis and other infectious diseases, however illegal immigrants, who flood the borders and who are being trafficked to different locations in California and elsewhere in the country do not go through such extensive testing.

.

5. I personally reviewed the press release of July 4, 201 4 by Ronald Zemeno, Health and Safety Director, National Border Patrol Council, Local 1613, regarding reported Scabies infection and contamination.

6. I am a doctor-provider for several programs, where medical and dental care is provided for new immigrants.

7. a number of my patients presented themselves with persistent cough.

8. I developed a persistent cough and on 07.09.2014 was seen by y medical doctor, Dr. Yolanda Gomez and had chest X-rays done to check for Tuberculosis. (Exhibit A)

9. when checked by Dr. Gomez, My x-rays were inconclusive and I am awaiting for an opinion of a radiologist.

10. Due to the fact that individuals infected with scabies may not show symptoms of the disease for two months, as a medical professional, I believe that if this court does not STAY transportation and release of illegal aliens in the general population, this court will be complicit in the spread of the epidemic of Scabies, as well as other infectious diseases, among them Tuberculosis, Measles, Pertussis (Whooping Cough), Swine Flu, Lice and others .

I attest that all of the above is true and correct to the best of my knowledge and informed consent

Signed

/s/ Dr. Orly Taitz,ESQ

07.10.2014



# National Border Patrol Council
## LOCAL 1613 (San Diego, CA)

Ronald Zermeno • **Health & Safety Director**
35585 Desert Rose Way • Lake Elsinore, CA 92532
Office/Fax: 800-620-1613 • Email: RZermeno@nbpc1613.org



July 4, 2014

Paul Beeson, Chief Patrol Agent
United States Border Patrol
2411 Boswell Road
Chula Vista, CA 91914

RE: Health Alert

Chief Beeson:

This morning I received a report from one of our agents what I have been fearing to hear. Two Agents from Brown Field station in Otay Mesa California developed a rash yesterday after processing detainees from Texas. One of the Agents sent me this picture of the rash and advised me he was diagnosed with Scabies by his doctor and had to apply pesticide cream all over his body and leave it on overnight. When the Agent got home he change in his garage and put his cloths in the washer, he immediately went to bed the next morning he saw the rash. The Agent is married with two small children. On top of that, the Agent carpools with another Agent who now is possibly exposed To make matters worse, the Agent put his uniform shirt in the back seat of the vehicle and now the other Agent's daughter has sat there before they were aware of the infection. Agents were told to trust the medical screenings.

I spoke to the Agent who advised me that the duties he was performing at the time he thinks he was exposed was that he was asked to do the medical screening of all detainees, prior to releasing them to ICE. He is not a trained medical professional but did the best he could do. He completed the questionnaire on all the detainees and documented what he saw. He observed several people with open sores and which he recorded on the questionnaire. He was not told about any precautions to take such as decontamination of himself and uniform. This demonstrates that we are not properly trained to identify infectious disease and to properly respond when we suspect a disease.

Chief Beeson you have stated that all the detainees underwent health screening by FEMA personnel and were declared medically sound for transportation to California. Our EMT Agents did an initial medical screening of the detainees upon their arrival and identified several with active scabies and other illnesses. Those that past the screening were sent to other stations in San Diego for processing, one of those stations being the Brown Field station. We do not know exactly which detainee was infected and processed at Brown Field that resulted in the agent contracting this disease. We suspect that they could have been already transferred to ICE custody and may have already been released in the surrounding communities.

I am again asking that all detainees be medically screened by doctors and decontaminated prior to transportation to California. That Agents are provided training to identify these diseases and how to report and respond to when the Agents suspect an illness. That Agents who are involved with the transport, processing and medical screening be provided protective disposable overalls to ensure that they do not contract scabies and other infectious diseases. Provide a facility that the Agents can decontaminate prior to departing the processing area. Provide laundry facility for the Agents so that they can decontaminate their uniforms. Recognize that the time spent by the Agents decontaminating themselves and their uniforms is compensable.

In addition that you please provide assistance to the infected Agent for his losses to include his bedding and clothing. That assistance be provided to the agent car pool partner for the decontamination of his vehicle and for both agents to have their families checked for possible exposure.

We do not encourage releasing the detainees, they should be held for deportation hearings. If ICE is going to release them then they should be quarantined prior to Ice releasing them into the communities to ensure that they will not transfer infectious diseases such as scabies into our communities.

I request that your staff not down play this incident and call it an isolated incident.

The Center for Disease Control and Prevention states the following for prevention and control of scabies:

Prevention & Control
When a person is infested with scabies mites the first time, symptoms may not appear for up to two months after being infested. However, an infested person can transmit scabies, even if they do not have symptoms. Scabies usually is passed by direct, prolonged skin-to-skin contact with an infested person. However, a person with crusted (Norwegian) scabies can spread the infestation by brief skin-to-skin contact or by exposure to bedding, clothing, or even furniture that he/she has used.

Scabies is prevented by avoiding direct skin-to-skin contact with an infested person or with items such as clothing or bedding used by an infested person. Scabies treatment usually is recommended for members of the same household, particularly for those who have had prolonged skin-to-skin contact. All household members and other potentially exposed persons should be treated at the same time as the infested person to prevent possible reexposure and reinfestation. Bedding and clothing worn or used next to the skin anytime during the 3 days before treatment should be machine washed and dried using the hot water and hot dryer cycles or be dry-cleaned. Items that cannot be dry-cleaned or laundered can be disinfested by storing in a closed plastic bag for several days to a week. Scabies mites generally do not survive more than 2 to 3 days away

from human skin. Children and adults usually can return to child care, school, or work the day after treatment.

Persons with crusted scabies and their close contacts, including household members, should be treated rapidly and aggressively to avoid outbreaks. Institutional outbreaks can be difficult to control and require a rapid, aggressive and sustained response.

Rooms used by a patient with crusted scabies should be thoroughly cleaned and vacuumed after use. Environmental disinfestation using pesticide sprays or fogs generally is unnecessary and is discouraged.

As I highlighted Institutional outbreaks can be difficult to control and require rapid, aggressive and sustained response. All processing facilities should be thoroughly cleaned and vacuumed after use with proper High-efficiency particulate air (HEPA) type vacuums. Cleaning contract personnel should be wearing protective clothing and respirators. All equipment used should be thoroughly cleaned and disinfected after use. All waste should be properly disposed of as biological hazardous waste. We are requesting that "CaviCide" brand disinfectant be provide for the agents to use for decontamination of work areas, equipment and transport vehicles This product comes highly recommended by medical and emergency response personnel. This is the product that they use to decontaminate their ambulances and equipment.

As you see in the attached picture which depicts contaminated bedding being placed in paper bags stored outside Chula Vista station. Border Patrol management is aware of the scabies outbreak but continue to ignore recommendations. The contaminated bedding should be placed in closed plastic bags not paper bags as recommended by CDC. We strongly recommend to control the spread of Scabies that disposable blankets be used instead of the wool blankets.

Sincerely,

Ronald Zermeno
Health and Safety Director
National Border Patrol Council
Local 1613



JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Dr. Orly Taitz, ESQ

**DEFENDANTS**
Jeh Johnson, in his capacity as the Secretary of DHS; Sylvia Burwell, in her capacity as Secretary of HHS, Barack Obama, in his capacity as the US President, US Border Patrol Rio Grande Valley Section, Bro

**(b)** County of Residence of First Listed Plaintiff  **Orange county, CA**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  **Cameron county**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**B-14-119**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |     Liability    ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
|    & Enforcement of Judgment |     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |     Liability    ☐ 368 Asbestos Personal | | ☐ 840 Trademark |     Corrupt Organizations |
|    Student Loans | ☐ 340 Marine     Injury Product | | | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product     Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |     Liability    **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud |     Act | ☐ 862 Black Lung (923) |     Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |     Product Liability    ☐ 380 Other Personal |     Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |     Injury    ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -     Product Liability |     Leave Act | |     Act |
| |     Medical Malpractice | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** |     Income Security Act | ☐ 870 Taxes (U.S. Plaintiff |     Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | |     or Defendant) |     Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | |     26 USC 7609 |     State Statutes |
| ☐ 245 Tort Product Liability |     Accommodations    ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |     Employment    **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☒ 465 Other Immigration | | |
| |     Other    ☐ 550 Civil Rights |     Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
**8 US 1324**
Brief description of cause:
**Application for STAY of transportation and release of illegal aliens with infectious diseases and criminal record**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE **Andrew S. Hanen**  DOCKET NUMBER **B-13-441-1**

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Advantages of a Life Expectancy Using Life Insurance Underwriting and Life Settlement Methods in the Legal Setting**

**By Vera F. Dolan MSPH FALU, Principal, VFD Consulting, Inc.**

**Introduction**

The advantages of a life expectancy using life insurance underwriting and life settlement methods include:

1. <u>Accuracy.</u> A life expectancy using life insurance underwriting and life settlement methods is very accurate, which can affect millions of dollars in judgments or awards. This addresses the inadequacy of life expectancies that are simply taken from a life table, estimated by a doctor, actuary or statistician, or have been excluded. In many cases, such life expectancies are too short, too long and/or not credible.

   As an example, a plaintiff with rheumatoid arthritis filing a disability claim had been given a short life expectancy by the disability insurer. A properly done life expectancy using life insurance underwriting and life settlement methods found that this individual would live far longer than what the disability insurer said. The case settled with the plaintiff getting the proper number and amount of disability payments.

2. <u>Provides a complete insight to the judge or jury of the individual's medical conditions and/or personal history of high-risk behaviors.</u> A life expectancy using life insurance underwriting and life settlement methods provides a comprehensive profile of the individual's medical conditions as well as any risky behaviors. The judge or jury will be given a comprehensive view of the individual's personal health and lifestyle, which often decides the case.

   As an example, in a wrongful death case against a hospital the plaintiff died in the hospital. A life expectancy was performed for the defense on the deceased plaintiff (who was a 60-year-old male) as of the day before his final admission to that hospital. During the investigation for the life expectancy, it was discovered that 1) the plaintiff was not compliant with his diabetes medications to the point where his central nervous system was dysfunctional long before his final admission to that hospital, 2) he had suffered a stroke 4 years previously and had severe cardiovascular conditions, 3) he had chronic obstructive pulmonary disease and emphysema as a result of 45 years of cigarette

EXHIBIT

7

2

smoking, and 4) he had a host of other medical conditions ranging from depression and anxiety to degenerative disc disease, gastrointestinal esophageal reflux, cataracts and prostatic hypertrophy. All of these medical conditions were included in the life expectancy report.

All of the above medical conditions were used to determine the plaintiff's life expectancy. During trial, these medical conditions were explained to the jury and how they affected the plaintiff's life expectancy. The jury heard all of the deceased plaintiff's medical conditions that affected his life expectancy prior to his final admission to that hospital, the jury then found a complete verdict for the defense. After the trial, jury members said, "It's a good thing that he died. His wife remarried a rich man."

In another defense case, the investigation conducted for the life expectancy uncovered evidence of prescription narcotic addiction, which was the deciding factor in winning the case at trial. Evidence of medical conditions, substance abuse and risky behavior that are relied on in a life expectancy using life insurance underwriting and life settlement methods comes from medical records, motor vehicle records, criminal records and any other documentation of health and risky behavior.

3.  <u>A way to admit excluded evidence using Rule 703.</u>  A life expectancy report can get excluded evidence admitted. A life expectancy using life insurance underwriting and life settlement methods relies on **all** available evidence related to the mortality risk of the individual involved, including evidence that may have been previously excluded. This evidence is essential to the accuracy of the life expectancy, and this evidence is what the expert relies on to render an opinion of the life expectancy. Rule 703 enables the judge to decide if the evidence that was previously excluded (on which the expert's opinion of the life expectancy relies) is to be re-admitted.

    As an example, Rule 703 was used in one case where the individual's extensive history of risky driving and hazardous motorcycle riding had been excluded from the evidence considered. This personal history of risky behavior was essential to the calculation of an accurate life expectancy. As a result, the evidence relied on to calculate the life expectancy was re-admitted, resulting in a decision that awarded plaintiff a half-million dollars instead of the requested $9 million.

3

**Factors that Affect a Life Expectancy**

A life expectancy is a statistical calculation that indicates the average length of life left until death that is expected for an individual with a known mortality risk profile. The most important factors in defining an individual's mortality risk profile are demographics (age, sex and race), personal and medical history. The more that is known about an individual's demographics, personal and medical history, the more accurate the life expectancy calculation. This information is critical to the judge or jury in understanding how, why and on what basis the life expectancy was calculated.

The investigation and use of personal and medical history in assessing mortality risk is standard practice in the life insurance and life settlement industries. Life insurers want to ensure that the premiums charged for a life insurance policy accurately reflect the mortality risk of an applicant. Life settlement providers similarly want to ensure that the calculated life expectancy accurately reflects the mortality risk of the insured seeking to settle (sell) his/her life insurance policy.

The process of investigating and assessing personal and medical mortality risk factors is called "underwriting" in both the life insurance and life settlement industries.[1,2] Many of these risk factors include: adverse medical conditions, substance abuse, psychological disorders, motor vehicle violations, disabilities, adverse family medical history, tobacco use, and hazardous lifestyles, sports, avocations or occupations.[3] All of these risk factors are known and well accepted by the life insurance and life settlement industries as influencing the risk of death.[4]

Accepted practices in underwriting include the authorized collection of information regarding these risk factors, and the evaluation of this evidence for any extra mortality risk beyond that which is expected for the average individual with the same demographic status.[5] Life insurers and life settlement providers are forbidden by law to use race as a risk factor in underwriting life insurance and life settlements, so the only demographic factors allowed in their underwriting are age and sex. However, additional demographic factors are used to calculate life expectancies for litigation purposes because the U.S. general population life tables are available by age, sex and race.

**The Life Expectancy Calculation Process**

In a life expectancy report produced for litigation purposes, the same methods used by the life insurance and life settlement industries are employed.  The process used for the life expectancy calculation is as follows:

1. Determine the individual's age, sex and race as of the date of interest (date of injury, date of onset or present day).

2. Select an appropriate life table to estimate an individual's life expectancy as if (s)he had the same overall health status as the U.S. general population for the same age, sex and race.  For our purpose here, this is called the "base life table."

3. Determine from the individual's personal and medical history if there were any risk factors that might affect his/her life expectancy on the date of interest, if the death or injury had not occurred.

4. Determine which risk factors would have the most impact on that individual's life expectancy on the date of interest.

5. Obtain reasonable estimates from the medical literature of mortality risks at or close to the individual's status of his/her risk factors.

6. Extract these mortality risks as numbers that can be applied to the selected base life table.  For our purpose here, these numbers are called "multipliers."

7. Calculate the adjusted life expectancy for the individual, using the selected base life table adjusted by the multipliers described in step 6.

Essentially, there are two parts to the life expectancy calculation.  The first part is the underwriting assessment of the individual, which identifies from the available evidence if there are risk factors in the personal and medical history that contribute to an excess risk of mortality above average.[6]  After these risk factors are identified, the second part is to quantify the excess mortality risk using multipliers that are used to adjust the base life table to reflect the increased risk in the resulting life expectancy.[7,8]  The methods to perform these steps are common to both the life insurance and life settlement industries, with the exception that the life settlement underwriters produce a life expectancy; life insurance underwriters complete their work with the assignment of the multiplier (when appropriate) to be used to calculate the insurance premiums for that case.  There are various terms used in life insurance underwriting and life settlements to denote such multipliers, including "rating," "debits," and "relative risk."

5

The life expectancy report can either be complete or abbreviated, based on the requirements and resources of the case. An abbreviated report follows all the steps necessary to calculate a life expectancy, but does not include full documentation of the evidence reviewed and evaluated. This option tailors the report when detailed documentation of the evidence is not required or resources are limited.

A complete life expectancy report documents the investigation of the individual's personal medical and history factors that can contribute an excess risk of mortality as of the date of interest. This documentation includes pertinent excerpts from all available evidence that establishes the identification and assessment of medical and nonmedical risk factors affecting the individual's mortality risk as of the date of interest.

In the legal setting, a complete insight into the individual's medical conditions and risky behaviors is often not possible to get before the judge or jury. A life expectancy using life insurance underwriting and life settlement methods now can get all of this essential insight to the judge or jury. This information, once presented to a judge or jury, strengthens the case. Most cases that benefit from getting this essential insight to the judge or jury result in reduced damages or an outright verdict for the defense.

Accuracy of a life expectancy is needed in many cases when life expectancies are estimated by a doctor, actuary or statistician, and are too short, too long, not credible or have been excluded. The individual will benefit by getting the proper judgment or award that sufficiently covers them into the future. As an example, in one case a life expectancy was calculated for a severely impaired 6-year-old with cerebral palsy. A statistician for the defense had calculated the life expectancy for this child to be 16 years, which was too short and not credible. A doctor for the plaintiff estimated the life expectancy of this child to be that of an average child, taking the life expectancy straight from the U.S. government life tables, which was too long and not credible.

A properly done life expectancy using life insurance underwriting and life settlement methods was done, showing that the true life expectancy of this 6-year-old child with cerebral palsy to be another 42 years. A life expectancy calculated using life insurance underwriting and life settlement methods is credible, stands up in court and passes Daubert challenges.

6

**The Qualitative Underwriting Assessment**

After all the pertinent factors and conditions related to the individual's excess mortality risk are identified, the qualitative underwriting assessment is made.[9,10] The underwriting approach is identical to that used by both the life insurance and life settlement industries. If only one factor in the personal and medical history indicates an excess mortality risk, then that is the only factor that is further investigated to determine its quantitative effect on the individual's life expectancy. However, if there are multiple factors which appear to contribute excess mortality risk, those risk factors must be evaluated to distinguish between factors that are related by their nature to each other, and those that are unrelated.

Risk factors that are unrelated to each other are straightforward to assess, while factors that are related to each other need more careful attention. A real case example of three unrelated risk factors that each contribute excess mortality risk is crack cocaine use, bipolar disorder, and smoking two packs of cigarettes a day. The life insurance and life settlement industries would evaluate the risk presented by each of these factors independently. A real case example of three related risk factors that jointly contribute excess mortality risk is hypertension, heart disease and Type 2 diabetes. These risk factors would be assessed to determine the highest likely risk that represents their combined effect, based on a reasonable degree of life insurance underwriting ("life underwriting") certainty.

**The Quantitative Assessment**

After the qualitative underwriting assessment is made from the available evidence, the most important risk factors which present excess risk are selected based on a reasonable degree of life underwriting certainty. The quantitative assessment then is made, which seeks the best number that represents the excess risk presented by each independent risk factor or group of related risk factors.[11,12] This "best number" is typically a multiplier that is applied to the selected base life table.

The mortality risk factor multipliers that are used in the life insurance and life settlement industries are found in underwriting manuals. These underwriting manuals are considered proprietary information critical to the competitiveness of their respective originating organizations and their clients. The contents of these manuals are the product of collaborative research among insurance professionals evaluating the most reliable available information about the mortality risk of a wide range of personal and medical history factors.

Because underwriting manuals and their risk factor multipliers are proprietary and thus not in the public domain, the multipliers for a life expectancy report must be developed specifically for each case. The same methods used by the life insurance and life settlement industries are used to investigate and derive the multipliers for a life expectancy report.[13]

Although the life insurance and life settlement industries are attuned to new information concerning the mortality risk of any personal or medical history factor, attention is paid to the most reliable available information. Accepted practices in developing risk factor multipliers include the evaluation of contemporary studies with the largest populations and longest follow-up for mortality.[14,15] For a life expectancy of a U.S. resident, a study of the U.S. population is preferable to studies of populations in other countries, unless the other country is similar in living conditions to that of the U.S. and the selected study is superior in its other qualities to those available from the U.S.

As described in Step 5 above, the medical literature is searched for the best studies that provide information about mortality risks at or close to the individual's status of his/her risk factors. The "best number" for a particular risk factor is selected from the best medical study available. If the risk factor is for a nonmedical risk, other information sources that address the mortality risk of that factor are investigated. Such information sources can include government or other institutional statistics in the public domain.

When more than one independent or interrelated group risk factor is used in calculating a life expectancy for an individual, the factor-specific multipliers are combined into one overall multiplier using accepted life insurance and life settlement methods.[16] How that overall multiplier is then used to adjust a life table to produce a life expectancy is described after basic information about life tables is discussed.

**Selecting a Base Life Table**

Life tables are constructed by actuaries, and are built from observed vital statistics combined with conservative statistical projections. Life tables used within the life insurance and life settlement industries are built from statistics of insured lives and deaths; they reflect the unique demographic composition, personal and medical history of the self-selected population of insureds. Life tables used within the life

insurance and life settlement industries are constructed separately by sex and smoking status; race is not allowed to be used as an underwriting risk factor.

Life tables constructed for the general population are built from information taken from vital records of births and deaths, as well as population counts from the latest national census.  Life tables for the general population are available for specific sex and race combinations (white males, white females, black males, black females, Hispanic males, Hispanic females, etc.), although in addition there are life tables available that are combined by sex or race (all males, all females, all white, all black, all Hispanic, etc.).

The U.S. government publishes its official life tables through the National Center for Health Statistics (http://www.cdc.gov/nchs/products/life_tables.htm).  For a life expectancy calculation done for litigation purposes, a general population life table is more appropriate to use as the selected base table than a life table built from insured lives.  The base table for the individual's sex and race is typically selected from the life tables available from the U.S. National Center for Health Statistics, if the individual has resided in the U.S. long enough to experience the same mortality risks that are documented by the U.S. life tables.

If the individual is still alive, the most recent available general population life table is selected as the base table.  If the individual is deceased, the general population life table most contemporaneous with the date of interest is selected.  If the individual resided in another country sufficiently long enough so that the mortality risk contributed by that individual's demographics reflects the mortality patterns of that country, then the selected base life table should be taken from that country's vital statistics agency.

**How Life Tables Work**

In the U.S. general population life tables published by the U.S. National Center for Health Statistics, a hypothetical population of 100,000 is followed progressively from birth through each successive year of age, with deaths expected for that population removed each year as the ages increase.  Each row of the life table lists the year of age evaluated for that row, along with:

- the number of the original hypothetical 100,000 entering into that year,
- the number of deaths expected for that year,
- the mortality rate attributable to that year (simply, the number of deaths divided by the total number alive),

- the combined years of life left for the remaining population in that life table for that year, and
- the life expectancy at that year of age.

The mortality rates in a general population life table start out very low in young ages, and progressively rise with older age. Currently, all U.S. general population life tables end at age 100 years, although this may change in the future as the number of centenarians in the U.S. grows larger over time.

Life expectancies reflect the average number of years of life left at each age in a life table. Simply, the total number of years of life left for each of the hypothetical 100,000 population are summed, and then divided by the number of lives counted within each age. For example, the life table for the U.S. white male population for the year 2007[17] shows the average life expectancy at birth (listed as 'age 0-1') is 75.9 years. This means that on average, a U.S. white male resident can expect a life expectancy of 75.9 years at the time of birth. At age 50 (listed as 'age 50-51') the life expectancy is 29.2 years, which reflects the 92,547 people left from the original hypothetical population, and the 2,712,517 combined years of life left for these people. The result of 2,712,517 years of life left divided by 92,547 people is the average life expectancy of 29.2 years, as listed in the table. There is some truncation of mortality rates in published U.S. life tables, so some rounding differences occur.

The probability of dying between one age and the next one is the mortality rate, discussed previously. The higher the mortality rate, the faster the hypothetical population dies, resulting in a lower life expectancy. The lower the mortality rate, the slower the hypothetical population dies, resulting in a higher life expectancy.

**Adjusting a Life Table with a Multiplier**

The multiplier that reflects an individual's overall excess mortality risk is entered into an Excel spreadsheet that duplicates the calculation of the selected base table, except with an additional column for the multiplier. The purpose of adding the multiplier to the life expectancy calculation worksheet is to increase the mortality rate (through multiplication), starting at the age of the individual on the date of interest.

This multiplier can be used for all successive ages in the life table, if the overall excess mortality risk is known to follow a constant pattern. The value of the multiplier also can change as age increases in the

life table, according to the underlying pattern developed during the quantitative assessment investigation. Each individual will have a unique set of risk factors that have an expected mortality risk pattern; the overall multiplier consistent with this pattern will be entered into the spreadsheet to adjust the selected base table appropriately.

After the selected base life table has been adjusted with the multiplier, the Excel spreadsheet will show the new adjusted life expectancy numbers.  The adjusted life expectancy to be used in the life expectancy report is associated with the age of the individual as of the date of interest.

**Hypothetical Case Example of Getting Excluded Evidence Re-admitted**

A hypothetical example based on a real case in which hazardous motorcycle riding was excluded as evidence and then was re-admitted with the use of a life expectancy will illustrate the process of calculating a life expectancy and the evidence necessary to complete it.  On October 4, 2011, John Doe was riding his Harley motorcycle on a rural Pennsylvania county road at a high rate of speed when he crashed into a county maintenance vehicle that was making a left turn into his path.  Mr. Doe died at the scene of the accident; his estate brought action against the county for wrongful death.  Mr. Doe was a white male born on June 22, 1963, which made him age 48 at the time of his death.  If Mr. Doe had the same mortality risk as the average U.S. white male as of the morning of October 4, 2011, his life expectancy using the latest available U.S. life table at the time of case investigation would have been 31.0 years.[17]

The county requested a report for Mr. Doe that would contain a life expectancy calculated for Mr. Doe as of the morning of October 4, 2011.  Mr. Doe's risk factors for death must be investigated and evaluated from all available evidence of his personal and medical history to produce an accurate life expectancy report.  As is generally accepted in life insurance and life settlement underwriting of medical risk factors for mortality, the evaluation of Mr. Doe's medical risks of death should include the investigation of his medical history, diagnoses, treatment, testing, rehabilitation, follow-up and prognosis.  As is generally accepted in life insurance underwriting of nonmedical risk factors for mortality, the evaluation of Mr. Doe's nonmedical risks of death should include the investigation of his adverse driving history, hazardous lifestyles, sports, avocations, occupations and criminal history.

To complete Mr. Doe's life expectancy calculation and report, records from Mr. Doe's physicians, clinic and hospital stays, ambulance, emergency room, police, employers, car and motorcycle insurers, disability and workman's comp benefit providers, motor vehicle registries, military service, and physical rehabilitation providers were obtained and reviewed. From these records, it was determined that as of the morning of October 4, 2011, Mr. Doe was married with four adult children, had three grandchildren that reside in the family home, did not complete high school, and spent 4 years in the Army starting at age 18.

After being honorably discharged from the Army, Mr. Doe had worked at a number of blue-collar occupations until 1999, when he became a self-employed floor installer. Because Mr. Doe had a contract with a local school district to install flooring in a new elementary school in 2001, he obtained workman's comp insurance. Since 2001, Mr. Doe had several instances of disability from worksite injuries that each lasted about 4 to 6 months and required some rehabilitation. Mr. Doe wore glasses, was diagnosed in October 2010 with recurrent hernia, and smoked one pack of Newport cigarettes per day from 1981 to 2003. The only family history of note was a paternal grandmother who died from breast cancer at age 65. At the time of his death, his medications included Prilosec for heartburn and Minipress for mild hypertension. Mr. Doe was 5'7" tall and weighed 175 pounds, indicating a body mass index of 27.4; this means that Mr. Doe was overweight but not obese.

Mr. Doe was an avid motorcycle rider. He was a member of his local Harley Davidson club in Pennsylvania, and took long trips every summer across the country. Mr. Doe had 12 ticketed speeding violations in both Pennsylvania and New Jersey between 2001 and 2011, the last 5 being on his Harley. Mr. Doe had a history of motorcycle accidents, and had a long history of multiple bone fractures associated with these accidents, dating to before 2001. In 2005 he was treated in an emergency room for concussion associated with an accident. He was cited by law enforcement in that accident for driving under the influence of alcohol; a blood test indicated that his alcohol level was above the legal threshold. Mr. Doe was also cited in 2007 for riding a motorcycle without a helmet.

From his police records, Mr. Doe had two arrests for simple possession of methamphetamine, each time at a traffic stop during a summer cross-country motorcycle trip. Mr. Doe was arrested in California in 2002 with 3.7 grams of methamphetamine, and in Nevada in 2006 with 2.1 grams of methamphetamine.

For each arrest, the charges were dismissed.  No other indication of Mr. Doe's criminal activities or use of methamphetamine was evident in any of his medical or nonmedical records.

After the qualitative underwriting assessment of Mr. Doe's available medical and nonmedical records, Mr. Doe was found to have an increased risk of death above that which would have been expected for an average U.S. white male.  The mortality risks attributable to Mr. Doe's bouts of occupational disability, his 8-year span of having quit smoking, hernias, mild hypertension and overweight were not primary factors for Mr. Doe's increased risk of death on the morning of October 4, 2011.  What was distinctive about Mr. Doe from the average U.S. white male was his risky motorcycle riding (speeding, DUI, lack of helmet), associated history of motorcycle accidents, his criminal history of methamphetamine possession, and his implied personal use of methamphetamines.

Mr. Doe's evidence of criminal history and implied methamphetamine use is documented as part of the life expectancy report to the county, because this information is relevant to the evaluation of Mr. Doe's mortality risk using generally accepted life underwriting practices.  Based on a reasonable degree of life underwriting certainty, because it was unclear what Mr. Doe's criminal activity status or methamphetamine use was as of October 4, 2011, this evidence was not sufficient to reliably assist in the quantitative calculation of his life expectancy.  Generally accepted practices in life insurance underwriting take careful note of criminal history and investigate thoroughly when possible.[18]  Generally accepted practices in life insurance underwriting take careful note of any substance abuse, with the understanding that it increases mortality risk.[19]

Based on a reasonable degree of life underwriting certainty, Mr. Doe's primary risk of death was from risky motorcycle riding and its associated risk of fatal motorcycle accidents.  There is certainty that Mr. Doe's criminal history and implied use of methamphetamine also were primary risks of death for Mr. Doe on the morning of October 4, 2011, but there was insufficient evidence to quantify their influence on his life expectancy.  Mr. Doe's mortality risk profile was different than the average U.S. white male because of his extensively documented risky motorcycle riding, so that is the risk factor that must be quantified in order to calculate his adjusted life expectancy from the base table life expectancy of the average U.S. white male.

13

**Life Expectancy Calculation for the Hypothetical Case**

The steps previously outlined for calculating a life expectancy can now be completed for Mr. Doe, as follows:

1. *Determine the individual's age, sex and race as of the date of interest (date of death or injury).* On October 4, 2011, John Doe was age 48. He was a white male.

2. *Select an appropriate life table to estimate individual's life expectancy as if (s)he had the same overall health status as the U.S. general population for the same age, sex and race.* Based on a reasonable degree of life settlement certainty, the appropriate base life table to estimate Mr. Doe's life expectancy on October 4, 2011 (as if he had the same overall health status as the U.S. general white male population) is the 2007 U.S. general population life table for white males.[17] This was the most contemporaneous U.S. general population life table available at the time of the case investigation.

3. *Determine from the individual's personal and medical history records if there were any risk factors that would affect his/her life expectancy on the date of interest, if the death or injury had not occurred.* Mr. Doe's personal history of occupational disability, his 8-year span of having quit smoking, hernias, mild hypertension, overweight, riding a motorcycle while intoxicated, riding a motorcycle without a helmet, large number of speed violations, motorcycle accidents associated with broken bones, and two arrests for simple possession of methamphetamine was evaluated using generally accepted practices in life underwriting.

4. *Determine which risk factors would have the most impact on that individual's life expectancy on the date of interest.* Based on a reasonable degree of life underwriting certainty, Mr. Doe's primary risk of death was from risky motorcycle riding and its associated risk of fatal motorcycle accidents. There was insufficient information to determine the influence of Mr. Doe's history of two arrests for simple possession of methamphetamine as Mr. Doe's primary risk of death on the date of interest.

5. *Obtain reasonable estimates from the medical literature of mortality risks at or close to the individual's status of his/her risk factors.* A search was conducted using the National Library of Medicine's PubMed facility (http://www.ncbi.nlm.nih.gov/sites/entrez) for articles in the peer-reviewed medical literature on risky motorcycle riding and fatal motorcycle accidents that would provide the best study to represent Mr. Doe's excess risk. Criteria for selection of these articles were based on generally accepted practices in the life insurance industry for developing underwriting manuals.[14] None of the literature sources used in the life expectancy calculation indicates the specific risk of an individual with Mr. Doe's precise characteristics. The mortality risk estimates closest to

Mr. Doe's risk factor status were selected from the medical literature based on a reasonable degree of life underwriting certainty. The article that was selected to help best estimate Mr. Doe's mortality risk from risky motorcycle riding and fatal motorcycle accidents was a study performed by the Centers for Disease Control that looks at U.S. traffic exposure data from 1999 to 2003 for fatal injury rates per 100 million person-trips, by age and mode of travel ("Beck, et al.").[20]

6. *Extract these mortality risks as multipliers that can be applied to the selected base life table*. From Table 2 in the Beck, et al. article, the annualized fatal injury rates per 100 million person-trips were compared for motorcycle riders between ages 25 and 64 years, and all individuals between ages 25 and 64 years. The fatal injury rate for motorcycle riders is 517.0 per 100 million person-trips (95% confidence interval 397.5 and 636.6) and the fatal injury rate for all individuals is 9.6 (95% confidence interval 9.5 and 9.8). A motorcycle rider's relative risk for mortality from fatal injuries is thus 517.0 divided by 9.6, or **53.8**, with 95 confidence intervals of **41.8** (lower limit) and **64.9** (upper limit). Based on a reasonable degree of life underwriting certainty, these relative risk estimates serve as the multipliers to adjust Mr. Doe's life expectancy.[15]

7. *Calculate the adjusted life expectancy for the individual, using the selected base life table adjusted by the multipliers described in step 6*. Three Excel spreadsheets were constructed to produce base life tables with the same data found in the 2007 U.S. general population life tables for white males. Each of these life table spreadsheets then were adjusted to produce a different life expectancy: a <u>middle</u> life expectancy (using the **53.8** multiplier taken from the Beck, et al. article), an <u>upper limit</u> life expectancy (using the lower 95% confidence interval **41.8**, since a small multiplier creates a longer life expectancy), and a <u>lower limit</u> life expectancy (using the upper 95% confidence interval **64.9**, since a large multiplier creates a shorter life expectancy).

The middle, lower limit and upper limit multipliers that best represented Mr. Doe's excess risk from risky motorcycle riding and fatal motorcycle accidents were applied to the base life table assuming a constant exposure over Mr. Doe's expected future lifetime. The lower and upper limit multipliers reflect the 95% confidence interval that was found in the Beck, et al. article that measured the relative risk of fatal injuries for motorcycle riders age 25 to 64 in comparison to all those age 25 to 64. In brief, 95% confidence intervals indicate statistically where a risk is likely to occur, with the middle risk being the most likely. The risk being measured would not likely occur outside of the 95% confidence interval.

15

As previously stated, Mr. Doe's primary risk of death was from risky motorcycle riding and its associated risk of fatal motorcycle accidents, because any increased risk associated with Mr. Doe's history of two arrests for simple possession of methamphetamine could not be assessed with certainty. Risky motorcycle riding was a risk that Mr. Doe was exposed to constantly over time; a risk that Mr. Doe repeated many times within a year; a risk that Mr. Doe was not likely to decrease in the future; and a risk that would not likely decrease in outcome severity over time. There was no evidence in Mr. Doe's file that Mr. Doe would have given up risky motorcycle riding as he got older, no matter how many motorcycle accidents and broken bones he had, or how many motorcycle speeding citations he received. Based on a reasonable degree of life settlement certainty, his overall excess mortality risk would follow a constant pattern, and therefore the multipliers were applied accordingly to the base life table.[18]

If Mr. Doe had the same mortality risk as the average U.S. white male as of October 4, 2011, his life expectancy using the most contemporaneous U.S. life table at the time of case investigation would have been **31.0** years. Based on a reasonable degree of life underwriting and life settlement certainty, on the morning of his death on October 4, 2011, Mr. Doe had a middle life expectancy of **3.1** years; his lower limit life expectancy was **2.5** years, and his upper limit life expectancy was **3.8** years. Mr. Doe's primary excess mortality risk was from risky motorcycle riding and its associated risk of fatal motorcycle accidents.

Mr. Doe's personal history of risky motorcycle riding and the evidence supporting that history had to be included in the report of his life expectancy to the county to document the accuracy of Mr. Doe's life expectancy calculation. Mr. Doe's personal history of two arrests for simple possession of methamphetamine had to be included in the report of his life expectancy to the county to document the completeness of the investigation of Mr. Doe's mortality risks, and their consideration in evaluating Mr. Doe's primary risks of death.

16

## References

1. Education Committee of the Academy of Life Underwriting. Fundamentals of risk selection: a resource guide. Academy of Life Underwriting. 2003, p 1. "In the context of life insurance, underwriting is the process of evaluating medical and non-medical information about an individual and determining the effect these factors statistically have on life expectancy or mortality. This process is often referred to as risk classification… After a review of all available pertinent information, the appropriate risk class is determined for each individual."

2. US Structured Finance Newsletter, 2008;4(20):1. "(Life settlement) medical underwriters provide an evaluation of the health conditions of the insured based on medical records and history. They also establish a life expectancy estimate, a mortality rating and a confidence level that are applied to base mortality tables."

3. Weaver R, Hartman B. Selected avocations and occupations and motor vehicle reports. Chapter 13, in: Basic life insurance underwriting, 2nd edition. Education committee of the Academy of Life Underwriting. 2007, p 1. Summary: Underwriters must assess the risk of each insurance applicant from several different perspectives, including nonmedical risk factors. Nonmedical risk factors must be evaluated in order to understand the entire risk profile and the assessed risk must be applied.

4. Woodman HA. Principles of risk selection and classification. Chapter 3, in: Medical selection of life risks, 5th edition. Brackenridge, Croxson, MacKenzie, eds. Palgrave Macmillan. 2006, p 36. "(M)edical selection of risks cannot be done without consideration of the entire risk. For some impairments the mortality from hazards other than medical may be unrelated to the mortality from the medical impairment."

5. Kita MW. The rating of substandard lives. Chapter 5, in: Medical selection of life risks, 5th edition. Brackenridge, Croxson, MacKenzie, eds. Palgrave Macmillan. 2006, p 72. …(U)nderwriting decisions, though not always (or easily) reducible to numbers, were also neither magical nor the result of some unique or inscrutable wisdom. Rather, such decision represented the systematic weighing of certain favorable and unfavorable risk variables, which…resulted in a summary assessment of risk.

6. Woodman HA. Principles of risk selection and classification. Chapter 3, in: Medical selection of life risks, 5th edition. Brackenridge, Croxson, MacKenzie, eds. Palgrave Macmillan. 2006, p 35. "It is the task of the underwriter to assess the degree of extra mortality that might be expected, and to make certain that the risk is placed in the same class as others having the same expected mortality.  The appropriate ratings for impairments may be developed from the results of previous intercompany mortality studies, from studies of a company's own experience, from studies published in the medical literature, and from current clinical opinion on prognosis in the light of developments in medical treatment and surgical procedures."

7. Fasano M. Underwriting. Chapter 6, in: Life markets: trading mortality and longevity risk with life settlements and linked securities. Bhuyan V, ed. Wiley Finance. 2009, p 25. "Life insurance underwriting has developed from the extensive mortality experience of the life and reinsurance companies. Excess mortality for most medical conditions has been analyzed and translated into 'debits,'

which converts this additional mortality into a percentage of standard mortality… Over the years, debit methodology has proven to be a reliable predictor of excess mortality for the life insurance market."

8. Fasano M. Underwriting. Chapter 6, in: Life markets: trading mortality and longevity risk with life settlements and linked securities. Bhuyan V, ed. Wiley Finance. 2009, p 26. "The modified debit methodology starts with the debit methodology developed for life insurance underwriting and adjusts it to the life settlement demographic."

9. Bickley MC, Brown BF, Brown JL, Jones HE. Life and health insurance underwriting, 2nd edition. Life Office Management Association, 2007. Summary: This textbook is required reading for those studying for a professional life insurance credential. It details the underlying reasons and methods for life insurance underwriting.

10. Aspinwall J, Chaplin G, Venn M. Life insurance: primary and secondary markets. Chapter 1, in: Life settlements and longevity structures. Wiley Finance. 2009, p 17. "(Life settlement) medical underwriter: Sometimes confusingly referred to as the 'life expectancy provider,' the medical underwriter uses its knowledge of elder mortality and medical records of the insured to provide a life expectancy report for the insured."

11. Brackenridge RDC. A historical survey of the development of life assurance. Chapter 1, in: Medical selection of life risks, 5th edition. Brackenridge, Croxson, MacKenzie, eds. Palgrave Macmillan. 2006, pp 9-10. Summary: Scientific underwriting uses a method of risk evaluation called the numerical rating system, based on the relative risk found in mortality studies of large groups of people. Oscar Rogers and Arthur Hunter introduced these methods in 1919, which are used universally throughout the life insurance industry.

12. Pokorski RJ. Mortality methodology and analysis seminar. Chapter 2, in: Medical risks: 1991 compend of mortality and morbidity. Singer, Kita, Avery, eds. Praeger. 1994. Summary: This material provides the core instruction for the basic mortality methodology course available through the American Academy of Insurance Medicine. This material is a guide for developing appropriate multipliers or "debits" from available information on mortality experience.

13. Kita MW. Morbidity/mortality abstraction – finding suitable articles. Chapter 3, in: Medical risks: 1991 compend of mortality and morbidity. Singer, Kita, Avery, eds. Praeger. 1994. Summary: this chapter details criteria for selecting medical literature sources that are most appropriate for extracting risk factor information to be used in life underwriting risk assessment.

14. Singer RB, Kita MW. Guidelines for evaluation of follow-up articles and preparation of mortality abstracts. Chapter 4, in: Medical risks: 1991 compend of mortality and morbidity. Singer, Kita, Avery, eds. Praeger. 1994. Summary: This chapter details the methods used in abstracting relative risk information as factors (multipliers) to be used in life underwriting risk assessment.

15. Aspinwall J, Chaplin G, Venn M. Life insurance: primary and secondary markets. Chapter 1, in: Life settlements and longevity structures. Wiley Finance. 2009, p 25. "Information has a very short half-life. Given the speed with which life expectancy underwriters adjust their methodologies, investors should try to refresh medical information and life expectancy assumptions regularly. As this may have an

impact on revenue recognition, investors should agree (on) an appropriate policy to address such information updates with senior management, advisers and auditors when setting up their business."

16. Kita MW. The rating of substandard lives. Chapter 5, in: Medical selection of life risks, 5th edition. Brackenridge, Croxson, MacKenzie, eds. Palgrave Macmillan. 2006, p 72. "(T)he standard risk is assigned a value of 100% (i.e. one unit of risk). Unfavorable risk factors, conditions or impairments expected to produce excess mortality risk are added to that baseline risk."

17. Arias E. United States life tables, 2007. National vital statistics reports; vol 59 no 9. Hyattsville, MD: National Center for Health Statistics. 2011. http://www.cdc.gov/nchs/data/nvsr/nvsr59/nvsr59_09.pdf, pp 16-17.

18. Bickley MC, Brown BF, Brown JL, Jones HE. Underwriting individual life insurance: personal factors. Chapter 7 in: Life and health insurance underwriting, 2nd ed. Life Office Management Association. 2007, pp 173-174. "Underwriters carefully investigate a proposed insured who has a history of criminal activities. Although the underwriter cannot predict that criminal activity will recur, such a case requires a thorough review of the facts, an extensive inspection report, a review of court records, and detailed interviews with people who know the current activities and character of the proposed insured. Underwriters typically rate or decline such cases. In assessing a case in which criminal history is present, the underwriter keeps in mind that the extent of a proposed insured's criminal activity may be difficult to assess because information is reported only for incidents for which the proposed insured was arrested. Other events may have occurred but may not have been reported. Moreover, a plea bargain may conceal the true nature and seriousness of a criminal offense."

19. Smith N. Substance abuse and dependency. Chapter 12, in: Intermediate non-medical life insurance underwriting, 2nd edition. Education committee of the Academy of Life Underwriting. 2007, p 1. "The mortality and morbidity of substance abuse are secondary to induced changes in behavior and judgment, abrupt withdrawal syndromes, direct acute and chronic effects of the drug, and secondary risks from the route of administration.  Many drugs of abuse involve criminal associations and increased mortality risk from violent events."

20. Beck LF, Dellinger AM, O'Neil ME. Motor vehicle crash injury rates by mode of travel, United States: Using exposure-based methods to quantify differences. *Am J Epidemiol*. 2007;166:212-218.

Vera F. Dolan MSPH, FALU may be contacted at:
VFD Consulting, Inc., 4788 Diza Court, Las Vegas, NV 89122-7574
dolanvp@consultancy.com / 702.476.8500

Last update June 15, 2020